**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SUSIE ONG, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CHIPOTLE MEXICAN GRILL, INC., M. STEVEN ELLS, MONTGOMERY F. MORAN, and JOHN R. HARTUNG,<br><br>Defendants. | **Case No.**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Susie Ong ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Chipotle Mexican Grill, Inc. ("Chipotle" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Chipotle securities between February 4, 2015 and January 5, 2016, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Chipotle, together with its subsidiaries, develops and operates fast-casual and fresh Mexican food restaurants. As of November 10, 2015, it operated approximately 1,900 restaurants, including 17 Chipotle restaurants outside the United States and 11 ShopHouse Southeast Asian Kitchen restaurants.

3. Chipotle was founded in 1993 and is headquartered in Denver, Colorado. Chipotle's shares trade on the NYSE under the ticker symbol "CMG."

4. During the week of August 18, 2015, approximately 100 patrons and employees of a Chipotle restaurant in Simi Valley, California became ill. On September 4, 2015, the Ventura County Environmental Health Division announced that the illnesses were a norovirus outbreak. Health inspectors said that the restaurant in question contained dirty and inoperative equipment, equipment directly linked to the sewer, and other sanitary and health violations.

5. As a result of this news, between August 18 and September 4, 2015, Chipotle stock fell $26.29, or 3.6%, to close at $719.23 on September 4, 2015.

6. Between August 19 and September 3, 2015, approximately 64 people fell ill after dining at Chipotle restaurants in Minnesota. On September 17, 2015, the Minnesota Department of Health announced that the illnesses were salmonella linked to tomatoes consumed at 22 Chipotle locations. The affected restaurants changed tomato suppliers but did not close.

7. As a result of this news, between August 19 and September 17, 2015, Chipotle stock fell $15.08, or approximately 2%, to close at $730.20 on September 17, 2015.

8. On or around November 1, 2015, Chipotle closed all of its restaurants in Portland, Oregon and Seattle, Washington, following reports of approximately 20 cases of E. coli by Chipotle patrons.

9. As a result of this news, Chipotle stock fell $16.23, or approximately 2.5%, to close at $24.00 on November 2, 2015.

10. Beginning on or around December 2, 2015, more than 140 Boston College students fell ill after dining at a Chipotle restaurant in Brighton, Massachusetts. On December 9, 2015, health officials confirmed that the students had contracted norovirus.

11. As a result of this news, between December 1 and December 9, 2015, Chipotle stock fell $32.73, or roughly 5.6%, to close at $548.01 on December 9, 2015.

12. Throughout the Class Period, defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) Chipotle's quality controls were not in compliance with applicable consumer and workplace safety regulations; (ii) Chipotle's quality controls were inadequate to safeguard consumer and employee health; and (iii) as a result of the foregoing, Chipotle's public statements were materially false and misleading at all relevant times.

13. On January 6, 2016, pre-market, Chipotle announced that the company was served in December 2015 with a federal grand jury subpoena as part of a criminal investigation tied to the previous summer's norovirus outbreak at the Company's restaurant in Simi Valley. The

investigation is being conducted by the U.S. Attorney's Office for the Central District of California in conjunction with the Food and Drug Administration ("FDA").

14. On this news, Chipotle stock fell $22.36, or 4.98%, to close at $426.67 on January 6, 2016.

15. As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

18. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as the Company's common stock trades on the New York Stock Exchange, located within this District.

19. In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

20. Plaintiff, as set forth in the attached Certification, acquired Chipotle securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

21. Defendant Chipotle is incorporated in Delaware, and the Company's principal executive offices are located at 1401 Wynkoop Street, Suite 500, Denver, Colorado 80202. Chipotle's common stock trades on the NYSE under the ticker symbol "CMG."

22. Defendant M. Steven Ells ("Ells") has served at all relevant times as the Company's Co-Chief Executive Officer ("Co-CEO") with defendant Montgomery F. Moran ("Moran") and as the Company's Chairman.

23. Defendant Moran has served at all relevant times as the Company's Co-CEO with defendant Ells and as the Company's President, Secretary and Director.

