UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUSIE ONG, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CHIPOTLE MEXICAN GRILL, INC., M. STEVEN ELLS, MONTGOMERY F. MORAN and JOHN R. HARTUNG,<br><br>Defendants. | Civil Action No. 1:16-cv-00141-KPF<br><br>CLASS ACTION<br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**


NATURE OF THE ACTION ....1

JURISDICTION AND VENUE ....6

PARTIES ....7

CLASS ACTION ALLEGATIONS ....11

PLAINTIFFS' ALLEGATIONS ARE SUPPORTED BY INFORMATION PROVIDED BY FORMER EMPLOYEES ....13

SUBSTANTIVE ALLEGATIONS ....14

- Chipotle and Its Focus on "Food With Integrity" ....14
- Chipotle Failed to Adequately Disclose Critical Changes to Its Food Safety Practices and that Such Changes Greatly Increased the Risk of the Company Experiencing Food-Borne Illness Outbreaks ....16
- Defendants Did Not Disclose that Chipotle Failed to Adequately Monitor and Enforce Its Food Safety Programs, Which Substantially Increased the Company's Exposure to Food-Borne Illness Outbreaks ....20
- Chipotle's Deficient Food Safety Practices Led to at Least Seven Food-Borne Illness Outbreaks from July to December 2015, Which Chipotle Attempted to Conceal from The Public ....23
  - The July E. Coli Outbreak ....23
  - The August Norovirus Outbreak in Washington ....25
  - The August Norovirus Outbreak in California ....27
  - The August Salmonella Outbreak ....30
  - The October E. Coli Outbreak ....37
  - The November E. Coli Outbreak ....54
  - The December Norovirus Outbreak ....55
- Chipotle Lacked a Reasonable Basis to Represent to Investors on November 10, 2015, that Health Officials Believed There Was "No Ongoing Risk" Related to the October E. Coli Outbreak ....56

**Page**


Defendants Failed to Disclose the Negative Impact Caused by the Numerous Food-Borne Illness Outbreaks Experienced by Chipotle During the Class Period When Reporting Chipotle's 3Q15 Financial Results and Lacked a Reasonable Basis at that Time to Provide Financial Guidance for 4Q15 and FY16 ............................65

Materially False and Misleading Statements and Omissions During the Class Period ............................68

Chipotle Admits the CDC's Investigation into the October E. Coli Outbreak Is Ongoing and Implements a Remediation Plan Consisting of New Food Safety Practices ............................75

The Company Receives a Criminal Subpoena Relating to the August Norovirus Outbreak in California ............................82

Post Class Period Events ............................84

Defendants Failed to Comply with Items 303 and 503 ............................92

ANY PURPORTED RISK WARNINGS WERE INADEQUATE ............................96

ADDITIONAL SCIENTER ALLEGATIONS ............................101

NO SAFE HARBOR ............................113

APPLICATION OF PRESUMPTION OF RELIANCE: THE *BASIC* AND *AFFILIATED UTE* PRESUMPTIONS ............................114

LOSS CAUSATION/ECONOMIC LOSS ............................116

COUNT I ............................119

For Violations of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ............................119

COUNT II ............................122

For Violations of §20(a) of the Exchange Act Against the Individual Defendants ............................122

PRAYER FOR RELIEF ............................123

JURY DEMAND ............................124

Lead Plaintiffs Metzler Investment GmbH and Construction Laborers Pension Trust of Greater St. Louis (collectively, "Lead Plaintiffs" or "Plaintiffs"), on behalf of themselves and all other persons similarly situated, by Lead Plaintiffs' undersigned attorneys, for Lead Plaintiffs' amended complaint for violations of the federal securities laws against Defendants (defined below) (the "Amended Complaint"), allege the following based upon personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiffs' attorneys, which included, among other things:

> (i) a review of United States Securities and Exchange Commission ("SEC") filings by Chipotle Mexican Grill, Inc. ("Chipotle" or the "Company"); (ii) a review of Chipotle regulatory filings and reports; (iii) a review of securities analysts' reports and advisories about the Company; (iv) a review of press releases, conference call transcripts, media interviews, and other public statements issued by the Company; (v) a review of media reports about the Company; (vi) a review of over 20,100 pages of documents produced to counsel for Lead Plaintiffs by the Washington State Department of Health, the Seattle & King County Public Health Office, the Minnesota Department of Health, and the Ventura County Environmental Health Division in response to Freedom of Information Act ("FOIA") requests; (vii) a review of the allegations contained in pleadings in numerous personal injury lawsuits filed in various federal courts involving Chipotle during the Class Period (defined below); (viii) a review of deposition transcripts and declarations in lawsuits in various federal courts involving Chipotle; (ix) a review of findings, announcements and updates issued by local, state and federal governmental agencies relating to the numerous food-borne illness outbreaks experienced by Chipotle during the Class Period; (x) discussions with state and local health and safety regulators with personal knowledge of the food-borne illness outbreaks experienced by Chipotle during the Class Period; (xi) interviews with former Chipotle employees; and (xii) consultations with experts in the food processing and safety industry.

Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all purchasers of the common stock of Chipotle between February 5, 2015 and January 5, 2016, inclusive (the "Class Period").

Lead Plaintiffs seek to pursue remedies against Chipotle and certain of its senior executives and/or directors under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule l0b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2. Chipotle is a publicly-traded fast-food restaurant chain that directly operates more than 1,900 Mexican food Chipotle restaurants in the United States.

3. This case concerns materially false and misleading statements and omissions by Defendants regarding: (i) critical changes in, and shortcomings with, the Company's food safety practices and that these changes and shortcomings greatly increased the risk of the Company experiencing food-borne illness outbreaks; (ii) the existence of food-borne illness outbreaks during the Class Period; (iii) the impact these food-borne illness outbreaks were already having on the Company and the impact that these outbreaks were reasonably expected to have on the Company's future operations and financial performance; and (iv) the status of the U.S. Center for Disease Control and Prevention ("CDC")'s investigation into the October E. coli outbreak (discussed below) at numerous Chipotle restaurants.

4. As detailed herein, there were at least seven food-borne illness outbreaks at Chipotle restaurants throughout the country beginning in late July 2015 through December 2015.[1] Several of these outbreaks appear to have resulted from a change in the way that Chipotle handled its produce (such as Romaine lettuce, cilantro and tomatoes). Specifically, in late 2014 (just before the start of

---

[1] These outbreaks include at least the following incidents: (i) an outbreak of E. coli O157:H7 in July in Washington State; (ii) an outbreak of Norovirus in August in Washington; (iii) an outbreak of Norovirus in August in California; (iv) an outbreak of Salmonella in August in Minnesota; (v) an outbreak of E. coli STEC O26 in October in Washington, Oregon, California, Illinois, Maryland, Minnesota, New York, Ohio, Pennsylvania, Delaware, and Kentucky; (vi) an outbreak of E. coli STEC O26 in November in Kansas, North Dakota, and Oklahoma; and (vii) an outbreak of Norovirus in December in Massachusetts.

the Class Period), Chipotle switched from using central commissary kitchens to process and prepare the produce used in its restaurants to processing produce in each of the Company's over 1,900 restaurants – a change that relinquished centralized control over food safety for its produce to thousands of workers at the individual restaurants and greatly increased the risk of food-borne illness outbreaks at Chipotle restaurants. These changes, and the resulting increase in the risk that the Company could experience food-borne illness outbreaks, were not communicated to investors as they should have been. Indeed, in December 2015 (after the Company experienced numerous Class Period outbreaks), Defendants admitted the switch was a mistake and immediately reverted back to commissary preparation for its produce as part of the Company's remediation efforts.

5. Compounding the problem, Defendants, despite Chipotle having food safety protocols in place, did not properly oversee and implement these protocols in the Company's restaurants before or during the Class Period, effectively ignoring food safety. Indeed, the fact that the Company experienced outbreaks from three different food pathogens over a period of several months plainly demonstrates this point. As Defendants knew, but investors did not, their failure to enforce Chipotle's food safety protocols in its restaurants had significantly increased the risk of food-borne illness outbreaks. To reduce this recognized risk, in January 2016 (shortly after the end of the Class Period), Defendants disclosed that Chipotle was now implementing "[e]nhanced internal training to ensure that all employees thoroughly understand the company's high standards for food safety and food handling" as another part of the Company's remediation efforts. In other words, the Company had not adequately ensured that its employees thoroughly understood food safety until after the Class Period.

6. In addition to not adequately disclosing these risks, Defendants also made materially false and misleading statements during the Class Period about the status of the CDC's investigation

into the October E. coli outbreak at Chipotle restaurants. In a press release regarding the October E. coli outbreak issued on *Business Wire* on November 10, 2015 (the "11/10/15 Press Release"), Chipotle stated that there was "no ongoing threat" in connection with this outbreak and that "[h]ealth officials have ***concluded*** that there is no ongoing risk from this incident."[2] Contrary to what Chipotle stated, health officials had reached no such conclusion and, in a letter dated April 15, 2016 (the "4/15/16 Letter"), the CDC made clear that it "***disagree[d] that there was 'no ongoing threat'*** at that time." Thus, Defendants knew, or were reckless in not knowing, that Chipotle's statements on November 10 were materially false and misleading.

7. Defendants also failed to timely disclose the existence and/or extent of these food-borne illness outbreaks to Chipotle's investors. For example, on October 20, 2015, in connection with reporting Chipotle's financial results for the third fiscal quarter of 2015 ("3Q15"), Defendants failed to disclose, among other things, that: (i) Chipotle had experienced numerous food-borne illness outbreaks;(ii) that such outbreaks had negatively impacted the Company's operations and financial performance; (iii) that, as these outbreaks and additional outbreaks became further publicized, they were reasonably expected to have an increased damaging effect on the Company's operations and financial performance; and (iv) that any investigations into these outbreaks would be lengthy and further negatively impact the Company's operations and financial performance as Chipotle did not have the capability to quickly identify the contaminated ingredient(s) that caused the food-borne illness(es).

8. Defendants undertook considerable effort during the Class Period to conceal the existence and/or extent of these numerous outbreaks from Chipotle's consumers, investors, and the public at large in an effort to protect the Company's reputation and maintain positive same store

---

[2] All emphasis in bold and italics is added throughout, unless otherwise noted.

sales. The Individual Defendants were also personally motivated to conceal the enhanced risks resulting from the changes to Chipotle's food safety practices. Indeed, a substantial reduction in their compensation starting in 2015 (a decline of around 50%, following an investor challenge) drove the Individual Defendants to seek alternative methods to supplement their reduced earnings. Thus, before disclosing the increased risk of investing in Chipotle as a result of the changes in, and shortcomings with, its food safety practices – and while Chipotle's common stock price remained artificially inflated – the Individual Defendants sold shares of their personally-held Chipotle stock for gross proceeds in excess of ***$213 million***.

9. Investors learned the true facts about Chipotle's deficient food safety practices, the existence of the numerous Class Period food-borne illness outbreaks, and the true status of the CDC's investigation through a series of disclosures. For example, on January 6, 2016, the day after the Class Period ended, Chipotle disclosed that it had received a criminal subpoena from the U.S. Attorney's Office for the Central District of California. While this subpoena was limited to the August Norovirus outbreak in California, a second subpoena was served on the Company shortly thereafter that superseded and broadened the first subpoena to now request documents relating to ***company-wide*** food safety matters dating back to January 1, 2013. In addition, after the Class Period, Defendants belatedly admitted that Chipotle was forced to reassess and revamp its food safety practices and implement a comprehensive remediation plan, including switching back to commissary preparation for its produce and properly implementing and adhering to its food safety protocols.

10. In response to these disclosures, beginning in late October 2015 and continuing through the end of the Class Period, the price of Chipotle's common stock plunged, erasing more than $6 billion in market capitalization.

## JURISDICTION AND VENUE

11. Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5.

12. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

13. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because, among other things: (i) Chipotle had corporate executive offices located at 71 Gansevoort Street, Suite 2A, in New York, New York during the Class Period; (ii) Chipotle had its Northeast regional office located at 129 West 48th Street in New York, New York during the Class Period; (iii) defendant Ells (defined below) owned a residence at 175 West 12th Street in New York, New York during the Class Period; (iv) according to a sworn declaration filed by Tim Spong ("Spong"),[3] Chipotle's Executive Director of Safety, Security and Risk, one of Chipotle's co-Chief Executive Officers ("CEO") splits his time between Chipotle's corporate executive office in New York City and the Company's other corporate executive office; and (v) Chipotle's common stock was traded on the New York Stock Exchange ("NYSE") during the Class Period.

14. In connection with the acts alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

---

[3] On June 26, 2012, Spong executed a declaration in *Lemus v. Chipotle Mexican Grill, Inc.*, No. 2:12-cv-05892-FMO-JC (C.D. Cal.), that is publicly available on that docket. Chipotle was represented by Messner & Reeves (defined below) in the *Lemus* matter.

## PARTIES

15. Lead Plaintiff Metzler Investment GmbH purchased Chipotle common stock during the Class Period, as set forth in the certification previously filed with the Court and incorporated herein by reference, and has been damaged thereby. *See* ECF No. 28-1 at 4-5.

16. Lead Plaintiff Construction Laborers Pension Trust of Greater St. Louis purchased Chipotle common stock during the Class Period, as set forth in the certification previously filed with the Court and incorporated herein by reference, and has been damaged thereby. *See id*. at 8.

17. Defendant Chipotle is a publicly-traded fast-food restaurant chain that distinguishes itself from its competitors primarily through its corporate philosophy of "Food With Integrity," which is Chipotle's promise to find the highest quality ingredients that are sourced sustainably and organically, while still charging reasonable prices. As of December 31, 2015, the Company operated more than 1,900 Chipotle restaurants in the United States, as well as thirteen ShopHouse Southeast Asian Kitchen restaurants, and twenty three Chipotle restaurants outside the United States. Chipotle common stock is listed and trades on the NYSE under the ticker symbol "CMG." As of February 4, 2015, the Company had more than 31 million shares of common stock issued and outstanding.

18. Defendant M. Steven Ells ("Ells") founded Chipotle in 1993 and is, and was, throughout the Class Period, the Company's co-CEO and Chairman of the Chipotle board of directors (the "Board"). Defendant Ells sold more than $79 million worth of Chipotle common stock during the Class Period.

19. Defendant Montgomery F. Moran ("Moran"),[4] is, and was, throughout the Class Period, the co-CEO of Chipotle along with defendant Ells, a position he has held since January 2009.

---

[4] On October 31, 2014, defendant Moran provided sworn deposition testimony in *Reynolds v. Chipotle Mexican Grill, Inc.*, No. 1:13-cv-146 (S.D. Ohio). The transcript of his sworn testimony is publicly available on that docket. References to defendant Moran's deposition testimony in this

Defendant Moran is also a director on the Board, a position he has also held since January 2009. Previously, defendant Moran served as the Company's President and Chief Operating Officer ("COO"), beginning in March 2005. Before that, defendant Moran, who is an attorney, served as CEO of the Denver law firm Messner & Reeves, LLC ("Messner & Reeves"), where he was employed since 1996, and where he simultaneously served as outside general counsel to Chipotle beginning in 1998. According to the Schedule 14A filed by Chipotle on March 26, 2015 in connection with the Company's annual shareholder meeting for 2015 (the "3/26/15 Schedule 14A"), defendant Moran's background as the Company's former outside general counsel "has given him an in-depth knowledge and understanding of every aspect of [Chipotle's] business" and "he has an outstanding skill set in such areas as risk management and crisis handling, and also is thoroughly familiar with management personnel throughout [Chipotle's] organization." Defendant Moran sold more than $107 million worth of Chipotle common stock during the Class Period.

20. Defendant John R. Hartung ("Hartung") is, and was, throughout the Class Period, the Chief Financial Officer ("CFO") of Chipotle. According to the 3/26/15 Schedule 14A, in addition to "having responsibility for all of [Chipotle's] financial and reporting functions," defendant Hartung "also oversees IT; safety, security and risk; and compensation and benefits." Defendant Hartung has served as Chipotle's CFO since 2002. Defendant Hartung sold more than $27 million worth of Chipotle common stock during the Class Period.

21. Defendants Ells, Moran and Hartung are collectively referred to herein as the "Individual Defendants." The Individual Defendants are all named as executive officers of Chipotle in the 3/26/15 Schedule 14A.

---

Amended Complaint are to this transcript. Messner & Reeves is representing Chipotle in the *Reynolds* matter.

22. Chipotle and the Individual Defendants are referred to herein, collectively, as "Defendants."

23. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

24. It is appropriate to treat Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers of Chipotle, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

25. As officers and controlling persons of a publicly-held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, and which is

governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded stock would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

26. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their executive and managerial positions and/or Board membership with Chipotle, the Individual Defendants each had access to the adverse undisclosed information about Chipotle's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Chipotle and its business materially false and misleading.

27. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible

for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

28. Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Chipotle common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Chipotle's financial reporting, business, operations and management and the intrinsic value of Chipotle's common stock; (ii) enabled the Individual Defendants to sell over $213 million worth of Chipotle common stock to the unsuspecting public at artificially inflated prices; and (iii) caused Lead Plaintiffs and the Class to purchase Chipotle publicly-traded stock at artificially inflated prices.

**CLASS ACTION ALLEGATIONS**

29. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Chipotle during the Class Period, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

30. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Chipotle common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds of thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Chipotle and/or its transfer agent and may be notified of

the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

31. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

32. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

33. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether statements made by Defendants misrepresented material facts about the business, operations and management of Chipotle;

(b) whether the federal securities laws were violated by Defendants' acts or omissions as alleged herein;

(c) whether Defendants failed to include material facts in discussing the business, operations and management of Chipotle, making those statements materially false and misleading;

(d) whether the price of Chipotle stock was artificially inflated during the Class Period; and

(e) to what extent the members of the Class have sustained damages and the proper measure of damages.

34. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**PLAINTIFFS' ALLEGATIONS ARE SUPPORTED BY INFORMATION PROVIDED BY FORMER EMPLOYEES**

35. As part of the investigation conducted by and under the supervision of Lead Plaintiffs' counsel, two former Chipotle employees ("FEs") provided their first-hand knowledge of information to support Lead Plaintiffs' allegations. These individuals are former employees of Chipotle, both of whom were affiliated with Chipotle before the Class Period, and provided facts concerning the allegations contained herein. As detailed below, the FEs each served in positions at Chipotle that provided them with access to the information ascribed to them in this Amended Complaint.

36. FE1 worked as a Development Purchasing Manager in Chipotle's Development Department from January 1999 through August 2013. FE1 was responsible for sourcing equipment, parts, materials and services for the construction of Chipotle restaurants and restaurant operations. FE1 worked very closely with defendant Ells.

37. FE2 worked as a Risk Analyst/Risk Manager for Chipotle from July 2006 through April 2013. FE2 reported directly to Spong, Chipotle's Executive Director of Safety, Security and Risk. According to Spong's deposition testimony,[5] Spong reports directly to defendant Hartung.

[5] On July 18 and September 8, 2014, Spong provided sworn deposition testimony in *Reynolds v. Chipotle Mexican Grill, Inc.*, No. 1:13-cv-146 (S.D. Ohio). The transcripts of his sworn testimony are publicly available on that docket. References to Spong's deposition testimony in this Amended Complaint are to those transcripts.

## SUBSTANTIVE ALLEGATIONS

### Chipotle and Its Focus on "Food With Integrity"

38. Chipotle is in the fast food business. According to Chipotle's Form 10-K for the fiscal year ended December 31, 2014, filed after the close of trading on February 4, 2015 (the "2014 Form 10-K"), Chipotle directly operates all of its restaurants in the U.S. Unlike most fast food restaurants, the Company does not franchise.

39. Chipotle's menu in its Mexican food restaurants only has a few options, and is relatively limited compared to most fast food restaurants. Customers choose as a base either a burrito, burrito bowl, tacos or salad; one of five different proteins (chicken, carnitas (pork), steak, barbacoa (spicy beef) or sofritas (tofu)); and any of several toppings, including cilantro-lime white rice, cilantro-lime brown rice, black beans, pinto beans, sautéed peppers and onions, fresh tomato salsa, green salsa, spicy salsa, roasted corn salsa, romaine lettuce, cheese, sour cream, and guacamole (a mixture of avocado, red onions, jalapenos and cilantro).

40. In addition to its limited menu, Chipotle distinguishes itself from most other fast food restaurants through its corporate philosophy of "Food With Integrity," which is Chipotle's pledge to only serve: (i) meat that is raised without the use of non-therapeutic antibiotics or added hormones, with a focus on sourcing sustainably-raised meat; (ii) produce that is organically grown and sourced locally while in season (defined as grown within 350 miles of the restaurant where it is served); and (iii) dairy that comes from cows that are not given rBGH (recombinant bovine growth hormone) and that is sourced from pasture-based dairies. Chipotle's dedication to "Food With Integrity" is the Company's central marketing message – the phrase is found prominently displayed in each of its restaurants, and in most of the Company's advertisements.

41. Chipotle's commitment to "Food With Integrity" extends to its pledge to consumers to only use non-genetically modified organisms ("GMO") as ingredients. In fact, during the Class

Period, on April 27, 2015, Chipotle issued a press release on *Business Wire* headlined "Chipotle Becomes the First National Restaurant Company to Use Only Non-GMO Ingredients," which announced that Chipotle had achieved its goal of using only non-GMO ingredients to make all of the food in its U.S. restaurants. This press release was followed by the launch of a massive media campaign to convince consumers and investors that Chipotle only uses non-GMO ingredients, with advertisements stating, for example, that "[g]iven that we don't think [GMOs] are better, we have replaced them with non-GMO ingredients. Now all of our food is non-GMO."

42. But, in what appears to be a disturbing pattern of Chipotle lacking candor in its communications and representations to consumers and investors, this claim is alleged to be inaccurate. In a class action lawsuit filed by a Chipotle consumer, initiated on September 10, 2015, the plaintiff alleges that Chipotle's meat and dairy products come from animals that are fed GMO ingredients, rendering them GMO ingredients. As a result, the plaintiff alleges that Chipotle's advertising and marketing was false, misleading and deceptive.

43. Chipotle, who is represented in the case by defendant Moran's former law firm Messner & Reeves, moved to dismiss the class action, but its motion was substantially denied on April 20, 2016. As stated in the order denying Chipotle's motion to dismiss, "[the plaintiff] alleges that she purchased for consumption Chipotle products that had been sourced from animals that were raised on GMO feed, and ***Chipotle does not deny this allegation***." *See* Order, *Reilly v. Chipotle Mexican Grill, Inc.*, No. 1:15-cv-23425-MGC (S.D. Fla) (Dkt. No. 42), at 2. This case is ongoing.

44. That Messner & Reeves represents Chipotle in *Reilly* is unsurprising – the law firm and Chipotle are closely connected. Though Chipotle has a small contingent of in-house lawyers, the Company keeps Messner & Reeves on a permanent retainer to function effectively as Chipotle's general counsel. According to deposition testimony provided by defendant Moran, Corky Messner,

the current CEO of Messner & Reeves, serves as Chipotle's outside general counsel while simultaneously working at Messner & Reeves, as defendant Moran did before joining the Company as COO and President in 2005.

**Chipotle Failed to Adequately Disclose Critical Changes to Its Food Safety Practices and that Such Changes Greatly Increased the Risk of the Company Experiencing Food-Borne Illness Outbreaks**

45. During the Class Period, not only did Chipotle omit critical aspects of its GMO ingredient usage policy in describing its "Food With Integrity" platform, Defendants also omitted material information in the Company's public communications to investors concerning Chipotle's food safety practices.

46. Chipotle had for years pre-chopped its tomatoes in a central commissary in Chicago, washed them, and then shipped the tomatoes in plastic bags to its stores. In late 2014, however, Chipotle changed its procedure and began chopping tomatoes in each individual store in top-loading dicing machines. The reason for the change was that Chipotle felt that the tomatoes tasted better chopped on-site.

47. This change was noticed by Leonard Batti ("Batti"), president of Taylor Farms Florida, a division of Taylor Fresh Foods Inc. ("Taylor Farms"), the largest supplier of fresh-cut produce in the U.S. and a supplier to Chipotle. In remarks made at the November 4, 2015 Florida Agriculture Exposition, Batti noted that Chipotle "made a decision a little less than a year ago to move away from fresh-cut and start cutting products in their facilities, somewhere around 1,700 restaurants. So basically, almost overnight, we had 1,700 new vegetable processors pop-up around the country."

48. Switching from commissary processing of produce to in-store processing dramatically increased the risk that Chipotle could experience a food-borne illness outbreak because it greatly expanded the number of workers handling the produce and the number of surfaces that the produce

touched, thereby exponentially increasing the risk of contamination from workers and cross-contamination from the other raw foods prepared in Chipotle's restaurants.

49. Batti expressed a similar sentiment in his November 4, 2015, remarks, commenting that a fast food restaurant by its nature cannot ensure the food safety protocols like those in place at large, fresh-cut processors.

50. Chipotle's senior executives, including and especially Chipotle's Director of Quality Assurance & Food Safety during the Class Period, Heidi Wederquist ("Wederquist"), knew or should have known that making this switch greatly increased the risk that Chipotle could be subject to food-borne illness outbreaks.

51. FE1, who worked "very closely" with defendant Ells, believed that Wederquist reported directly to Jason Von Rohr ("Von Rohr"), Chipotle's Supply Chain Executive Director. According to deposition testimony provided by defendant Moran, Von Rohr reported directly to him.

