UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
:
SUSIE ONG, *individually and*
*on behalf of all others similarly situated,*
*et al.,*
:
:
:
:
                              Plaintiffs,    :
:
              v.                             :
:
CHIPOTLE MEXICAN GRILL, INC., *et al.,*       :
:
                              Defendants.    :
------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 8, 2017
```

16 Civ. 141 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

        In the wake of several food-borne illness outbreaks in 2015 that were

sourced to Chipotle restaurants, Lead Plaintiffs Metzler Investment GmbH

("Metzler") and Construction Laborers Pension Trust of Greater St. Louis (the

"Trust," and together, "Plaintiffs") brought this lawsuit on behalf of a putative

class of purchasers (the "Class") of the common stock of Defendant Chipotle

Mexican Grill, Inc. ("Chipotle" or the "Company"), for the period between

February 5, 2015, and January 5, 2016, inclusive (the "Class Period").

Plaintiffs allege that Chipotle and certain of its executives, M. Steven Ells,

Montgomery F. Moran, and John R. Hartung (together, the "Individual

Defendants"), violated Sections 10(b) and 20(a) of the Securities Exchange Act

of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5

promulgated thereunder, 17 C.F.R. § 240.10b-5, in public statements issued

throughout 2015.  Defendants have moved to dismiss Plaintiffs' Amended

Complaint (the "Complaint") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) for failure to state a claim.  Plaintiffs have cross-moved to strike Exhibits 8, 11-14, and 17-40 (the "Exhibits") attached to Defendants' motion.

Plaintiffs' Complaint may be long on text, but it is short on adequately-pleaded claims.  Accordingly, and for the reasons outlined below, Defendants' motion to dismiss is granted and Plaintiffs' related motion to strike is denied.  However, Plaintiffs' request for leave to file an amended pleading is also granted, and the Complaint is therefore dismissed without prejudice.

BACKGROUND[1]

## A.    Factual Background

### 1.    The Parties

Plaintiffs are purchasers of Chipotle common stock during the Class Period.  (Compl. ¶ 1; *see also* Dkt. #28, Ex. A).  "Chipotle is a publicly traded fast-food restaurant chain that directly operate[d] more than 1,900 Mexican food restaurants in the United States" during the Class Period.  (Compl. ¶ 2; *see also id.* at ¶ 17).[2]  The Company "distinguishes itself from its competitors primarily through its corporate philosophy of 'Food with Integrity,' which is Chipotle's promise to find the highest quality ingredients that are sourced

---

[1]    This Opinion draws on facts from Plaintiffs' Amended Complaint ("Compl." (Dkt. #49)), taking all well-pleaded allegations as true as the Court must at this stage.  *See, e.g.*, *Peralta* v. *St. Luke's Roosevelt Hosp.*, No. 14 Civ. 2609 (KPF), 2015 WL 3947641, at *1 n.1 (S.D.N.Y. June 26, 2015).  The Court has also reviewed the briefing submitted by the parties and will refer to it as follows:  Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint (Dkt. #61) will be referred to as "Def. Br.," Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion (Dkt. #70) as "Pl. Opp.," and Defendants' Memorandum in Reply (Dkt. #74) as "Def. Reply."

[2]    Chipotle also operated 13 ShopHouse Southeast Asian Kitchen restaurants and 23 Chipotle restaurants abroad.  (Compl. ¶ 17).

sustainably and organically, while still charging reasonable prices." (*Id.* at ¶ 17; *see also id.* at ¶¶ 40-41).  As of February 4, 2015, Chipotle had more than 31 million shares of common stock issued and outstanding, and these were listed on the New York Stock Exchange under the ticker symbol "CMG." (*Id.* at ¶ 17).

The Individual Defendants are Chipotle executives.  Defendant Ells founded Chipotle in 1993, and during the Class Period was the Company's co-CEO and Chairman of its Board of Directors (the "Board").  (Compl. ¶ 18).  Defendant Moran was Ells's co-CEO and also a Director on the Board; he had joined Chipotle in 2005 as President and Chief Operating Officer.  (*Id.* at ¶ 19).  Moran had also previously served as the Company's outside general counsel while working as the CEO of the Denver law firm Messner & Reeves, LLC.  (*Id.*).  Defendant Hartung was Chipotle's Chief Financial Officer, and had been since 2002.  (*Id.* at ¶ 20).  In these positions, Plaintiffs allege, each of the Individual Defendants "directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels[,] and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition." (*Id.* at ¶ 24; *see also id.* at ¶¶ 23, 25-28).

### 2.    The Outbreaks and Their Aftermath

Between July 2015 and December 2015, there were at least seven incidents of food-borne illness outbreaks involving Chipotle restaurants in the United States.  (Compl. ¶ 4).  These included:

> (i) an outbreak of E. coli O157:H7 in July in Washington State; (ii) an outbreak of Norovirus in August in Washington; (iii) an outbreak of Norovirus in August in California; (iv) an outbreak of Salmonella in August in Minnesota; (v) an outbreak of E. coli STEC O26 in October in Washington, Oregon, California, Illinois, Maryland, Minnesota, New York, Ohio, Pennsylvania, Delaware, and Kentucky; (vi) an outbreak of E. coli STEC O26 in November in Kansas, North Dakota, and Oklahoma; and (vii) an outbreak of Norovirus in December in Massachusetts.

(*Id.* at ¶ 14 n.1; *see also id.* at ¶ 76).[3]  According to Plaintiffs, Chipotle in late 2014 had "switched from using central commissary kitchens to process and

---

[3]   "E. coli O157:H7 is a type of Escherichia coli and a cause of illness, typically contracted through consumption of contaminated and raw food or water, and is highly virulent.  E. coli O157:H7 infection is characterized by the sudden onset of severe, acute hemorrhagic diarrhea and abdominal cramps.  The incubation period for the disease (the period from ingestion of the bacteria to the start of symptoms) is typically five to ten days, although shorter and longer periods are not unusual.  In most infected individuals, the intestinal illness lasts about a week and resolves without any long-term problems."  (Compl. ¶¶ 78-79).

"Norovirus, also known as the 'Norwalk virus,' is a member of the virus family Caliciviridae, which consists of several distinct groups of viruses.  Humans are the only host of Norovirus, which has several mechanisms that allow it to spread quickly and easily.  Norovirus infects humans through person-to-person transmission or through contamination of food or water. ... Norovirus illness usually develops within one or two days after ingestion.  Symptoms include nausea, vomiting, diarrhea, abdominal pain, headache and low-grade fever.  Although symptoms usually last a few days, Norovirus infections can become quite serious in children and the elderly, and those who are immune-compromised."  (Compl. ¶¶ 62-63).

"The term Salmonella refers to a group or family of bacteria that variously cause illness in humans.  Salmonella is an enteric bacterium, which means that it lives in the intestinal tracts of humans and other animals.  Salmonella bacteria are usually transmitted to humans by eating foods contaminated with animal feces or foods that have been handled by infected food service workers who have practiced poor personal hygiene. ... Many raw foods of animal origin are frequently contaminated, but thorough cooking kills Salmonella.  Several bacteria, including Salmonella, induce reactive arthritis. ... Salmonella is also a cause of a condition called post infectious irritable bowel syndrome ("IBS"). ... Both Salmonella and E. coli are spread in a similar, nearly identical fashion."  (Compl. ¶¶ 105-10).

"E. coli STEC O26 is grouped with other non-O157 Shiga toxin-producing Escherichia coli.  E. coli STEC O26 infection is characterized by the sudden onset of abdominal pain and severe cramps, followed within 24 hours by diarrhea. As the disease progresses, the diarrhea becomes watery and then may become bloody to the naked eye.  Vomiting can also occur, but there is usually no fever.  The incubation period for the disease (the period from ingestion of the bacteria to the start of symptoms) is typically three to nine

prepare the produce used in its restaurants to processing produce in each of the Company's over 1,900 restaurants," and "[s]everal of the[] outbreaks appear to have resulted from [this] change." (*Id.* at ¶ 4; *see also id.* at ¶¶ 46-47). Plaintiffs alleges that "Chipotle repeatedly undertook efforts to conceal these outbreaks from its customers, investors, and the public at large." (*Id.* at ¶ 75). And "[i]nstead of immediately improving its food safety practices after these numerous outbreaks, Chipotle sought to shift the blame for these food-borne illnesses to other entities, including one of its own suppliers, even when such conclusions were not supported by the available scientific evidence." (*Id.*).