24. Defendant John R. Hartung ("Hartung") has served at all relevant times as the Company's Chief Financial Officer.

25. The defendants referenced above in ¶¶ 22-24 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

26. Chipotle, together with its subsidiaries, develops and operates fast-casual and fresh Mexican food restaurants. As of November 10, 2015, it operated approximately 1,900 restaurants, including 17 Chipotle restaurants outside the United States and 11 ShopHouse Southeast Asian Kitchen restaurants.

27. Chipotle was founded in 1993 and is headquartered in Denver, Colorado. Chipotle's shares trade on the NYSE under the ticker symbol "CMG."

**Materially False and Misleading Statements Issued During the Class Period**

28. The Class Period begins on February 4, 2015, when Chipotle filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K"). For the quarter, the Company reported net income of $121.23 million, or $3.84 per diluted share, on revenue of $1.07 billion, compared to net income of $79.62 million, or $2.53 per diluted share, on revenue of $844.15 million for the same period in the prior year. For 2014, the Company reported net income of $445.37 million, or $14.13 per diluted share, on revenue of $4.11 billion, compared to net income of $327.44 million, or $10.47 per diluted share, on revenue of $3.21 billion for 2013.

29. In the 2014 10-K, Chipotle stated, in part:

> ***We use high-quality raw ingredients***, classic cooking methods and distinctive interior design, and have friendly people to take care of each customer—features that are more frequently found in the world of fine dining. Our approach is also guided by our belief in an idea we call "Food With Integrity." ***Our objective is to find the highest quality ingredients we can***—ingredients that are grown or raised with respect for the environment, animals, and people who grow or raise the food.
>
> . . .
>
> ***On a small number of occasions one or more Chipotle restaurants have been associated with customer illness***, and on those occasions our sales have sometimes been adversely impacted, at times even in markets beyond those impacted by the illness. If our customers become ill from food-borne or localized illnesses or if an illness is attributed to our food, even incorrectly, we could also be forced to temporarily close some restaurants, further impacting sales.
>
> . . .
>
> *Food With Integrity.* Serving high quality food while still charging reasonable prices is critical to our vision to change the way people think about and eat fast food. As part of our Food With Integrity philosophy, ***we believe that purchasing fresh ingredients and preparing them by hand are not enough, so we spend time***

> ***on farms and in the field to understand where our food comes from and how it is raised. Because our menu is so focused, we can concentrate on the sources of each ingredient, and this has become a cornerstone of our continuous effort to improve our food.***
>
> . . .
>
> *Importance of Methods and Culture.* Although we have many restaurants, we believe that our departure from the automated cooking techniques and microwaves used by many traditional fast-food and fast-casual restaurants helps to set us apart. ***Our crews use classic cooking methods: they marinate and grill meats, hand-cut produce and herbs, make fresh salsa and guacamole, and cook rice in small batches throughout the day. They work in kitchens that more closely resemble those of high-end restaurants than they do a typical fast-food place.*** Despite our more labor-intensive method of food preparation, our focused menu creates efficiencies which allow us to serve high quality food made from ingredients typically found in fine dining restaurants.
>
> . . .
>
> *Close Relationships with Suppliers.* ***Maintaining the high levels of quality we expect in our restaurants depends in part on our ability to acquire high-quality, fresh ingredients and other necessary supplies that meet our specifications from reliable suppliers.*** Our 22 independently owned and operated regional distribution centers purchase from various suppliers we carefully select based on quality and their understanding of our mission, and we seek to develop mutually beneficial long-term relationships with suppliers. We work closely with our suppliers and use a mix of forward, fixed and formula pricing protocols, and our distribution centers purchase within the pricing guidelines and protocols we have established with the suppliers.

(Emphases added.)

30. The 2014 10-K contained signed certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX") by the Individual Defendants, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

31. On April 22, 2015, Chipotle filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q"). For the quarter, the Company reported net income of $122.64 million, or

$3.88 per diluted share, on revenue of $1.09 billion, compared to net income of $83.07 million, or $2.64 per diluted share, on revenue of $904.16 million for the same period in the prior year.