52. FE1 further stated that defendant Ells was a hands-on CEO who knew "about everything that goes on in those restaurants . . . he was so involved in any procedures that were being done in the restaurant all the way down to selecting a ladle or a pan or a piece of equipment, he was highly involved in all of that[.]" FE1 also confirmed that defendant Ells was aware of Chipotle's food-borne illness procedures.

53. Rather than disclose that the Company had switched to in-store produce processing and that such a switch greatly increased the risk that Chipotle could be subject to food-borne illness outbreaks, Defendants instead chose to mislead investors by omitting this information from the Company's public filings and statements during the Class Period, even after such outbreaks began in July 2015.

54. In failing to disclose the actual state of affairs regarding the Company's risk of experiencing a food-borne illness outbreak, Defendants failed to provide investors with accurate information to enable them to make an informed decision about whether or not they should purchase Chipotle stock at the prices at which they purchased them.

55. Defendants' appreciation of the significant risk associated with switching from commissaries to in-store produce preparation is evidenced by their decision near the end of the Class Period to immediately switch back to commissary preparation as part of the Company's remediation efforts. Specifically, on December 8, 2015 at the Sanford C. Bernstein Consumer Summit (the "12/8/15 Conference"), defendant Ells revealed to investors that the switch back to commissary preparation was made as part of Chipotle's remediation efforts to improve the Company's food safety practices and stated, in pertinent part, that:

> But we immediately took action after the outbreak in the Pacific Northwest by closing many restaurants in that area in an abundance of caution, ***but then system-wide made some changes***, specifically to some produce items that could have been suspect, that were suspect.
>
> ***We immediately started dicing our tomatoes in a commissary, so that they could go through a sanitizing kill step and then hermetically sealed in containers and delivered to the restaurants***. We found it impossible that we could test every tomato coming into the restaurants. So we went with an abundance of caution to make sure that we're testing that way. ***A similar protocol for cilantro***, where the amount of testing assures that there are no pathogens coming into the restaurant.

56. Also at the 12/8/15 Conference, defendant Moran commented that Chipotle was also switching to commissary preparation for romaine lettuce, stating, in pertinent part, that:

> Romaine lettuce is another example of another one that we're taking action to change the way we bring that into the restaurants, ***so that it's washed in a similar way that Steve suggested and then brought into our restaurants having been already washed and tested.***

57. After the Class Period, on January 19, 2016, Chipotle issued a press release on *Business Wire* (the "1/19/16 Press Release") and, among other things, again mentioned the

Company's switch back to commissary preparation as part of Chipotle's remediation efforts, stating, in pertinent part, that the Company has made "[c]hanges to food prep and food handling practices, including washing and cutting of some produce items (such as tomatoes and romaine lettuce) and shredding cheese in central kitchens."

58. Finally, on February 5, 2016, Chipotle filed its Form 10-K for the fiscal year ended December 31, 2015 (the "2015 Form 10-K") and disclosed, among other things, that:

> While our food safety programs have always been carefully designed and have been in conformance with applicable industry standards, in response to food safety incidents during 2015 that impacted hundreds of customers we have recently undertaken a comprehensive assessment of our food safety programs and practices. Using the assistance of highly respected experts we performed a review of the ingredients we use, with a goal of designing an industry-leading food safety program. ***Components of the new program include*** DNA-based testing of many ingredients designed to ensure the quality and safety of ingredients before they are shipped to our restaurants, ***changes to food preparation and food handling practices, including washing and cutting some produce items (such as tomatoes and romaine lettuce) in central kitchens***, blanching of some produce items (including avocados, onions, jalapenos and citrus) in our restaurants before cutting them, and new protocols for marinating meats. We are also working to enhance our internal controls surrounding food safety by utilizing the Food and Drug Administration's Hazard Analysis Critical Control Point (HACCP) management system. Additionally, we are focused on internal training programs to ensure that all employees thoroughly understand our high standards for food safety and food handling, and we offer paid sick leave to employees to reduce incentives for employees to work while sick. These and other enhancements underscore our commitment to becoming a leader in food safety while we continue to serve high quality food that our customers love.

59. Accordingly, during the Class Period, Defendants knew, or recklessly disregarded, that switching from commissary preparation to processing produce in the individual restaurants greatly increased Chipotle's exposure to food-borne illness outbreaks and, therefore, posed a significant risk to Chipotle's operations and financial performance. By omitting this information from the Company's quarterly and annual SEC filings and other public statements during the Class Period, Defendants rendered the statements therein false and misleading.

**Defendants Did Not Disclose that Chipotle Failed to Adequately Monitor and Enforce Its Food Safety Programs, Which Substantially Increased the Company's Exposure to Food-Borne Illness Outbreaks**

60. Changes made to Chipotle's food safety practices were not the only material facts that Defendants omitted from their communications with investors that concerned an increased risk of Chipotle experiencing a food-borne illness outbreak during the Class Period.

61. Defendants also omitted that the Company's Quality Assurance department did not adequately monitor Chipotle's food safety programs during the Class Period, and failed to disclose that there were insufficient controls and procedures in place to ensure that operating standards had been properly implemented and enforced. Indeed, the fact that the Company experienced outbreaks from three different food pathogens over a period of several months plainly demonstrates this point.

62. Sick food workers at fast food restaurants are highly likely to be conduits for spreading, among other food-borne illnesses, Norovirus. Norovirus, also known as the "Norwalk virus," is a member of the virus family Caliciviridae, which consists of several distinct groups of viruses. Humans are the only host of Norovirus, which has several mechanisms that allow it to spread quickly and easily. Norovirus infects humans through person-to-person transmission or through contamination of food or water. In addition, Norovirus is able to survive a wide range of temperatures and has evolved to avoid the immune system, which results in outbreaks.

63. Norovirus illness usually develops within one or two days after ingestion. Symptoms include nausea, vomiting, diarrhea, abdominal pain, headache and low-grade fever. Although symptoms usually last a few days, Norovirus infections can become quite serious in children and the elderly, and those who are immune-compromised.

64. There is no specific treatment available for Norovirus. For infants, children, elderly, and immune-compromised populations, infections can lead to severe complications, including death.

65. As Chipotle belatedly informed investors, during the Class Period, Chipotle was not adhering to or monitoring the food safety programs it had in place and sick employees worked at its restaurants. These circumstances are the precise conditions that facilitate food-borne illness outbreaks.

66. Chipotle's senior executives, including and especially Wederquist, who was Chipotle's Director of Quality Assurance & Food Safety, knew or should have known that the Quality Assurance department's failure to adequately monitor and enforce Chipotle's food safety programs greatly increased the risk that Chipotle could experience food-borne illness outbreaks during the Class Period.

67. Rather than disclosing that Chipotle failed to adequately monitor or enforce its food safety programs and that the risk that Chipotle could experience food-borne illness outbreaks had greatly increased, Defendants instead chose to mislead investors by omitting this information from their public statements during the Class Period.

68. In failing to disclose the actual state of affairs concerning the Company's risk of experiencing food-borne illness outbreaks, Defendants knew, or consciously disregarded, that food-borne illness outbreaks had a significantly increased likelihood of occurring at Chipotle's restaurants, which would negatively impact the Company's operations and financial performance.

69. Only at the end of the Class Period – after all but one of the at least seven food-borne illness outbreaks had occurred, and thereafter – did Defendants finally reveal to investors that, as part of the Company's remediation efforts in response to the food-borne illness outbreaks experienced by the Company during the Class Period, Chipotle would properly train its employees regarding food safety and food handling and properly oversee its employees to ensure these protocols were being adhered to.

70. Specifically, in a press release issued on December 4, 2015 (the "12/4/15 Press Release"), the Company disclosed, among other things, that Chipotle was "[***e***]***nhancing internal training to ensure that all employees thoroughly understand the company's high standards for food safety and food handling***."

71. That same day, Chipotle filed a Form 8-K with the SEC (the "12/4/15 Form 8-K") and, among other things, disclosed, in pertinent part, that:

> Among the new or enhanced programs we have put in place include high-resolution testing where a series of DNA-based tests ensure the quality and safety of ingredients before they are shipped, end-of-shelf-life testing to be sure quality specifications are maintained throughout the shelf life of an ingredient, continuous improvement throughout our supply chain based on test results, and ***enhanced internal training to ensure that our teams understand and adhere to all of our food safety standards***. Collectively, we believe these changes will put us at the forefront of the restaurant industry in terms of food safety practices. No Chipotle employees have been identified as having E. coli at any time during this incident, and we continue to serve more than 1 million customers on a daily basis.

72. Finally, on February 8, 2016, Chipotle closed all of its stores for a company-wide staff meeting to review Chipotle's new food safety protocols issued as part of the Company's remediation efforts. At this meeting, defendant Moran stated, in pertinent part, that "[i]f you're feeling sick, especially if you've vomited, whether at work or at home, you need to let your manager or your field leader know right away[.]" Chipotle confirmed that if any employee vomits in a Company restaurant, it is now a "red event," which means that the restaurant is closed immediately.

73. Accordingly, during the Class Period, Defendants knew, or recklessly disregarded, that Chipotle failed to adequately monitor or enforce its food safety programs and that the risk of Chipotle experiencing food-borne illness outbreaks had greatly increased, posing a significant risk to Chipotle's operations and financial performance. By omitting this information from the Company's public statements during the Class Period, Defendants made material omissions that rendered the statements therein false and misleading.

**Chipotle's Deficient Food Safety Practices Led to at Least Seven Food-Borne Illness Outbreaks from July to December 2015, Which Chipotle Attempted to Conceal from The Public**

74. Chipotle experienced at least seven food-borne illness outbreaks during the Class Period. Defendants knew, or recklessly disregarded, that Chipotle's switch to processing produce in each individual store, and its overall failure to ensure proper food safety practices, greatly increased the risk that such outbreaks could occur during the Class Period. In addition, once Chipotle began experiencing these outbreaks, which Defendants knew about or recklessly disregarded, Defendants failed to timely inform investors of the scope and magnitude of the impact those outbreaks had, and were reasonably expected to have, on Chipotle's operations and financial performance.

75. Likewise, as discussed below, Chipotle repeatedly undertook efforts to conceal these outbreaks from its customers, investors, and the public at large. Instead of immediately improving its food safety practices after these numerous outbreaks, Chipotle sought to shift the blame for these food-borne illnesses to other entities, including one of its own suppliers, even when such conclusions were not supported by the available scientific evidence. Chipotle's actions in this regard demonstrate the contemporaneous knowledge and understanding that the Company's senior executives, including the Individual Defendants, had regarding these outbreaks.

76. Chipotle experienced outbreaks of the following pathogens during the Class Period: (i) three Norovirus outbreaks; (ii) two E. coli STEC O26 outbreaks; (iii) one E. coli O157:H7 outbreak; and (iv) one Salmonella outbreak.

**The July E. Coli Outbreak**

77. In late July 2015, an outbreak of E. coli O157:H7 was traced to the same Chipotle location in Seattle by the Washington State Department of Health. Five people were sickened in the outbreak and the source of the outbreak was never conclusively identified. The common ingredient

eaten by these individuals was identified as cilantro, which was supplied to Chipotle by Taylor Farms.

78. E. coli O157:H7 is a type of Escherichia coli and a cause of illness, typically contracted through consumption of contaminated and raw food or water, and is highly virulent.

79. E. coli O157:H7 infection is characterized by the sudden onset of severe, acute hemorrhagic diarrhea and abdominal cramps. The incubation period for the disease (the period from ingestion of the bacteria to the start of symptoms) is typically five to ten days, although shorter and longer periods are not unusual. In most infected individuals, the intestinal illness lasts about a week and resolves without any long-term problems.

80. This strain of E. coli was responsible for the most infamous food poison outbreak in recent history. After being infected with E. coli O157:H7 through eating undercooked beef patties in hamburgers at Jack in the Box locations in California, Idaho, Washington, Nevada, Louisiana and Texas in 1993 (the "Jack in the Box Outbreak"), four children died and 178 others were seriously injured.

81. E. coli lives in the intestines of humans and animals and may be found in their feces. E. coli is spread to humans when they consume foods contaminated with small amounts of E. coli. According to the CDC, contamination usually happens in one of five ways. First, raw meat, poultry, dairy or eggs pose a risk of E. coli infection by virtue of not being cooked. Second, when preparing raw meat or poultry, food workers can transfer E. coli onto their hands and then to other foods if they do not wash their hands between food preparation steps. Third, drippings from raw meat or poultry can contaminate surfaces and other foods in the food preparation area of a restaurant's kitchen that then come into contact with other foods that pick up the disease. Fourth, when raw meat or poultry is prepared with a cutting board and knife without being washed thoroughly between uses, and then

used on other items such as produce, they can contaminate other foods. Fifth, food handlers who do not wash their hands with soap after using the bathroom can also contaminate food with E. coli. Both E. coli and Salmonella are spread in similar, nearly identical fashion.

82. According to the Washington State Department of Health, by at least August 3, 2015, Chipotle was apprised of this outbreak and was involved in testing restaurant employees for the presence of E. coli O157:H7.

83. According to James Apa, communications director for Seattle & King County Public Health, Chipotle knew about and participated in the testing for this outbreak. In addition, Mr. Apa stated that the CDC was made aware of this outbreak in July, but no public disclosure was made because by the time the link to Chipotle was discovered, health officials had determined that this outbreak posed no ongoing risk to the public.

84. This outbreak was not publicly disclosed until November 10, 2015, when *The Oregonian* published an article entitled "Chipotle Involved in 4th Outbreak This Year That Was Kept Secret."

**The August Norovirus Outbreak in Washington**

85. According to health officials at the Washington State Department of Health, in early August 2015, Chipotle experienced a Norovirus outbreak at its Hazel Dell, Washington, restaurant location.

86. Despite the publicity surrounding Chipotle's six other food-borne illness outbreaks during the Class Period, this Norovirus outbreak has never been publicly acknowledged by any news outlet, the Washington State Department of Health, or Chipotle. Lead Plaintiffs uncovered the existence of this outbreak in email communications between Washington State Department of Health officials and Chipotle corporate employees as part of counsel for Lead Plaintiffs' FOIA requests to the Washington State Department of Health.

87. According to internal emails between health officials with the Washington State Department of Health, before reporting to work, a Chipotle restaurant employee at this location informed her manager that she was sick. The manager replied that she needed to come into work or find someone to cover for her. The woman reported for work and stayed for four hours and was vomiting. According to Joe M. Graham ("Graham"), Food Safety Program Supervisor for the Washington State Department of Health, that this worker reported to work sick and was vomiting was "one of the proverbial smoking guns for this outbreak."

88. In response to this Norovirus outbreak, this Chipotle restaurant initiated the Company's corporate policy for responding to a suspected Norovirus outbreak, named internally by Chipotle as the "Norwalk Protocol."

89. The Norwalk Protocol requires that Chipotle close any location where two or more customers complain of food-borne illness. Once the location is closed, the Norwalk Protocol requires the restaurant in question to dispose of all food items, and bleach all cooking and food handling surfaces. There is no requirement in the Norwalk Protocol to notify public health officials or customers that a possible food-borne illness outbreak is occurring at the Chipotle restaurant in question. Counsel for Lead Plaintiffs received copies of the Norwalk Protocol as part of the FOIA request document productions made by the Washington State Department of Health and the Ventura County Environmental Health Division.

90. Internal emails between officials at the Washington State Department of Health criticized the Norwalk Protocol because it lacked any instruction to inform health officials about suspected outbreaks. According to Janet L. Anderberg, a Washington State Department of Health official, "[o]ne of the big things that appears to be missing [from the Norwalk Protocol] is for [Chipotle] to contact the health dept if there is an [outbreak]."

**The August Norovirus Outbreak in California**

91. Beginning on August 18, 2015, Chipotle experienced a Norovirus outbreak at its Simi Valley, California restaurant location. According to Chipotle, 243 individuals were reported as ill, and Norovirus was the confirmed pathogen that caused these illnesses.

92. In response to numerous sick employees and customers at this location, on Thursday, August 20, 2015, Chipotle initiated the Norwalk Protocol and closed its Simi Valley restaurant to the public. Rather than inform its customers or public health officials that a food-borne illness outbreak had occurred at its Simi Valley location and that the Norwalk Protocol had been implemented, Chipotle instead posted the following sign on this restaurant during its closure on August 20, 2015:




93. On Friday, August 21, 2015, Chipotle reopened its Simi Valley, California location with a new crew of employees from other Chipotle restaurants.

94. It was not until Saturday, August 22, 2015, that Chipotle left a voicemail message with the Ventura County Environmental Health Division notifying it for the first time that seventeen

employees from the Simi Valley location were sick with gastrointestinal illness and had been replaced with a new crew from other Chipotle restaurants.

95. Because Chipotle waited until the weekend to notify health officials, the Ventura County Environmental Health Division did not access the Simi Valley location until Monday, August 24, 2015. Health officials were unable to conduct their normal testing due to the steps Chipotle had already taken pursuant to the Norwalk Protocol. Nonetheless, even the belated testing undertaken by the Ventura County Environmental Health Division allowed them to determine that nine employees had Norovirus. As a result, the investigation concluded that the cause of the outbreak was Norovirus.

96. On August 27, 2015, lawyers for Chipotle emailed Mike Byrne and Doug Beach ("Beach"), health officials with the Ventura County Environmental Health Division. Upon information and belief, these lawyers were from defendant Moran's former law firm, Messner & Reeves. In this email, Chipotle's lawyers stated, in pertinent part, that:

> First, as I understood you, Mike, your department has continued to field calls and plans to issue a press release. I asked that you allow me to review the release or at least call to discuss the contents with me prior to issuance. You indicated that Mr. B[]each will be handling this, and you agreed to pass my request on to him. All my contact information is below, and I am available to speak to either of you at any time. I would very much appreciate it if one of you or someone in your office would call me prior to any such release. Thank you for your consideration.

97. On September 4, 2015, the Ventura County Environmental Health Division issued a press release informing the public for the first time about this Norovirus outbreak.

98. Ventura County Environmental Health Division health officials were frustrated by Chipotle's response to this Norovirus outbreak and implementation of the Norwalk Protocol. Specifically, on September 8, 2015, Sandy Murray, a Ventura County Environmental Health Division health official, commented in an internal email communication, in pertinent part, that:

> Chipotle has an inadequate employee health protocol and failed to report to us in a timely manner (more than 5-6 days) despite many employees reported ill at work. They then subsequently closed voluntarily and disposed of all the food items and super sanitized the facility. By the time we were aware of the outbreak, there was nothing left for us to sample. ***The corporate office was not cooperating which made it more complicated***.

99. On September 14, 2015, the Ventura County Environmental Health Division issued a Notice of Violation to Chipotle related to this Norovirus outbreak. Among several repeated violations noted was Chipotle's failure to notify the Ventura County Environmental Health Division when it was first aware of sick employees.

100. In commenting on this Norovirus outbreak in January 2016, Beach stated, in pertinent part, that:

> We believe [Chipotle] should have notified us sooner, not late in the game. Because they had already shut the restaurant down, thrown out all the food, completely cleaned the place up, went top to bottom with bleach, and brought in a new staff, we didn't have any opportunity to sample food or do some of the things we normally do to investigate a foodborne outbreak.
>
> * * *
>
> [We don't] know exactly what the restaurant did between the 18th and the 21st as far as who they knew was sick on their staff, did they send them home, did they keep them there? Had we known earlier, we potentially could have prevented more people from getting sick.

101. On January 6, 2016, the day after the Class Period ended, Chipotle filed a Form 8-K with the SEC (the "1/6/16 Form 8-K") before the opening of trading and disclosed, for the first time, among other things, that:

> In December 2015, Chipotle was served with a Federal Grand Jury Subpoena from the U.S. District Court for the Central District of California in connection with an official criminal investigation being conducted by the U.S. Attorney's Office for the Central District of California, in conjunction with the U.S. Food and Drug Administration's Office of Criminal Investigations. ***The subpoena requires us to produce a broad range of documents related to a Chipotle restaurant in Simi Valley, California, that experienced an isolated norovirus incident during August 2015.*** We intend to fully cooperate in the investigation. It is not possible at this time to determine whether we will incur, or to reasonably estimate the amount of, any

fines, penalties or further liabilities in connection with the investigation pursuant to which the subpoena was issued.

102. The 1/6/16 Form 8-K is the first time that Chipotle publicly acknowledged this Norovirus outbreak. In response to this news, the price of Chipotle's common stock declined from $449.03 per share to $426.67 per share, or 4.98%, on unusually heavy trading volume.

103. On January 19, 2016, a class action lawsuit captioned *H.C.L. et al. v. Chipotle Mexican Grill Inc.*, No. 2:16-cv-399, was filed in the U.S. District Court for the Central District of California, Western Division, alleging various causes of action on behalf of a purported class of Chipotle consumers who were infected with Norovirus at the Simi Valley location between August 18 and 20, 2015. Defendant Moran's former law firm, Messner & Reeves, is representing Chipotle in the case. Chipotle has not moved to dismiss the case, and the proceedings remain ongoing.

**The August Salmonella Outbreak**

104. Beginning around August 24, 2015, Chipotle experienced a Salmonella outbreak at 22 Chipotle locations throughout Minnesota. According to Chipotle, 64 individuals were reported ill, ranging in age from 10 to 69, and Salmonella was the confirmed source of this outbreak. On September 16, 2015, the Minnesota Department of Health named tomatoes as the ingredient that was tainted with Salmonella at these Chipotle locations.

105. The term Salmonella refers to a group or family of bacteria that variously cause illness in humans. Salmonella is an enteric bacterium, which means that it lives in the intestinal tracts of humans and other animals.

106. Salmonella bacteria are usually transmitted to humans by eating foods contaminated with animal feces or foods that have been handled by infected food service workers who have practiced poor personal hygiene. Contaminated foods usually look and smell normal and are often of animal origin, such as beef, poultry, milk, or eggs, but all foods, including vegetables, may

become contaminated. Many raw foods of animal origin are frequently contaminated, but thorough cooking kills Salmonella.

107. Several bacteria, including Salmonella, induce reactive arthritis. The term reactive arthritis refers to an inflammation of one or more joints, following an infection localized at a site distant from the affected joints. The predominant site of the infection is the gastrointestinal tract. And although the resulting joint pain and inflammation can resolve completely over time, permanent joint damage can occur.

108. Reiter's Syndrome, a form of reactive arthritis, is an uncommon but debilitating syndrome caused by gastrointestinal or genitourinary infections. In a small number of persons, the joint inflammation is accompanied by conjunctivitis (inflammation of the eyes), and uveitis (painful urination). This triad of symptoms is called Reiter's Syndrome. The reactive arthritis associated with Reiter's may develop after a person eats food that has been tainted with bacteria. The most common gastrointestinal bacteria involved are Salmonella, Campylobacter, Yersinia, and Shigella. Although a triad of arthritis, conjunctivitis, and uveitis characterizes Reiter's Syndrome, not all three symptoms occur in all affected individuals.

109. Salmonella is also a cause of a condition called post infectious irritable bowel syndrome ("IBS"), which is a chronic disorder characterized by alternating bouts of constipation and diarrhea, both of which are generally accompanied by abdominal cramping and pain. In one recent study, over one-third of IBS sufferers have had IBS for more than ten years, with their symptoms remaining fairly constant over time. IBS sufferers typically experience symptoms for an average of 8.1 days per month.

110. Salmonella lives in the intestines of humans and animals and may be found in their feces. Salmonella is spread to humans when they consume foods contaminated with small amounts

of Salmonella. According to the CDC, contamination usually happens in one of five ways. First, raw meat, poultry, dairy or eggs pose a risk of Salmonella infection by virtue of not being cooked. Second, when preparing raw meat or poultry, food workers can transfer Salmonella onto their hands and then to other foods if they do not wash their hands between food preparation steps. Third, drippings from raw meat or poultry can contaminate surfaces and other foods in the food preparation area of a restaurant's kitchen that then come into contact with other foods that pick up the disease. Fourth, when raw meat or poultry are prepared with a cutting board and knife without being washed thoroughly between uses, and then used on other items such as produce, they can contaminate other foods. Fifth, food handlers who do not wash their hands with soap after using the bathroom can also contaminate food with Salmonella. Both Salmonella and E. coli are spread in a similar, nearly identical fashion.

111. By September 3, 2015, Dana Eikmeier ("Eikmeier"), an epidemiologist with the Minnesota Department of Health had informed Chipotle corporate employees, including Patti Mann ("Mann"), of this Salmonella outbreak. Mann traded multiple email communications with the Minnesota Department of Health about this Salmonella outbreak between September 3 and 5, 2015, including which locations reported infections.

112. Mann is Chipotle's Investigations Manager. According to deposition testimony provided by Spong, Mann reports directly to him, and Spong reports directly to defendant Hartung. According to deposition testimony provided by defendant Moran, defendant Hartung reports directly to him.

113. Spong further testified that he serves as Chipotle's Executive Director of Safety, Security and Risk, a role he has held since February 2013, and, before this, Spong served as Chipotle's Director of Safety, Security and Risk. Spong, who became an attorney in 1991, testified

that he became a solo practitioner that same year with a focus on personal injury law. In 1992, defendant Ells was in an automobile accident, and became one of Spong's first clients. Thereafter, Spong served as Chipotle's outside general counsel from 1992 until 1998. Spong testified that he continued his private practice until September 18, 2006, when he was hired as Chipotle's Director of Safety, Security and Risk. Spong, whose undergraduate degree is in economics, had no experience in the fast food industry or with food safety before being hired by Chipotle.