### a.  The July E. coli Outbreak in Washington

The first outbreak was identified in late-July 2015, when the Washington State Department of Health traced an outbreak of E. coli O157:H7 that sickened five people to a Chipotle restaurant in Seattle. (Compl. ¶ 77). "The common ingredient eaten by these individuals was identified as cilantro, which was supplied to Chipotle by Taylor Farms." (*Id.*).  Chipotle was apprised of the outbreak no later than August 3, 2015, and participated in testing restaurant employees for E. coli. (*Id.* at ¶¶ 82-83).  Despite this awareness on Chipotle's part, "the outbreak was not publicly disclosed until November 10, 2015." (*Id.* at ¶ 84).

---

days, although shorter and longer periods are not unusual.  In most infected individuals, the intestinal illness lasts about a week and resolves without any long-term problems." (Compl. ¶¶ 135-36).

### b.      The August Norovirus Outbreak in Washington

In early August 2015, the Washington State Department of Health identified a Norovirus outbreak at Chipotle's Hazel Dell location.  (Compl. ¶ 85). The outbreak was caused by a Chipotle restaurant employee who had reported to work sick and stayed for several hours while vomiting.  (*Id.* at ¶ 87).  Once the outbreak was recognized, the restaurant initiated Chipotle's "Norwalk Protocol," which "requires that Chipotle close any location where two or more customers complain of food-borne illness[,] ... dispose of all food items, and bleach all cooking and food handling surfaces."  (*Id.* at ¶¶ 88-89).

### c.      The August Norovirus Outbreak in California

On August 18, 2015, another Norovirus outbreak was identified, this time at Chipotle's Simi Valley restaurant.  (Compl. ¶ 91).  243 individuals were reported ill.  (*Id.*).  By August 20, 2015, the Company had initiated its Norwalk Protocol and closed the Simi Valley restaurant.  (*Id.* at ¶ 92).  A sign was posted at the restaurant indicating that it had "closed for the rest of the day due to a severe staffing shortage."  (*Id.*).  The restaurant reopened the following day "with a new crew of employees from other Chipotle restaurants."  (*Id.* at ¶ 93).

On August 22, 2015, Chipotle reported to the Ventura County Environmental Health Division that 17 Simi Valley employees "were sick with gastrointestinal illness and had been replaced" with other Chipotle employees. (Compl. ¶ 94).  Health officials conducted testing on August 24 — though their ability to do so was hindered by Chipotle's sanitization during the implementation of the Norwalk Protocol — and "concluded that the cause of the

outbreak was Norovirus." (*Id.* at ¶ 95). The Ventura County Environmental Health Division issued a press release to this effect on September 4, 2015. (*Id.* at ¶ 97). On September 14, 2015, it issued a Notice of Violation to Chipotle regarding violations that included "Chipotle's failure to notify the … Division when it was first aware of sick employees." (*Id.* at ¶ 99).

"In December 2015, Chipotle was served with a Federal Grand Jury Subpoena from the U.S. District Court for the Central District of California in connection with an official criminal investigation being conducted by the U.S. Attorney's Office for the Central District of California," and the U.S. Food and Drug Administration's Office of Criminal Investigations. (Compl. ¶ 101 (quoting Chipotle's January 6, 2016 Form 8-K)). Chipotle announced that it "intend[ed] to fully cooperate with the investigation." (*Id.*). But "[i]n response to this news, the price of Chipotle's common stock declined … 4.98%, on unusually heavy trading volume." (*Id.* at ¶ 102). A class action lawsuit brought by a "purported class of Chipotle consumers who were infected with Norovirus at the Simi Valley location" was filed on January 19, 2016. (*Id.* at ¶ 103).

### d.   The August Salmonella Outbreak in Minnesota

On or about August 24, 2015, a Salmonella outbreak was identified at 22 Chipotle locations in Minnesota. (Compl. ¶ 104). 64 individuals were reported ill. (*Id.*). The Minnesota Department of Health informed Chipotle corporate employees, including the Company's Investigations Manager Patti Mann, of the outbreak by September 3, 2015. (*Id.* at ¶ 111). On September 10, 2015, the Department issued a press release indicating that 45 cases had been identified

and that an investigation was ongoing.  (*Id.* at ¶ 119).  On September 16, 2015, the Department issued a second press release to update the first, in which it "named tomatoes as the ingredient that was tainted with Salmonella at these Chipotle locations."  (*Id.* at ¶ 104; *see also id.* at ¶¶ 123-25).  The press release also indicated that "Chipotle had switched its supplier for tomatoes in light of this outbreak."  (*Id.* at ¶ 125).  Several civil lawsuits were filed alleging personal injuries related to this outbreak.  (*Id.* at ¶¶ 121-22, 126, 128-29).  According to Plaintiffs, "[t]he August Salmonella outbreak had a negative impact on the Company's operations and financial performance."  (*Id.* at ¶ 133).

### e.   The October E. coli Outbreak in Washington and Oregon

On October 30, 2015, the Washington State Department of Health alerted Chipotle that an outbreak of E. coli STEC O26 beginning on October 17, 2015, had been identified at Chipotle restaurants in Washington and Oregon.  (Compl. ¶ 134).  On October 31, 2015, Chipotle closed 43 of its restaurants in these states.  (*Id.* at 139).  Somewhat curiously, "signs on the closed Oregon restaurants blam[ed] the closures on 'equipment issues,'" and "similar signs" at Chipotle locations in Washington blamed "supply issues." (*Id.* at ¶ 140).  But on November 1, 2015, news coverage began reporting that the closures were due to an E. coli outbreak.  (*Id.* at ¶ 141).  "Almost immediately, news of this E. coli outbreak began having a significantly negative impact on Chipotle's common stock price and same store sales."  (*Id.* at ¶ 142).

The outbreak was chronicled in a series of press releases.  On November 3, 2015, the outbreak was publically acknowledged; "a spokesman

for the Oregon Public Health Division[] publicly stated that the specific produce under scrutiny for this E. coli outbreak was cilantro, romaine lettuce and tomatoes," and Chipotle issued a press release that "publicly addressed this E. coli outbreak and the remediation efforts that the Company had begun to undertake." (Compl. ¶¶ 146-47).  Chipotle indicated that it would "continue[] to work swiftly and thoroughly with health department officials as they look[ed] to conclude this investigation." (*Id.* at ¶ 147).  The Center for Disease Control and Prevention (the "CDC") joined the conversation on November 4, 2015, announcing in a web posting that 39 people were ill in Washington and Oregon and that the CDC and its local partners were "continuing laboratory surveillance ... to identify additional ill persons and to interview them." (*Id.* at ¶¶ 148-49).  CDC updates issued on November 5, 6, and 9 reiterated this information and indicated the count of infected persons had risen to 41.  (*Id.* at ¶¶ 151-52, 154).  A November 9, 2015, press release from the Washington State Department of Health stated that the Department's staff were "still working to investigate the cause of an outbreak of illnesses," because "[t]he first round of test results did not find E. coli bacteria in food samples taken from several Chipotle restaurants." (*Id.* at ¶ 155).  Chipotle published a press release on November 10 stating that its 43 closed restaurants would be reopened because "[h]ealth officials [had] concluded that there [was] no ongoing risk from this incident." (*Id.* at ¶ 156).  The November 10 press release also claimed that "[n]o Chipotle locations outside of Oregon and Washington [had] been connected to this issue in any way." (*Id.*).  "[N]o fewer than 30 news

9

outlets reported on and repeated Chipotle's ... claim ... that the health officials believed there was 'no ongoing risk.'" (*Id.* at ¶ 192).

But on November 12, 2015, the CDC announced that it had identified 51 ill persons in Washington and Oregon, that it was "continuing laboratory surveillance," and that its investigation was "still ongoing to determine if the ill people ate a meal item or ingredient in common that was served at the Chipotle Mexican Grill locations." (Compl. ¶ 157). And on November 20, 2015, another CDC update indicated that the E. coli outbreak had "been linked to Chipotle customers in California, New York, Ohio[,] and Minnesota as well." (*Id.* at ¶ 158). The November 20 statement repeated that the CDC was "continuing laboratory surveillance," and engaged in "ongoing" investigatory work. (*Id.*). Chipotle issued a responsive statement later that day, providing more detail regarding the cases in California, Ohio, New York, and Minnesota and Chipotle's remediation efforts. (*Id.* at ¶ 159). "In response to this news, which became public during the trading day on November 20, 2015, the price of Chipotle common stock declined $75.81 per share, or approximately 12.4%[.]" (*Id.* at ¶ 160).

The CDC's investigation concluded on February 1, 2016, when the CDC issued its Final Case Count Update. (Compl. ¶ 171). The CDC's "Final Count stated that the October E. coli outbreak infected 55 people across 11 states — California, Delaware, Illinois, Kentucky, Maryland, Minnesota, New York, Ohio, Oregon, Pennsylvania[,] and Washington." (*Id.*).