32. The Q1 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

33. On July 21, 2015, Chipotle filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"). For the quarter, the Company reported net income of $140.2 million, or $4.45 per diluted share, on revenue of $1.20 billion, compared to net income of $110.27 million, or $3.50 per diluted share, on revenue of $1.05 billion for the same period in the prior year.

34. The Q2 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

35. During the week of August 18, 2015, approximately 100 patrons and employees of a Chipotle restaurant in Simi Valley, California became ill. On September 4, 2015, the Ventura County Environmental Health Division announced that the illnesses were a norovirus outbreak. Health inspectors said that the restaurant in question contained dirty and inoperative equipment, equipment directly linked to the sewer, and other sanitary and health violations.

36. As a result of this news, between August 18 and September 4, 2015, Chipotle stock fell $26.29, or 3.6%, to close at $719.23 on September 4, 2015.

37. Between August 19 and September 3, 2015, approximately 64 people fell ill after dining at Chipotle restaurants in Minnesota. On September 17, 2015, the Minnesota Department of Health announced that the illnesses were salmonella linked to tomatoes consumed at 22 Chipotle locations. The affected restaurants changed tomato suppliers but did not close.

38. As a result of this news, between August 19 and September 17, 2015, Chipotle stock fell $15.08, or approximately 2%, to close at $730.20 on September 17, 2015.

39. On October 21, 2015, Chipotle filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q3 2015 10-Q"). For the quarter, the Company reported net income of $144.88 million, or $4.59 per diluted share, on revenue of $1.22 billion, compared to net income of $130.80 million, or $4.15 per diluted share, on revenue of $1.08 billion for the same period in the prior year.

40. The Q3 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

41. On or around November 1, 2015, Chipotle closed all of its restaurants in Portland, Oregon and Seattle, Washington, following reports of approximately 20 cases of E. coli by Chipotle patrons.

42. As a result of this news, Chipotle stock fell $16.23, or approximately 2.5%, to close at $24.00 on November 2, 2015.

43. On November 10, 2015, Chipotle issued a press release addressing the restaurant closures in Portland and Seattle (the "November 2015 Press Release"). In the November 2015 Press Release, Chipotle stated, in part:

> Health officials have concluded that there is no ongoing risk from this incident. ***Chipotle has taken important steps to make certain that their food is as safe as it can be***, including:
>
> - Conducting additional deep cleaning and sanitization in all its restaurants nationwide.
> - Replacing all ingredients in the closed restaurants.
> - Confirming that none of its employees in these restaurants had E. coli. Note: No Chipotle employees have had E. coli stemming from this incident.
> - Working with health officials to improve food handling procedures.
> - Testing fresh produce, raw meat, and dairy items (cheese and sour cream) prior to restocking restaurants.
> - Going above and beyond required testing, and enhancing nationwide testing of produce and fresh meat.
> - Testing food, restaurant surfaces, and equipment in its restaurants (to date, Chipotle has received nearly 900 test results, all of which showed no E. coli).
> - Implementing additional safety procedures, and audits, in all of its 2,000 restaurants to ensure that robust food safety standards are in place.
>
> . . .
>
> "***The safety of our customers and integrity of our food supply has always been our highest priority***," said Steve Ells, chairman and co-CEO of Chipotle. "If there are any opportunities for us to do better in any facet of our sourcing or food handling – from the farms to our restaurants – we will find them. . . ."

44. Beginning on or around December 2, 2015, more than 140 Boston College students fell ill after dining at a Chipotle restaurant in Brighton, Massachusetts. On December 9, 2015, health officials confirmed that the students had contracted norovirus.

45. As a result of this news, between December 1 and December 9, 2015, Chipotle stock fell $32.73, or roughly 5.6%, to close at $548.01 on December 9, 2015.