114. Defendant Moran testified that Mann and Spong, as part of their job responsibilities, knew that if "a Chipotle restaurant . . . was unfit to remain open," that "they could call [defendant Moran] and say, Man, this is really, really bad, Monty. You should make a call." Defendant Moran also testified that "I encourage everyone in this company, including hourly crew members, to contact me whenever they would like to contact me, send me an email, call me if there's a problem."

115. According to FE2, defendant Moran and Spong are "incredibly" close and "there is absolutely no reason why Monty Moran would not have known about [the Class Period food-borne illness outbreaks] because Tim [Spong] would have spoken to him directly about it, just from the nature of their relationship."

116. On September 9, 2015, Roslyn Stone ("Stone"), COO of Corporate Wellness, Inc., emailed Eikmeier and copied Spong and Mann, explaining that Wederquist had identified a suspect produce producer and that the focus of Chipotle's internal investigation into this Salmonella outbreak has been on tomatoes. Upon information and belief, Corporate Wellness, Inc. provides companies with workplace and employee health testing and protocols, among other health services.

117. On September 10, 2015, Stone emailed Eikmeier, copying Chris Arnold ("Arnold"), Chipotle's Public Relations Director, and Corky Messner, CEO of Messner & Reeves, with the subject line "Press release draft – Urgent." Stone wrote, in pertinent part, that: "[w]e are [*sic*] some

specific concerns about the press release draft forwarded for review. . . . We believe there are some points that require clarification and are concerned that the public will become unduly alarmed . . . . We want to be sure this doesn't set off unnecessary panic[.]"

118. That same day, Eikmeier responded to Stone, Arnold and Corky Messner about the Minnesota Department of Health's forthcoming press release disclosing to the public the existence of this Salmonella outbreak, stating, in pertinent part, that: "[w]e can't [be] strong in our conclusions about the tomatoes until we have official traceback information from our state and federal partners. We know this is not exactly the text that was hoped for, but this is what we are going to put out."

119. On September 10, 2015, the Minnesota Department of Health issued a press release explaining the scope and extent of this outbreak to the public. The press release stated that 45 cases of Salmonella have been identified. The source of the outbreak was listed as still being under investigation.

120. On September 11, 2015, Wederquist emailed Eikmeier and acknowledged that the Salmonella outbreak has grown to include 58 individuals over 21 Chipotle locations in Minnesota.

121. Also on September 11, 2015, a complaint was filed in *Beck v. Chipotle Mexican Grill, Inc.*, No. 15-cv-3648 (D. Minn.), alleging personal injuries related to this Salmonella outbreak. The summons served on Chipotle was returned on September 29, 2015. Chipotle was represented in this case by Messner & Reeves.

122. On September 16, 2015, a complaint was filed in *Mohawk v. Chipotle Mexican Grill, Inc.*, No. 15-cv-3681 (D. Minn.), alleging personal injuries related to this Salmonella outbreak. The summons served on Chipotle was returned on September 29, 2015. Chipotle was represented in this case by Messner & Reeves.

123. Also on September 16, 2015, Doug Schultz ("Schultz"), an employee in the Minnesota Department of Health's Communications Office, informed Arnold that the Minnesota Department of Health was prepared to issue a press release to update the one issued on September 10. Arnold pushed back, writing, in pertinent part: "[w]hy is this necessary? This seems purely punitive. The story has been covered more than 200 times around the country. What is the reason you believe a release is necessary?"

124. Schultz responded, in pertinent part, that: "[w]e have an obligation to be fair and transparent with our media. On something like this, we don't believe it's appropriate to give one media outlet updated information and not provide it to others." Arnold replied, in pertinent part, that: "[t]he last release generated more than 200 stories all over the country. This will generate more than 100, again in markets all over the country. I guess I'd argue that you can continue to be honest, transparent and forthcoming with media without issuing a release."

125. On September 16, 2015, the Minnesota Department of Health issued a press release which provided an update to the September 10 press release. This press release announced that tomatoes were the source of this Salmonella outbreak, that 64 people had been sickened and 22 Chipotle locations had been linked to the outbreak, and that Chipotle had switched its supplier for tomatoes in light of this outbreak. This press release did not disclose the name of the supplier.

126. On September 24, 2015, a complaint was filed in *Bento v. Chipotle Mexican Grill, Inc.*, No. 15-cv-3724 (D. Minn.), alleging personal injuries related to this Salmonella outbreak. The summons served on Chipotle was returned on October 6, 2015. Chipotle was represented in this case by Messner & Reeves.

127. On September 30, 2015, Wederquist participated in the 4th Summit on Food Safety Regulatory Compliance in Chicago, Illinois (the "9/30/15 Conference"), and presented a seminar

entitled "How to Conduct an Effective Food Safety Risk Assessment – Developing a Strategic Approach." The presentation for the 9/30/15 Conference included a section on "Chipotle's Traceability Program," and stated, in pertinent part, that "[t]o support [Chipotle's commitment to Food With Integrity] and our commitment to safe food for our customers [Chipotle is] implementing a comprehensive whole chain traceability program." One of the stated benefits of this program was that it would allow Chipotle to "investigate reports of non-conforming quality issues, trace back to the source and trace forward to other locations."

128. On October 7, 2015, a complaint was filed in *Smith v. Chipotle Mexican Grill, Inc.*, No. 15-cv-3812 (D. Minn.), alleging personal injuries related to this Salmonella outbreak. The summons served on Chipotle was returned on October 14, 2015. Chipotle was represented in this case by Messner & Reeves.

129. On October 14, 2015, an amended complaint was filed in *Wikstrom v. Chipotle Mexican Grill, Inc.*, No. 15-cv-3668 (D. Minn.), alleging personal injuries related to this Salmonella outbreak. The amended complaint added Six L's Packing Company, Inc. (d/b/a Lipman Produce) ("Lipman") as an additional defendant. Chipotle is represented in this case by Messner & Reeves.

130. On October 16, 2015, it was reported that an unknown source had leaked that the supplier for the tomatoes at the center of this Salmonella outbreak was Lipman.

131. On October 20, 2015, Darren Micelle, Lipman's COO, is quoted by *ThePacker.com* as stating, in pertinent part, that: "[t]he claim that Lipman was the source of the recent Chipotle contamination is highly flawed both statistically and scientifically" and "[d]uring the time the food poisoning claims were made at Chipotle locations across Minnesota, our tomatoes were used by vendors across the country with no reported illness. In fact, just 2.2% of our national tomato supply was allocated to Minnesota Chipotle locations."

132. Personal injury attorney Bill Marler, of Marler Clark LLP, who was the counsel of record for plaintiffs in the *Beck*, *Mohawk*, *Bento* and *Smith* personal injury cases against Chipotle, is quoted in the same October 20 article as stating, in pertinent part, that: "Chipotle's lawyers pitched me on suing Lipman as well, but I didn't bite." Upon information and belief, "Chipotle's lawyers" as referenced by Marler, is referring to the law firm of Messner & Reeves.

133. The August Salmonella outbreak had a negative impact on the Company's operations and financial performance. Specifically, on December 4, 2015, Sharon Zackfia and Matthew Curtis, analysts with William Blair, wrote in a report, in pertinent part, that:

> [W]e estimate the late-summer salmonella outbreak at 22 Chipotle locations in Minnesota resulted in a double-digit drop in sales in the affected region for a few weeks before sales largely recovered (although not quite back to pre-salmonella levels).

**The October E. Coli Outbreak**

134. No less than ten days after Defendants reported Chipotle's 3Q15 financial results, on October 30, 2015, the Washington State Department of Health contacted Mann and Wederquist and told them that, beginning on October 17, 2015, an outbreak of E. coli STEC O26 had been identified at multiple Chipotle locations in Washington and Oregon.

135. E. coli STEC O26 is grouped with other non-O157 Shiga toxin-producing Escherichia coli.

136. E. coli STEC O26 infection is characterized by the sudden onset of abdominal pain and severe cramps, followed within 24 hours by diarrhea. As the disease progresses, the diarrhea becomes watery and then may become bloody to the naked eye. Vomiting can also occur, but there is usually no fever. The incubation period for the disease (the period from ingestion of the bacteria to the start of symptoms) is typically three to nine days, although shorter and longer periods are not

unusual. In most infected individuals, the intestinal illness lasts about a week and resolves without any long-term problems.

137. Hemolytic Uremic Syndrome ("HUS") is a severe, life-threatening complication of an E. coli STEC O26 infection. Although most people recover from an E. coli STEC O26 infection, about 5-10% of infected individuals go on to develop HUS. E. coli STEC O26 is responsible for over 90% of the cases of HUS that develop in North America. Some organs, such as the kidney, pancreas, and brain, appear more susceptible than others to the damage caused by these toxins, possibly due to the presence of increased numbers of toxin-receptors.

138. Thrombotic Thrombocytopenic Purpura ("TTP") is a clinical syndrome defined by the presence of thrombocytopenia (low blood platelet counts) and microangiopathic hemolytic anemia. This has generally been recognized as "adult HUS." There are many possible causes, including E. coli STEC O26, all of which act through the common mechanism of inducing endothelial cell damage. The damage triggers a cascade of biochemical events that ultimately leads to the characteristic feature of TTP – widespread dissemination of hyaline thrombi, which are composed predominantly of platelets and fibrin and block the terminal arterioles and capillaries (microcirculation) of most of the major body organs, commonly including the heart, brain, kidneys, pancreas and adrenals. Other organs are involved to a lesser degree. The pathophysiology of this disease results in multisystem abnormalities and the clinical manifestations of the syndrome.

139. On October 31, 2015, shortly after Mann and Wederquist learned about this E. coli outbreak, Chipotle closed 43 restaurant locations in Washington and Oregon. Internal emails between health officials from the Washington State Department of Health, dated October 31, 2015, indicate that all Chipotle locations in King County, Washington, would likely have been forcibly closed if Chipotle did not agree to voluntarily close these restaurants.

140. Rather than disclose the true reason for these closures, Chipotle instead chose to post signs on the closed Oregon restaurants blaming the closures on "equipment issues." Internal emails between health officials from the Washington State Department of Health, dated October 31, 2015, indicate that similar signs were observed at several closed Chipotle locations in Washington that were blamed on "supply issues."

141. Beginning on Sunday, November 1, 2015, news articles began reporting that Chipotle locations had been closed due to an E. coli outbreak. The August Norovirus outbreak in California and the August Salmonella outbreak are mentioned in news reports during this time as other food safety incidents that plagued Chipotle during 2015.

142. Almost immediately, news of this E. coli outbreak began having a significantly negative impact on Chipotle's common stock price and same store sales.

143. In addition, beginning on November 2, 2015, analyst reports, including those issued by Matthew Difrisco and Matthew Kirschner of Guggenheim, Karen Short and Bret Levy of Deutsche Bank, David Palmer of RBC Capital Markets, and Jake Bartlett of SunTrust Robinson Humphrey, mention that this E. coli outbreak is the latest food-borne illness experienced by Chipotle in recent months, mentioning the August Salmonella outbreak and the August Norovirus outbreak in California as other examples.

144. On November 2, 2015, Graham conveyed in an internal email to Washington State Department of Health officials his notes from a call that he participated in earlier in the day between the CDC, the U.S. Food and Drug Administration ("FDA"), and Chipotle. According to Graham, Spong and Wederquist from Chipotle were participants on the call. Further, Graham relayed that Matthew Wise, a CDC health official, stated on the call that the CDC did not have "a lot of confidence that this [outbreak] is only OR and WA and CDC [is] working hard to figure this out."

145. On November 3, 2015, an internal email between Washington State Department of Health officials indicated that Messner & Reeves was involved in Chipotle's response to this outbreak.

146. Also on November 3, 2015, Jonathan Modie, a spokesman for the Oregon Public Health Division, publicly stated that the specific produce under scrutiny for this E. coli outbreak was cilantro, romaine lettuce and tomatoes.

147. Also on November 3, 2015, Chipotle, for the first time, publicly addressed this E. coli outbreak and the remediation efforts that the Company had begun to undertake by issuing a press release on *Business Wire* (the "11/3/15 Press Release"), which states, in pertinent part, that:

> DENVER--(BUSINESS WIRE)--Nov. 3, 2015-- On the heels of an E. coli incident that was linked to eight of its restaurants in Oregon and Washington state, Chipotle Mexican Grill (NYSE:CMG) has taken a number of immediate steps to assist investigators as they conduct their review of the incident in Oregon and Washington. ***Among the specific actions the company has taken since the incident began are:***
>
> • Immediately closing 43 restaurants in Oregon and Washington state out of an abundance of caution, even though only eight restaurants have drawn concern, while investigators search for a cause;
>
> • Conducting additional deep cleaning and full sanitization of its restaurants in the area;
>
> • Conducting environmental testing in its restaurants, and food testing in its restaurants and distribution centers in addition to testing being conducted by health department officials;
>
> • Replacing all food items in the restaurants we closed, out of an abundance of caution;
>
> • Batch testing some ingredients before resupplying;
>
> • Continuing to help in the investigation; and
>
> • ***Retaining two preeminent food safety consulting firms (including Seattle-based IEH Laboratories and Consulting Group) to help the company assess and improve upon its already high standards for food safety.***
>
> "The safety of our customers and integrity of our food supply has always been our highest priority," said Steve Ells, chairman and co-CEO of Chipotle. "We work with

> a number of very fresh ingredients in order to serve our customers the highest-quality, best-tasting food we can. If there are opportunities to do better, we will push ourselves to find them and enhance our already high standards for food safety. Our deepest sympathies go out to those who have been affected by this situation and it is our greatest priority to ensure the safety of all of the food we serve and maintain our customers' confidence in eating at Chipotle."
>
> While no cause has yet been identified by investigating health officials, ***Chipotle continues to work swiftly and thoroughly with health department officials as they look to conclude this investigation.***

148. The CDC, however, was far from concluding its investigation into this E. coli outbreak – it was just beginning. In fact, as of November 3, 2015, the CDC had not yet made its first public announcement regarding its investigation into this outbreak.

149. On November 4, 2015, the next day, the CDC made its initial web posting announcing the status of its investigation into this E. coli outbreak. The CDC web posting reported that 39 people were ill in Washington and Oregon, and stated, in pertinent part, that "most of the ill people ate at several locations of Chipotle Mexican Grill before getting sick," and that "CDC and state and local public health partners are ***continuing laboratory surveillance*** through PulseNet to identify additional ill persons and to interview them. Updates will be provided when more information is available."

150. Also on November 4, 2015, Graham conveyed to Mann that in order for Chipotle to reopen in Washington, it must revise its produce rinsing procedures. Mann confirmed later that day that Chipotle agreed to revise these procedures.

151. On November 5, 2015, the CDC provided a web update on its investigation, reporting that 40 people were ill in Washington and Oregon, and stated, in pertinent part, that "CDC and state and local public health partners are ***continuing laboratory surveillance*** through PulseNet to identify additional ill persons and to interview them. Updates will be provided when more information is available."

152. On November 6, 2015, the CDC provided another web update on its investigation, reporting that 41 people were ill in Washington and Oregon, that an additional person had been reported ill in Minnesota but did not dine at Chipotle, and stated, in pertinent part, that "CDC and state and local public health partners are ***continuing laboratory surveillance*** through PulseNet to identify additional ill persons and to interview them. Updates will be provided when more information is available."

153. Also on November 6, 2015, health officials from the Washington State Department of Health, including Graham, had a call with Spong and Wederquist from Chipotle. According to Graham's notes from the call, "using new methods of clean, rinse, and sanitize as well as produce rinsing procedures" were discussed.

154. On November 9, 2015, the CDC provided another web update on its investigation, reporting that 41 people were ill in Washington and Oregon, that an additional person had been reported ill in Minnesota but did not dine at Chipotle, and stated, in pertinent part, that "CDC and state and local public health partners are ***continuing laboratory surveillance*** through PulseNet to identify additional ill persons and to interview them. Updates will be provided when more information is available."

155. Also on November 9, 2015, the Washington Department of Health issued a press release providing an update on the status of its investigation into the October E. coli outbreak (the "11/9/15 Press Release"). The 11/9/15 Press Release stated in no uncertain terms that this investigation remained active and ongoing, and, among other things, stated, in pertinent part, that:

> ***Food safety and disease investigation staff from the Washington State Department of Health are still working to investigate*** the cause of an outbreak of illnesses linked to 27 cases of E. coli O26 illnesses in Washington. The first round of test results did not find E. coli bacteria in food samples taken from several Chipotle restaurants according to officials at the Food and Drug Administration.

> The 27 cases, connected in this outbreak include people from Clark (11), Cowlitz (2), Island (2), King (6), Skagit (5), and Whatcom (1) counties. Ten of these people were hospitalized; no Hemolytic Uremic Syndrome (HUS) complications or deaths have been reported. Most people who are ill report eating at Chipotle restaurants before getting sick.
>
> In Washington, the most recent case reported eating at Chipotle on October 24. While health officials believe the risk for new exposures is very low, the number of cases in the outbreak may rise or fall as pending lab tests determine if more ill people have this specific strain of E.coli infection. In Washington, ***four tests are still in progress.***
>
> * * *
>
> The type of E. coli in this outbreak is a strain of Shiga toxin-producing E. coli (STEC O26). It can cause bloody diarrhea, abdominal cramps, fever, and vomiting, and sometimes result in severe, life-threatening illness which can, in some cases, be fatal.
>
> ***Local and state health officials in Washington and Oregon are investigating***, ***working with the U.S. Food and Drug Administration and the U.S. Centers for Disease Control and Prevention.***

156. Despite the CDC repeatedly announcing that its investigation into this E. coli outbreak was "continuing," and the Washington Department of Health announcing on November 9 that it was "still working to investigate" this outbreak, Chipotle, in a desperate attempt to reverse declining same store sales in the fourth fiscal quarter of 2015 ("4Q15") and beyond, issued the 11/10/15 Press Release, which claimed, among other things, that health officials believed there was "no ongoing risk" or "threat" from this outbreak and further stated, in pertinent part, that:

> All test results negative for E. Coli; ***no ongoing threat***
>
> DENVER--(BUSINESS WIRE)--Nov. 10, 2015-- Chipotle Mexican Grill (NYSE: CMG) will reopen all 43 restaurants in the Seattle and Portland, Ore. markets that the company voluntarily closed. The restaurants are opening in the coming days with a fresh supply of all new ingredients.
>
> ***Health officials have concluded that there is no ongoing risk from this incident.*** Chipotle has taken important steps to make certain that their food is as safe as it can be, including:
>
> • Conducting additional deep cleaning and sanitization in all its restaurants nationwide.

• Replacing all ingredients in the closed restaurants.

• Confirming that none of its employees in these restaurants had E. coli. Note: No Chipotle employees have had E. coli stemming from this incident.

• Working with health officials to improve food handling procedures.

• Testing fresh produce, raw meat, and dairy items (cheese and sour cream) prior to restocking restaurants.

• Going above and beyond required testing, and enhancing nationwide testing of produce and fresh meat.

• Testing food, restaurant surfaces, and equipment in its restaurants (to date, Chipotle has received nearly 900 test results, all of which showed no E. coli).

• Implementing additional safety procedures, and audits, in all of its 2,000 restaurants to ensure that robust food safety standards are in place.

Since this issue began, Chipotle has taken a number of additional steps to help health officials investigate this incident. Those measures included:

• Immediately closing 43 restaurants in Oregon and Washington out of an abundance of caution, although the incident was limited to 11 restaurants.

• Conducting independent testing in its restaurants and distribution center in addition to testing conducted by health department and Food and Drug Administration officials, all of which showed no E. coli.

• Actively assisting health authorities during all phases of the investigation.

• Retaining two preeminent food safety scientists to help the company assess and improve upon its already high standards for food safety.

Details surrounding the investigation include:

• The most recent reported date that a meal was served that may be linked with this incident is October 24. Incubation period for E. coli is typically three to four days after exposure, but may be as short as one day or as long as 10 days, according to the Centers for Disease Control and Prevention.

• Eleven Chipotle restaurants, including six restaurants in Oregon and five in Washington have been linked to this incident by the health departments. Out of an abundance of caution, Chipotle voluntarily closed 43 restaurants in Oregon and Washington.

• No Chipotle locations outside of Oregon and Washington have been connected to this issue in any way.

> • No cause has been established between this issue and any ingredient. Both Chipotle and health officials have been conducting food and environmental testing in Chipotle restaurants and distribution centers, but tests have not confirmed a link to any ingredient.
>
> • No Chipotle employees are among the confirmed cases.
>
> "The safety of our customers and integrity of our food supply has always been our highest priority," said Steve Ells, chairman and co-CEO of Chipotle. "If there are any opportunities for us to do better in any facet of our sourcing or food handling – from the farms to our restaurants – we will find them. We are sorry to those affected by this situation, and it is our greatest priority to ensure that we go above and beyond to make certain that we find any opportunity to do better in any area of food safety."

157. These statements were demonstrably false, as the CDC repeatedly characterized its investigation as "continuing" in its updates on November 4, 5, 6 and 9, and the Washington Department of Health stated it was "still working to investigate" this outbreak on November 9. In fact, just two days after the 11/10/15 Press Release was issued, on November 12, 2015, the CDC provided another web update on its investigation, reporting that 51 people were reported ill in Washington and Oregon, and stated, in pertinent part, that "CDC and state and local public health partners are ***continuing laboratory surveillance*** through PulseNet to identify additional ill persons and to interview them. Updates will be provided when more information is available[,]" and further that "[t]he investigation is ***still ongoing*** to determine if the ill people ate a meal item or ingredient in common that was served at the Chipotle Mexican Grill locations."

158. The truth about the status of the CDC's investigation and the geographic reach of this E. coli outbreak was not disclosed to investors until on November 20, 2015, when the CDC provided another web update on its investigation (the "11/20/15 CDC Update"). The 11/20/15 CDC Update reported for the first time that, in addition to the Washington and Oregon cases, this E. coli outbreak has been linked to Chipotle customers in California, New York, Ohio and Minnesota as well, and stated, in pertinent part, that "CDC and state and local public health partners are ***continuing***

***laboratory surveillance*** through PulseNet to identify additional ill persons and to interview them" and further that:

> The epidemiologic evidence available to investigators at this time suggests that a meal item or ingredient served at Chipotle Mexican Grill restaurants at several states is a likely source of this outbreak. The investigation has not identified what specific food is linked to illness. Chipotle Mexican Grill is assisting public health officials with understanding the distribution of food items served at locations where ill people ate and ***this work is ongoing.***

159. That same day, Chipotle quickly issued its own press release on *Business Wire* in response to the 11/20/15 CDC Update (the "11/20/15 Press Release"). The 11/20/15 Press Release no longer claims that "health officials have concluded that there is no ongoing risk" from this outbreak, and instead states, in pertinent part, that:

> DENVER--(BUSINESS WIRE)--Nov. 20, 2015-- Chipotle Mexican Grill (NYSE: CMG) continues to work closely with state and federal health officials, as the investigation continues into an E. coli incident initially linked to 11 Chipotle restaurants in Washington and Oregon.
>
> The Centers for Disease Control and Prevention (CDC) reduced the number of cases connected to Chipotle from 50 to 37 cases on November 18 (with 24 in Washington and 13 in Oregon). This reduction of nearly 25% was based upon more sensitive testing which revealed the cases were not related to Chipotle. The CDC has informed Chipotle that it identified six additional cases in which initial testing matches the E. coli strain involved in the Washington and Oregon incident. Although one of the individuals has no known link to Chipotle, five individuals did report eating at Chipotle, including two in Turlock, Calif., one in Akron, Ohio, one in Amherst, NY, and one in Burnsville, Minn.
>
> Investigators have suggested that in incidents like this, it is not unusual to see additional cases after the initial incident as the investigation moves forward. The source of the problem appears to have been contained during a period in late October. Forty-two of the 43 cases linked to Chipotle, reported visiting one of the restaurants in question between October 13 and October 30. One person reported having eaten November 6.
>
> In response to this incident, Chipotle has taken aggressive steps to make sure its restaurants are as safe as possible. There have been no reported new cases in Washington or Oregon since Chipotle put its remediation plan into effect.
>
> Specifically, the company conducted deep cleaning at the restaurants that have been linked to this incident, replacing ingredients in those restaurants, changing food

> preparation procedures, providing all necessary supply chain data to investigators, and surveying employees to be sure none have had any symptoms of illness (note: no Chipotle employees in any states have been ill related to this incident). Similar actions are immediately being taken in response to these newly reported cases.
>
> Chipotle is also taking significant steps to be sure all of its food is as safe as possible. Specifically, the company is expanding testing of key ingredients, examining all of its food-safety procedures to find any opportunity for improvement, and is working with two renowned food safety scientists to assess all of its food safety programs, from the farms that provide its food to its restaurants.
>
> "We take this incident very seriously because the safety of our food and wellbeing of our customers is always our highest priority," said Steve Ells, chairman and co-CEO of Chipotle. "We are committed to taking any and all necessary actions to make sure our food is as safe as possible, and we are working diligently with the health agencies."
>
> "We offer our sincerest apologies to those who have been affected," said Ells. "We will leave no stone unturned to ensure the safety of our food – from enhancing the safety and quality assurance program for all of our fresh produce suppliers, to examining all of our food safety procedures from farm to restaurant, and expanding testing programs for produce, meat and dairy items before they are sent to our restaurants."

160. In response to this news, which became public during the trading day on November 20, 2015, the price of Chipotle common stock declined $75.81 per share, or approximately 12.4%, from an opening price of $612.00 per share before the commencement of trading on November 20 to a closing price of $536.19 per share at the close of trading that day.