### f. The November E. coli Outbreak in Kansas, North Dakota, and Oklahoma

While the October outbreak was evolving, a second E. coli STEC O26 outbreak manifested in Chipotle customers in Kansas, North Dakota, and Oklahoma.  (Compl. ¶ 174).  Five people were sickened and two Chipotle restaurants implicated.  (*Id.* at ¶¶ 174, 176).  Both Chipotle and the CDC were aware of this outbreak by November 26, 2015.  (*Id.* at ¶ 175).  The CDC investigated a possible connection between this outbreak and the October E. coli outbreak, but announced definitively in its February 2016 Final Count that "the November E. coli outbreak had a different DNA profile from the October E. coli outbreak," and that the CDC's investigation into both outbreaks had concluded.  (*Id.* at ¶ 178).

### g. The December Norovirus Outbreak in Massachusetts

On December 7, 2015, there was a Norovirus outbreak identified at Chipotle's Brighton location.  (Compl. ¶ 179).  143 individuals were reported ill.  (*Id.*).  The restaurant was closed from December 7 to 9, 2015, and the employee found to have caused the outbreak by "reporting to work while sick" was fired.  (*Id.* at ¶¶ 182-83).  "In response to public reports of this Norovirus outbreak, which began surfacing after the close of trading, the price of Chipotle common stock declined $19.64 per share, or approximately 3.6%, from a close of $551.75 per share on December 7, to an opening price of $532.11 per share on December 8, 2015."  (*Id.* at ¶ 181).

11

### h.      Chipotle's Remediation Efforts

On December 4, 2015, Chipotle filed its Form 8-K, "which quantified for the first time the devastating impact that this E. coli outbreak had on Chipotle's operations and financial performance." (Compl. ¶ 165). Chipotle rescinded its "previously announced 2016 outlook for comparable restaurant sales increases," because of "recent sales trends and additional uncertainty related to the E. coli incident." (*Id.*). "In response to the [December 4] Form 8-K, filed after the close of trading on Friday, December 4, the price of Chipotle common stock declined $44.37 per share, or approximately 7.9%, from a close of $561.20 per share before the announcement, to an opening price of $516.83 per share on Monday, December 7, 2015." (*Id.* at ¶ 166).

Among other modifications to its policies and procedures, Chipotle "reverted back to commissary preparation for its produce." (Compl. ¶ 4; *see also id.* at ¶¶ 55-58). On December 4, 2015, the Company announced that it had agreed to implement a new food safety regimen that it had devised together with "food safety experts IEH Laboratories." (*Id.* at ¶ 163). In December 2015 and January 2016, the company announced that it was "implementing '[e]nhanced internal training to ensure that all employees thoroughly understand the [C]ompany's high standards for food safety and food handling.'" (*Id.* at ¶ 5; *see also id.* at ¶ 71). And on February 8, 2016, "Chipotle closed all of its stores for a company-wide staff meeting to review Chipotle's new food safety protocols issued as part of the Company's remediation efforts." (*Id.* at ¶ 72).

12

### B.      Procedural Background

This lawsuit was first brought on January 8, 2016.  (Dkt. #1).  On March 8, 2016, then-putative Class Members Metzler and the Trust moved the Court for an order appointing them together as Lead Plaintiffs in this case and approving their selected counsel as Lead Counsel.  (Dkt. #23, 28-30; *see also* Dkt. #39).  This motion was granted on April 18, 2016.  (Dkt. #43, 45).

On June 17, 2016, Plaintiffs filed the Complaint.  (Dkt. #49).  On August 18, 2016, Defendants filed their motion to dismiss the Complaint.  (Dkt. #60-62).  Plaintiffs filed their opposition to Defendants' motion on October 31, 2016 (Dkt. #70), along with a Motion to Strike the majority of the 40 exhibits that Defendants had submitted in support of their motion (Dkt. #66-68).  On December 14, 2016, Defendants filed their opposition to Plaintiffs' motion to strike their exhibits (Dkt. #75), as well as their reply in further support of their motion to dismiss the Complaint (Dkt. #74) and a request for oral argument with regard to both pending motions (Dkt. #76).  Plaintiffs filed their reply in support of their motion to strike on January 11, 2017.  (Dkt. #77).

### DISCUSSION

### A.      Applicable Law

#### 1.      Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under this rule, a court should "draw all reasonable inferences in [the plaintiffs'] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir.

2011) (internal quotation marks and citation omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  In this regard, a complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.  *See, e.g.*, *Hart* v. *FCI Lender Servs., Inc.*, 797 F.3d 219, 221 (2d Cir. 2015) (citing Fed. R. Civ. P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion.  A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.")).

"While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to '[nudge a plaintiff's] claims across the line from conceivable to plausible.'"  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

14

2.      **The Relevant Securities Laws**

Under Section 10(b) of the Exchange Act, it is

> unlawful for any person, directly or indirectly, by the
> use of any means or instrumentality of interstate
> commerce or of the mails, or of any facility of any
> national securities exchange ... [t]o use or employ, in
> connection with the purchase or sale of any security
> registered on a national securities exchange or any
> security not so registered, or any securities-based swap
> agreement any manipulative or deceptive device or
> contrivance in contravention of such rules and
> regulations as the Commission may prescribe as
> necessary or appropriate in the public interest or for the
> protection of investors.

15 U.S.C. § 78j.  Rule 10b-5, promulgated by the SEC under Section 10(b),

further provides that a person may not

> employ any device, scheme, or artifice to defraud[;] ...
> make any untrue statement of a material fact or ... omit
> to state a material fact necessary in order to make the
> statements made, in the light of the circumstances
> under which they were made, not misleading[;] or ...
> engage in any act, practice, or course of business which
> operates or would operate as a fraud or deceit upon any
> person[;] in connection with the purchase or sale of any
> security.

17 C.F.R. § 240.10b-5.  "Although Section 10(b) does not expressly provide for

a private right of action, courts have long recognized an implied private right of

action under Section 10(b) and Rule 10b-5." *In re Longtop Fin. Techs. Ltd. Sec.*

*Litig.*, 939 F. Supp. 2d 360, 376 (S.D.N.Y. 2013) (citing *Superintendent of Ins. of*

*State of N.Y.* v. *Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971) ("It is now

established that a private right of action is implied under [Section] 10(b).")).

To succeed on a Section 10(b) and Rule 10b-5 claim, a plaintiff must

prove "[i] a material misrepresentation or omission by the defendant;

15

[ii] scienter; [iii] a connection between the misrepresentation or omission and the purchase or sale of a security; [iv] reliance upon the misrepresentation or omission; [v] economic loss; and [vi] loss causation."' *GAMCO Inv'rs, Inc.* v. *Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co.* v. *Erica P. John Fund, Inc.*, — U.S. —, 134 S. Ct. 2398, 2407 (2014)).

Section 20(a) establishes that "[e]very person who, directly or indirectly, controls any person liable under [the Exchange Act and its implementing regulations] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a). To state a Section 20(a) claim, a plaintiff must show [i] "a primary violation by the controlled person"; [ii] "control of the primary violator by the defendant"; and [iii] that the controlling person "was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

### 3. Heightened Pleading of Fraud Claims Under Federal Rule of Civil Procedure 9(b)

Plaintiffs' securities fraud claims are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b). *See, e.g.*, *ATSI Commc'ns*, 493 F.3d at 99 (affirming that securities fraud claims must satisfy the heightened pleading standards of both Rule 9(b) and the PSLRA); *Arco Capital Corp.* v. *Deutsche Bank AG*, 949 F. Supp. 2d 532, 539

16

(S.D.N.Y. 2013) (same).  The Court will discuss the PSLRA in more detail below, as it primarily pertains to Plaintiff's pleading of the element of scienter.

Rule 9(b)'s requirements pertain to Plaintiff's fraud claim as a whole, however.  Under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting [a] fraud."  Fed. R. Civ. P. 9(b).  This requires that a plaintiff's complaint: "[i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent."  *Rombach* v. *Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Mills* v. *Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  In contrast, "intent, knowledge, and other conditions of mind may be averred generally."  *Kalnit* v. *Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting Fed. R. Civ. P. 9(b)).