46. On December 4, 2015, Chipotle filed a current report on Form 8-K, addressing the outbreak linked to its Brighton restaurant (the "December 2015 8-K"). In the December 2015 8-K, the Company stated, in part:

> <u>Food Safety Commitment</u>
> As a restaurant company, ***nothing is more important to us than serving our guests food that is delicious and safe to eat.*** Since this incident began, we

> have significantly increased our efforts to ensure that our teams are adhering to all of our food safety protocols, reassessed all facets of our food safety programs — from the farms that provide the ingredients we use, to the restaurants where we serve our customers — and made a number of improvements to help ensure that our food is as safe as it can be. Among the new or enhanced programs we have put in place include high-resolution testing where a series of DNA-based tests ensure the quality and safety of ingredients before they are shipped, end-of-shelf-life testing to be sure quality specifications are maintained throughout the shelf life of an ingredient, continuous improvement throughout our supply chain based on test results, and enhanced internal training to ensure that our teams understand and adhere to all of our food safety standards. ***Collectively, we believe these changes will put us at the forefront of the restaurant industry in terms of food safety practices.*** No Chipotle employees have been identified as having E. coli at any time during this incident, and we continue to serve more than 1 million customers on a daily basis.

47. The statements referenced in ¶¶ 28-34, 39-40, 43 and 46 were materially false and misleading because defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) Chipotle's quality controls were not in compliance with applicable consumer and workplace safety regulations; (ii) Chipotle's quality controls were inadequate to safeguard consumer and employee health; and (iii) as a result of the foregoing, Chipotle's public statements were materially false and misleading at all relevant times.

## **The Truth Emerges**

48. On January 6, 2016, pre-market, Chipotle announced that the company was served in December 2015 with a federal grand jury subpoena as part of a criminal investigation tied to the previous summer's norovirus outbreak at the Company's restaurant in Simi Valley. The investigation is being conducted by the U.S. Attorney's Office for the Central District of California in conjunction with the FDA.

49. As a result of this news, Chipotle stock fell $22.36, or 4.98%, to close at $426.67 on January 6, 2016.

50. As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

51. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Chipotle securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

52. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Chipotle securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Chipotle or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

53. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

54. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

55. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;
- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Chipotle;
- whether the Individual Defendants caused Chipotle to issue false and misleading financial statements during the Class Period;
- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Chipotle securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

56. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

57. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Chipotle securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased, acquired and/or sold Chipotle securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

58. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

59. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Against All Defendants For Violations of**
**Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

60. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

62. During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Chipotle securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Chipotle securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

63. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Chipotle securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Chipotle's internal quality controls, finances, and business prospects.

64. By virtue of their positions at Chipotle, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

65. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Chipotle securities from their personal portfolios.

66. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of Chipotle, the Individual Defendants had knowledge of the details of Chipotle's internal affairs.

67. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Chipotle. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Chipotle's quality controls, businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements,

the market price of Chipotle securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Chipotle's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Chipotle securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

68. During the Class Period, Chipotle securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Chipotle securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Chipotle securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Chipotle securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

69. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

70. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

71. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

72. During the Class Period, the Individual Defendants participated in the operation and management of Chipotle, and conducted and participated, directly and indirectly, in the conduct of Chipotle's business affairs. Because of their senior positions, they knew the adverse non-public information about Chipotle's misstatement of income and expenses and false financial statements.

73. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Chipotle's financial condition and results of operations, and to correct promptly any public statements issued by Chipotle which had become materially false or misleading.

74. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Chipotle disseminated in the marketplace during the Class Period concerning Chipotle's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Chipotle to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Chipotle within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Chipotle securities.

75. Each of the Individual Defendants, therefore, acted as a controlling person of Chipotle. By reason of their senior management positions and/or being directors of Chipotle, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Chipotle to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Chipotle and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

76. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Chipotle.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: January 8, 2016

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Marc Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***

**CERTIFICATION PURSUANT**
**TO FEDERAL SECURITIES LAWS**

1. I, Susie Ong, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Chipotle Mexican Grill, Inc. ("Chipotle" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3. I did not purchase or acquire Chipotle securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4. I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Chipotle securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in Chipotle securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7. I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8. I declare under penalty of perjury that the foregoing is true and correct.

**Executed** 1/7/16
**(Date)**

**(Signature)**

Susie Ong
**(Type or Print Name)**

**CHIPOTLE MEXICAN GRILL, INC (CMG)** **Ong, Susie**

**LIST OF PURCHASES AND SALES**

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|
| 12/17/2015 | Purchase | 105 | $558.0500 |
| 12/22/2015 | Purchase | 105 | $501.4600 |