161. The CDC's investigation into this E. coli outbreak continued beyond November 10 until after the end of the Class Period. On December 4, 2015, the CDC provided another web update on its investigation (the "12/4/15 CDC Update"), and reported, among other things, that "[s]ince the last update on November 20, seven more ill people have been reported from California (1), Illinois (1), Maryland (1), Ohio (2), Pennsylvania (1), and Washington (1)."

162. The 12/4/15 CDC Update further stated, among other things, that "[a]mong people for whom information is available, illnesses started on dates ranging from October 19, 2015 to November 13, 2015," that "whole genome sequencing has been performed on STEC O26 isolates

from 21 ill people in Washington (16), California (2), Minnesota (2), and New York (1). All 21 isolates were highly related genetically to one another. This provides additional evidence that illnesses outside the Pacific Northwest are related to the illnesses in Oregon and Washington[,]" and that "CDC and state and local public health partners are continuing laboratory surveillance through PulseNet to identify additional ill people and to interview them."

163. As Chipotle disclosed on November 3, among other initial remedial steps, it had retained food safety experts IEH Laboratories, headed by Dr. Mansour Samadpour, to assist it in designing a new food safety regimen. On December 4, 2015, Chipotle issued the 12/4/15 Press Release, which detailed the recommendations made by Dr. Samadpour and that Chipotle agreed to implement all of them as part of its remediation efforts, and further stated, in pertinent part, that:

> DENVER--(BUSINESS WIRE)--Dec. 4, 2015-- Chipotle Mexican Grill (NYSE:CMG) has taken aggressive actions to implement industry-leading food safety and food handling practices in all of its restaurants and throughout its supply chain. Its enhanced food safety program will establish Chipotle at the forefront of food safety protocols in the restaurant industry.
>
> "While Chipotle's food safety practices were already well within industry norms***, I was asked to design a more robust food safety program to ensure the highest level of safety and the best quality of all meals served at Chipotle," said Mansour Samadpour, Ph.D., CEO of IEH Laboratories and Consulting Group. "I am happy to report that our proposed program was adopted in its entirety, without any modification.*** While it is never possible to completely eliminate all risk, this program eliminates or mitigates risk to a level near zero, and will establish Chipotle as the industry leader in this area."
>
> ***Work on Chipotle's enhanced food safety program began immediately after reports surfaced at the end of October that linked 11 Chipotle locations in Washington and Oregon to E. coli cases in those states.*** Even though there is no evidence of exposures after the period of October 13 to November 7, and no new illnesses have occurred since then, ***officials at the Centers for Disease Control and Prevention have indicated that additional cases may yet be reported as cases make their way through various state health departments to the federal health officials***.
>
> Specifically, Chipotle has set an objective to achieve the highest level of safety possible. The company retained Seattle-based IEH Laboratories to help it identify opportunities to enhance food safety practices throughout its operations – from the farms that supply its food to its restaurants that prepare and serve it.

> Chipotle's enhanced food safety program is the product of a comprehensive reassessment of its food safety practices conducted with IEH Laboratories that included a farm-to-fork assessment of each ingredient Chipotle uses with an eye toward establishing the highest standards for safety. Specifically, program components include:
>
> • Implementing high-resolution testing of all fresh produce in which a series of DNA-based tests will ensure the quality and safety of ingredients before they are shipped to restaurants, a testing program that far exceeds requirements of state and federal regulatory agencies, as well as industry standards.
>
> • Initiating end-of-shelf-life testing where ingredient samples will be tested to ensure that quality specifications are maintained throughout the shelf life of an ingredient.
>
> • Pursuing continuous improvements throughout its supply chain using data from test results to enhance the ability to measure the performance of its vendors and suppliers.
>
> • ***Enhancing internal training to ensure that all employees thoroughly understand the company's high standards for food safety and food handling***.
>
> Thousands of food sample tests from Chipotle restaurants linked to the incident have shown no E. coli. No ingredients that are likely to have been connected to this incident remain in Chipotle's restaurants or in its supply system. No Chipotle employees have been identified as having E. coli since this incident began.
>
> "When I opened the first Chipotle 22 years ago, I offered a focused menu of just a few things made with fresh ingredients and prepared using classic cooking techniques," said Steve Ells, chairman and co-CEO of Chipotle. "We do the same thing today, even with nearly 2,000 restaurants, and we are working harder than ever to ensure that our food is safe and delicious."

164. In response to the 12/4/15 Press Release, issued before the opening of trading on December 4, 2015, the price of Chipotle common stock declined over $6.42 per share, or 1.13%, from a close of $565.31 per share the day before the announcement, to open at $558.89 per share on December 4, 2015.

165. Also on December 4, 2015, Chipotle filed the 12/4/15 Form 8-K, which quantified for the first time the devastating impact that this E. coli outbreak had on Chipotle's operations and financial performance, and stated, in pertinent part, that:

This report is filed to provide an update regarding the impact of the recent E. coli incident associated with Chipotle Mexican Grill restaurants. The incident has had an adverse impact on financial and operating results thus far during the fourth quarter of 2015.

This report is also filed to announce that our Board of Directors has authorized additional repurchases of Chipotle common stock, with a total aggregate purchase price of $300 million, exclusive of commissions.

E. coli Incident Impact

***If recent sales trends continue (as discussed below), we anticipate for the fourth quarter 2015:***

***· Comparable restaurant sales to be in a range of -8% to -11% (negative)***

· Non-recurring expenses during the fourth quarter of 2015 in the range of $6.0 to $8.0 million

The estimate of non-recurring expenses includes costs to replace food in select restaurants, lab analysis of food samples and environmental swabs, and retaining expert advisory services related to epidemiology and food safety; it does not include any estimate for legal claims and related expenses.

· Restaurant level operating margins of 22% to 24%

· Diluted earnings per share in the range of $2.45 to $2.85

· No impact to anticipated new restaurant openings during the fourth quarter of 2015

***We are also rescinding our previously-announced 2016 outlook for comparable restaurant sales increases.*** In light of recent sales trends and additional uncertainty related to the E. coli incident, we cannot reasonably estimate 2016 comparable restaurant sales at this time.

Sales Trend Detail

Sales trends during the quarter so far have been extremely volatile. October comparable restaurant sales were positive in the low-single digit range. When we announced the closure of 43 restaurants on November 3, company-wide comparable restaurant sales dropped for the ensuing few days to approximately -20%. The severity of the national impact was temporary, and when we announced the re-opening of restaurants in Oregon and Washington on November 10, 2015, comparable restaurant sales over the next several days quickly improved to approximately -9%. On November 20, 2015 the U.S. Centers for Disease Control and Prevention (CDC) announced four additional cases linked to the same E. coli incident; following this announcement and related negative publicity, daily comparable restaurant sales trended down to approximately -22%. Over the past five

> days, comparable sales have gradually improved to an average of approximately -16%. For the full month of November, comparable restaurant sales were -16%.
>
> If these sales trends continue, we believe comparable restaurant sales could be in a range of -8% to -11% for the three month period ending December 31, 2015. Future sales trends may be significantly influenced by further developments, including potential additional announcements from federal and state health authorities.
>
> Food Safety Commitment
>
> As a restaurant company, nothing is more important to us than serving our guests food that is delicious and safe to eat. ***Since this incident began, we have significantly increased our efforts to ensure that our teams are adhering to all of our food safety protocols, reassessed all facets of our food safety programs — from the farms that provide the ingredients we use, to the restaurants where we serve our customers — and made a number of improvements to help ensure that our food is as safe as it can be***. Among the new or enhanced programs we have put in place include high-resolution testing where a series of DNA-based tests ensure the quality and safety of ingredients before they are shipped, end-of-shelf-life testing to be sure quality specifications are maintained throughout the shelf life of an ingredient, continuous improvement throughout our supply chain based on test results, ***and enhanced internal training to ensure that our teams understand and adhere to all of our food safety standards***. Collectively, we believe these changes will put us at the forefront of the restaurant industry in terms of food safety practices. No Chipotle employees have been identified as having E. coli at any time during this incident, and we continue to serve more than 1 million customers on a daily basis.

166. In response to the 12/4/15 Form 8-K, filed after the close of trading on Friday, December 4, the price of Chipotle common stock declined $44.37 per share, or approximately 7.9%, from a close of $561.20 per share before the announcement, to an opening price of $516.83 per share on Monday, December 7, 2015.

167. At the 12/8/15 Conference, defendant Ells provided further detail on the Company's remediation efforts, stating, in pertinent part, that:

> But we immediately took action after the outbreak in the Pacific Northwest by closing many restaurants in that area in an abundance of caution, but then system-wide made some changes, specifically to some produce items that could have been suspect, that were suspect.
>
> ***We immediately started dicing our tomatoes in a commissary, so that they could go through a sanitizing kill step and then hermetically sealed in containers and delivered to the restaurants. We found it impossible that we could test every tomato***

> ***coming into the restaurants. So we went with an abundance of caution to make sure that we're testing that way. A similar protocol for cilantro, where the amount of testing assures that there are no pathogens coming into the restaurant.***

168. On December 21, 2015, the CDC provided another web update on its investigation (the "12/21/15 CDC Update"), reporting that 53 people were ill in Washington, Oregon, California, Illinois, Maryland, Minnesota, New York, Ohio and Pennsylvania, with illnesses starting on dates ranging from October 19 to November 14, 2015. According to the 12/21/15 CDC Update, the most recent person reporting Chipotle exposure became ill on November 10, 2015, and "CDC and state and local public health partners are continuing laboratory surveillance through PulseNet to identify additional ill persons and to interview them."

169. On December 22, 2015, *The New York Times* reported on Chipotle's various food-borne illness outbreaks. The article quoted Dr. Ian Williams ("Williams"), Chief of the Outbreak Response and Prevention Branch of the CDC, as stating, in pertinent part, that:

> One of the challenges here has been than we have been able to identify the restaurants where people ate, ***but because of the way Chipotle does its record-keeping, we have been unable to figure out what food is in common across all those restaurants***.

170. After the end of the Class Period, on January 13, 2016, defendant Ells participated at the ICR Conference (the "1/13/16 Conference") and continued to detail the Company's remediation efforts, stating, in pertinent part, that:

> A couple of important things, though, we are doing to ensure the risk of bringing in any microbe would be near zero, would be with tomatoes and lettuce, in particular, on the produce side. Those would be in central kitchens.
>
> ***For years though we were dicing our tomatoes in a central kitchen. It was only for the last couple years that we brought them back in-house to dice. But you are not able to do the high-resolution testing in the restaurant, so that's why back into the central kitchen.***
>
> The other item that we think is important to do in the central kitchen is lettuce, but you can think of this as you would think about lettuce in your grocery store. You see very nice washed and trimmed and prepared lettuces that are triple washed in those

> nice little packages. ***Well, that's kind of what we're going to be doing with our Romaine lettuce.***
>
> It's still the same Romaine lettuce. ***We'll shred it in the central kitchen and wash it;*** do this high resolution testing. Then dry it and package it and off to the restaurant it will go, and I think it will be very, very high quality. It's not going to be any dramatic change for our customers.

171. It was not until February 1, 2016, that the CDC issued its Final Case Count Update and officially closed its investigation into this E. coli outbreak and the November E. coli outbreak discussed below (the "2/1/16 CDC Final Count"). The 2/1/16 CDC Final Count stated that the October E. coli outbreak infected 55 people across 11 states – California, Delaware, Illinois, Kentucky, Maryland, Minnesota, New York, Ohio, Oregon, Pennsylvania and Washington. The disease affected people ranging in age from 1 to 94 years old.

172. On February 2, 2016, Chipotle issued a press release on *Business Wire* announcing the Company's financial results for 4Q15 and fiscal year 2015 ("FY15") that was also filed on Form 8-K (the "2/2/16 Form 8-K"). In the 2/2/16 Form 8-K, Chipotle acknowledged that the CDC's investigation had finally concluded, stating, in pertinent part, that:

> The fourth quarter of 2015 was the most challenging period in Chipotle's history, ***but the Centers for Disease Control and Prevention has now concluded its investigation into the recent E. coli incidents associated with Chipotle***. We are pleased to have this behind us and can place our full energies to implementing our enhanced food safety plan that will establish Chipotle as an industry leader in food safety. We are extremely focused on executing this program, which designs layers of redundancy and enhanced safety measures to reduce the food safety risk to a level as near to zero as is possible. By adding these programs to an already strong and proven food culture, we strongly believe that we can establish Chipotle as a leader in food safety just as we have become a leader in our quest for the very best ingredients we can find," said Steve Ells, founder, chairman and co-CEO of Chipotle.

173. Throughout its three month investigation, that was ongoing at all relevant times, the CDC was unable to determine the food source of this E. coli outbreak. According to an analyst report issued by Jason West, James O'Brien and Jordy Winslow of Credit Suisse on November 24, 2015, a troubling aspect of the October E. coli outbreak was that, in contrast to a comparable E. coli

outbreak at Taco Bell in 2006, the source of the Chipotle outbreak was not quickly pinpointed. Specifically, this report stated, in pertinent part, that "[t]his [Chipotle outbreak] stands in contrast to the Taco Bell situation, in which the company was able to identify the source (shredded lettuce) of the outbreak within ~10 days."

**The November E. Coli Outbreak**

174. Amidst the October E. coli outbreak, beginning on November 18, 2015, an outbreak of E. coli STEC O26 was traced to Chipotle customers from Kansas, North Dakota, and Oklahoma. Five people were sickened in the outbreak, ranging in age from 6 to 25. As with the October E. coli outbreak, the source of this E. coli outbreak was never conclusively identified.

175. Upon information and belief, Chipotle became aware of the November E. coli outbreak no later than when the CDC learned about these individuals' illnesses, which was on or around November 26, 2015.

176. In the 12/21/15 CDC Update, the CDC also announced, for the first time, the November E. coli outbreak, and that two Chipotle locations – one in Oklahoma and one in Kansas (the North Dakota victim ate at the same Kansas location as the Kansas victim) – were implicated in this E. coli outbreak. The CDC clarified that the strain of E. coli found in these five individuals was a "different, rare DNA fingerprint[ ] of STEC O26," and that "[i]t is not known if these infections are related to the larger outbreak of STEC O26 infections; this investigation is ongoing."

177. Further, as reported by *The New York Times* on December 21, 2015, according to Williams, the strain of E. coli STEC O26 involved in both the October and November E. coli outbreaks is rare, with the CDC seeing it previously on only three other occasions. Williams further commented that, while both the October and November E. coli outbreaks were of the same strain of STEC O26, their DNA appeared different, meaning that the two outbreaks were unrelated and likely came from different ingredient sources.

178. In the 2/1/16 CDC Final Count, the CDC confirmed that the November E. coli outbreak had a different DNA profile from the October E. coli outbreak, and that the CDC had officially closed its investigation into both the October and the November E. coli outbreaks. Below is a graphic from the CDC detailing the geographic reach of these two outbreaks:

2015 E.coli Cases Linked to Chipotle




Source: Centers for Disease Control and Prevention.
Cases in North Dakota, Kansas, and Oklahoma are a different strain of STEC O26. Data as of December 21, 2015

**The December Norovirus Outbreak**

179. As explained above, on December 7, 2015, Chipotle experienced a Norovirus outbreak at its Brighton, Massachusetts restaurant location. According to Chipotle, 143 individuals were reported ill, and Norovirus was the confirmed source of this outbreak.

180. Public reports of this outbreak began circulating on the evening of December 7, 2015. Upon information and belief, Chipotle was contemporaneously aware of this Norovirus outbreak by December 7, 2015.

181. In response to public reports of this Norovirus outbreak, which began surfacing after the close of trading, the price of Chipotle common stock declined $19.64 per share, or approximately 3.6%, from a close of $551.75 per share on December 7, to an opening price of $532.11 per share on December 8, 2015.

182. Due to this Norovirus outbreak, Chipotle closed this restaurant from December 7 to 9, 2015.

183. The source of this Norovirus outbreak was determined to be a sick employee who Chipotle subsequently fired for reporting to work while sick.

184. Chipotle never issued a press release explaining to the public the events surrounding this Norovirus outbreak.

**Chipotle Lacked a Reasonable Basis to Represent to Investors on November 10, 2015, that Health Officials Believed There Was "No Ongoing Risk" Related to the October E. Coli Outbreak**

185. Defendants knew, or recklessly disregarded, that the CDC's investigation into the October E. coli outbreak was ongoing at all relevant times during the Class Period. By virtue of the CDC's investigation remaining ongoing, this meant that the CDC had not concluded that there was no ongoing risk or threat to public health posed by the October E. coli outbreak. In other words, contrary to what Chipotle told investors, the CDC believed there was still an ongoing risk and threat to the public health posed by the October E. coli outbreak.

186. Despite this reality, Defendants desperately sought to stem the tide of the significant financial losses incurred by the Company in the wake of the October E. coli outbreak by falsely and misleadingly representing in the 11/10/15 Press Release that "[h]ealth officials have concluded that

there is no ongoing risk from this incident[,]" and that there was "no ongoing threat" related to the October E. coli outbreak.

187. Defendants wanted the CDC's investigation to end before it even started. In the 11/3/15 Press Release, among other things, Defendants stated, in pertinent part, that "Chipotle continues to work swiftly and thoroughly with health department officials as they look to conclude this investigation." Chipotle's comment about the CDC's investigation concluding came an entire day before the CDC made its initial web announcement of its investigation into the October E. coli outbreak.

188. Chipotle's statements in the 11/10/15 Press Release were directly contradicted by the CDC's initial announcement, and each subsequent CDC web update provided by the CDC on the October E. coli outbreak. The CDC's initial web announcement on November 4, 2015, stated, in pertinent part, that "***[t]he investigation is ongoing*** to determine if the ill people ate a common meal item or ingredient that was served at the [Chipotle] restaurant locations."

189. Further, beginning on November 4, 2015, and repeated on November 5, 6 and 9, the CDC stated in its web updates, without equivocation, that "CDC and state and local public health partners are ***continuing laboratory surveillance*** . . ." and that "[u]pdates will be provided when more information is available," meaning that the CDC and state and local investigations into this outbreak all remained open and ongoing at all relevant times.

190. In addition, in the 11/9/15 Press Release, the Washington Department of Health provided an update on the status of its investigation into the October E. coli outbreak, and clearly indicated that this investigation was active and ongoing, stating, among other things, that "[f]ood safety and disease investigation staff from the Washington State Department of Health ***are still***

***working to investigate*** the cause of an outbreak of illnesses linked to 27 cases of E. coli O26 illnesses in Washington."

191. The CDC provided additional web updates on November 12 and 17 regarding new information concerning the Washington and Oregon illnesses that had been previously reported as linked to the October E. coli outbreak on November 12 and 17. While these web updates contained the same statements about the CDC's surveillance being "continuing" and that "[u]pdates will be provided," as were made in the November 4, 5,6 and 9 web updates, these post-November 10 web updates were merely posted on the CDC's website and were not publicly disseminated as official press releases from the CDC. In fact, the CDC did not issue a single press release or media advisory regarding any of Chipotle's numerous food-borne illness outbreaks during the Class Period. As a result, the November 12 and 17, 2015 CDC web updates did not receive anywhere near the attention given to each of the press releases issued by Chipotle during the November and December 2015 time frame regarding the October and November E. coli outbreaks.

192. In fact, on November 11, 2015, no fewer than 30 news outlets reported on and repeated Chipotle's false and misleading claim in the 11/10/15 Press Release that the health officials believed there was "no ongoing risk" related to the October E. coli outbreak, including *The Wall Street Journal* and *The New York Times*.

193. It was not until the 11/20/15 CDC Update, and the 11/20/15 Press Release that was issued in its wake, that the corrective information – that the CDC's investigation was not only ongoing, but that the October E. coli outbreak had spread to additional states – was conveyed to investors with the degree of intensity and credibility sufficient to effectively counter-balance Chipotle's misstatements in the 11/10/15 Press Release.

194. In response to this news, which became public during the trading day on November 20, 2015, the price of Chipotle common stock declined $75.81 per share, or approximately 12.4%, from an opening price of $612.00 per share before the commencement of trading on November 20, 2016, to a closing price of $536.19 per share at the close of trading that day. The trading volume was unusually high, with trading volume of approximately five million shares traded, more than six times the average daily trading volume over the preceding 30 trading days.

195. Chipotle was outraged by the periodic web updates issued by the CDC because it conflicted with how Chipotle sought to control the public messaging surrounding the October E. coli outbreak. In fact, during the 12/8/15 Conference, defendant Moran stated, in pertinent part, that:

> Sure. Well, the incident you're referring to last night was Boston College and was erroneously reported sort of immediately as E. coli, and has since then been shown not to be and probably is the common flu or norovirus. And there are other restaurant brands there that were shut down before Chipotle, and there's sort of an outbreak there.
>
> So, I think that's something that we can probably expect on an ongoing basis. ***And it's been fueled by the sort of unusual and even unorthodox way the CDC has chosen to announce cases related to the original outbreak in the Northwest. They've done that a couple of times now.*** And they're not announcing new cases. They're just simply announcing new reporting to them from local health agencies. But of course the press writes -- outbreak expands, new state -- which is not true. All of the cases of E. coli remain within a window from October 24th to November 7th, so there's been no new cases.
>
> But, because the media likes to write sensational headlines, we'll probably see when somebody sneezes that they're going to say -- ah, it's E. coli from Chipotle for a little bit of time. And so that's unfortunate, but I think we've taken all the right measures internally, which I can let Steve speak to, to show that we're going to do the best we can not to have any of these be real outbreaks.

196. Thereafter, Defendants' criticisms of the CDC's web updates intensified. On December 21, 2015, the CEO of defendant Moran's former law firm, Messner & Reeves, sent a blistering letter on behalf of the Company to the CDC accusing the federal agency of badly

mishandling the web updates issued from November 5 through December 4, 2015. Among other accusations, Corky Messner charged in the 12/21/15 Letter, in pertinent part, that:

> Beginning on November 4, 2015, the CDC posted periodic web updates concerning the E. coli O26 investigation, including the number of illnesses, epidemiological findings, and Chipotle's response. While the initial announcement and early updates were generally necessary and appropriate, ***the ongoing updates were not useful and did not serve to inform the public of a significant health risk. Rather, these updates misrepresented the E. coli O26 outbreak as ongoing and unnecessarily intensified the public's concern.*** Additionally, on December 4, 2015, the CDC issued a statement which was patently inaccurate.
>
> We understand the importance of notifying the public of a significant health risk and also understand the importance of proving relevant and meaningful updates when there is an ongoing public health risk. However, each update must stand on its own as to whether there is a significant health risk that necessitates an update to the public.
>
> We are not claiming that the CDC intentionally misrepresented certain information. However, ***certain web updates actually misinformed the public because they were confusing and unclea***r. A review of media coverage, citing to the CDC updates, reflects the confusion and inaccuracies. ***Despite no ongoing threat, with four weeks passing between the last exposure date and the most recent web update, the web updates did not serve to protect the public and, in fact, led to inaccurate conclusions***. For the reasons outlined below, these web updates do not conform with CDC guidelines, and Office of Management and Budget ("OMB") and Department of Health and Human Services ("HHS") regulations concerning the dissemination of information to the public.
>
> * * *
>
> While the December 4, 2015 web update is arguably the most misleading, there are other web updates that also caused confusion about the true nature of the outbreak. For example, on November 4, 2015, the CDC reported thirty-nine cases of E. coli O26 throughout Washington and Oregon. In rapid succession, the CDC released two updates, on November 5, 2015, and November 6, 2015, that each identified only one new reported case of E. coli O26. Neither the November 5, 2015, nor the November 6, 2015 update informed the public of substantive developments in the E. coli investigation. Again, on November 9, 2015, the CDC reported one additional E. coli O26 case. The remainder of the November 9, 2015 update referenced a case of E. coli O26 in Minnesota with no connection to Chipotle.
>
> In light of these circumstances, Chipotle does not believe the web updates between November 4, 2015, and November 6, 2015 provided the public with information that was clear and useful, as mandated by CDC regulations. Rather, the piecemeal release of information which does not inform the public of investigatory benchmarks

or remedial steps by Chipotle only acts to create public panic. Moreover, it is our belief that most of the general public is not familiar with foodborne illnesses, and the inclusion of an unrelated case in a Chipotle-specific update is confusing.

Similarly, ***on November 20, 2015, the CDC reported six cases of E. coli O26 throughout four additional states. It does not appear that the information provided in this update was useful to the public.*** For over a month, the events of the E. coli O26 outbreak stemming from various Chipotle restaurants have been heavily publicized by national and international news outlets. Furthermore, such information has been widely disseminated through social media outlets, including Facebook and Twitter. ***The November 20, 2015 web update identified only a marginal number of cases within the same E. coli O26 event during the same timeframe as previously reported, and did not provide the public with information of which they were not already aware.***

* * *

The CDC has released adverse information in a way that does not comport with HHS guidelines. Specifically, CDC officials have made misleading and unnecessary comments to the media about matters which relate to an ongoing agency investigation. ***On November 20, 2015, a CDC representative was quoted by a national news outlet as follows***:

> The cause of the outbreak hasn't been determined, but it "probably wasn't meat," Matt Wise, a CDC epidemiologist who is leading the investigation, said in an interview. He noted that a "couple of vegetarians" are among those sickened.
>
> ***"The fact that these outbreaks don't seem to be confined to a geographical region is harmful to the brand," he said. "Chipotle's brand-perception problem has just gone coast to coast."***

See Exhibit B. These comments were made nearly three weeks into the E. coli investigation, and at a time when all affected food was removed from Chipotle restaurants and supply chains. Therefore, there was no impending public health risk which necessitated the statements. Moreover, these comments were not an accurate representation of the status of the investigation. Neither the government agencies, Chipotle, nor any privately retained experts have been able to identify the source of the E. coli. As such, it has not been feasible to rule out any one ingredient as the cause of the outbreak. We believe these remarks were unnecessary and not made in a legitimate attempt to avoid a significant risk to public health or safety.