## B.    Analysis

Plaintiffs have alleged that Defendants violated Sections 10(a) and 20(a) and Rule 10b-5 when they: (i) failed to disclose the 2014 change to in-store produce processing and preparation "and the resulting increase in the risk that the Company could experience food-borne illness outbreaks" (Compl. ¶ 4; *see also id.* at ¶¶ 45-59); (ii) failed to disclose that "their failure to enforce Chipotle's food safety protocols in its restaurants had significantly increased the risk of food-borne illness outbreaks" (*id.* at ¶ 5; *see also id.* at ¶¶ 60-73); (iii) "made materially false and misleading statements ... about the status of the CDC's investigation into the October E. coli outbreak at Chipotle restaurants"

17

in the November 10, 2015 press release (*id.* at ¶ 6); and (iv) "failed to timely disclose the existence and/or extent of the[] food-borne illness outbreaks to Chipotle's investors," including in the company's October 20, 2015 financial report (*id.* at ¶ 7; *see also id.* at ¶ 200).

Because Section 20(a) liability can only arise if there is a primary violation by a controlled person, the Court considers first the antecedent issue of whether Plaintiffs have adequately pleaded that any Defendant violated Section 10(b) and Rule 10b-5.  *See SRM Glob. Master Fund Ltd. P'ship* v. *Bear Stearns Cos. L.L.C.*, 829 F.3d 173, 177 (2d Cir. 2016) (quoting *ECA & Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.* (hereinafter, "*ECA*"), 553 F.3d 187, 207 (2d Cir. 2009)).  The Court concludes that Plaintiffs have not, and dismisses all of Plaintiffs' remaining claims.

### 1.  Plaintiffs Have Not Stated a Claim Under Section 10(b) and Rule 10b-5

Plaintiffs' claim fails because they fail to plead adequately both the existence of a material misrepresentation or omission by Defendants and scienter.  The Court therefore focuses its analysis on these two elements.

### a.  Actionable Misrepresentations or Omissions

To establish his or her securities fraud claim, a plaintiff must first identify "an actual statement, one that is either 'untrue' outright or [that is] 'misleading' by virtue of what it omits to state."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016).  Statements of the latter ilk, "statements that are misleading by omission," are governed by the "rule against half-truths."  *Id.* at 240.  This rule is analogous to "the common-law tort of fraudulent

misrepresentation, according to which 'a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue.'" *Id.* (quoting *Restatement (Second) of Torts*, § 529, cmt. a (1977)).

Half-truths are distinguished from "pure omissions," which entail "a complete failure to make a statement." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 239 (quoting *Litwin* v. *Blackstone Grp., L.P.*, 634 F.3d 706, 719 (2d Cir. 2011)). Pure omissions are "actionable" only when they arise despite a "duty to disclose the omitted facts." *Id.* (internal quotation mark omitted) (quoting *Stratte-McClure* v. *Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015)). "[I]n and of themselves, '[Section] 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information.'" *Id.* (quoting *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 44 (2011)). And "[n]o such duty arises 'merely because a reasonable investor would very much like to know'" the omitted information. *Id.* (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)).

A duty to disclose can arise from "statutes or regulations that obligate a party to speak." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 239 n.8 (internal quotation mark omitted) (quoting *Stratte-McClure*, 776 F.3d at 102). For example, this Circuit has determined that the affirmative disclosure requirements of Item 303 of Regulation S-K "can serve as the basis for a securities fraud claim under Section 10(b)." *Stratte-McClure*, 776 F.3d at 100. The Circuit explained that "this conclusion stands to reason — for omitting an

item required to be disclosed on a 10-Q can render that financial statement misleading," because "a reasonable investor would interpret the absence of an Item 303 disclosure to imply the nonexistence of 'known trends or uncertainties … that the registrant reasonably expects will have a material … unfavorable impact on … revenues or income from continuing operations.'" *Id.* at 102 (quoting 17 C.F.R. § 229.303(a)(3)(ii)).

A duty can also arise from a company's decision to speak.  "It is well-established precedent in this Circuit that 'once a company speaks on an issue or topic, there is a duty to tell the whole truth,' '[e]ven when there is no existing independent duty to disclose information' on the issue or topic." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 258 (alteration in original) (quoting *Meyer* v. *Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014)) (citing *Caiola* v. *Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[T]he lack of an independent duty [to disclose] is not … a defense to … liability[,] because upon choosing to speak, one must speak truthfully about material issues.")).

Of course, identifying a statement that is outright untrue or misleading on the basis of what is omitted, or a pure omission, is only the first step of the inquiry.  *See Stratte-McClure*, 776 F.3d at 102-03.  A plaintiff must also plead materiality.  *See id.* at 102-04.  To analyze materiality, "courts must engage in a fact-specific inquiry." *ECA*, 553 F.3d at 197 (citing *Basic Inc.* v. *Levinson*, 485 U.S. 224, 240 (1988)).  "[I]n order for the misstatement to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the

total mix of information made available.'" *Id.* (quoting *Basic Inc.*, 485 U.S. at 231-32). Because this determination "necessarily depends on all relevant circumstances," it poses "a mixed question of law and fact, in the context of a ... 12(b)(6) motion." *Id.* Therefore, "a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* (internal quotation marks omitted) (quoting *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)).

### b.    The Alleged Material Misrepresentations or Omissions

In this case, Plaintiffs have identified a host of statements and omissions that they allege violate Section 10(a) and Rule 10b-5. Taking the last-in-time statement first, the Court begins its analysis with Plaintiffs challenge to statements in Chipotle's November 10, 2015 press release, which averred that (i) "[h]ealth officials have concluded that there is no ongoing risk from this incident," and (ii) there was "no ongoing threat related to the October E. coli outbreak." (Compl. ¶ 220; *see also* Pl. Opp. 13). Plaintiffs claim that even if the Company lacked a duty to disclose the status of the CDC investigation initially, it was obligated to ensure that its statements regarding this incident were accurate and complete once it elected to make them. (Pl. Opp. 13).

Second, Plaintiffs challenge statements that Chipotle made in its 2014 Form 10-K (Compl. ¶¶ 204-08); April 22, 2015 Form 10-Q for the fiscal quarter ended March 31, 2015 (*id.* at ¶¶ 209-10); July 22, 2015 Form 10-Q for the

fiscal quarter ended June 30, 2015 (*id.* at ¶¶ 211-12); and October 21, 2015

Form 10-Q for the fiscal quarter ended September 30, 2015 (*id.* at ¶¶ 217-18).

Each of these forms was signed by Hartung and certified under the Sarbanes-

Oxley Act of 2002 ("Sarbanes-Oxley") by all of the Individual Defendants.  (*Id.*

at ¶¶ 204, 209, 211, 217).

Plaintiffs first allege that the 2014 Form 10-K "made incomplete

representations concerning the Company's usage of commissaries and

susceptibility to food-borne illnesses." (Compl. ¶ 204).  Specifically, Plaintiffs

take issue with three statements therein:

- "Our food is prepared from scratch, with the majority prepared in our restaurants while some is prepared with the same fresh ingredients in larger batches in commissaries."

- "Instances of food-borne illnesses, real or perceived, whether at our restaurants or those of our competitors, may subject us to liability to affected customers, and could result in negative publicity about us or the restaurant industry that adversely affects our sales.  We may be at a higher risk for food-borne illness outbreaks than some competitors due to our use of fresh produce and meats rather than frozen, and our reliance on employees cooking with traditional methods rather than automation."

- "We are committed to serving safe, high quality food to our customers. Quality and food safety are integrated throughout our supply chain and everything we do; from the farms that supply our food all the way through to our front line. We have established close relationships with some of the top suppliers in the industry, and we actively maintain a limited list of approved suppliers from whom our distributors must purchase.  Our quality assurance department establishes and monitors our quality and food safety programs for our supply chain.  Our training and risk management departments develop and implement

> operating standards for food quality, preparation,
> cleanliness and safety in the restaurants.  Our food
> safety programs are also designed to ensure that we
> comply with applicable federal, state and local food
> safety regulations."

(*Id.* at ¶¶ 204, 206).  Plaintiffs argue that the first two statements were materially misleading because Defendants made them without disclosing the Company's "transition in late 2014 to in-store processing of produce instead of commissary preparation," which transition is alleged to have "dramatically increased Chipotle's risk of experiencing food-borne illness outbreaks during the Class Period."  (*Id.* at ¶ 205).  The third statement is contested because "Defendants failed to disclose that Chipotle's quality assurance department did not adequately monitor Chipotle's food safety programs and there were insufficient controls and procedures in place to ensure that operating standards had been properly implemented and adhered to."  (*Id.* at ¶ 207).