* * *

Chipotle is not requesting any compensation for damages from the CDC in connection with our request to withhold the web updates. Chipotle is simply asking the CDC to review CDC, HHS, and OMB guidelines to ensure it is in conformance with the same prior to issuing any additional web updates.

> Once again, thank you for allowing us to have this discussion. We value the relationship we have established with the CDC. We would implore the CDC to take into consideration the guidelines and regulations discussed above before issuing additional web updates.

197. In a letter dated April 15, 2016, Jeremy Sobel, the CDC's Associate Director for Epidemiological Sciences, responded to the 12/21/15 Letter and flatly rejected each of the criticisms contained in it. Specifically, the 4/15/16 Letter stated, in pertinent part, that:

> The Centers for Disease Control and Prevention (CDC) is the lead federal agency for protecting the health and safety of people at home and abroad, providing credible information to enhance health decisions and promoting health through strong partnerships. CDC follows guidance as specified in OMB Guidelines for Ensuring and Maximizing the Quality, Objectivity, and Integrity of Information Disseminated by Federal Agencies (*see* http://www.whitehouse.gov/sites/default/files/omb/fedreg/reproducible2.pdf and http://aspe.hhs.gov/infoquality/Guidelines/cdcinfo2.shtml). CDC also follows the Transparency and Open Government Memorandum for Heads of Executive Departments and Agencies, which requires us to take appropriate action, consistent with law and policy, to disclose information rapidly in forms that the public can readily find and use (https://www.whitehouse.gov/the_press_office/TransparencyandOpenGovernment). This guidance was issued to ensure the public trust and establish a system of transparency, public participation, and collaboration.
>
> CDC, the U.S. Food and Drug Administration, the U.S. Department of Agriculture Food Safety and Inspection Service, and public health and regulatory officials in several states investigated two outbreaks of STEC O26 infections. Fifty-five people were infected with the outbreak strain of STEC O26 from eleven states in the initial outbreak. ***The DNA fingerprint of this STEC O26 was extremely rare, providing strong laboratory evidence that the illnesses were all linked to a common contaminated food item.*** Twenty-one ill people were hospitalized. There were no reports of hemolytic uremic syndrome and no deaths. The majority of illnesses were reported from Washington and Oregon during October 2015. ***The epidemiologic evidence available at that time suggests that a common meal item or ingredient served at Chipotle Mexican Grill restaurants in several states was a likely source of this outbreak.*** The investigation did not identify what specific food was linked to illness. Forty-seven (87%) of 54 ill people interviewed reported eating at a Chipotle Mexican Grill restaurant in the week before their illness started. CDC also investigated a second, more recent outbreak of another rare DNA fingerprint of Shiga toxin-producing E. coli O26 (STEC O26) linked to Chipotle Mexican Grill. Because it was not known whether these infections were related to the initial outbreak of STEC O26 infections, these illnesses were not included in the case count for that outbreak. All five (100%) people infected in the second outbreak reported eating at a Chipotle Mexican Grill in the week before illness started. Three ill people ate at a single Chipotle location in Oklahoma and two ill people ate at a single Chipotle location in Kansas. This investigation also did not identify what specific food was

linked to the illnesses. ***On February 1, 2016, CDC posted a final web update declaring that the two outbreaks appeared to be over.***

* * *

In the initial outbreak of 55 cases linked to Chipotle Mexican Grill Restaurants, the case definition is an E. coli O26 infection with isolate matching PFGE pattern EVCX01.1180 reported to PulseNet with an isolation date on or after October 20, 2015. In the second outbreak linked to Chipotle Mexican Grill Restaurants, the case definition is an E. coli O26 infection with isolate matching PFGE pattern EVCX01.0670 with an isolation date on or after November 24, 2015. Reported illness onset dates in these two outbreaks range from October 19, 2015 to December 1, 2015. ***Given that two to three weeks typically pass between when a person becomes ill to when the illness is reported to PulseNet and the most recent illness onset date of December 1, 2015, we disagree that there was "no ongoing threat" at the time of the web postings, particularly since the investigation of these two outbreaks linked to Chipotle Mexican Grill Restaurants has not identified a specific cause. A public health professional would not conclude that transmission had ceased until at least several weeks after the last reported case.***

CDC believes that the web postings served to protect and inform the public as well as inform public health and regulatory partners at the federal, state, and local level about this ongoing outbreak investigation in three ways. First, information provided in these web posting provided people who may have become ill after eating at Chipotle Mexican Grill locations with information they might need to seek diagnosis and treatment for a potentially serious illness (E. coli O26 infection); medical attention would also entail provision of information on measures to prevent secondary transmission of STEC infection to other close contacts such as family members. Second, this information also could assist in identifying additional ill people who might provide critical information essential to determine the specific cause of the outbreak. Third, ***the web postings provided information the public might use to protect themselves by choosing to avoid certain food exposures associated with the outbreak***.

* * *

The November 20, 2015 CDC web posting provided the public as well as public health and regulatory partners in federal, state, and local agencies information regarding the ongoing investigation. This included information on the eight ill people which had been newly identified since the previous posting on November 17, 2015. CDC believes that the web postings served to protect and inform the public as well as inform public health and regulatory partners at federal, state, and local agencies about this ongoing outbreak investigation in three ways. First, information provided in these web posting provided people who may have become ill after eating at Chipotle Mexican Grill locations with information they might need to seek diagnosis and treatment for a potentially serious illness (E. coli O26 infection); medical attention would also entail provision of information on measures to prevent

> secondary transmission of STEC infection to other close contacts such as family members. Second, this information also could assist in identifying additional ill people who might provide critical information essential to determine the specific cause of the outbreak. Third, the web postings provided information the public might use to protect themselves by choosing to avoid certain food exposures associated with the outbreak.
>
> * * *
>
> The first two statements attributed to Dr. Wise are correctly attributed to Dr. Wise and constitute an accurate characterization of the investigation findings to date ("The cause of the outbreak hasn't been determined, but it 'probably wasn't meat,' Matt Wise, a CDC epidemiologist who is leading the investigation, said in an interview. He noted that a 'couple of vegetarians' are among those sickened."). ***As shown on page 1 of Exhibit B in the Information Quality Challenge submitted by Messner Reeves, LLC, the third statement ("The fact that these outbreaks don't seem to be confined to a geographical region is harmful to the brand", he said, "Chipotle's brand-perception problem has just gone coast to coast") is clearly attributed to Asit Sharma, "an Analyst at the Motley Fool" who is not an employee of CDC or any Department of Health and Human Services agency.***
>
> * * *
>
> We hope these explanations answer your concerns. If you wish to appeal this response to your request for a correction, you may send a written hard copy or electronic request for reconsideration within 30 days of receipt of the agency's decision. The appeal must state the reasons why the agency response is insufficient or inadequate.

198. On May 6, 2016, Arnold, Chipotle's Public Relations Director, confirmed that the Company did not plan to appeal the CDC's responses as set forth in the 4/15/16 Letter.

199. Defendants also knew, or recklessly disregarded, that the CDC's investigation was open and ongoing at all relevant times because, as with the July E. coli outbreak, health officials will not publicly disclose a food-borne illness outbreak unless there is an ongoing threat to public health. Moreover, based on their recent experience with health officials and food-borne illness outbreaks, Defendants knew, or recklessly disregarded, that a public health professional would not conclude that transmission had ceased until at least several weeks after the last reported case.

**Defendants Failed to Disclose the Negative Impact Caused by the Numerous Food-Borne Illness Outbreaks Experienced by Chipotle During the Class Period When Reporting Chipotle's 3Q15 Financial Results and Lacked a Reasonable Basis at that Time to Provide Financial Guidance for 4Q15 and FY16**

200. On October 20, 2015, the Company issued a press release over *Business Wire* announcing Chipotle's financial results for 3Q15, a copy of which was also filed on Form 8-K (the "10/20/15 Form 8-K"), which, among other things, provided Chipotle's financial guidance for 4Q15 and fiscal year 2016 ("FY16"), and stated, in pertinent part, that:

> For 2015, management expects the following:
>
> · We are increasing our guidance to 215-225 new restaurant openings, up from the previously announced range of 190-205
>
> · ***Low-to-mid single digit comparable restaurant sales increases***
>
> · An effective full year tax rate of approximately 38.7%
>
> For 2016, management expects the following:
>
> · 220-235 new restaurant openings
>
> · ***Low-single digit comparable restaurant sales increases***
>
> · An effective full year tax rate of approximately 38.7%

201. On the accompanying conference call to explain the 3Q15 financial results contained in the 10/20/15 Form 8-K, which included the participation of the Individual Defendants and also occurred on October 20, 2015 (the "10/20/15 Conference Call"), analysts were surprised that Chipotle had provided conservative guidance for 4Q15 and FY16, and pointedly asked defendant Hartung about the "recent trends" in Chipotle's business and operations, stating, in pertinent part, as follows:

> David Tarantino - Robert W. Baird & Company, Inc. – Analyst: Jack, just a question on how you are viewing the recent trends in your business. And I know you mentioned that August and September were a little slower than July. Do you think you've seen a change in the underlying momentum of the business? Or was that just moreso related to the benefit you saw from the buy-one, get-one-free promotion?

Jack Hartung [CFO]: Well, definitely, David, the reason I wanted to go through the monthly comps is -- July, we benefited; there was a lot of awareness, a lot of people playing the games, a lot of people earning and then redeeming the buy-one-get-one, and that always results in a short-term bump in sales. So I would say that the July moving to September -- or moving to August, was more the hangover effect from Friend or Faux. But we're kind of holding at that lower level, that low-single-digit level.

Some of that also is due to very, very tough comparisons to last year. So I would say we're just holding our own right now. I wouldn't say, after the July bump that we got Friend or Faux, I would say we're just kind of holding our own. I don't think we're accelerating, but we're not -- or we're not decelerating, but I don't see us accelerating either.

* * *

Andrew Charles - Cowen & Company – Analyst: On the same-store sales guidance, it seems low-single-digit for 2016 reflects significant deceleration on a two- and three-year basis. Yes, of course, there's some price that's likely to fall off, but ***what are the other factors driving deceleration***? Or would you say that low-single-digits is a function more of conservatism?

Jack Hartung [CFO]: Well, the way I would think about it, Andrew, is that we just finished a three-year trend -- and I've talked about this on some earlier calls. If you go back and look to 2013, we started a new trend where we started in low-single-digit comps and we built our comp for the next several quarters. We had a price increase in 2014. But if you combine the last three years -- and this is the end of that trend -- our three-year comps are up in the high 27%, 28% range.

We now need to start a new trend, because we started that momentum -- and if you look quarter by quarter to quarter, you can see that the momentum builds for several quarters; it levels off. It peaked last year at 19.8%. And then as you are comparing to multiple years of double-digit comps -- and none of this is based on gimmicks, on promotions, on discounting, or anything like that. It's really just inviting more customers in; they have a great experience; they want to come back.

There's then education that Mark and the team have done, with things like Scarecrow, and things that raise the awareness of where food comes from, why in our food is different. And our customers have been able, during this three-year trend, to connect the dots between why the food they love so much, why it tastes so good -- because it comes from these great ingredients. ***Because the food is prepared using classic cooking techniques***. There's real cooking going on at our restaurants.

And so right now, we're in this challenge where we've got three years of growing our sales by 27%, 28%, and comparing to that is difficult. And so what we're hoping will happen is we'll be able to ignite another trend, another three-year trend. When that will happen, what the order of magnitude of that happening, is very difficult to

predict. But over the last 10, 15 years, Chipotle has seen these kind of waves of comps. And most of it is around creating awareness and appreciation for what we do at Chipotle.

* * *

Karen Short - Deutsche Bank – Analyst: First question just on the fourth-quarter comp guidance, the guidance seems a little light or conservative, in light of the price increases. ***And I know you gave some color on October, but any more color in terms of what the composition of the comp has been so far in October***? And then I just had a follow-up.

Jack Hartung [CFO]: October would be similar, but there's maybe a little bit more menu pricing in October, but not much more. So I would say the makeup of the comp is similar in terms of we're running about a 70 basis point price increase. Maybe that's 80 or 90, something like that. We will gradually get that up to 130. We hope it does prove to be conservative, and maybe it is conservative. But October is so choppy right now, it really isn't giving us any indication of what the current underlying pattern is.

And so, I hope that when we report in January, we'll come back and you all say, you guys were too conservative. But right now with what we saw finishing the quarter, and then what we saw in October being very, very choppy, it's very difficult to read.

202. Rather than disclose the truth, defendant Hartung instead professed ignorance, and merely repeated that October sales had so far been "choppy." Defendant Hartung's failure to fully and accurately disclose: (i) that the Company had switched from processing produce in commissaries to in the restaurants and the risk from this switch that food-borne illness outbreaks could occur and could continue to occur had greatly increased; (ii) that the Company had failed to adequately monitor its food safety programs and establish sufficient related controls and procedures to ensure compliance, thereby greatly increasing the risk that food-borne illness outbreaks could occur and could continue to occur; (iii) these food-borne illness outbreaks; (iv) the impact they had on the Company's operations and financial performance; (v) that, as these outbreaks and additional outbreaks became further publicized, they were reasonably expected to have an increased damaging effect on the Company's operations and financial performance; and (vi) that any investigations into these outbreaks would be lengthy and further negatively impact the Company's operations and

financial performance as Chipotle did not have the capability to quickly identify the contaminated ingredient(s) that caused the food-borne illness(es), were material omissions that rendered his statements on the 10/20/15 Conference Call false and misleading.

203. In addition, Defendants knew that the 4Q15 and FY16 financial guidance in the 10/20/15 Form 8-K was lacking in any reasonable basis because the guidance was not adjusted to reflect these same undisclosed facts.

**Materially False and Misleading Statements and Omissions During the Class Period**

204. The Class Period begins on February 5, 2015. After the close of trading the prior evening, on February 4, 2015, Defendants filed the 2014 Form 10-K, which was signed, and certified under the Sarbanes Oxley Act of 2002 ("SOX"), by the Individual Defendants. The 2014 Form 10-K made incomplete representations concerning the Company's usage of commissaries and susceptibility to food-borne illnesses, stating, in pertinent part, that:

> In preparing our food, we use stoves and grills, pots and pans, cutting knives, wire whisks and other kitchen utensils, walk-in refrigerators stocked with a variety of fresh ingredients, herbs and spices and dry goods such as rice. Ingredients we use include chicken and steak that is marinated and grilled in our restaurants, carnitas (seasoned and braised pork), barbacoa (spicy shredded beef) and vegetarian pinto and black beans. We add our rice, which is tossed with lime juice and freshly chopped cilantro, as well as freshly shredded cheese, sour cream, lettuce, peppers and onions, depending on each customer's request. We use various herbs, spices and seasonings to prepare our meats and vegetables. We also provide a variety of extras such as guacamole, salsas and tortilla chips seasoned with fresh lime juice and kosher salt. In addition to sodas, fruit drinks and organic milk, most of our restaurants also offer a selection of beer and margaritas. ***Our food is prepared from scratch, with the majority prepared in our restaurants while some is prepared with the same fresh ingredients in larger batches in commissaries.***
>
> * * *
>
> Instances of food-borne illnesses, real or perceived, whether at our restaurants or those of our competitors, may subject us to liability to affected customers, and could result in negative publicity about us or the restaurant industry that adversely affects our sales. ***We may be at a higher risk for food-borne illness outbreaks than some competitors due to our use of fresh produce and meats rather than frozen, and our reliance on employees cooking with traditional methods rather than automation.***

> The risk of illnesses associated with our food might also increase in connection with an expansion of our catering business or other situations in which our food is served in conditions we cannot control.

205. The statements referenced above in ¶204 that "some [food] is prepared with the same fresh ingredients in larger batches in commissaries" and that "[w]e may be at a higher risk for food-borne illness outbreaks . . . due to our use of fresh produce and meats rather than frozen[,]" were materially false and misleading when made because the 2014 Form 10-K failed to disclose that the risk associated with Chipotle's produce was even greater following a transition in late 2014 to in-store processing of produce instead of commissary preparation. Switching from commissary processing of produce to in-store processing caused this risk to dramatically increase because it greatly expanded the number of workers handling the produce and the number of surfaces that the produce touched, thereby exponentially increasing the risk of contamination from workers and cross-contamination from the other raw foods prepared in Chipotle's restaurants. As Defendants knew, or recklessly disregarded, for these reasons this switch dramatically increased Chipotle's risk of experiencing food-borne illness outbreaks during the Class Period. Defendants' failure to disclose this increased risk in the 2014 Form 10-K rendered these statements materially false and misleading.

206. Further, the 2014 Form 10-K made representations concerning Chipotle's commitment to food safety, stating, in pertinent part, that:

> ***Quality Assurance and Food Safety***. We are committed to serving safe, high quality food to our customers. Quality and food safety are integrated throughout our supply chain and everything we do; from the farms that supply our food all the way through to our front line. We have established close relationships with some of the top suppliers in the industry, and we actively maintain a limited list of approved suppliers from whom our distributors must purchase. ***Our quality assurance department establishes and monitors our quality and food safety programs for our supply chain***. ***Our training and risk management departments develop and implement operating standards for food quality, preparation, cleanliness and safety in the restaurants.*** Our food safety programs are also designed to ensure that we comply with applicable federal, state and local food safety regulations.

207. The statements referenced above in ¶206 that "[o]ur quality assurance department establishes and monitors our quality and food safety programs for our supply chain" and "[o]ur training and risk management departments develop and implement operating standards for food quality, preparation, cleanliness and safety in the restaurants" were materially false and misleading when made because Defendants failed to disclose that Chipotle's quality assurance department did not adequately monitor Chipotle's food safety programs and there were insufficient controls and procedures in place to ensure that operating standards had been properly implemented and adhered to. Defendants' failure to disclose this risk in the 2014 Form 10-K rendered this statement materially false and misleading.

208. The 2014 Form 10-K further purported to list the known risks of investing in Chipotle common stock. Defendants' failure to disclose the risks listed above in ¶205 and ¶207 also rendered the 2014 Form 10-K materially false and misleading.

209. On April 22, 2015, Defendants filed a Form 10-Q for the fiscal quarter ended March 31, 2015 (the "1Q15 Form 10-Q"), which was signed by defendant Hartung, and certified under SOX by the Individual Defendants. The 1Q15 Form 10-Q provided no update to the Company's risk factors since the filing of the 2014 Form 10-K, stating, in pertinent part, that:

> ITEM 1A. RISK FACTORS
>
> There have been no material changes in our risk factors since our annual report on Form 10-K for the year ended December 31, 2014.

210. The statement referenced above in ¶209 was materially false and misleading when made for failing to disclose the material facts set forth in ¶205 and ¶207 above.

211. On July 22, 2015, Defendants filed a Form 10-Q for the fiscal quarter ended June 30, 2015 (the "2Q15 Form 10-Q"), which was signed by defendant Hartung, and certified under SOX by

the Individual Defendants. The 2Q15 Form 10-Q provided no update to the Company's risk factors since the filing of the 2014 Form 10-K, stating, in pertinent part, that:

> ITEM 1A. RISK FACTORS
>
> There have been no material changes in our risk factors since our annual report on Form 10-K for the year ended December 31, 2014.

212. The statement referenced above in ¶211 was materially false and misleading when made for failing to disclose the material facts set forth in ¶205 and ¶207 above.

213. On October 20, 2015, the Company announced financial guidance for 4Q15 and FY16 in the 10/20/15 Form 8-K, which contained the Company's press release announcing its 3Q15 financial results. The 10/20/15 Form 8-K stated, in pertinent part, that:

> For 2015, management expects the following:
>
> · We are increasing our guidance to 215-225 new restaurant openings, up from the previously announced range of 190-205
>
> · ***Low-to-mid single digit comparable restaurant sales increases***
>
> · An effective full year tax rate of approximately 38.7%
>
> For 2016, management expects the following:
>
> · 220-235 new restaurant openings
>
> · ***Low-single digit comparable restaurant sales increases***
>
> · An effective full year tax rate of approximately 38.7%

214. The provision of comparable restaurant sales guidance, as referenced above in ¶213, was materially false and misleading when made because Defendants did not have a reasonable basis to issue such guidance due to the following material adverse facts existing at the time, which were known by Defendants but not disclosed to investors:

(a) the Company had switched from processing produce in commissaries to in the restaurants and the risk from this switch that food-borne illness outbreaks could occur and could continue to occur had greatly increased;

(b) the Company had failed to adequately monitor its food safety programs and establish sufficient related controls and procedures to ensure compliance, thereby greatly increasing the risk that food-borne illness outbreaks could occur and could continue to occur;

(c) Chipotle had experienced numerous food-borne illness outbreaks;

(d) such outbreaks had negatively impacted the Company's operations and financial performance;

(e) as these outbreaks and additional outbreaks became further publicized, they were reasonably expected to have an increased damaging effect on the Company's operations and financial performance; and

(f) any investigations into these outbreaks would be lengthy and further negatively impact the Company's operations and financial performance as Chipotle did not have the capability to quickly identify the contaminated ingredient(s) that caused the food-borne illness(es).

215. Also, on October 20, 2015, the Company held a conference call to discuss the 3Q15 financial results detailed in the 10/20/15 Form 8-K. On the 10/20/15 Conference Call, defendant Hartung responded to questions from analysts concerned about recent trends in Chipotle's business and operations, and stated, in pertinent part, that:

> David Tarantino - Robert W. Baird & Company, Inc. – Analyst: Jack, just a question on ***how you are viewing the recent trends in your business. And I know you mentioned that August and September were a little slower than July. Do you think you've seen a change in the underlying momentum of the business***? Or was that just moreso related to the benefit you saw from the buy-one, get-one-free promotion?
>
> Jack Hartung [CFO]: Well, definitely, David, the reason I wanted to go through the monthly comps is -- July, we benefited; there was a lot of awareness, a lot of people playing the games, a lot of people earning and then redeeming the buy-one-get-one,

and that always results in a short-term bump in sales. So I would say that the July moving to September -- or moving to August, was more the hangover effect from Friend or Faux. But we're kind of holding at that lower level, that low-single-digit level.

Some of that also is due to very, very tough comparisons to last year. So I would say we're just holding our own right now. I wouldn't say, after the July bump that we got Friend or Faux, I would say we're just kind of holding our own. I don't think we're accelerating, but we're not -- or we're not decelerating, but I don't see us accelerating either.

* * *

Andrew Charles - Cowen & Company – Analyst: On the same-store sales guidance, it seems low-single-digit for 2016 reflects significant deceleration on a two- and three-year basis. Yes, of course, there's some price that's likely to fall off, but ***what are the other factors driving deceleration***? Or would you say that low-single-digits is a function more of conservatism?

Jack Hartung [CFO]: Well, the way I would think about it, Andrew, is that we just finished a three-year trend -- and I've talked about this on some earlier calls. If you go back and look to 2013, we started a new trend where we started in low-single-digit comps and we built our comp for the next several quarters. We had a price increase in 2014. But if you combine the last three years -- and this is the end of that trend -- our three-year comps are up in the high 27%, 28% range.

We now need to start a new trend, because we started that momentum -- and if you look quarter by quarter to quarter, you can see that the momentum builds for several quarters; it levels off. It peaked last year at 19.8%. And then as you are comparing to multiple years of double-digit comps -- and none of this is based on gimmicks, on promotions, on discounting, or anything like that. It's really just inviting more customers in; they have a great experience; they want to come back.

There's then education that Mark and the team have done, with things like Scarecrow, and things that raise the awareness of where food comes from, why in our food is different. And our customers have been able, during this three-year trend, to connect the dots between why the food they love so much, why it tastes so good -- because it comes from these great ingredients. Because the food is prepared using classic cooking techniques. There's real cooking going on at our restaurants.

And so right now, we're in this challenge where we've got three years of growing our sales by 27%, 28%, and comparing to that is difficult. And so what we're hoping will happen is we'll be able to ignite another trend, another three-year trend. When that will happen, what the order of magnitude of that happening, is very difficult to predict. But over the last 10, 15 years, Chipotle has seen these kind of waves of comps. And most of it is around creating awareness and appreciation for what we do at Chipotle.

* * *

> Karen Short - Deutsche Bank – Analyst: First question just on the fourth-quarter comp guidance, the guidance seems a little light or conservative, in light of the price increases. ***And I know you gave some color on October, but any more color in terms of what the composition of the comp has been so far in October? And then I just had a follow-up***.
>
> Jack Hartung [CFO]: October would be similar, but there's maybe a little bit more menu pricing in October, but not much more. So I would say the makeup of the comp is similar in terms of we're running about a 70 basis point price increase. Maybe that's 80 or 90, something like that. We will gradually get that up to 130. We hope it does prove to be conservative, and maybe it is conservative. But October is so choppy right now, it really isn't giving us any indication of what the current underlying pattern is.
>
> And so, I hope that when we report in January, we'll come back and you all say, you guys were too conservative. But right now with what we saw finishing the quarter, and then what we saw in October being very, very choppy, it's very difficult to read.