Plaintiffs' second challenge — to Defendants' April 22, 2015; July 22, 2015; and October 21, 2015 Form 10-Qs — proceeds from their challenge to the 2014 10-K.  With regard to each Form 10-Q, Plaintiffs allege that Defendants' statement therein that there had been "no material changes" in Chipotle's risk factors since its 2014 Form 10-K was false and materially misleading.  (Compl. ¶¶ 209-12, 217-18).  Specifically, Plaintiffs allege that Defendants failed to disclose the 2014 transition from commissary to in-store produce preparation, and, further, were required to do so because (i) their discussion of risk in these statements put the risk engendered by this transition at issue (*id.* at ¶¶ 205, 207; Pl. Opp. 16-17) and (ii) this disclosure

23

was required by Items 303 and 503 of Regulation S-K (Compl. ¶¶ 251-60; Pl. Opp. 17-19).  More broadly, with regard to all of the statements contained in the Company's SEC filings, Plaintiffs allege that Defendants' failure to disclose the 2014 transition from commissary to in-store produce preparation and the failure of the Company's food safety programs and operation standards violated its duties to disclose under Items 303 and 503 of the SEC's Regulation S-K. (Compl. ¶¶ 251-60; Pl. Opp. 17-19).[4]

Third, Plaintiffs take issue with statements made in the Company's Form 8-K filed on October 20, 2015, "which, among other things, provided Chipotle's financial guidance" for the fiscal quarter ended December 31, 2015, and fiscal year 2016.  (Compl. ¶ 200; *see also* Pl. Opp. 24).  Specifically, the Form 8-K indicated that "[f]or 2015, management expects ... [l]ow-to-mid single digit comparable restaurant sales increases," and "[f]or 2016, management expects ... [l]ow-single digit comparable sales increases." (Compl. ¶ 200; *see also id.* at ¶ 213; Pl. Opp. 24).  Analysts considered this surprising, conservative guidance.  (Compl. ¶ 201).  Plaintiffs allege that it "was materially false and misleading when made because Defendants did not have a

---

[4]    In relevant part, Item 303 requires a company to "[d]escribe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected," and "[d]escribe any known trends or uncertainties that have had or that the [Company] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3).  Item 503 requires that a company "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky[,] ... [e]xplain how the risk affects the issuer or the securities being offered[,] ... and adequately describe[] the risk."  17 C.F.R. § 229.503(c).

reasonable basis to issue such guidance due to the ... material adverse facts existing at the time," such as the Company's transition to in-store produce preparation, the Company's failure to monitor food safety, the numerous outbreaks of food-borne illnesses and their impact on the Company's business, and the future effects that additional outbreaks, publicity of them, and investigations into them would have on the Company.  (*Id.* at ¶ 214).

Fourth and finally, Plaintiffs challenge statements made by Hartung in an October 20, 2015 conference call held to discuss the Form 8-K financial results published that day.  (Compl. ¶¶ 215-16; Pl. Opp. 22-23)).  These too, Plaintiffs allege, were materially false and misleading because they did not disclose the material adverse facts existing at that time described above, and their connection to the Company's performance.  (Compl. ¶ 216).

### c. The Challenged Statements in Chipotle's 2014 Form 10-K; April 22, 2015 Form 10-Q; and July 22, 2015 Form 10-Q Are Not Actionable

Plaintiffs have failed to plead adequately that Defendants made material false or misleading statements or omissions in Chipotle's 2014 Form 10-K; April 22, 2015 Form 10-Q; or July 22, 2015 Form 10-Q.  In the Company's 2014 Form 10-K, the Company disclosed that "the majority" of its food was "prepared in [its] restaurants," and that it was therefore possibly "at a higher risk for food-borne illness outbreaks than some competitors due to [its] use of fresh produce ... and ... reliance on employees cooking with traditional methods rather than automation."  (Compl. ¶ 204).  Significantly, Plaintiffs have not

provided any facts to indicate that, at the time this statement was made, Defendants had any reason to believe that it was false.

It is perhaps true that in electing to speak regarding the risks posed by its food preparation methods, Chipotle put those risks at issue and was required to ensure that its statements regarding them were truthful and complete. But Plaintiffs have not indicated that Chipotle's statements were not: Plaintiffs have not argued, for instance, that it is untrue that "the majority" of Chipotle's food was prepared "in-store," or that this fact put Chipotle at a higher risk for food-borne illness. Rather, Plaintiffs have argued that Chipotle was obligated to disclose that this risk was perhaps heightened by Chipotle's 2014 transition to in-store produce preparation.

No facts support an inference that any Defendants were aware of this heightened risk at the time this statement was made, if indeed there was such a heightened risk. Rather, Plaintiffs' facts support just the opposite inference: Plaintiffs allege that Chipotle transitioned to in-store produce production in "late 2014," and have pleaded facts indicating that the first outbreak of food-borne illness at a Chipotle restaurant occurred in July 2015, at least seven months later. (Compl. ¶¶ 4, 77). For at least seven months, therefore, this transition appeared not to heighten Chipotle's risk at all. Plaintiffs argue awareness from the mere fact that the later events transpired, but such *post hoc, ergo propter hoc* pleading has been repeatedly rejected by the courts: "Corporate officials need not [be] clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations

26

that defendants should have anticipated future events and made certain
disclosures earlier than they actually did do not suffice to make out a claim of
securities fraud." *Elliott Assocs., L.P.* v. *Covance, Inc.*, No. 00 Civ. 4115 (SAS),
2000 WL 1752848, at *8 (S.D.N.Y. Nov. 28, 2000) (quoting *Novak* v. *Kasaks*,
216 F.3d 300, 309 (2d Cir. 2000)).  Here, Chipotle provided disclosures
regarding its risks that were company-specific and related to the direct risks it
uniquely faced; there can be no argument that these were boilerplate
statements insufficient to satisfy the Company's obligations under Items 303 or
503.  *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 536 (S.D.N.Y. 2015)
("These statements conveyed substantive information about the risk that
ultimately materialized.  As such, they were meaningful cautionary language,
not mere boilerplate."), *aff'd sub nom. Tongue* v. *Sanofi*, 816 F.3d 199 (2d Cir.
2016).

The Court likewise finds that the statements in this filing regarding
Chipotle's food-safety programs and protocols are generalized statements that
courts in this Circuit have consistently deemed inactionable puffery.  *See, e.g.*,
*ECA*, 553 F.3d at 206 ("The statements are too general to cause a reasonable
investor to rely upon them. ... [They] did not, and could not, amount to a
guarantee that [the company's] choices would prevent failures in its risk
management practices[, but rather were] ... merely generalizations regarding

[the company's] business practices."); *Lasker* v. *N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 58-59 (2d Cir. 1996).[5]

### d.   The Statements in the October 20, 2015 8-K; October 20, 2015 Conference Call; October 21, 2015 Form 10-Q; and November 10, 2015 Press Release May Be Actionable

On the other hand, Plaintiffs may have pleaded adequately that specific statements contained in Chipotle's October 20, 2015 8-K; its October 21, 2015 Form 10-Q; the October 21, 2015 conference call; and the November 10, 2015 Press Release were untrue outright or "half-truths."  Taking the last of these statements first, Plaintiffs have alleged that the November 10, 2015 statements to the effect that (i) health officials had concluded there was no ongoing risk and (ii) there was no ongoing threat related to the October E. Coli outbreak were false, citing to letters published by the CDC on November 20, 2015, and April 15, 2016.  (Compl. ¶¶ 222-23, 248).  Such an alleged misrepresentation of existing fact may be actionable.  *See Novak*, 216 F.3d at 315.

Plaintiffs have also alleged that Chipotle's statement in its October 21, 2015 Form 10-Q that there had been "no material changes" in Chipotle's risk factors since its 2014 Form 10-K was a misrepresentation of existing fact given the four food-borne illness outbreaks identified prior to October 21.  And

---

[5]    Though the Court does not need to reach the second step in the Section 10(b) and Rule 10b-5 analysis with regard to these statements, because it finds them insufficient at the first, the Court notes that these statements would also fail with regard to scienter.  Plaintiffs have pleaded no facts to demonstrate that these statements were known to be untrue when made.  The fact that Chipotle later found itself beset by a plague of food-borne illness outbreaks does not prove that Chipotle was not committed to serving safe food, that its quality assurance department did not establish and monitor its quality and food safety programs, and that such programs were not designed to ensure compliance with safety regulations.

similarly, Plaintiffs have pleaded that advising investors regarding Chipotle's financial performance and future in the October 20 8-K and conference call, without discussing the import of the food-borne illness outbreaks for that future, misrepresented existing facts by propagating a material omission. The Court finds that these statements are more than the declarations of "intention, hope, or projections of future earnings" that courts in this Circuit have deemed "the hallmarks of inactionable puffery." *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 509 (S.D.N.Y.), *opinion corrected on denial of reconsideration*, 612 F. Supp. 2d 397 (S.D.N.Y. 2009). "They were neither 'vague' nor 'non-specific' pronouncements that were incapable of 'objective verification,'" but rather specific, affirmative statements of fact regarding Chipotle's risk and the reasons for its past, present, and hoped-for future performance that could be verified. *Id.* (quoting *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 336 (S.D.N.Y. 2007)). These too may be actionable allegations.