216. Defendant Hartung's statements referenced above in ¶215 were materially false and misleading when made because defendant Hartung failed to disclose the material facts set forth in ¶214 above.

217. On October 21, 2015, Defendants filed a Form 10-Q for the fiscal quarter ended September 30, 2015 (the "3Q15 Form 10-Q"), which was signed by defendant Hartung, and certified under SOX by the Individual Defendants. The 3Q15 Form 10-Q provided no update to the Company's risk factors since the filing of the 2014 Form 10-K, stating, in pertinent part, that:

> ITEM 1A. RISK FACTORS
>
> There have been no material changes in our risk factors since our annual report on Form 10-K for the year ended December 31, 2014.

218. The statement referenced above in ¶217 was materially false and misleading when made for failing to disclose the material facts set forth in ¶214 above.

219. On Saturday, October 31, 2015, Chipotle closed 43 restaurants in Washington and Oregon as news of the October E. coli outbreak first began being publicly reported. In response to

Chipotle's closure of these locations and the revelation that Chipotle was experiencing yet another food-borne illness outbreak in as many months, the price of Chipotle common stock plummeted from $640.23 per share on October 30, 2015 to open at $610.00 per share on November 2, 2015, the next trading day – a decline of approximately $30.23 per share, or approximately 4.7%, on heavy trading volume. Chipotle common stock, however, remained artificially inflated as a result of false and misleading statements and material omissions by Defendants during the Class Period.

220. On November 10, 2015, amidst the October E. coli outbreak, the Company issued a press release providing an update on this outbreak. In the 11/10/15 Press Release, Chipotle stated, in pertinent part, that "[h]ealth officials have concluded that there is no ongoing risk from this incident[,]" and that there was "no ongoing threat" related to the October E. coli outbreak.

221. The statements referenced above in ¶220 were materially false and misleading when made because they misrepresented or failed to disclose the following facts, which were known or recklessly disregarded by Defendants:

(a) that the CDC and state and local investigations into the October E. coli outbreak remained open and ongoing at this time and all relevant times thereafter; and

(b) by virtue of these investigations remaining ongoing, health officials, especially the CDC, believed that there was an ongoing risk and/or threat from this outbreak.

**Chipotle Admits the CDC's Investigation into the October E. Coli Outbreak Is Ongoing and Implements a Remediation Plan Consisting of New Food Safety Practices**

*222.* On November 20, 2015, the CDC issued the 11/20/15 CDC Update, reporting for the first time that, in addition to the Washington and Oregon cases, the October E. coli outbreak has been linked to Chipotle customers in California, New York, Ohio and Minnesota as well, and stating, in pertinent part, that the "CDC and state and local public health partners are ***continuing laboratory***

***surveillance*** through PulseNet to identify additional ill persons and to interview them" and further that:

> The epidemiologic evidence available to investigators at this time suggests that a meal item or ingredient served at Chipotle Mexican Grill restaurants at several states is a likely source of this outbreak. The investigation has not identified what specific food is linked to illness. Chipotle Mexican Grill is assisting public health officials with understanding the distribution of food items served at locations where ill people ate and ***this work is ongoing.***

223. That same day, Chipotle issued the 11/20/15 Press Release in response to the 11/20/15 CDC Update. The 11/20/15 Press Release removed any mention of health officials concluding that there is "no ongoing risk" or "threat" from this outbreak, and did not dispute that the October E. coli outbreak had spread to four additional states beyond Washington and Oregon.

224. In response to the news during the trading day on November 20, 2015 that the CDC's investigation remained ongoing and that the October E. coli outbreak had spread to additional states, the price of Chipotle common stock declined $75.81 per share, or approximately 12.4%, from an opening price of $612.00 per share before the commencement of trading on November 20 to a closing price of $536.19 per share at the close of trading that day. Chipotle common stock, however, remained artificially inflated as a result of false and misleading statements and material omissions by Defendants during the Class Period.

225. On December 4, 2015, Chipotle issued the 12/4/15 Press Release, which began to disclose parts of the remediation plan that Chipotle agreed to implement in response to its numerous food-borne illness outbreaks during the Class Period. The 12/4/15 Press Release states, in pertinent part, that:

> DENVER--(BUSINESS WIRE)--Dec. 4, 2015-- Chipotle Mexican Grill (NYSE:CMG) has taken aggressive actions to implement industry-leading food safety and food handling practices in all of its restaurants and throughout its supply chain. Its enhanced food safety program will establish Chipotle at the forefront of food safety protocols in the restaurant industry.

"While Chipotle's food safety practices were already well within industry norms***, I was asked to design a more robust food safety program to ensure the highest level of safety and the best quality of all meals served at Chipotle," said Mansour Samadpour, Ph.D., CEO of IEH Laboratories and Consulting Group. "I am happy to report that our proposed program was adopted in its entirety, without any modification.*** While it is never possible to completely eliminate all risk, this program eliminates or mitigates risk to a level near zero, and will establish Chipotle as the industry leader in this area."

***Work on Chipotle's enhanced food safety program began immediately after reports surfaced at the end of October that linked 11 Chipotle locations in Washington and Oregon to E. coli cases in those states.*** Even though there is no evidence of exposures after the period of October 13 to November 7, and no new illnesses have occurred since then, ***officials at the Centers for Disease Control and Prevention have indicated that additional cases may yet be reported as cases make their way through various state health departments to the federal health officials***.

Specifically, Chipotle has set an objective to achieve the highest level of safety possible. The company retained Seattle-based IEH Laboratories to help it identify opportunities to enhance food safety practices throughout its operations – from the farms that supply its food to its restaurants that prepare and serve it.

Chipotle's enhanced food safety program is the product of a comprehensive reassessment of its food safety practices conducted with IEH Laboratories that included a farm-to-fork assessment of each ingredient Chipotle uses with an eye toward establishing the highest standards for safety. Specifically, program components include:

• Implementing high-resolution testing of all fresh produce in which a series of DNA-based tests will ensure the quality and safety of ingredients before they are shipped to restaurants, a testing program that far exceeds requirements of state and federal regulatory agencies, as well as industry standards.

• Initiating end-of-shelf-life testing where ingredient samples will be tested to ensure that quality specifications are maintained throughout the shelf life of an ingredient.

• Pursuing continuous improvements throughout its supply chain using data from test results to enhance the ability to measure the performance of its vendors and suppliers.

• ***Enhancing internal training to ensure that all employees thoroughly understand the company's high standards for food safety and food handling***.

Thousands of food sample tests from Chipotle restaurants linked to the incident have shown no E. coli. No ingredients that are likely to have been connected to this incident remain in Chipotle's restaurants or in its supply system. No Chipotle employees have been identified as having E. coli since this incident began.

> "When I opened the first Chipotle 22 years ago, I offered a focused menu of just a few things made with fresh ingredients and prepared using classic cooking techniques," said Steve Ells, chairman and co-CEO of Chipotle. "We do the same thing today, even with nearly 2,000 restaurants, and we are working harder than ever to ensure that our food is safe and delicious."

226. In response to the Company's announcement on December 4, 2015, made before the open of trading that day, the price of Chipotle common stock declined $6.42 per share, or approximately 1.13%, from a close of $565.31 per share on December 3, 2015, to an opening price of $558.89 on December 4, 2015. Chipotle common stock, however, remained artificially inflated as a result of false and misleading statements and material omissions made by Defendants during the Class Period.

227. After the close of trading on December 4, 2015, the Company filed the 12/4/15 Form 8-K, detailing for the first time the significant negative impact these adverse events were having on the Company's operations and financial performance, and also announcing that the Company was withdrawing its FY16 financial guidance. The 12/4/15 Form 8-K further stated, in pertinent part, that:

> This report is filed to provide an update regarding the impact of the recent E. coli incident associated with Chipotle Mexican Grill restaurants. The incident has had an adverse impact on financial and operating results thus far during the fourth quarter of 2015.
>
> This report is also filed to announce that our Board of Directors has authorized additional repurchases of Chipotle common stock, with a total aggregate purchase price of $300 million, exclusive of commissions.
>
> E. coli Incident Impact
>
> ***If recent sales trends continue (as discussed below), we anticipate for the fourth quarter 2015:***
>
> · ***Comparable restaurant sales to be in a range of -8% to -11% (negative)***
>
> · Non-recurring expenses during the fourth quarter of 2015 in the range of $6.0 to $8.0 million

· The estimate of non-recurring expenses includes costs to replace food in select restaurants, lab analysis of food samples and environmental swabs, and retaining expert advisory services related to epidemiology and food safety; it does not include any estimate for legal claims and related expenses.

· Restaurant level operating margins of 22% to 24%

· Diluted earnings per share in the range of $2.45 to $2.85

· No impact to anticipated new restaurant openings during the fourth quarter of 2015

***We are also rescinding our previously-announced 2016 outlook for comparable restaurant sales increases.*** In light of recent sales trends and additional uncertainty related to the E. coli incident, we cannot reasonably estimate 2016 comparable restaurant sales at this time.

Sales Trend Detail

Sales trends during the quarter so far have been extremely volatile. October comparable restaurant sales were positive in the low-single digit range. When we announced the closure of 43 restaurants on November 3, company-wide comparable restaurant sales dropped for the ensuing few days to approximately -20%. The severity of the national impact was temporary, and when we announced the re-opening of restaurants in Oregon and Washington on November 10, 2015, comparable restaurant sales over the next several days quickly improved to approximately -9%. On November 20, 2015 the U.S. Centers for Disease Control and Prevention (CDC) announced four additional cases linked to the same E. coli incident; following this announcement and related negative publicity, daily comparable restaurant sales trended down to approximately -22%. Over the past five days, comparable sales have gradually improved to an average of approximately -16%. For the full month of November, comparable restaurant sales were -16%.

If these sales trends continue, we believe comparable restaurant sales could be in a range of -8% to -11% for the three month period ending December 31, 2015. Future sales trends may be significantly influenced by further developments, including potential additional announcements from federal and state health authorities.

Food Safety Commitment

As a restaurant company, nothing is more important to us than serving our guests food that is delicious and safe to eat. Since this incident began, we have significantly increased our efforts to ensure that our teams are adhering to all of our food safety protocols, reassessed all facets of our food safety programs — from the farms that provide the ingredients we use, to the restaurants where we serve our customers — and made a number of improvements to help ensure that our food is as safe as it can be. Among the new or enhanced programs we have put in place include high-resolution testing where a series of DNA-based tests ensure the quality and safety of ingredients before they are shipped, end-of-shelf-life testing to be sure quality

> specifications are maintained throughout the shelf life of an ingredient, continuous improvement throughout our supply chain based on test results, and ***enhanced internal training to ensure that our teams understand and adhere to all of our food safety standards***. Collectively, we believe these changes will put us at the forefront of the restaurant industry in terms of food safety practices. No Chipotle employees have been identified as having E. coli at any time during this incident, and we continue to serve more than 1 million customers on a daily basis.

228. In response to the Company's announcement on December 4, 2015, made after the close of trading that day, the price of Chipotle common stock declined $44.37 per share, or approximately 7.9%, from a close of $561.20 per share before the announcement, to an opening price of $516.83 per share on Monday, December 7, 2015. Chipotle common stock, however, remained artificially inflated as a result of false and misleading statements and material omissions made by Defendants during the Class Period.

229. After the close of trading on December 7, 2015, news reports began to surface detailing the December Norovirus outbreak. In response to this news, the price of Chipotle common stock declined $19.64 per share, or approximately 3.6%, from a close of $551.75 per share on December 7, to an opening price of $532.11 per share on December 8, 2015. Chipotle common stock, however, remained artificially inflated as a result of false and misleading statements and material omissions by Defendants during the Class Period.

230. On December 8, 2015, the Individual Defendants participated in the 12/8/15 Conference and provided an update on the Company's remediation efforts, including that the Company immediately switched back to processing tomatoes, cilantro and romaine lettuce in a commissary once the October E. coli outbreak began, and quantified the financial impact of the Company's remediation efforts, stating, in pertinent part, that:

> Steve Ells [Co-CEO]: But we immediately took action after the outbreak in the Pacific Northwest by closing many restaurants in that area in an abundance of caution, but then system-wide made some changes, specifically to some produce items that could have been suspect, that were suspect.

***We immediately started dicing our tomatoes in a commissary, so that they could go through a sanitizing kill step and then hermetically sealed in containers and delivered to the restaurants. We found it impossible that we could test every tomato coming into the restaurants. So we went with an abundance of caution to make sure that we're testing that way. A similar protocol for cilantro, where the amount of testing assures that there are no pathogens coming into the restaurant.***

* * *

Jack Hartung [CFO]: It's going to cost money. It's going to be an investment. It's going to be a significant investment. We're not going be very efficient at doing this right now. What's most important is that we get this done, that food safety is the most important thing that we focus on right now, and we've got to act with a sense of urgency, which is what we're doing, to get it done.

That means we'll probably do it inefficiently. Any time you don't debate the efficiencies, any time you don't debate the different alternatives – ***we're going fast with Dr. Samadpour's recommendations. So it's likely when it's all said and done we're going to have really safe food and the investment's probably going to be outsized.***

And what we will do at that point is then take a look and say -- okay, our food is safe now. Let's look at how we're doing it. Let's look at how we're doing it at the supplier, what procedures we're changing in the restaurants, and then we can go back and circle back and look at efficiencies.

I think over time our model will still be the strongest model in the restaurant industry. We might have to take future menu price increases. ***And instead of investing that in food integrity we might have to invest that in food safety***. And we're willing to do that.

* * *

Steve Ells [Co-CEO]: ***Well, cilantro and tomatoes were pointed out as high-risk items. And so those were definitely on our radar screens right away and we took action on those, even though we didn't know that that was necessarily the cause, they were flagged.***

***Lettuce was also identified as a high-risk item.*** And so we're going to use that same process to ensure that the lettuce is free of microbes, through the same washing and bagging process.

Corn also goes through this. Corn is also a very limited harvest window in the late summer. And so we IQF all our corn. We've been doing this since our inception 22 years ago. So it comes from a very short harvest period and it's individually quick-frozen. And that's heavily, heavily tested and always has been. And that has not been a suspect.

> There are some things, though, that we'll continue to bring in whole into the restaurants -- avocados, jalapenos, things like this.
>
> Monty Moran [Co-CEO]: But just to be real clear, the ingredients that Steve just mentioned are not ingredients that we have -- we have not narrowed it down to say those are the likely ingredients. When Steve said those are higher-risk ingredients, he means those are just higher-risk ingredients generally speaking, not in this case, not because of this case, just generally higher-risk ingredients that we -- because they are such, were ones that we were quick to take action on.
>
> ***Romaine lettuce is another example of another one that we're taking action to change the way we bring that into the restaurants, so that it's washed in a similar way that Steve suggested and then brought into our restaurants having been already washed and tested.***

231. On December 21, 2015, Messner & Reeves sent the 12/21/15 Letter on behalf of the Company to the CDC to formally protest the web updates issued by the CDC in connection with its three month investigation into the October E. coli outbreak.

232. Also on December 21, 2015, the CDC provided the 12/21/15 CDC Update, which included an update on the October E. coli outbreak and publicly disclosed, for the first time, the existence of the November E. coli outbreak.

233. In response to the news of the existence of the November E. coli outbreak, the price of Chipotle common stock declined $22.24 per share, or approximately 4.1%, from a close of $544.25 per share at the open of trading on December 21, to a closing price of $522.01 per share that same day. Chipotle common stock, however, remained artificially inflated as a result of false and misleading statements and material omissions by Defendants during the Class Period.

**The Company Receives a Criminal Subpoena Relating to the August Norovirus Outbreak in California**

234. The Class Period ends on January 5, 2016. The next day the Company filed the 1/6/16 Form 8-K, which, among other things, disclosed, for the first time, that the U.S. Attorney's Office for the Central District of California had served a criminal subpoena on the Company relating to the August Norovirus outbreak in California.

235. In response to this news, issued before the opening of trading on January 6, 2016, the price of Chipotle common stock declined $11.09 per share, or approximately 2.5%, from a close of $449.03 per share on January 5, 2016, to an opening price of $437.94 per share on January 6, 2016.

236. The market for Chipotle common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions as set forth above, Chipotle common stock traded at artificially inflated prices during the Class Period. Lead Plaintiffs and other members of the Class purchased or otherwise acquired Chipotle common stock relying upon the integrity of the market price of Chipotle stock and market information relating to Chipotle, and have been damaged thereby.

237. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Chipotle common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business, prospects and operations, as alleged herein.

238. At all relevant times, the material misrepresentations and omissions particularized in this Amended Complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Lead Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Chipotle's business, prospects, and operations. These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of Chipotle and its business, prospects, and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.

Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing Chipotle common stock at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the inflation in the price of Chipotle common stock was removed and the price of Chipotle common stock declined dramatically, causing losses to Lead Plaintiffs and the other members of the Class.

**Post Class Period Events**

239. On January 13, 2016, defendant Ells participated at the 1/13/16 Conference and further discussed the Company's switch back to processing produce in a central commissary, stating, in pertinent part, that:

> Steve Ells [Co-CEO]: ***A couple of important things, though, we are doing to ensure the risk of bringing in any microbe would be near zero, would be with tomatoes and lettuce, in particular, on the produce side. Those would be in central kitchens.***
>
> ***For years though we were dicing our tomatoes in a central kitchen. It was only for the last couple years that we brought them back in-house to dice. But you are not able to do the high-resolution testing in the restaurant, so that's why back into the central kitchen.***
>
> ***The other item that we think is important to do in the central kitchen is lettuce***, but you can think of this as you would think about lettuce in your grocery store. You see very nice washed and trimmed and prepared lettuces that are triple washed in those nice little packages. ***Well, that's kind of what we're going to be doing with our Romaine lettuce***.
>
> It's still the same Romaine lettuce. ***We'll shred it in the central kitchen and wash it***; do this high resolution testing. Then dry it and package it and off to the restaurant it will go, and I think it will be very, very high quality. It's not going to be any dramatic change for our customers.
>
> * * *
>
> Steve Ells [Co-CEO]: ***It's our desire to be as in front of food safety as we are in front of sourcing great ingredients, like food with integrity***.

240. On January 19, 2016, the Company issued the 1/19/16 Press Release and further detailed the Company's remediation efforts, including that Chipotle would be implementing enhanced food safety practices, and disclosed that the Company would be having a national employee meeting on February 8, 2016 to discuss food safety, stating, in pertinent part, that:

> DENVER--(BUSINESS WIRE)--Jan. 19, 2016-- Chipotle Mexican Grill (NYSE:CMG) will host a national employee meeting on February 8, to thank employees for their extraordinary work implementing Chipotle's ***comprehensive new food safety programs*** in their restaurants, as well as outlining for all employees the steps that have been taken outside the restaurants to make Chipotle ingredients safer than ever. The company will also share information as to what may have caused some customers to become ill in 2015.
>
> "Over the last few months, we have been implementing an enhanced food safety plan that will establish Chipotle as an industry leader in food safety," said Steve Ells, founder, chairman and co-CEO of Chipotle. "Most of the new protocols are already in place, thanks to the hard work and dedication [of] our excellent restaurant teams. Additionally, we have implemented unprecedented food safety standards with our suppliers, which make the food coming into our restaurants safer than ever before."
>
> ***Chipotle's enhanced food safety program is the product of a comprehensive reassessment of its food safety practices conducted with industry leading experts*** that included a farm-to-fork assessment of each ingredient Chipotle uses with an eye toward establishing the highest standards for safety. ***The program's many components include:***
>
> • High-resolution DNA-based testing of many ingredients designed to ensure the quality and safety of ingredients before they are shipped to restaurants -- a testing program that far exceeds requirements of state and federal regulatory agencies, as well as industry standards.
>
> • ***Changes to food prep and food handling practices, including washing and cutting of some produce items (such as tomatoes and romaine lettuce) and shredding cheese in central kitchens, blanching of some produce items (including avocados, onions and limes) in its restaurants, and new protocols for marinating chicken and steak.***
>
> • Enhanced internal training to ensure that all employees thoroughly understand the company's high standards for food safety and food handling.
>
> • Paid sick leave helping to ensure that ill employees have no incentive to work while ill.

> The meeting will be broadcast live from Denver to hundreds of locations across the country. In order to allow all employees to attend, the company will be closing its restaurants for lunch that day. The restaurants will reopen nationally at 3:00 PM.
>
> "Chipotle is an established leader in our use of high quality ingredients – ingredients like Responsibly Raised™ meats, local and organically grown produce and pasture-raised dairy – and preparing our food using classic cooking techniques," said Ells. "Now, we are working to establish the company as the leader in food safety as well. Our employees will play a critical role in helping us achieve this goal and we want them to know how much we appreciate their dedication to this critical mission."

241. On January 28, 2016, Chipotle was served with a subpoena broadening the scope of the investigation by the U.S. Attorney's Office for the Central District of California. This subpoena superseded the previously served subpoena that was first disclosed on January 6, and required Chipotle to produce documents and information relating to Chipotle's food safety practices dating back to January 1, 2013.[6] Chipotle has agreed to fully cooperate in this investigation.

242. On February 2, 2016, Chipotle filed the 2/2/16 Form 8-K, which included a press release announcing the Company's 4Q15 and FY15 financial results, and disclosed, for the first time, the second subpoena, stating, in pertinent part, that:

> On January 28, 2016, Chipotle was served with a subpoena broadening the scope of the previously-announced criminal investigation by the U.S. Attorney's office for the Central District of California. ***The new subpoena requires us to produce documents and information related to company-wide food safety matters dating back to January 1, 2013, and supersedes the subpoena served in December 2015 that was limited to a single Chipotle restaurant in Simi Valley, California.*** We intend to fully cooperate in the investigation.

243. On February 2, 2016, Chipotle held a conference call to discuss the 2/2/16 Form 8-K (the "2/2/16 Conference Call"). The Individual Defendants participated on the 2/2/16 Conference Call, and the Individual Defendants stated, in pertinent part, that:

---

[6] In the event that the U.S. Attorney's Office's investigation results in information that supports Lead Plaintiffs' allegations or broadens the scope of this Amended Complaint, Lead Plaintiffs respectfully request permission to amend this Amended Complaint pursuant to Federal Rules of Civil Procedure 15(a) within a reasonable period of time after such disclosure to include any such relevant information.

Steve Ells [Co-CEO]: To achieve our goal of establishing Chipotle as a leader in food safety, ***we have completed a comprehensive reassessment of our supply chain and restaurant practices***, from the farms and ranches that supply our ingredients to the restaurants where we are serving customers, to evaluate each and every ingredient. ***The objective of this food safety system is that we will reduce the risk of something like this happening again in our restaurants to as near to zero as possible.***

In developing this plan, we established testing and safety protocols that go well beyond industry standard to ensure the quality and safety of all of our ingredients. The plan is designed to prevent unsafe food from ever entering our restaurants through the use of extensive testing and through washing in central kitchens. And even in the unlikely event that some pathogen still find its way into our restaurants, ***we have improved our restaurant procedures to provide additional protection to prevent contamination of our food.***

Among the specific components of this enhanced food safety system and plan are high-resolution DNA-based testing of fresh produce and meats to identify harmful bacteria in these ingredients before they enter our supply. Under this testing protocol, a batch of any ingredient that does not meet our testing standards will be rejected well before it reaches our restaurants. These testing programs will allow us to continually improve our supply chain.

Second, ***we have also added important changes to food handling and food preparation procedures, including preparing tomatoes, lettuce, and bell peppers in a central kitchen*** and blanching certain produce items, including avocados, onions, jalapenos, and citrus, in our restaurants before they are used; and a new procedure for marinating chicken and steak, which now happens distinct from and after the preparation of other fresh items. We are also marinating chopped onions, jalapenos, and cilantro in citrus juice when we make salsas and guacamole. This process brings out more flavor from these ingredients and adds another measure of food safety.

And third, ***we have an enhanced crew training program to be sure all of our teams understand all of the facets of our new food safety program. Through education about foodborne illness and explaining why we have made these changes, we can assure that we are empowering our employees to carry out all of these new protocols***.

While individual elements of this food safety program stand on their own as risk mitigation steps, it is the combination of multiple layers of mitigation that provide us a high level of confidence in our food safety enhancements. The comprehensive nature of these enhancements is designed not only to address our ingredients and preparation procedures, but also to offer redundancies that will improve food safety and help Chipotle become an industry standard in this area.