The Court pauses to underscore that these alleged misstatements can only be actionable if Plaintiffs have also adequately pleaded that they are material. That is, the Court must find that there is a substantial likelihood that a disclosure of (i) an ongoing CDC investigation, (ii) the existence of "material changes" in Chipotle's risk factors since its 2014 Form 10-K, and (iii) the impact of the food-borne illness outbreaks on Chipotle's past, present, and future financial performance each "would have been viewed by the reasonable investor as having significantly altered the total mix of information

29

made available." *ECA*, 553 F.3d at 197 (internal quotation mark omitted) (quoting *Basic Inc.*, 485 U.S. at 231-32).

The Court is skeptical that these particular disclosures would have "altered the total mix of information available," given the highly publicized nature of the outbreaks documented in the Complaint. *See In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 290 (S.D.N.Y. 2010) ("'[W]idely reported' facts disseminated in the news media may be part of the 'total mix' of information." (alteration in original) (quoting *United Paperworkers Int'l Union* v. *Int'l Paper Co.*, 985 F.2d 1190, 1197-98 (2d Cir. 1993)); *see also GAF Corp.* v. *Heyman*, 724 F.2d 727, 741 (2d Cir. 1983) (justifying finding that disclosure would not have altered the total mix of information available in part on the basis of news stories). "But case law does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information." *Litwin*, 634 F.3d at 718; *see also id.* at 718-19 ("In this case, the key information that plaintiffs assert should have been disclosed is whether, and to what extent, the particular known trend, event, or uncertainty might have been reasonably expected to materially affect [defendant's] investments.  And this potential future impact was certainly not public knowledge[.]").  Moreover, the Court cannot say that these disclosures "are *so obviously* unimportant to a reasonable investor that reasonable minds *could not differ* on the question of their importance." *Id.* at 718 (emphasis added) (quoting *Ganino*, 228 F.3d at 162).  The Court will not therefore dismiss the disputed statements made on these four occasions on the

30

basis of their questionable materiality.  As it happens, these statements fail at the second step of the Court's § 10(b) analysis.[6]

### e.    The Law on Scienter

As discussed above, Plaintiffs' securities fraud claims are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA, 15 U.S.C. § 78u-4(b).  *See, e.g.*, *ATSI Commc'ns*, 493 F.3d at 99 (affirming that securities fraud claims must satisfy the heightened pleading standards of both Rule 9(b) and the PSLRA); *Arco Capital Corp.*, 949 F. Supp. 2d at 539 (same).

The PSLRA "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'"  *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 193 & n.12 (1976)) (citing 15 U.S.C. § 78u-4(b)(1), (2)).  To satisfy the scienter requirement, a complaint must give "rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  A "strong inference" that a defendant acted with scienter is not an irrefutable inference, though it "must be more than merely plausible or reasonable[.]"  *Tellabs*, 551 U.S. at 314.  It cannot be identified "in a vacuum," as "[t]he inquiry is inherently comparative[.]"  *Id.* at 323.  A "strong

---

[6]     The Court also assumes here, *arguendo*, that these statements do not fall within one of the PSLRA's safe harbor provisions.  The Court will consider this question more fully below, however, because it is bound up with the Court's scienter analysis.

inference" is an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

To evaluate whether the PSLRA's scienter standard has been met, courts consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc.*, 551 U.S. at 323 (emphasis in original); *see also id.* at 326 ("[The court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. ... [A] court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"). And "[w]hen the defendant is a corporate entity, ... the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

The facts pled must show either "that the defendants had the motive and opportunity to commit fraud" or constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. "In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, [a plaintiff] must allege that [defendants] 'benefitted in some concrete and personal way from the purported fraud.'" *Id.* (emphasis added) (quoting *Novak*, 216 F.3d at 307-08). It is not enough for a plaintiff to show "[m]otives that are common to most corporate officers, such as the desire for the corporation to

appear profitable and the desire to keep stock prices high to increase officer compensation[.]"  *Id.*; *accord, e.g.*, *Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("[A] generalized motive ... which could be imputed to any publicly owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter.").

In the absence of a showing of motive, "it is still possible to plead scienter by identifying circumstances" indicative of conscious misbehavior or recklessness on the part of the defendant, "though the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit*, 264 F.3d at 142 (quoting *Beck* v. *Mfrs. Hanover Tr. Co.*, 820 F.2d 46, 50 (2d Cir. 1987)). Conscious recklessness is a "state of mind approximating actual intent, and not merely a heightened form of negligence."  *S. Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quotation mark and emphasis omitted) (quoting *Novak*, 216 F.3d at 312).  To plead conscious recklessness adequately, a plaintiff must allege facts showing "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendants or so obvious that the defendant must have been aware of it."  *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000); *accord Rothman* v. *Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (quoting *Rolf* v. *Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)).  A plaintiff may allege that a defendant "engaged in deliberately illegal behavior, knew facts or had access to information suggesting his public statements were not accurate, or failed to

check information that he had a duty to monitor." *Nathel* v. *Siegal*, 592 F. Supp. 2d 452, 464 (S.D.N.Y. 2008) (citing *Novak*, 216 F.3d at 311).  Opinions or predictions can be the basis for scienter "if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (citation omitted).

### f.   Plaintiffs Have Not Pleaded Scienter on the Basis of Defendants' Motive and Opportunity to Commit Fraud

In attempting to comply with Rule 9(b), Plaintiffs have specified the statements that are alleged to be fraudulent: they are the particular statements described above within Chipotle's October 20, 2015 8-K; October 21, 2015 Form 10-Q; the October 21, 2015 conference call, and November 10, 2015 Press Release.  Plaintiffs have identified the speaker, attributing these statements to Defendants.[7]  They have described the circumstances in which

---

[7]   Plaintiffs have identified Hartung as the author of the October 20 conference call statements.  The Individual Defendants are alleged to be the collective authors of the statements in made in the Company's SEC filings.  *See Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*, 797 F.3d 160, 173 (2d Cir. 2015) ("Where a plural author is implied by the nature of the representations — for instance, where, as here, [i] the alleged fraud is based on statements made in the offering materials and [ii] the complaint gives grounds for attributing the statements to the group — group pleading may satisfy the source identification required by Rule 9(b)."  The Court is skeptical of this attribution with regard to Chipotle's press releases, but does not need to resolve this issue, since Plaintiffs' claims fail on other grounds.

The Court notes, however, that courts in this Circuit have held that "[s]cienter must be separately pled and individually supportable as to each defendant; scienter is not amenable to group pleading." *C.D.T.S.* v. *UBS AG*, No. 12 Civ. 4924 (KBF), 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013), *aff'd sub nom. Westchester Teamsters Pension Fund* v. *UBS AG*, 604 F. App'x 5 (2d Cir. 2015) (summary order); *see also, e.g., S.E.C.* v. *Espuelas*, 579 F. Supp. 2d 461, 482 n.10 (S.D.N.Y. 2008) ("[T]he group pleading doctrine can only be invoked to attribute fraudulent statements to defendants, remaining wholly insufficient to plead scienter.").  Other courts have aptly noted that "Individual Defendants' signatures on SEC filings contribute, at most, a weak inference of scienter." *Christine Asia Co.* v. *Alibaba Grp. Holding Ltd.*, 192 F. Supp. 3d 456, 482 (S.D.N.Y. 2016).  "To hold otherwise would allow plaintiffs to plead the scienter of whole

the statements were made, and explained their belief as to why they were fraudulent.  Rule 9(b)'s requirements are satisfied.

With regard to the PSLRA, Plaintiffs have argued both that Defendants had "the motive and opportunity to commit fraud" and that there is "strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA*, 553 F.3d at 198.  Considering the first of these scienter arguments, the Court focuses on Plaintiffs' demonstration of motive; there is no dispute that Defendants had the opportunity to commit fraud.  *See, e.g.*, *In re PXRE Grp., Ltd., Sec. Litig.* (hereinafter "*PXRE*"), 600 F. Supp. 2d 510, 529-30 (S.D.N.Y.), *aff'd sub nom. Condra* v. *PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009) (summary order); *Pension Comm. of Univ. of Montreal Pension Plan* v. *Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006) ("Regarding the 'opportunity' prong, courts often assume that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired.").

Plaintiffs' motive argument focuses on the stock sales made by the Individual Defendants just prior to the Class Period.  In particular, Plaintiffs argue that, following a proxy fight that resulted in the reduction of the Individual Defendants' salaries, the Defendants were motivated to, and did,

---

classes of defendants solely by alleging a misstatement."  *Id.* (internal quotation marks omitted) (quoting *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 485 (S.D.N.Y. 2006)).  Therefore, while the Court ultimately finds Plaintiffs have pleaded scienter insufficiently on other grounds, it notes this attribution issue so that Plaintiffs may consider it carefully in any amended pleading they may choose to file.