* * *

> Jack Hartung [CFO]: ***Our margins and EPS results will continue to be negatively affected by three main forces during this recovery.*** Those three forces include, one, deleverage from lower sales; two, increased discretionary costs, such as marketing and promotional costs, as well as higher labor as we staff to welcome customers back; ***and three, ongoing costs to support our newly designed food safety program.***
>
> * * *
>
> Monty Moran [Co-CEO]: Yes, David, there is not much to say at this point about the investigation because we just don't know tremendously much about it. ***But basically, there is a statute in California dealing with, essentially, selling adultered food or selling food that can be harmful. And because of that statute, the United States Attorney for the Central District of California has opted to undertake an investigation***, and obviously, we are cooperating with that investigation, providing all the documents that they would like to look at. And I think they're just wanting to make sure that everything we did was on the up and up, and I think that, obviously, we are confident that at the close of such an investigation, that is what they found. ***And I'm sorry, it is a federal statute under which that investigation is taking place.***

244. On February 5, 2016, Chipotle filed the 2015 Form 10-K which, among other things, included pages of new information and risk disclosures pertaining to Chipotle's food safety practices, the risk of Chipotle experiencing food-borne illness outbreaks, Chipotle's food safety remediation efforts, and the fallout from the seven food-borne illness outbreaks that the Company experienced during the Class Period. The 2015 Form 10-K states, in pertinent part, that:

> While our food safety programs have always been carefully designed and have been in conformance with applicable industry standards, in response to food safety incidents during 2015 that impacted hundreds of customers we have recently undertaken a comprehensive assessment of our food safety programs and practices. Using the assistance of highly respected experts we performed a review of the ingredients we use, with a goal of designing an industry-leading food safety program. ***Components of the new program include*** DNA-based testing of many ingredients designed to ensure the quality and safety of ingredients before they are shipped to our restaurants, changes to food preparation and food handling practices, ***including washing and cutting some produce items (such as tomatoes and romaine lettuce) in central kitchens,*** blanching of some produce items (including avocados, onions, jalapenos and citrus) in our restaurants before cutting them, and new protocols for marinating meats. We are also working to enhance our internal controls surrounding food safety by utilizing the Food and Drug Administration's Hazard Analysis Critical Control Point (HACCP) management system. Additionally, ***we are focused on internal training programs to ensure that all employees thoroughly understand our high standards for food safety and food handling***, and we offer paid sick leave to employees to reduce incentives for employees to work while sick. ***These and other***

***enhancements underscore our commitment to becoming a leader in food safety while we continue to serve high quality food that our customers love.***

* * *

Additionally, ***some of the enhanced food safety procedures we have introduced or may introduce in the future rely on increased use of centralized food preparation***, additional in-restaurant preparation steps, or new ingredients, some or all of which may be inconsistent with previous customer perceptions of our restaurant operations. To the extent customers perceive any of these developments as a move away from our Food With Integrity strategy and/or towards a more traditional fast food experience, our ability to win back customers may be adversely impacted and our sales may decline or recover more slowly than they otherwise would have.

* * *

We are facing ongoing government investigations into the food safety incidents that occurred in 2015, including the criminal investigation described in Note 10. "Commitments and Contingencies" in our consolidated financial statements included in Item 8. "Financial Statements and Supplementary Data." We also have received numerous claims from customers who were or claim to have been impacted by these incidents, and a number of those claimants have filed lawsuits against us. ***We are cooperating in the government investigations and with many of the customers impacted by these incidents, but will incur significant legal and other costs in doing so.*** We have also been sued in a shareholder class action lawsuit in connection with the decline in our stock price in the wake of the food safety incidents, and defending this lawsuit will subject us to significant legal expense. Additionally, the liabilities from customer claims and related litigation expenses may be greater than we anticipate due to the uncertainties inherent in litigation. All of these costs, liabilities and expenses will negatively impact our operating results. Moreover, publicity regarding any legal proceedings related to food safety incidents may increase or prolong consumer awareness of the incidents or otherwise negatively impact perceptions of our brand, which may hamper our ability to regain lost sales or attract new customers to our restaurants.

* * *

***Because of customer perceptions about our restaurants and brand in the wake of the food safety incidents described above, any future occurrence of food-borne illness associated with our restaurants would likely have an even more significant negative impact on our sales and our ability to regain customers***. Although we have followed industry standard food safety protocols in the past and are further enhancing our food safety procedures to ensure that our food is as safe as it can be, we may still be at a higher risk for food-borne illness occurrences than some competitors due to our greater use of fresh, unprocessed produce and meats, our reliance on employees cooking with traditional methods rather than automation, and our avoiding frozen ingredients. And in any event, no food safety protocols can

completely eliminate the risk of food-borne illness in any restaurant, so our enhanced food safety protocols may not be successful in preventing a food-borne illness incident in the future. The risk of illnesses associated with our food might also increase in connection with an expansion of our catering business or other situations in which our food is served in conditions we cannot control. Even if food-borne illnesses arise from conditions outside of our control, the negative impact from any such illnesses is likely to be significant.

* * *

Beginning in the fourth quarter of 2015, significant publicity regarding a number of food-borne illness incidents associated with Chipotle restaurants in as many as 15 states had a severe adverse impact on our sales and profitability. As a result of these incidents, comparable restaurant sales declined 14.6% for the fourth quarter of 2015, including a decline of 30% for the month of December, and the decline worsened to over 36% in January 2016. Comparable restaurant sales represent the change in period-over-period sales for restaurants beginning in their 13th full calendar month of operation. ***We anticipate some improvement in sales trends as a result of the announcement on February 1, 2016 by the U.S. Centers for Disease Control and Prevention that it has closed its investigation into the E. coli incidents that first led to the significant decline in our comparable restaurant sales.*** However, due to the uncertainties created by the food-borne illness incidents, we are unable to provide estimates of any future movements in comparable restaurant sales. We plan to increase marketing and promotional spending considerably during the first half of 2016, including significant use of free and discounted food promotions, in an effort to attract customers back to our restaurants and reverse negative sales trends.

In addition to the impact on sales, the food-borne illness incidents resulted in non-recurring expenses in the fourth quarter of 2015 of approximately $16.0 million, which includes food waste, impairment charges for kitchen equipment that will no longer be used, insurance claim estimates, increased marketing expenses, lab analysis of food samples and environmental swabs, and retaining expert advisory services related to epidemiology and food safety.

***As part of our response to the food-borne illness incidents, we are implementing enhanced food safety procedures in our supply chain and restaurants that we expect to increase our food costs as a percentage of revenue***. Some of these changes are expected to result in fewer labor hours being required in our restaurants, but we do not expect to see the benefit until free and discounted food promotions return to normal levels. We expect the ongoing net impact of the enhanced food safety procedures on our food and labor costs as a percentage of revenue to be approximately 2% when fully implemented and after our operations are normalized. Additionally, we expect that our restaurant operating costs as a percentage of revenue will continue to be significantly impacted due to expected lower average restaurant sales, as well as increased costs to support marketing initiatives. As a result of the sales impact from the food-borne illness incidents and the additional costs described

> above, we believe that our net income will be at approximately break-even levels in the first quarter of 2016.
>
> * * *
>
> In December 2015, the Company was served with a Federal Grand Jury Subpoena from the U.S. District Court for the Central District of California in connection with an official criminal investigation being conducted by the U.S. Attorney's Office for the Central District of California, in conjunction with the U.S. Food and Drug Administration's Office of Criminal Investigations. The subpoena required the Company to produce a broad range of documents related to a Chipotle restaurant in Simi Valley, California, that experienced an isolated norovirus incident during August 2015. ***On January 28, 2016, the Company was served with an additional subpoena broadening the investigation and requiring the production of documents and information related to company-wide food safety matters dating back to January 1, 2013. The Company has been informed that this subpoena supersedes the subpoena served in December 2015, which has been withdrawn.*** The Company intends to fully cooperate in the investigation. It is not possible at this time to determine whether the Company will incur, or to reasonably estimate the amount of, any fines or penalties in connection with the investigation pursuant to which the subpoena was issued.

245. On February 8, 2016, Chipotle closed all of its restaurants and held a food safety symposium for all of its employees.

246. On March 15, 2016, Chipotle filed a report on Form 8-K (the "3/15/16 Form 8-K") which, among other things, disclosed that, as part of the Company's remediation efforts, it had hired Dr. James Marsden as Executive Director of Food Safety at Chipotle. The 3/15/16 Form 8-K stated, in pertinent part, that:

> Chipotle Hires Food Safety Expert
>
> This report is also filed to announce the hiring of James (Jim) Marsden, Ph.D. as Executive Director of Food Safety at Chipotle. Dr. Marsden, one of the nation's foremost authorities on food safety, is actively working to further our food safety efforts and continue the progress we have already made towards establishing Chipotle as a leader in food safety. Dr. Marsden was previously a member of the faculty at Kansas State University's Animal Science and Industry Department as the Regent's Distinguished Professor of Food Safety and Security, and also served as the associate director of the Biosecurity Research Institute at Kansas State University.

247. According to the LinkedIn profile for Wederquist – Chipotle's Director of Quality Assurance & Food Safety during the Class Period, a position she assumed in April 2006, shortly after Chipotle went public in January 2006 – she departed Chipotle in March 2016. As of the filing of this Amended Complaint, Wederquist does not list a current job position on her LinkedIn profile.

248. On April 15, 2016, the CDC issued the 4/15/16 Letter in response to the 12/21/15 Letter, and, among other things, stated, in pertinent part, that:

> ***[W]e disagree that there was "no ongoing threat" at the time of the web postings, particularly since the investigation of these two outbreaks linked to Chipotle Mexican Grill Restaurants has not identified a specific cause. A public health professional would not conclude that transmission had ceased until at least several weeks after the last reported case***.

249. On May 6, 2016, Arnold, Chipotle's Public Relations director, confirmed that the Company will not appeal the conclusions reached by the CDC in the 4/15/16 Letter.

250. On May 11, 2016, media outlets reported that, in late 2015, Chipotle hired two food safety experts in addition to Dr. Samadpour of IEH Laboratories – David Theno, a former Jack in the Box executive who was credited with fixing food safety issues in the aftermath of the Jack in the Box Outbreak, and David Acheson, a former FDA official who had been critical of Chipotle's initial response to the various Class Period food-borne illness outbreaks.

**Defendants Failed to Comply with Items 303 and 503**

251. During the Class Period, Chipotle filed the 2014 Form 10-K, the 1Q15 Form 10-Q, the 2Q15 Form 10-Q and the 3Q15 Form 10-Q with the SEC. Each of these documents was signed by defendant Hartung and the 2014 Form 10-K was also signed by defendants Ells and Moran. Each of these documents was certified pursuant to SOX by the Individual Defendants. As detailed herein, these filings failed to disclose material information required to be disclosed pursuant to controlling SEC rules and regulations.

252. The SEC created specific rules governing the content of disclosures made by public companies in their filings with the SEC. SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

253. Pursuant to Item 7 of Form 10-K and Item 2 of Form 10-Q, Chipotle's Class Period SEC filings were required to furnish the information required under Item 303(a)(3) of Regulation S-K including, among other things:

(a) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations; and

(b) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

254. Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported

financial information not to be necessarily indicative of future operating results or of future financial condition."

255. The following were known trends, events, or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations and, therefore, were required to be disclosed by Defendants pursuant to Item 303 in the 2014 Form 10-K, 1Q15 Form 10-Q, 2Q15 Form 10-Q, and the 3Q15 Form 10-Q, but were not:

(a) that the Company had switched from processing produce in commissaries to in the restaurants and the risk from this switch that food-borne illness outbreaks could occur and reasonably continue to occur had greatly increased; and

(b) that the Company had failed to adequately monitor its food safety programs and establish sufficient related controls and procedures to ensure compliance, thereby greatly increasing the risk that food-borne illness outbreaks could occur and would continue to occur.

256. In addition, the following were known trends, events, or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations and, therefore, were required to be disclosed by Defendants pursuant to Item 303 in the 3Q15 Form 10-Q, but were not:

(a) that the Company had experienced the July E. coli outbreak, the August Norovirus outbreak in Washington, the August Norovirus outbreak in California, and the August Salmonella outbreaks;

(b) that the July E. coli outbreak, the August Norovirus outbreak in Washington, the August Norovirus outbreak in California, and the August Salmonella outbreak had impacted the Company's operations and financial performance during 3Q15 and 4Q15;

(c) that, as these outbreaks and additional outbreaks became further publicized, they were reasonably expected to have an increased damaging effect on the Company's operations and financial performance; and

(d) that any investigations into these outbreaks would be lengthy and further negatively impact the Company's operations and financial performance as Chipotle did not have the capability to quickly identify the contaminated ingredient(s) that caused the food-borne illness(es).

257. The foregoing facts were required to be disclosed because they were, among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition;" (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations;" and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

258. Pursuant to Item 1A of Form 10-K, Chipotle's 2014 Form 10-K was required to furnish the information pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.503], including, among other things, a "discussion of the most significant factors that make the [securities] speculative or risky." Pursuant to Item 1A of Form 10-Q, Chipotle's Class Period Forms 10-Q were required to "[s]et forth any material changes from risk factors as previously disclosed" in Chipotle's 2014 Form 10-K pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.503]. Defendants failed to comply with Item 503 by failing to adequately disclose risk factors or material changes in risk factors in these SEC filings.

259. Specifically, Defendants failed to disclose the following in Chipotle's 2014 Form 10-K, 1Q15 Form 10-Q, 2Q15 Form 10-Q, and the 3Q15 Form 10-Q, as required under Item 503:

(a) that the Company had switched from processing produce in commissaries to in the restaurants and the risk from this switch that food-borne illness outbreaks could occur and reasonably continue to occur had greatly increased; and

(b) that the Company had failed to adequately monitor its food safety programs and establish sufficient related controls and procedures to ensure compliance, thereby greatly increasing the risk that food-borne illness outbreaks could occur and would continue to occur.

260. Furthermore, Defendants failed to disclose in Chipotle's 3Q15 Form 10-Q the following material changes from risk factors as previously disclosed in Chipotle's 2014 Form 10-K, as required under Item 503:

(a) that the July E. coli outbreak, the August Norovirus outbreak in Washington, the August Norovirus outbreak in California, and the August Salmonella outbreak had impacted the Company's operations and financial performance during 3Q15 and 4Q15;

(b) that, as these outbreaks and additional outbreaks became further publicized, they were reasonably expected to have an increased damaging effect on the Company's operations and financial performance; and

(c) that any investigations into these outbreaks would be lengthy and further negatively impact the Company's operations and financial performance as Chipotle did not have the capability to quickly identify the contaminated ingredient(s) that caused the food-borne illness(es).

**ANY PURPORTED RISK WARNINGS WERE INADEQUATE**

261. Even though the Company's SEC filings, earnings press releases, conference calls and other Class Period statements may have been accompanied by purported risk warnings or warnings that certain statements may be forward-looking, they did not adequately warn investors

about the materially false and misleading statements or omissions alleged herein. These risk warnings were not meaningful because, among other things, they were vague, boilerplate, failed to adequately warn of the true risks of investing in Chipotle, and failed to account for changing trends and conditions in Chipotle's business and operations.

262. During the Class Period, the Company repeated substantially similar boilerplate cautionary language for forward-looking statements during conference calls and in press releases and SEC filings. For example, the 2014 Form 10-K stated, in pertinent part, that:

> Instances of food-borne illnesses, real or perceived, whether at our restaurants or those of our competitors, may subject us to liability to affected customers, and could result in negative publicity about us or the restaurant industry that adversely affects our sales. ***We may be at a higher risk for food-borne illness outbreaks than some competitors due to our use of fresh produce and meats rather than frozen, and our reliance on employees cooking with traditional methods rather than automation.*** The risk of illnesses associated with our food might also increase in connection with an expansion of our catering business or other situations in which our food is served in conditions we cannot control.

263. The purported cautionary language contained in ¶262 above, which was incorporated by reference into the 1Q15 Form 10-Q, the 2Q15 Form 10-Q, and the 3Q15 Form 10-Q, was not meaningful because it was vague, boilerplate, and not substantive or tailored to the specific risks with respect to the Company's food safety practices that Lead Plaintiffs have challenged.

264. For example, the purported cautionary language was not tailored to the specific increased risk associated with Chipotle's produce following a transition in late 2014 to in-store processing of produce instead of commissary preparation. While this language mentions that Chipotle uses fresh produce, it does not disclose that Chipotle had switched from commissary processing of produce to in-store and that such a change greatly expanded the number of workers handling the produce and the number of surfaces that the produce touched, thereby exponentially increasing the risk of contamination from workers and cross-contamination from the other raw foods prepared in Chipotle's restaurants. In addition, the purported cautionary language was not tailored to

the specific increased risk of food-borne illness caused by Defendants' failure to adequately monitor Chipotle's food safety programs and establish sufficient related controls and procedures to ensure compliance.

265. Not only is this purported cautionary language vague and unspecific, it is also boilerplate. Chipotle provided substantially similar purported cautionary language as contained in ¶262 above in its Form 10-K for the fiscal year ended December 31, 2013, filed on February 5, 2014 (the "2013 Form 10-K"). The repeated use of this language shows that it was not tailored to the specific risks then facing Chipotle. Thus, this language could not have been tailored to the specific risks alleged herein.

266. Further, with respect to the 3Q15 Form 10-Q, the purported cautionary language contained in ¶262 above was not substantive or tailored to the risks posed by: (i) the July E. coli outbreak, the August Norovirus outbreak in Washington, the August Norovirus outbreak in California, and the August Salmonella outbreak; (ii) the impact of these outbreaks on the Company's operations and financial prospects; (iii) further publicity of these outbreaks and additional outbreaks that would reasonably have an increased damaging effect on the Company's operations and financial performance; and (iv) investigations into these outbreaks that would be lengthy and further negatively impact the Company's operations and financial performance as Chipotle did not have the capability to quickly identify the contaminated ingredient(s) that caused the food-borne illness(es).

267. In addition, the 2014 Form 10-K states, in pertinent part, that:

> ***On a small number of occasions one or more Chipotle restaurants have been associated with customer illness, and on those occasions our sales have sometimes been adversely impacted, at times even in markets beyond those impacted by the illness***. If our customers become ill from food-borne or localized illnesses or if an illness is attributed to our food, even incorrectly, we could also be forced to temporarily close some restaurants, further impacting sales. In addition, reports linking nationwide or regional outbreaks of food-borne illnesses have caused us to temporarily suspend serving some produce items in our foods or to otherwise alter

our menu. Similarly, past outbreaks of E. coli relating to certain food items caused consumers to avoid certain products and restaurant chains, Asian and European countries have experienced outbreaks of avian flu, and incidents of "mad cow" disease have occurred in Canadian and U.S. cattle herds. These problems, other food-borne illnesses (such as hepatitis A or norovirus) and injuries caused by food tampering have had in the past, and could have in the future, an adverse effect on the price and availability of affected ingredients. A decrease in customer traffic as a result of these health concerns or negative publicity, or as a result of a change in our menu or dining experience or a temporary closure of any of our restaurants, would adversely impact our restaurant sales and profitability. Furthermore, if we react to these problems by changing our menu or other key aspects of the Chipotle experience, we may lose customers who do not accept those changes, and may not be able to attract enough new customers to generate sufficient revenue to make our restaurants profitable. Customers may also shift away from us if we choose to pass along to consumers any higher ingredient costs resulting from supply problems associated with outbreaks of food-borne illnesses, which would also have a negative impact on our sales and profitability.

* * *

Furthermore, as we grow, the ability of our suppliers to expand output or otherwise increase their supplies to meet our needs may be constrained. Moreover, we have made a significant commitment to serving local or organic produce when seasonally available, and a small portion of our restaurants also serves produce purchased from farmers markets seasonally as well. ***These produce initiatives may make it more difficult to keep quality consistent, and present additional risk of food-borne illnesses given the greater number of suppliers involved in such a system and the difficulty of imposing our quality assurance programs on all such suppliers. Quality variations and food-borne illness concerns could adversely impact public perceptions of Food With Integrity or our brand generally.***

* * *

Our quarterly results may fluctuate significantly and could fail to meet the expectations of securities analysts and investors because of various factors, including . . . negative publicity about the ingredients we use ***or the occurrence of food-borne illnesses or other problems at our restaurants.***

268. The purported cautionary language contained in ¶267 above, which was incorporated by reference into the 1Q15 Form 10-Q, the 2Q15 Form 10-Q, and the 3Q15 Form 10-Q, was not meaningful because it was vague, boilerplate, and not substantive or tailored to the specific risks with respect to the Company's food safety practices that Lead Plaintiffs have challenged.

269. For example, the purported cautionary language was not tailored to the specific increased risk associated with Chipotle's produce following a transition in late 2014 to in-store processing of produce instead of commissary preparation. While this language mentions that Chipotle uses fresh produce, it does not explain that switching from commissary processing of produce to in-store processing greatly expanded the number of workers handling the produce and the number of surfaces that the produce touched, thereby exponentially increasing the risk of contamination from workers and cross-contamination from the other raw foods prepared in Chipotle's restaurants. In addition, the purported cautionary language was not tailored to the specific increased risk of food-borne illness caused by Defendants' failure to adequately monitor Chipotle's food safety programs and establish sufficient related controls and procedures to ensure compliance.

270. Not only is this purported cautionary language vague and unspecific, it is also boilerplate. Chipotle provided substantially similar purported cautionary language as contained in ¶267 above in its 2013 Form 10-K and in its Form 10-K for the fiscal year ended December 31, 2012, filed on February 8, 2013 (the "2012 Form 10-K"). The repeated use of this language shows that it was not tailored to the specific risks then facing Chipotle. Thus, this language could not have been tailored to the specific risks alleged herein.

271. Further, with respect to the 3Q15 Form 10-Q, the purported cautionary language contained in ¶267 above was not substantive or tailored to the risks posed by: (i) the July E. coli outbreak, the August Norovirus outbreak in Washington, the August Norovirus outbreak in California, and the August Salmonella outbreak; (ii) the impact of these outbreaks on the Company's operations and financial prospects; (iii) further publicity of these outbreaks and additional outbreaks that would reasonably have an increased damaging effect on the Company's operations and financial

performance; and (iv) investigations into these outbreaks that would be lengthy and further negatively impact the Company's operations and financial performance as Chipotle did not have the capability to quickly identify the contaminated ingredient(s) that caused the food-borne illness(es).

## ADDITIONAL SCIENTER ALLEGATIONS

272. As alleged herein, Chipotle and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding Chipotle, their control over, and/or receipt and/or modification of Chipotle's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Chipotle, participated in the fraudulent scheme alleged herein.

273. Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

274. The Individual Defendants were executive officers of Chipotle and, at a minimum, should have been aware of key facts related to the Company's operations, including its food safety practices and related risks, and the numerous food-borne illness outbreaks experienced during the Class Period. With respect to defendant Ells, FE1, who worked closely with him, stated that he was "highly integrated in everything that happened in the restaurants" and was aware of Chipotle's food-

borne illness procedures. With respect to defendant Moran, according to his deposition testimony, Mann and Spong were instructed to inform him if any Chipotle location was unfit to remain open, and FE2 confirmed that Spong would have informed defendant Moran of any food-borne illness outbreak at Chipotle's restaurants. With respect to defendant Hartung, according to the 3/26/15 Schedule 14A, he was responsible for overseeing, among other things, safety, security and risk for the Company during the Class Period. These facts establish that the Individual Defendants were personally involved in, and knowledgeable about, Chipotle's food safety practices, the numerous food-borne illness outbreaks experienced during the Class Period, and the status of local, state and federal investigations into these outbreaks.

275. The Individual Defendants were each members of Chipotle's senior management during the Class Period. Based on their roles at Chipotle, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

276. The scienter of the Individual Defendants and Chipotle is further evidenced by, among other things, the following factors:

(a) beginning at the end of the Class Period and continuing thereafter, the Company implemented a remediation plan that included a comprehensive overhaul of its food safety practices, including, among other things, enhancing internal training to ensure that all employees thoroughly understand the Company's food safety and food handling standards, and switching back to commissary preparation of its produce;

(b) at all relevant times during the Class Period, Mann, Wederquist, and Spong, among other Chipotle employees and executives, all interfaced with local, state and federal health officials in connection with the numerous food-borne illness outbreaks experienced during the Class Period;

(c) Mann reported to Spong, who reported directly to defendant Hartung, who in turn reported directly to defendant Moran, and Wederquist reported to Van Rohr, who reported directly to defendant Moran;

(d) defendant Moran's former law firm, Messner & Reeves, interfaced with local, state and federal health officials in connection with each of the numerous food-borne illness outbreaks experienced during the Class Period;

(e) Messner & Reeves represented Chipotle in the numerous personal injury lawsuits that were filed in the wake of the numerous food-borne illness outbreaks experienced during the Class Period;

(f) Chipotle attempted to downplay its store closures related to food-borne illness outbreaks during the Class Period by variously claiming that such closures were due to staff shortages, equipment problems or supply shortages;

(g) Chipotle pressured the Minnesota Department of Health to publicly name the Company's tomato supplier in connection with the August Salmonella outbreak in order to deflect attention from the Company, and even contacted a personal injury lawyer who was suing the Company to persuade that lawyer to add Chipotle's tomato supplier to the various personal injury lawsuits that had been brought in connection with the August Salmonella outbreak;

(h) Chipotle's Norwalk Protocol omitted any provision requiring that the restaurant location contact local, state or federal health officials to notify them of a potential food-borne illness outbreak and, as exemplified by the August Norovirus outbreak in California, Chipotle was dilatory in contacting public health officials when a restaurant location experienced a food-borne illness outbreak;

(i) Chipotle lacked the capability to quickly identify the contaminated ingredient(s) that caused the numerous Class Period outbreaks because, during the Class Period, Wederquist had just begun to oversee the implementation of a new traceability program for Chipotle's ingredients that was designed to allow Chipotle to investigate and trace ingredients with quality issues;

(j) as acknowledged in the 12/21/15 Letter to the CDC, Chipotle had contemporaneous awareness of the CDC's web updates during the Class Period and understood that the CDC is charged with providing updates to the public when there is an ongoing public health risk;

(k) despite the pointed accusations made in the 12/21/15 Letter, Chipotle decided not to appeal the findings and conclusions set forth in the CDC's 4/15/16 Letter;

(l) the CDC investigation would not have been concluded at the time of the 11/10/15 Press Release since a public health professional would not conclude that transmission of a food-borne illness had ceased until a few weeks after the last reported case; and

(m) the July E. coli outbreak was never investigated by the CDC because, by the time they ultimately learned about this outbreak, health officials did not believe there was an ongoing risk to the public.