"artificially increase the price of Chipotle stock so that they could maximize the sales of substantial amounts of their personal holdings." (Compl. ¶¶ 286-87).

The Second Circuit has made clear that general motives that any corporate director would have are insufficient, and that plaintiffs must allege concrete and personal benefits that the defendants perpetrating the fraud stood to gain. *See Kalnit*, 264 F.3d at 139 (citing *Novak*, 216 F.3d at 307-08). Insufficient motives in this context include "[i] the desire for the corporation to appear profitable and [ii] the desire to keep stock prices high to increase officer compensation." *Id.* (citing *Novak*, 216 F.3d at 307-08 (collecting cases)). However, motive has been deemed "sufficiently pleaded where [a] plaintiff alleged that defendants misrepresented corporate performance to inflate stock prices while they sold their own shares." *Id.* (citing *Novak*, 216 F.3d at 307-08 (collecting cases)).

It is this latter needle that Plaintiffs attempt to thread. Plaintiffs argue that the Individual Defendants' trading activity during the Class Period permits an inference of bad faith and scienter because the Defendants' "stock sales were 'unusual.'" *Acito* v. *IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (citation omitted) (citing *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989)). And, indeed, courts have identified facts that can make a single defendant's stock sales "unusual," including the size of the sale relative to that defendant's total stock holdings and other defendants' sale of shares during the class period. "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the

36

portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-75 (2d Cir. 2001); *see also Stevelman* v. *Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999). The timing of the sales is also critical: sales made only before alleged misstatements may be inconsistent with a motive showing. *Stevelman*, 174 F.3d at 85; *cf. id.* at 86 ("Some of the sales occurred after the representations were made, several officers made large sales, and a motive for inflation of the stock price can be inferred from these sales.").

Defendants have attempted to rebut Plaintiffs' allegations with a factual argument, claiming that the sales were not unusual because they were made pursuant to Rule 10b5-1 plans. (Def. Br. 28). However, for reasons discussed in more depth below, the Court will not consider at this stage the extrinsic evidence that Defendants attempted to introduce in connection with their motion to dismiss. Shorn of any factual support, Defendants' argument fails.

Ultimately, though, the Court finds that Plaintiffs have not adequately pleaded motive. It may be true that Defendants sold stock during the Class Period, in quantities larger than usual, and for a profit that was larger than typical. (Compl. ¶¶ 287-89). However, these sales were made long before the alleged misstatements that the Court has deemed actionable above. To accept Plaintiffs' theory of motive, the Court must infer that Defendants were selling off a small portion of their stock for months prior to the first outbreak of food-borne disease because they believed that such an outbreak was imminent. But this inference cannot be said to be "at least as compelling as any opposing

inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  Far more plausible is the inference that the Individual Defendants sold more stock than they had previously because they were being paid less than they had been previously.  Defendants sold stock through July 2015 and stopped selling once the food-borne illness outbreaks occasioned a diminution of Chipotle stock's value, as would any rational economic actor.  Because the stock sales ended prior to the occasion of the alleged misstatements that the Court has found actionable, they cannot support an argument for scienter with regard to those misstatements.  *See Stevelman*, 174 F.3d at 85.

### g.    Plaintiffs Have Not Pleaded Scienter on the Basis of Defendants' Conscious Misbehavior or Recklessness

The Court next considers the circumstantial evidence of Defendants' conscious misbehavior or recklessness with regard to each of the alleged material misstatements or omissions.  Again, taking the last in time first, the Court is skeptical that Plaintiffs have alleged adequately that Defendants' statement in the November 10, 2015 press release was highly unreasonable and evinced an extreme departure from standards of ordinary care.  *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d at 39.  It is true that by November 10, 2015, Chipotle was aware of at least five prior outbreaks of food-borne illness, in connection with which it had worked with food safety authorities.  Plaintiffs allege therefore that the Company's statement that there was "no ongoing risk and that there was no ongoing threat related to the October E. Coli outbreak" was untrue, or, at the very least, that the possibility of an ongoing risk or threat "was either known to the [D]efendant[s] or so obvious that the

38

[D]efendant[s] must have been aware of it." *Id.* They seek to bolster this allegation by circumstantial evidence including the letters published by the CDC on November 20, 2015, and April 15, 2016 (Compl. ¶¶ 222-23, 248); subsequent press releases issued by Chipotle regarding the October E. coli outbreak; and the experience that Plaintiffs assume the Company must have garnered from its involvement in the prior outbreak investigations.

But looking carefully at Chipotle's public statement, the Court finds that Plaintiffs' inference is considerably less compelling than others. The November 10 press release announced that Chipotle would reopen the 43 stores it had closed in the Seattle and Portland areas after the outbreak, because the Company had procured "a fresh supply of all new ingredients," and "health officials [had] concluded that there [was] no ongoing risk from this incident." (Compl. ¶ 156). This is not inconsistent with the CDC's statements that it was continuing laboratory surveillance to identify the cause of the outbreak and any additional persons affected by it. Chipotle's statement is forward-facing: Health officials had concluded that there was no future risk posed by dining at the restaurants that Chipotle was reopening. The CDC's statement, in contrast, is backward-looking: Its investigation into the causes of the outbreak and identification of infected persons was ongoing.

Moreover, the Court notes that the Complaint only alleges CDC involvement with regard to one prior investigation: Specifically, with regard to the July E. coli outbreak, the Complaint alleges that the "CDC was made aware of this outbreak in July, but no public disclosure was made because by the

time the link to Chipotle was discovered, health officials had determined that this outbreak posed no ongoing risk to the public." (Compl. ¶ 83). Plaintiffs' contention that Chipotle must have learned from its past experiences about the length of time an investigation would take is undermined by this fact, which appears to imply that health officials' July investigation concluded very promptly.

Similarly, Chipotle's statement in its October 21, 2015 Form 10-Q that there had been "*no* material changes" in Chipotle's risk factors since its 2014 Form 10-K is alleged to conflict with the fact that there had been five outbreaks of food-borne illness at Chipotle restaurants by that date. (Compl. ¶¶ 217-18 (emphasis added)). From this, Plaintiffs reason that on or before October 21, the fact there had been "material changes" to Chipotle's risk factors "was either known to the defendant[s] or so obvious that the defendant[s] must have been aware of it." *See In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d at 39.

But again, this allegation falters when the Court drills down into Chipotle's specific disclosures and obligations, assuming in the first instance that Items 303 and 503 gave rise to any such obligations with regard to the disputed statements. Item 303 requires the disclosure of harm that is "probable," "imminent," and "not merely potential." *See Christine Asia Co.* v. *Alibaba Grp. Holding Ltd.*, 192 F. Supp. 3d 456, 477 (S.D.N.Y. 2016). And a court's inquiry with regard to Item 503 "boil[s] down ... to 'whether the Offering Documents were accurate and sufficiently candid." *Id.* (quoting *City of Roseville Emps.' Ret. Sys.* v. *EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426

(S.D.N.Y. 2011)).  Here, Defendants described the risks posed by their in-store

production of the "majority" of their food in the "Risk Factors" section of the

2014 10-K that the October 21, 2015 Form 10-Q incorporated by reference.

This risk was adequately described, as was its potential impact on the

Company's business:

> On a small number of occasions one or more Chipotle
> restaurants have been associated with customer illness,
> and on those occasions our sales have sometimes been
> adversely impacted, at times even in markets beyond
> those impacted by the illness.  If our customers become
> ill from food-borne or localized illnesses or if an illness
> is attributed to our food, even incorrectly, we could also
> be forced to temporarily close some restaurants, further
> impacting sales. ... A decrease in customer traffic as a
> result of these health concerns or negative publicity, or
> as a result of a change in our menu or dining experience
> or a temporary closure of any of our restaurants, would
> adversely impact our restaurant sales and profitability.
> Furthermore, if we react to these problems by changing
> our menu or other key aspects of the Chipotle
> experience, we may lose customers who do not accept
> those changes, and may not be able to attract enough
> new customers to generate sufficient revenue to make
> our restaurants profitable.  Customers may also shift
> away from us if we choose to pass along to consumers
> any higher ingredient costs resulting from supply
> problems associated with outbreaks of food-borne
> illnesses, which would also have a negative impact on
> our sales and profitability.

(Compl. ¶ 267 (emphasis omitted)).  The Court is not convinced that the

Company's decision to transition to in-store produce production changed these

disclosed risk factors in a material way.  Any heightened risk posed by that

transition was only potential, and the Company's disclosure of its probable,

imminent risks was both accurate and candid.