277. Taken collectively, the facts and circumstances described above in ¶276 demonstrate a strong inference that Defendants acted with scienter in making the misrepresentations and omissions challenged in this Amended Complaint.

278. Additionally, the resignation and/or termination of Wederquist – who was the Director of Quality Assurance and Food Safety (according to the 2014 Form 10-K, Chipotle's "quality assurance department establishes and ***monitors*** [its] quality and food safety programs for [its] supply chain") – supports a finding of scienter. The timing of Wederquist's departure in March

2016 supports scienter because it came shortly after the end of the Class Period and shortly after the Company's food safety symposium in February 2016 and implementation of the Company's remediation plan for food safety practices. Likewise, Chipotle's hiring of Dr. Marsden as the Company's Executive Director of Food Safety on March 15, 2016, in concert with Wederquist's departure from the Company, demonstrates Defendants' acknowledgement that the Company lacked adequate personnel monitoring its food safety practices, or, at a minimum, were reckless in not ensuring that adequate personnel were overseeing Chipotle's food safety practices during the Class Period.

279. Relatedly, Chipotle's hiring of food safety experts during the Class Period, including Dr. Samadpour of IEH Laboratories, David Acheson, a former critic of Chipotle, and David Theno, who was involved in the remediation efforts associated with the Jack in the Box Outbreak, implicitly demonstrates Defendants' acknowledgement that the Company's food safety practices were deficient, or, at a minimum, were reckless in connection with the causes and circumstances underlying the numerous food-borne illness outbreaks experienced during the Class Period.

280. Additionally, in December 2015, Chipotle was served with a federal grand jury subpoena from the U.S. District Court for the Central District of California in connection with a criminal investigation being conducted by the U.S. Attorney's Office for the Central District of California, in conjunction with the FDA's Office of Criminal Investigations. The subpoena requires Chipotle to produce a broad range of documents relating to the August Norovirus outbreak in California. Chipotle acknowledged in the 1/6/16 Form 8-K that the Company had been and intended to continue cooperating with this investigation. On January 28, 2016, Chipotle was served with a second subpoena from the U.S. Attorney's Office for the Central District of California which superseded and broadened the scope of the first subpoena from December 2015 and requires

Chipotle to produce documents and information relating to ***company-wide*** food safety matters dating back to January 1, 2013. Chipotle has publicly acknowledged that it will continue to fully cooperate with this investigation. The existence of these subpoenas and this investigation further support a finding of scienter.

281. At a minimum, Defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at Chipotle, Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Class Period.

282. Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

283. Moreover, given Defendants' failure to disclose the increased risk associated with, among other things: (a) Chipotle's switch from processing produce in commissaries to in the restaurants; and (b) the Company's failure to adequately monitor its food safety programs and establish sufficient related controls and procedures to ensure compliance, and Defendants' failure to disclose, among other things: (i) that the Company had experienced the July E. coli outbreak, the August Norovirus outbreak in Washington, the August Norovirus outbreak in California, and the

August Salmonella outbreaks; (ii) that the July E. coli outbreak, the August Norovirus outbreak in Washington, the August Norovirus outbreak in California, and the August Salmonella outbreak had impacted the Company's operations and financial performance during 3Q15 and 4Q15; (iii) that, as these outbreaks and additional outbreaks became further publicized, they were reasonably expected to have an increased damaging effect on the Company's operations and financial performance; and (iv) that any investigations into these outbreaks would be lengthy and further negatively impact the Company's operations and financial performance as Chipotle did not have the capability to quickly identify the contaminated ingredient(s) that caused the food-borne illness(es), all of which rendered the challenged statements materially false and misleading, thereby giving rise to an affirmative duty and/or obligation to disclose these known trends and uncertainties.

284. Likewise, the fraud alleged herein relates to the core business and operations of Chipotle so knowledge of the fraud may be imputed to Defendants. Given Defendants' knowledge of the truth concerning the Company's increased risk of its food safety practices, the existence and extent of the numerous food-borne illness outbreaks experienced during the Class Period, and the status of local, state and federal investigations into these outbreaks, the positive statements detailed above, made contemporaneously with that knowledge, were false and/or misleading. Furthermore, these facts were known by Chipotle employees in senior positions at Chipotle and their knowledge can be imputed to Chipotle itself.

285. Additionally, the Individual Defendants possessed substantial motives for misrepresenting the increased risks associated with Chipotle's food safety practices.

286. In connection with the Company's 2014 annual shareholder meeting, leading proxy advisory firm Institutional Shareholder Services ("ISS") joined other investors in opposing the Individual Defendants' compensation because, among other reasons, Chipotle had one of the worst

pay-for-performance profiles in the Russell 3000 and was providing "stratospheric compensation levels for [its] co-CEOs[,]" where Chipotle's "CEOs . . . [were] treated like Sun Kings at investor expense." Following a proxy fight, the compensation of the Individual Defendants was dramatically reduced. For example, instead of earning the same compensation of $28.924 million as he did in 2014, defendant Ells earned $13.837 million in 2015, a reduction of ***approximately 52.2%***. Likewise, instead of earning the same compensation of $28.153 million as he did in 2014, defendant Moran earned $13.561 million in 2015, a reduction of ***approximately 51.8%***. Finally, instead of earning the same compensation of $10.246 million as he did in 2014, defendant Hartung earned $6.033 million in 2015, a reduction of ***approximately 41.1%***.

287. To offset the reduction in their salaries (which began in 2015 and was likely to continue in future years), the Individual Defendants were motivated to artificially increase the price of Chipotle stock so that they could maximize the sales of substantial amounts of their personal holdings. To that end, they ended up selling more than ***$213 million*** worth of Chipotle common stock during the Class Period at times and amounts that were highly suspicious, unusual and out of character with prior sales, as set forth below:

| **Name** | **Position** | **Date** | **No. of Shares Sold** | **Price** | **Proceeds** |
|---|---|---|---|---|---|
| Defendant Moran | Co-CEO | 05/19/2015 | 19,820 | $637.40 | $12,633,268 |
| | | 05/19/2015 | 16,140 | $631.90 | $10,198,866 |
| | | 05/19/2015 | 801 | $639.12 | $511,935 |
| | | 05/19/2015 | 6,154 | $635.24 | $3,909,267 |
| | | 05/19/2015 | 5,018 | $636.33 | $3,193,104 |
| | | 05/19/2015 | 2,863 | $632.63 | $1,811,220 |
| | | 05/19/2015 | 1,100 | $638.41 | $702,251 |
| | | 05/19/2015 | 171 | $636.10 | $108,773 |
| | | 05/19/2015 | 6,511 | $634.07 | $4,128,430 |
| | | 05/20/2015 | 7,414 | $630.64 | $4,675,565 |
| | | 05/20/2015 | 22,719 | $629.45 | $14,300,475 |
| | | 05/20/2015 | 24,342 | $631.82 | $15,379,762 |
| | | 05/20/2015 | 24,386 | $628.49 | $15,326,357 |
| | | 05/20/2015 | 7,357 | $632.37 | $4,652,346 |

| | | | | | |
|---|---|---|---|---|---|
| | | 07/13/2015 | 2,146 | $651.13 | $1,397,325 |
| | | 07/15/2015 | 2,197 | $662.52 | $1,455,556 |
| | | 07/20/2015 | 4,502 | $676.24 | $3,044,432 |
| | | 07/22/2015 | 1,500 | $721.94 | $1,082,910 |
| | | 07/22/2015 | 3,800 | $721.08 | $2,740,104 |
| | | 07/22/2015 | 3,900 | $719.78 | $2,807,142 |
| | | 07/22/2015 | 5,123 | $718.85 | $3,682,669 |
| | | | **167,964** | | **$107,741,757.00** |
| | | | | | |
| Defendant Ells | Co-CEO | 02/19/2015 | 5,635 | $674.71 | $3,801,991 |
| | | 03/16/2015 | 5,675 | $680.03 | $3,859,170 |
| | | 03/20/2015 | 5,014 | $685.03 | $3,434,740 |
| | | 03/20/2015 | 700 | $686.46 | $480,522 |
| | | 04/21/2015 | 14,910 | $699.00 | $10,422,090 |
| | | 04/21/2015 | 5,816 | $695.00 | $4,042,120 |
| | | 04/21/2015 | 5,636 | $690.00 | $3,888,840 |
| | | 04/21/2015 | 131 | $690.77 | $90,491 |
| | | 05/18/2015 | 2,346 | $631.77 | $1,482,132 |
| | | 05/18/2015 | 2,757 | $631.66 | $1,741,487 |
| | | 05/18/2015 | 2,000 | $633.16 | $1,266,320 |
| | | 05/19/2015 | 1,398 | $636.03 | $889,170 |
| | | 05/19/2015 | 536 | $636.75 | $341,298 |
| | | 05/19/2015 | 6,713 | $635.20 | $4,264,098 |
| | | 05/19/2015 | 100 | $636.93 | $63,693 |
| | | 05/20/2015 | 1,551 | $629.95 | $977,052 |
| | | 05/20/2015 | 1,264 | $627.77 | $793,501 |
| | | 05/20/2015 | 2,003 | $634.74 | $1,271,384 |
| | | 05/20/2015 | 4,107 | $630.72 | $2,590,367 |
| | | 05/20/2015 | 2,000 | $630.65 | $1,261,300 |
| | | 05/20/2015 | 3,610 | $631.82 | $2,280,870 |
| | | 05/20/2015 | 2,348 | $628.41 | $1,475,507 |
| | | 05/20/2015 | 490 | $634.74 | $311,023 |
| | | 05/20/2015 | 497 | $633.18 | $314,690 |
| | | 05/20/2015 | 900 | $631.72 | $568,548 |
| | | 05/20/2015 | 1,171 | $629.80 | $737,496 |
| | | 05/20/2015 | 1,260 | $628.43 | $791,822 |
| | | 05/21/2015 | 2,799 | $626.77 | $1,754,329 |
| | | 05/21/2015 | 1,600 | $625.57 | $1,000,912 |
| | | 05/21/2015 | 588 | $633.36 | $372,416 |
| | | 05/21/2015 | 100 | $628.32 | $62,832 |
| | | 05/21/2015 | 3,712 | $627.47 | $2,329,169 |
| | | 05/21/2015 | 12,500 | $628.11 | $7,851,375 |
| | | 05/22/2015 | 3,913 | $631.66 | $2,471,686 |
| | | 05/22/2015 | 3,701 | $632.45 | $2,340,697 |
| | | 05/22/2015 | 800 | $633.35 | $506,680 |

| | | | | | |
|---|---|---|---|---|---|
| | | 05/22/2015 | 300 | $634.27 | $190,281 |
| | | 07/22/2015 | 700 | $700.18 | $490,126 |
| | | 07/22/2015 | 9,390 | $691.64 | $6,494,500 |
| | | | **120,671** | | **$79,306,725.00** |
| | | | | | |
| Defendant Hartung | CFO | 03/16/2015 | 3,030 | $680.44 | $2,061,733 |
| | | 03/20/2015 | 3,044 | $686.39 | $2,089,371 |
| | | 04/21/2015 | 3,052 | $690.00 | $2,105,880 |
| | | 04/21/2015 | 3,076 | $699.00 | $2,150,124 |
| | | 04/21/2015 | 3,066 | $695.00 | $2,130,870 |
| | | 07/14/2015 | 2,177 | $660.08 | $1,436,994 |
| | | 07/20/2015 | 2,272 | $680.50 | $1,546,096 |
| | | 07/20/2015 | 2,265 | $667.89 | $1,512,771 |
| | | 07/22/2015 | 2,419 | $720.07 | $1,741,849 |
| | | 07/22/2015 | 2,985 | $714.73 | $2,133,469 |
| | | 07/22/2015 | 3,288 | $717.09 | $2,357,792 |
| | | 07/22/2015 | 1,000 | $715.93 | $715,930 |
| | | 07/23/2015 | 2,465 | $731.34 | $1,802,753 |
| | | 07/30/2015 | 2,485 | $740.08 | $1,839,099 |
| | | 08/05/2015 | 2,522 | $750.01 | $1,891,525 |
| | | | **39,146** | | **$27,516,256.00** |

288. The timing of Chipotle stock sales by the Individual Defendants was highly suspicious and unusual. Before his Class Period sales, defendant Moran only sold Chipotle stock one time dating back to January 1, 2013 – on October 14, 2013, for proceeds of approximately $1.7 million, or 1.5% of his Class Period sales. Likewise, before his Class Period sales, defendant Hartung only sold Chipotle stock two times dating back to January 1, 2014 – both sales occurred on January 31, 2014, for proceeds of approximately $5.75 million, or 20.9% of his Class Period sales. In addition, before his Class Period sales, defendant Ells only sold Chipotle stock a few times dating back to January 1, 2014 – in February, March, October and November of 2014, for proceeds of approximately $52.58 million, or 66.3% of his Class Period sales.

289. Additionally, the Individual Defendants made their Class Period Chipotle sales near Class Period highs, with the least expensive of these sales – $625.57 per share, by defendant Ells on May 20, 2015 – being $187.63 per share more than the $437.94 per share opening price of Chipotle

common stock on January 6, 2016, the last day of the Class Period, a difference of approximately 29.9%. The most expensive of these sales – $750.01 per share, by defendant Hartung on August 5, 2015 – is only $7.76 per share less than, or approximately 1.02%, the highest opening or closing price Chipotle common stock has ever reached, which was a closing price of $757.77 per share that same day, on August 5, 2015.

290. The Individual Defendants' sales also came before the numerous food-borne illness outbreaks that plagued the Company during the Class Period started to become publicly known. Defendants Ells and Moran both made their final Class Period sales on July 22, 2015, and defendant Hartung made his last Class Period sale on August 5, 2015. During the Class Period, none of the Individual Defendants made any other Chipotle common stock sales after those dates.

291. The unusual amount of the stock sales also supports scienter. According to the Schedule 14A filed by Chipotle on March 11, 2016 in connection with the Company's annual shareholder meeting for 2016 (the "3/11/16 Schedule 14A"), for fiscal year 2015, defendant Moran received total annual compensation of approximately $13.561 million. Defendant Moran's Chipotle stock sales during the Class Period added an additional $107.741 million, an approximate ***794% increase*** over his 2015 total compensation. Defendant Moran's net profit on his $107.741 million in Chipotle stock sales was approximately $69.883 million, representing approximately 64.5% of his gross sales. According to the 3/11/16 Schedule 14A, for fiscal year 2015, defendant Ells received total annual compensation of approximately $13.838 million. Defendant Ells' Chipotle stock sales during the Class Period added an additional $79.307 million, an approximate ***573% increase*** over his 2015 total compensation. Defendant Ells' net profit on his $79.307 million in Chipotle stock sales was approximately $47.319 million, representing approximately 59.5% of his gross sales. According to the 3/11/16 Schedule 14A, for fiscal year 2015, defendant Hartung received total

annual compensation of approximately $6.033 million. Defendant Hartung's Chipotle stock sales during the Class Period added an additional $27.516 million, an approximate ***456% increase*** over his 2015 total compensation. Defendant Hartung's net profit on his $27.516 million in Chipotle stock sales was approximately $15.196 million, representing approximately 55.5% of his gross sales. As these calculations demonstrate, the Individual Defendants' Chipotle stock sales during the Class Period resulted in unusually large profits, both objectively and relative to their annual compensation.

292. Furthermore, as reflected in the table above in ¶287, defendant Moran sold 167,964 shares of Chipotle stock during the Class Period, representing approximately 25.44% of his pre-Class Period Chipotle stock holdings, which stood at 492,255 shares as of January 6, 2016. Likewise, defendant Ells sold 120,671 shares of Chipotle stock during the Class Period, representing approximately 25.14% of his pre-Class Period Chipotle stock holdings, which stood at 359,302 shares as of January 6, 2016. In addition, defendant Hartung sold 39,146 shares of Chipotle stock during the Class Period, representing approximately 26.17% of his pre-Class Period Chipotle stock holdings, which stood at 110,464 shares as of January 6, 2016. As a result, the Individual Defendants sold a significant percentage of their total personal Chipotle stockholdings during the Class Period.

293. Taken collectively, the Individual Defendants' Class Period Chipotle stock sales support an inference of scienter because: (i) they were done to offset the Individual Defendants' reduced compensation, which began in 2015 and was likely to continue in future years; (ii) Defendants historically sold very little stock before the Class Period; (iii) these sales resulted in unusually large profits both objectively and relative to the Individual Defendants' 2015 total annual compensation; (iv) the quantity sold represented a significant percentage of the Individual Defendants' overall total holdings; and (v) these sales took place near Class Period highs and were

timed to capitalize on Chipotle's inflated stock price before Defendants' inadequate food safety practices were exposed by no less than seven food-borne illness outbreaks and became known to investors.

294. The allegations above also establish a strong inference that Chipotle as an entity acted with corporate scienter throughout the Class Period, as its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing Chipotle's true operating condition and present and expected financial performance from the investing public. By concealing these material facts from investors, Chipotle maintained and/or increased its artificially inflated common stock price throughout the Class Period.

**NO SAFE HARBOR**

295. The "Safe Harbor" warnings accompanying Chipotle's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

296. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Chipotle who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or

relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE: THE *BASIC* AND *AFFILIATED UTE* PRESUMPTIONS

297. Lead Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine as outlined in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and the presumption of reliance for omissions as outlined in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

298. With respect to the *Basic* presumption, a presumption of reliance under the fraud on the market doctrine is appropriate because, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's common stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e) Lead Plaintiffs and other members of the Class purchased Chipotle stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

299. At all relevant times, the market for Chipotle common stock was efficient for the following reasons, among others:

(a) Chipotle common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b) as a regulated issuer, Chipotle filed periodic public reports with the SEC and the NYSE;

(c) Chipotle regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Chipotle was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

300. As a result of the foregoing, the market for Chipotle common stock promptly digested current information regarding Chipotle from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Chipotle common stock during the Class Period suffered similar injury through their purchase of Chipotle common stock at artificially inflated prices and a presumption of reliance applies.

301. In addition to the *Basic* presumption, a Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute*, because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Chipotle's business operations and financial prospects and performance – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts

withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**LOSS CAUSATION/ECONOMIC LOSS**

302. During the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of Chipotle's common stock and operated as a fraud or deceit on Class Period purchasers of Chipotle's stock. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Chipotle's stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of Chipotle stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

303. Defendants' false and misleading statements had the intended effect and caused Chipotle's stock to trade at artificially inflated levels throughout the Class Period.

304. As a direct result of the disclosures set forth above, and a materialization of the undisclosed risk of investing in Chipotle's stock, the price of Chipotle's stock fell precipitously. These drops removed the inflation from the price of Chipotle's stock, causing real economic loss to investors who purchased Chipotle's stock during the Class Period.

305. Lead Plaintiffs allege numerous corrective disclosures during the Class Period, including as set forth below:

(a) During the trading day on October 31, 2015, the market learned, among other things, that the Company was closing 43 stores in Washington and Oregon in response to the October E. coli outbreak. In response, the price of Chipotle common stock declined $30.23 per share, or 4.7%, from an opening price of $640.23 per share before this news came into the market, to close at $610.00 per share on October 31, 2015. This drop removed inflation from the price of

Chipotle's stock, causing real economic loss to investors who purchased Chipotle's stock during the Class Period. Chipotle's stock, however, remained artificially inflated as a result of false and misleading statements, and material omissions, by Defendants during the Class Period;

(b) During the trading day on November 20, 2015, the CDC announced, among other things, that the October E. coli outbreak had spread to four additional states and that its investigation into this outbreak was ongoing. In response, the price of Chipotle common stock declined over $75.81 per share, or 12.4%, from an opening price of $612.00 per share before the announcement, to close at $536.19 per share on November 20, 2015. This drop removed inflation from the price of Chipotle's stock, causing real economic loss to investors who purchased Chipotle's stock during the Class Period. Chipotle's stock, however, remained artificially inflated as a result of false and misleading statements, and material omissions, by Defendants during the Class Period;

(c) Before the opening of trading on December 4, 2015, Defendants announced, among other things, that Chipotle had agreed to implement numerous remediation efforts in response to the Company's various food-borne illness outbreaks during the Class Period. In response to the Company's announcement before the opening of trading on December 4, 2015, the price of Chipotle common stock declined over $6.42 per share, or 1.13%, from a close of $565.31 per share the day before the announcement, to open at $558.89 per share on December 4, 2015. This drop removed inflation from the price of Chipotle's stock, causing real economic loss to investors who purchased Chipotle's stock during the Class Period. Chipotle's stock, however, remained artificially inflated as a result of false and misleading statements, and material omissions, by Defendants during the Class Period;

(d) After the close of trading on December 4, 2015, Defendants announced, among other things, that Chipotle's same store sales had decreased dramatically and that it was

withdrawing its FY16 financial guidance due to the numerous Class Period food-borne illness outbreaks. In response to the Company's announcement after the close of trading on December 4, 2015, the price of Chipotle common stock declined over $44.37 per share, or 7.9%, from a close of $561.20 per share before the announcement, to open at $516.83 per share on Monday, December 7, 2015. This drop removed inflation from the price of Chipotle's stock, causing real economic loss to investors who purchased Chipotle's stock during the Class Period. Chipotle's stock, however, remained artificially inflated as a result of false and misleading statements, and material omissions, by Defendants during the Class Period;

(e) After the close of trading on December 7, 2015, the market learned, among other things, about the December Norovirus outbreak. In response to this news, which came after the close of trading on December 7, 2015, the price of Chipotle common stock declined over $19.64 per share, or 3.6%, from a close of $551.75 per share before the announcement, to open at $532.11 per share on December 8, 2015. This drop removed inflation from the price of Chipotle's stock, causing real economic loss to investors who purchased Chipotle's stock during the Class Period. Chipotle's stock, however, remained artificially inflated as a result of false and misleading statements, and material omissions, by Defendants during the Class Period;

(f) During the trading day on December 21, 2015, the CDC announced, among other things, the existence of the November E. coli outbreak for the first time. In response to the CDC's announcement, the price of Chipotle common stock declined over $22.24 per share, or 4.1%, from an opening price of $544.25 per share before the announcement, to close at $522.01 per share on December 21, 2015. This drop removed inflation from the price of Chipotle's stock, causing real economic loss to investors who purchased Chipotle's stock during the Class Period. Chipotle's

stock, however, remained artificially inflated as a result of false and misleading statements, and material omissions, by Defendants during the Class Period; and

(g) Before the open of trading on January 6, 2016, Defendants announced, among other things, that Chipotle had received a criminal subpoena from the U.S. Attorney's Office for the Central District of California seeking documents related to the August Norovirus outbreak in California. In response to the Company's announcement before the opening of trading on January 6, 2016, the price of Chipotle common stock declined over $22.36 per share, or 4.98%, from a close of $449.03 per share on January 5, 2016, to close at $426.67 per share on January 6, 2016. This drop removed inflation from the price of Chipotle's stock, causing real economic loss to investors who purchased Chipotle's stock during the Class Period.

306. The timing and magnitude of the price declines in Chipotle's stock negate any inference that the losses suffered by Lead Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Chipotle's stock and the subsequent significant decline in the value of Chipotle's stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

307. As a result of these revelations, and the corresponding drop in the price of Chipotle's stock, Lead Plaintiffs and the Class suffered real economic loss.

**COUNT I**

**For Violations of §10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

308. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

309. This Count is asserted against Chipotle and the Individual Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

310. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

311. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the Company as specified herein.

312. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Chipotle stock during the Class Period in an effort to maintain artificially high market prices for Chipotle's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

313. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as senior officers and/or a director of the Company, was privy to and participated in the

creation, development and reporting of the Company's financial results and guidance; (iii) each of the Individual Defendants was advised of and had access to other members of the Company's management team, internal reports and other data and information at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

314. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing from the investing public the significant problems with Chipotle and supporting the artificially inflated price of Chipotle's stock. As demonstrated by Defendants' misstatements of the Company's business and operations during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

315. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Chipotle's stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of Chipotle's stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class purchased Chipotle stock during the Class

Period at artificially high prices and were damaged as a result of the securities law violations alleged herein.

316. At the time of said misrepresentations and omissions, Lead Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other members of the Class, and the marketplace, known the truth regarding the significant problems alleged herein, which were not disclosed by Defendants, Lead Plaintiffs and the other members of the Class would not have purchased or otherwise acquired their Chipotle stock, or, if they had purchased such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

317. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

318. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Chipotle stock during the Class Period.

## COUNT II

### For Violations of §20(a) of the Exchange Act Against the Individual Defendants

319. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

320. This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act.

321. The Individual Defendants acted as controlling persons of Chipotle within the meaning of Section 20(a) of the Exchange Act.

322. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

323. As set forth above, the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Amended Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of Chipotle stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, certifying Lead Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding Lead Plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances.

**JURY DEMAND**

Lead Plaintiffs demand a trial by jury.

DATED: June 17, 2016

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MICHAEL G. CAPECI

/s/ David A. Rosenfeld
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
mcapeci@rgrdlaw.com

MOTLEY RICE LLC
JAMES M. HUGHES (*pro hac vice*)
CHRISTOPHER F. MORIARTY (*pro hac vice*)
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: 843/216-9000
843/216-9450 (fax)
jhughes@motleyrice.com
cmoriarty@motleyrice.com

WILLIAM H. NARWOLD
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone: 860/882-1681
860/882-1682 (fax)
bnarwold@motleyrice.com

*Attorneys for Lead Plaintiff*