Similarly, Plaintiffs allege that the possibility that the past and potential future food-borne disease outbreaks had impacted and would continue to impact Chipotle's financial performance and future was "either known to the defendants or so obvious that the defendant[s] must have been aware of it." *See In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d at 39.  On this point, Plaintiffs allege that in Defendants' statements made in the October 21, 2015 Form 10-Q and on the October 21, 2015 conference call, Defendants disclosed only "half-truths," because they failed to mention, discuss, or even account for the variable of Chipotle's issues with food-borne illness when describing the reasons for Chipotle's recent performance and Defendants' projections for its future.

Once more, the Court finds that Plaintiffs' allegations cannot survive any measure of scrutiny.  In the October 20 Form 8-K, Chipotle predicted "low-to-mid single digit comparable restaurant sales increases" for 2015, and a worse performance in 2016, with only "low-single digit comparable restaurant sales increases." (Compl. ¶ 200).  In the corresponding press conference, Defendant Hartung answered the specific questions he was posed with specific answers, describing long-standing trends the applicability and validity of which Plaintiffs do not dispute.  With regard to all of the 8-K and press conference statements, there is no indication in the Complaint that Chipotle's projections were inconsistent with or did not account for the Company's assessments of the impact of the food-borne illness outbreaks.  And "as long as the public statements are consistent with reasonably available data, corporate officials

42

need not present an overly gloomy or cautious picture of current performance and future prospects." *Novak*, 216 F.3d at 309; *cf. id.* at 315 ("Here, the complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true.").

Finally, the Court notes that this failure to plead scienter implicates the PSLRA's safe harbor. This statutory exception provides that "a defendant is not liable if [a] forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with *actual knowledge* that it was false or misleading." *Slayton* v. *Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (last emphasis added) (citing 15 U.S.C. § 78u-5(c)). Defendants' 8-K and press conference statements "were plainly forward looking under 15 U.S.C. § 78u-5(c)(1), as they were framed as an expectation or projection." *Prime Mover Capital Partners L.P.* v. *Elixir Gaming Techs., Inc.*, 548 F. App'x 16, 18 (2d Cir. 2013) (summary order) (citing *Slayton*, 604 F.3d at 766-67). And both fall within the third safe-harbor prong involving the absence of actual knowledge. "The scienter requirement for forward-looking statements — actual knowledge — is 'stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches *only* upon proof of *knowing falsity*.'" *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d at 530 (emphasis added) (quoting *Slayton*, 604 F.3d at 773). Here, for the reasons described above, "the allegations in the [Complaint], considered

43

as a whole, do not support an inference of recklessness, much less a 'strong inference' of actual knowledge."  *Id.* at 535 (citing *Slayton*, 604 F.3d at 773). Therefore, these two statements are protected by the PSLRA safe harbor.[8]

In sum, because Plaintiffs have failed to plead adequately the elements of (i) material misstatements or omissions and (ii) scienter, their claims under Section 10(b) and Rule 10b-5 fail.  The Court therefore declines to reach loss causation, the third element Defendants have disputed in their motion to dismiss.[9]

---

[8]    The press conference statement is likely protected by the first prong of the safe harbor as well, which prong protects forward-looking statements accompanied by meaningful cautionary language.  In his statements, Hartung notes that predicting future performance based on the Company's past performance is a "challenge," and that the Company is "hoping" it will be "able" to ignite a trend.  (Compl. ¶ 201).  He further warns that "[w]hen that will happen, what the order of magnitude of that happening, is very difficult to predict."  (*Id.*).  When asked about the company's performance in October, Hartung describes what he is "hoping will happen," and gives an estimate that is "maybe" conservative, noting that because "October is so choppy right now, it isn't really giving us any indication of what the current underlying pattern is[,] ... it's very difficult to read."  (*Id.*).

"Of course, cautionary language about future risk does not insulate a defendant from liability where the defendant fails to disclose that the risk is already present."  *Bettis* v. *Aixtron SE*, No. 16 Civ. 25 (CM), 2016 WL 7468194, at *14 (S.D.N.Y. Dec. 20, 2016). But the Court does not find that within the cabined context of the challenged October 20, 2015 statements, Hartung failed to disclose a risk he knew to be present.  Hartung gave tailored answers to the tailored questions he was asked, and was not required to append *sua sponte* a broad warning to the end of each answer regarding the food-borne illness outbreaks.

The Court pauses here to note Defendants' troubling claim that Plaintiffs are selectively quoting, and thereby misrepresenting, the substance of these challenged statements. The Court cannot determine what warnings Hartung gave in the press conference because it has been presented with only a small portion of a transcript of that conference.  And the Court may not infer at this stage that statements more favorable to Defendants may have been omitted from the Complaint; for now, the Court's hands are tied, and it must take Plaintiffs' well-pleaded allegations as true.  Both sides are on notice that false claims, whether in pleadings or in motion papers, are unlikely to serve them well in this litigation.

[9]    That said, the Court is skeptical that Plaintiffs have pleaded adequately loss causation. Plaintiffs attempt to do so by describing a series of drops in the value of Chipotle's stock.  However, the timing of these drops appear to undermine their claims.  *See 60223 Tr.* v. *Goldman, Sachs & Co.*, 540 F. Supp. 2d 449, 461 (S.D.N.Y. 2007) (finding loss causation was not adequately pleaded when a stock lost its value "gradually over

### 2.      Plaintiffs Have Not Stated a Claim Under Section 20(a)

To state a Section 20(a) claim, a plaintiff must show [i] "a primary violation by the controlled person"; [ii] "control of the primary violator by the defendant"; and [iii] evidence that the controlling person "was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc.*, 493 F.3d at 108.  This claim fails because Plaintiffs have not stated a primary violation under Section 10(b) and Rule 10b-5.

### C.      Plaintiffs' Application for Leave to Amend Is Granted

Plaintiffs request leave to amend the Complaint and file a Second Amended Complaint rectifying its deficiencies.  (Pl. Opp. 40).  Rule 15(a)(2) instructs courts to freely give leave to amend "when justice so requires." *McCarthy* v. *Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007); *see also* Fed. R. Civ. P. 15(a).  "This permissive standard is consistent with [the Second Circuit's] 'strong preference for resolving disputes on the merits.'"  *Williams* v. *Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (per curiam) (quoting *New York* v. *Green*, 420 F.3d 99, 104 (2d Cir. 2005)).  And where, as here, a securities fraud case "combines a complex commercial reality with a long, multi-prong complaint," the Circuit has encouraged courts to grant leave to amend, because "pleading defects may not only be latent, and easily missed or misperceived without full briefing and judicial resolution; they may also be

---

the course of the entire class period," such that it had "already lost almost all its value" "by the time of the disclosures which allegedly caused the economic loss").  The Court also finds compelling Defendants' argument that the result of the alleged corrective disclosures is difficult to disentangle from the announcement of additional outbreaks. (Def. Br. 39-40).

borderline, and hence subject to reasonable dispute." *Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015).

The Court has not granted Plaintiffs leave to amend to correct pleading deficiencies on any prior occasion, and cannot find that amendment would be futile or unduly prejudicial. It cautions Plaintiffs, however, that additional clarity need not require additional length. The Court also expects that Plaintiffs will consider carefully the Court's observations in this Opinion.

**D.    Plaintiffs' Motion to Strike Is Denied**

The Court is aware of the limits on its ability to consider materials outside the pleadings when adjudicating a motion brought under Rule 12(b)(6). *See Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016). Generally courts may "not look beyond 'facts stated on the face of the complaint, ... documents appended to the complaint or incorporated in the complaint by reference, and ... matters of which judicial notice may be taken.'" *Id.* at 559 (quoting *Concord Assocs., L.P.* v. *Entm't Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)). Defendants here urge the Court to take judicial notice of the Exhibits, but the Court declines. The Court was able to resolve Defendants' motion without considering these materials. Accordingly, Plaintiffs' motion to strike the Exhibits is denied as moot.

## CONCLUSION

For the reasons outlined above, Defendants' motion to dismiss the Complaint for failure to state a claim is GRANTED. The Complaint is DISMISSED WITHOUT PREJUDICE. Plaintiffs' motion to strike Defendants'

Exhibits, mooted given this result, is DENIED.  The Clerk of Court is directed to terminate the motions at docket entries 60 and 66.

Plaintiffs' request for leave to amend is GRANTED.  Plaintiffs must file their Second Amended Complaint within 30 days of this Opinion.  Defendants must answer or otherwise respond within 30 days of Plaintiffs' filing.

SO ORDERED.

Dated:      March 8, 2017
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge