UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X
                              :

SUSIE ONG, *individually and*
*on behalf of all others similarly situated,* :
*et al.,* :
                              :

                  Plaintiffs, :

                       v. :

CHIPOTLE MEXICAN GRILL, INC., M. :
STEVEN ELLS, MONTGOMERY F. MORAN, :
and JOHN R. HARTUNG, :
                  Defendants. :
                              :
-----------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 22, 2018

16 Civ. 141 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Lead Plaintiffs Metzler Asset Management GmbH and Construction

Laborers Pension Trust of Greater St. Louis ("Plaintiffs"), on behalf of

themselves and other similarly situated shareholders, bring this securities

class action against Defendants Chipotle Mexican Grill, Inc. ("Chipotle" or "the

Company"), and Chipotle executives Steven Ells, Montgomery F. Moran, and

John R. Hartung (collectively, the "Chipotle Executives" or the "Individual

Defendants," and including Chipotle, "Defendants"). Plaintiffs allege, and

Defendants do not dispute, that after a rash of food-borne illness outbreaks in

late 2014 and 2015, some of which were linked to Chipotle, the value of the

Company's stock steeply declined. But while others attribute these losses to

the adverse publicity surrounding the outbreaks, Plaintiffs instead claim that

they are due, in part or in whole, to the Company's failure to disclose certain

granular details and attendant risks of its produce-processing and food-safety procedures.

Plaintiffs have brought securities fraud claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  The Court previously dismissed Plaintiffs' First Amended Complaint (the "FAC"), and Defendants now move to dismiss the Second Amended Complaint (the "SAC"). Defendants also move to strike an expert witness declaration attached to the SAC.  For the reasons that follow, the Court grants Defendants' motion to strike in part, and grants their motion to dismiss in its totality.  The Court is as concerned as the parties about food-borne illness outbreaks generally and about those described in the SAC specifically.  That said, not all adverse events are the product of corporate misfeasance or nonfeasance, and the Court cannot find on this record that Plaintiffs have adequately pleaded securities fraud.

**BACKGROUND**[1]

**A.    Factual Background**

The Court's prior opinion considering Defendants' motion to dismiss the FAC provided an extensive discussion of the alleged facts.  *See Ong* v. *Chipotle*

---

[1]    This Opinion draws its facts from Plaintiffs' Second Amended Complaint (the "SAC" (Dkt. #80)), taking all well-pleaded allegations as true as the Court must at this stage. *See, e.g., Flores* v. *201 W. 103 Corp.*, 256 F. Supp. 3d 433, 435 n.1 (S.D.N.Y. 2017). The Court has also reviewed the briefing submitted by the parties on the motion to dismiss and will refer to it as follows:  Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint (Dkt. #84) will be referred to as "Def. Br.," Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion (Dkt. #91) as "Pl. Opp.," and Defendants' Memorandum in Reply (Dkt. #94) as "Def. Reply"  Additionally, the Court has reviewed the briefing submitted by the parties in connection with the motion to strike and will refer to it as follows:  Defendants' Memorandum of Law in Support of their Motion to Strike (Dkt. #87) as "Def. Strike Br.," Plaintiffs' Memorandum

2

*Mexican Grill, Inc.* ("*Chipotle I*"), No. 16 Civ. 141 (KPF), 2017 WL 933108, at *1-5 (S.D.N.Y. Mar. 8, 2017). Nevertheless, given the extensive additions to Plaintiffs' complaint, the Court again outlines the factual allegations, while noting at times where Plaintiffs' allegations have remained the same and where they have changed.

### 1. The Parties

Plaintiffs bring this case as a class action "on behalf of all purchasers of the common stock of Chipotle between February 5, 2015[,] and February 2, 2016, inclusive" (the "Class Period"). (SAC ¶ 1). "Chipotle is a publicly traded fast-food restaurant chain," which, as of December 31, 2015, operated over 1,900 restaurants in the United States that offer cuisine containing produce items including tomatoes, lettuce, red onion, jalapeños, and cilantro. (*Id.* at ¶ 20). As of February 4, 2015, Chipotle had more than 31 million shares of common stock issued and outstanding. (*Id.*).

The SAC names, as individual defendants, three current and former Chipotle executives. Defendant M. Steven Ells is Chipotle's founder and, during the Class Period, was one of two of the Company's co-Chief Executive Officers, along with Defendant Montgomery F. Moran. (SAC ¶¶ 21-22). Moran was also on Chipotle's Board of Directors during the Class Period. (*Id.* at ¶ 22). Before serving in these capacities, Moran was Chipotle's outside counsel while working for the Denver law firm of Messner & Reeves, LLC. (*Id.*). It is alleged

---

of Law in Opposition to Defendants' Motion (Dkt. #90) as "Pl. Strike Opp.," and Defendants' Memorandum in Reply (Dkt. #95) as "Def. Strike Reply."

that "[o]n December 12, 2016, in light of the significant fallout from the Class Period food-borne illness outbreaks[,] Moran resigned as co-CEO and director at the Board's request." (*Id.*).  Defendant John R. Hartung is, and served throughout the Class Period as, Chipotle's Chief Financial Officer.  (*Id.* at ¶ 23). In this capacity, Hartung was responsible for Chipotle's "financial and reporting functions," as well as overseeing information technology; safety, security, and risk; and compensation and benefits.  (*Id.*).

Plaintiffs allege that, given their positions in the Company during the Class Period, the Chipotle Executives "had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via internal corporate documents," as well as "conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to them[.]"  (SAC ¶ 26).  Drawing from this, along with other allegations, Plaintiffs posit that these Executives, and thus Chipotle, "were aware of[] food-borne illness outbreaks at the Company," as discussed more fully below.  (*Id.* at ¶ 44).

## 2.    Chipotle's Food-Safety Practices

The SAC expands on the FAC's discussion of food-safety procedures that Chipotle had in place before, during, and after the Class Period.[2]  Before the

---

[2]        Much of this discussion is sourced to the Declaration of L. Scott Donnelly, Ph.D., which Plaintiffs seek to incorporate in the SAC and Defendants move to strike.  (*See generally* Def. Strike Br.).  As discussed more fully below, the Court grants Defendants' motion to

Class Period, Chipotle received its produce "from a central commissary where it was processed, prepared[,] and tested at least twice for pathogens before being delivered." (SAC ¶ 2). Plaintiffs contend that this is "the industry standard practice in the fast food industry" for ready-to-eat food, as it "allows for much greater control over food safety than at individual restaurants." (*Id.* at ¶ 63). Commissary food-processing systems also provide "the ability to conduct raw material testing and end product testing." (*Id.* at ¶ 64). Raw material testing involves testing food products for pathogens at their preliminary arrival at the commissary. (*Id.*). Food product that passes these tests is then subject to end product testing, which involves sampling batches of the food at intervals and disposing of any batch that fails. (*Id.* at ¶¶ 64-65). A negative test result may also trigger procedures for tracing the contaminated product back to its source to prevent further distribution of pathogen-ridden food. (*See id.* at ¶ 65). Plaintiffs assert that "any professional in the food safety business understands that raw material testing and end product testing are the industry standard for verifying that the food served at individual restaurants is safe." (*Id.* at ¶ 67).

In late 2014, Chipotle "switch[ed] the cutting and processing of its produce to each of its 1,900 individual restaurants, instead of a central commissary, believing that this would improve taste and freshness." (SAC ¶ 2). In Plaintiffs' view, because this entailed a drastic shift in the method in which

---

strike insofar as the Court shall not consider the Declaration or any conclusory allegations that the SAC derives from it. But for the sake of completeness, here, the Court recounts both facts and conclusions that may derive from the Donnelly Declaration.

Chipotle went about assuring food safety, maintaining the same standard of quality "would have required a detailed hazard analysis of the food safety risks associated with this change in operations." (*Id.* at ¶ 70; *see id.* at ¶ 69). Failure to do so would "exponentially increase" the risk that Chipotle would experience food-borne illness outbreaks "as soon as the switch was made," as Chipotle would be unable to recreate the safety mechanisms in place at commissary distributors. (*Id.* at ¶ 70; *see id.* at ¶¶ 70-76). Plaintiffs also allege that the switch away from commissary food distribution prevented Chipotle from being able to trace its ingredients back to specific suppliers, which in turn would frustrate investigations into the source of pathogens. (*See id.* at ¶¶ 82-85).

Plaintiffs further claim that Chipotle maintained a practice of internally auditing the food safety levels at individual locations, rather than what they claim is the "industry standard" of external auditing, which eliminates "the possibility of collusion between the stores and the auditors." (SAC ¶¶ 86-87). Chipotle would also "pre-announce[]" the audits, which would allow the restaurants "ample time to hide or mask deficient food safety practices." (*Id.* at ¶ 88).

On December 4, 2015, after Chipotle was involved in a number of food-borne illness outbreaks (discussed more fully below), the Company "disclosed that it had begun high-resolution testing of produce as part of its remediation plan." (SAC ¶ 77). High-resolution testing is a form of end product testing "that uses a larger number of samples based on the timing of

6

manufacturing … or the lot size," and it "can only take place at commissaries or food factories." (*Id.*).  According to Plaintiffs, "this means that Chipotle had switched back to commissary preparation for its produce by the time of this disclosure." (*Id.* at ¶ 78).  As another remedial measure, on February 8, 2016, Chipotle closed all of its restaurants to train employees in food safety.  (*Id.* at ¶ 90).  Plaintiffs allege that this decision indicates "that employees were not properly safety trained before the[] outbreaks." (*Id.*).

### 3.    Food-Borne Illness Outbreaks

As opposed to the seven food-borne illness outbreaks detailed in the FAC, *see Chipotle I*, 2017 WL 933108, at *2, the SAC alleges that "Chipotle experienced no fewer than thirteen food-borne illness outbreaks during the Class Period, many of which have still not been disclosed to the public" (SAC ¶ 92).  Specifically, Plaintiffs premised the FAC on the following outbreaks, all of which took place in 2015:

> (i) an outbreak of E. coli … in July [2015] in Washington State; (ii) an outbreak of Norovirus in August [2015] in Washington; (iii) an outbreak of Norovirus in August [2015] in California; (iv) an outbreak of Salmonella in August [2015] in Minnesota; (v) an outbreak of E. coli … in October [2015] in Washington, Oregon, California, Illinois, Maryland, Minnesota, New York, Ohio, Pennsylvania, Delaware, and Kentucky; (vi) an outbreak of E. coli … in November [2015] in Kansas, North Dakota, and Oklahoma; and (vii) an outbreak of Norovirus in December [2015] in Massachusetts.

*Chipotle I*, 2017 WL 933108, at *2.[3]

---

[3]    The Complaint defines these conditions as follows:

> The term Salmonella refers to a group or family of bacteria that variously cause illness in humans.  Salmonella is an enteric

In addition to these outbreaks, the SAC describes the following outbreaks involving Chipotle customers:

> (viii) an outbreak of Salmonella beginning in December 2014 involving customers in Wisconsin, Massachusetts, New Jersey, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and Washington; (ix) an outbreak of Salmonella beginning in February 2015 involving customers in New York, Wisconsin, Ohio, Texas, and Massachusetts; (x) an outbreak of E. coli beginning in March 2015 involving customers in California, Connecticut, and Nevada; (xi) an outbreak of Salmonella in May 2015 involving customers in New Jersey, Kentucky, and New York; (xii) an outbreak of Salmonella beginning in July 2015 involving customers in New York; and (xiii) an outbreak of E. coli beginning

---

bacterium, which means that it lives in the intestinal tracts of humans and other animals. Salmonella bacteria are usually transmitted to humans by eating foods contaminated with foods that have been handled by infected food service workers who have practiced poor personal hygiene. Contaminated foods usually look and smell normal and are often of animal origin, such as beef, poultry, milk, or eggs, but all foods, including vegetables, may become contaminated. Many raw foods of animal origin are frequently contaminated, but thorough cooking kills Salmonella. Salmonella is spread to humans when they consume foods contaminated with small amounts of Salmonella....

E. coli is a cause of illness, typically contracted through consumption of contaminated and raw food or water, and is highly virulent. The incubation period for the disease (the period from ingestion of the bacteria to the start of symptoms) is typically five to ten days, although shorter and longer periods are not unusual. E. coli is spread to humans when they consume foods contaminated with small amounts of E. coli.

Sick food workers at fast food restaurants are highly likely to be conduits for spreading, among other food-borne illnesses, Norovirus. Norovirus, also known as the "Norwalk virus," is a member of the virus family Caliciviridae, which consists of several distinct groups of viruses. Humans are the only host of Norovirus, which has several mechanisms that allow it to spread quickly and easily. Norovirus infects humans through person-to-person transmission or through contamination of food or water. IN addition, Norovirus is able to survive a wide range of temperatures and has evolved to avoid the immune system, which results in outbreaks. Norovirus illness usually develops within one or two days after ingestion.

(SAC ¶ 92 nn. 9-11).

in October 2015 involving customers in California, Colorado, and Oregon.

(*See* SAC ¶¶ 93-110, 187-90).  Plaintiffs' discovery of the additional outbreaks are a result of requests for documents from the Center for Disease Control and Prevention (the "CDC") and state and local health officials.  (*See id.* at ¶ 92).  In total, these outbreaks in the operative complaint include "(i) five Salmonella outbreaks; (ii) five E. Coli outbreaks; and (iii) three Norovirus outbreaks." (*Id.* (footnote call numbers omitted)).  All of the outbreaks — and the degree, if any, to which they were connected by public health officials to Chipotle — are discussed individually in the remainder of this section.

### a.  The December 2014 Multistate Salmonella Outbreak

From December 2014 through February 2015, 31 individuals in several states fell ill after being exposed to Salmonella.  (SAC ¶ 94).  "Within this group, the CDC found a link to four Chipotle customers, with at least one coming from Wisconsin and the others coming from at least one or more of the following states: Massachusetts, New Jersey, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and Washington." (*Id.*).  The SAC acknowledges, however, that "[t]he CDC did not conclusively link a specific ingredient or supplier as the source of this outbreak." (*Id.* at ¶ 95).

### b.  The February 2015 Multistate Salmonella Outbreak

From February 22, 2015, to June 5, 2015, 30 individuals in several states fell ill after being exposed to Salmonella.  (SAC ¶ 97).  "Within this group, the CDC found a link to eight Chipotle customers: four from a combination of New York, Wisconsin[,] and Ohio, two from Texas, and two from

Massachusetts." (*Id*.).  Documents from the Massachusetts Department of Public Health indicate that an employee of Corporate Wellness, an agent of Chipotle, "was apprised that this outbreak was plaguing Chipotle customers in Massachusetts by no later than May 13, 2015, and that these sicknesses had been observed in mid-April 2015." (*Id*. at ¶ 98).  In addition, Chipotle employees "participated in the response to the Massachusetts portion of this outbreak by at least May 18, 2015." (*Id*.).  Again, however, "[t]he CDC did not conclusively link a specific ingredient or supplier as the source of this outbreak." (*Id*. at ¶ 99).

### c.    The March 2015 Multistate E. Coli Outbreak

From March 23, 2015, through May 14, 2015, six individuals in multiple states fell ill after being exposed to E. coli.  (SAC ¶ 101).  "Within this group, the CDC found a link to five or six Chipotle customers from a combination of California, Connecticut[,] and Nevada." (*Id*.).  Yet again, "[t]he CDC did not conclusively link a specific ingredient or supplier as the source of this outbreak." (*Id*. at ¶ 102).

### d.    The May 2015 Multistate Salmonella Outbreak

Beginning on May 26, 2015, 79 individuals in multiple states fell ill after being exposed to Salmonella.  (SAC ¶ 104).  "Within this group, the CDC found a link to 19 Chipotle customers from New Jersey, Kentucky[,] and New York during the time period of July 7, 2015[,] to July 15, 2015." (*Id*.).  On August 24, 2015, the CDC and Food and Drug Administration (the "FDA") held a conference call with Chipotle representatives "to discuss the ongoing

investigation and to request supplier information for the six Chipotle restaurants involved in the outbreak." (*Id.* at ¶ 105). But "[b]ecause the CDC was unable to conclusively link a specific ingredient or supplier as the source of this outbreak, the CDC's and FDA's investigations" ceased on October 13, 2015. (*Id.* at ¶ 107).

### e.    The July 2015 New York Salmonella Outbreak

From "mid-July to mid-August 2015," six Chipotle customers from New York fell ill after being exposed to Salmonella. (SAC ¶ 109). "These were all of the individuals associated with Salmonella that were identified as part of this outbreak." (*Id.*). "The CDC did not," however, "conclusively link a specific ingredient or supplier as the source of this outbreak." (*Id.*).

### f.    The July 2015 Washington E. Coli Outbreak

"In late July 2015," the Washington State Department of Health traced an outbreak of E. coli to a Chipotle restaurant in Seattle. (SAC ¶ 111). The outbreak sickened five people between July 28 and 31, 2015. (*Id.*). "[B]y at least August 3, 2015, Chipotle was apprised of this outbreak and was involved in testing restaurant employees for the presence of E. coli[.]" (*Id.* at ¶ 112). But "[t]he CDC did not conclusively link a specific ingredient[] or supplier[] as the source of this outbreak." (*Id.* at ¶ 111).

According to a communications director for Seattle & King County Public Health, "Chipotle knew about and participated in the testing for the outbreak," and "the CDC was made aware of this outbreak in July [2015], but no public disclosure was made because it took a long time to link this outbreak to

Chipotle." (SAC ¶ 113). Thus, when "the link was discovered, Washington state health officials had determined that this outbreak posed no ongoing risk to the public." (*Id.*). The "outbreak was not publicly disclosed until November 10, 2015, when *The Oregonian* published an article entitled 'Chipotle Involved in 4th Outbreak This Year That Was Kept Secret.'" (*Id.* at ¶ 116).

### g. The August 2015 California Norovirus Outbreak

Starting on August 18, 2015, a Chipotle restaurant in Simi Valley, California experienced a Norovirus outbreak that left 243 customers ill. (SAC ¶ 117). In response, on August 20, 2015, Chipotle closed its Simi Valley location to the public and initiated a corporate policy known as the "Norwalk Protocol." (*Id.* at ¶ 118). The Norwalk Protocol was Chipotle's policy for responding to a suspected Norovirus outbreak that required Chipotle to close any location at which two or more customers complain of food-borne illness, after which the restaurant would dispose of any food items and bleach cooking and food-handling surfaces. (*Id.* at ¶ 118 n.12). The Simi Valley location did not inform customers or public health officials of the outbreak, but instead posted a sign during its closure stating that the restaurant was "closed for the rest of the day due to a severe staffing shortage." (*Id.* at ¶ 118).

One day later, on Friday, August 21, 2015, the restaurant reopened with a new crew of employees from other Chipotle locations, and the following day, Chipotle contacted the Ventura County Environmental Health Division to provide notice that 17 Simi Valley Chipotle employees were suffering from gastrointestinal illness and had been replaced with other Chipotle employees.

12

(SAC ¶¶ 119-20).  The following Monday, Ventura County health officials determined that nine Chipotle employees had contracted Norovirus, although the officials could not carry out their normal testing because of the remedial measures taken as a result of the Norwalk Protocol.  (*Id.* at ¶ 121).

"On September 14, 2015, the Ventura County (CA) Environmental Health Division issued a Notice of Violation to Chipotle," noting among other violations that Chipotle failed to notify the Health Division "when it was first aware of sick employees." (SAC ¶ 126).  This was not the only government action resulting from the Norovirus outbreak:  In December 2015, Chipotle received "a Federal Grand Jury Subpoena from the U.S. District Court for the Central District of California in connection with an official criminal investigation being conducted by the U.S. Attorney's Office for the Central District of California, in conjunction with the [FDA]'s Office of Criminal Investigations." (*Id.* at ¶ 128). Chipotle first disclosed the subpoena on January 6, 2016, in a Form 8-K filed with the Securities and Exchange Commission ("SEC").  (*Id.*).  According to a Form 10-K that Chipotle filed on February 7, 2017, for the fiscal year ending December 31, 2016, the investigation remains ongoing.  (*Id.* at ¶ 129).

### h.    The August 2015 Washington Norovirus Outbreak

From August 22, 2015, to September 1, 2015, Chipotle experienced a Norovirus outbreak at its restaurant in Hazel Dell, Washington.  (SAC ¶ 130). Plaintiffs claim that before they filed the FAC in this action, this outbreak was "never … publicly acknowledged," and, further, that Plaintiffs discovered it by accessing "email communications between Washington State Department of

Health officials and Chipotle corporate executives." (*Id.* at ¶ 131). According to those emails, a Chipotle employee at the Hazel Dell location reported to work sick and remained at work "for four hours and was vomiting." (*Id.* at ¶ 132). In response, Chipotle initiated the Norwalk Protocol, indicating "that at least two Chipotle customers were sickened." (*Id.* at ¶¶ 133-35). On December 21, 2015, Clark County Public Health officials completed a report on the outbreak "verif[ying] that 22 individuals were sickened," including 18 customers and four employees. (*Id.* at ¶ 136).

### i. The August 2015 Minnesota and Wisconsin Salmonella Outbreak

"Beginning around August 24, 2015," 22 Minnesota Chipotle locations and five Wisconsin locations experienced a Salmonella outbreak. (SAC ¶ 137). In total, 95 individuals reported ill, 64 of whom were Minnesota Chipotle customers and 19 of whom were Wisconsin Chipotle customers. (*Id.*). "According to the CDC," its "investigation into this outbreak was hindered by Chipotle's inability to trace its ingredients to the point of sale," and "[t]he CDC never conclusively linked a supplier or farm to this outbreak." (*Id.* at ¶ 139). "By September 3, 2015, … an epidemiologist with the Minnesota Department of Health[] had informed Chipotle … of [the] outbreak." (*Id.* at ¶ 140).

On September 10, 2015, the Minnesota Department of Health published a press release stating that 45 cases of Salmonella had been identified. (SAC ¶ 146). The Minnesota Department of Health published an additional release on September 16, 2015, announcing "that tomatoes were the source of this Salmonella outbreak, that 64 Minnesota customers had been sickened[,] and

14

22 Minnesota Chipotle locations had been linked to the outbreak, and that Chipotle had switched its supplier for tomatoes in light of this outbreak." (*Id.* at ¶ 150). Ultimately, however, the Minnesota Department of Health was not "able to conclusively link a specific Chipotle supplier or farm to the tomatoes that were the suspected cause of this outbreak." (*Id.* at ¶ 155). This outbreak nevertheless "had a negative impact on the Company's operations and financial performance." (*Id.* at ¶ 156).

### j. The October 2015 Multistate E. Coli Outbreak

"On October 30, 2015, the Washington State Department of Health" notified Chipotle that, on October 17, 2015, it had identified an E. coli outbreak at multiple Chipotle locations in Washington and Oregon. (SAC ¶ 157). The following day, Chipotle closed 43 restaurants in those states. (*Id.* at ¶ 158). In similar fashion to the Simi Valley closure, Chipotle "post[ed] signs on the closed Oregon restaurants blaming the closures on 'equipment issues,'" and "similar signs were observed at several closed Chipotle locations in Washington that were blamed on 'supply issues.'" (*Id.* at ¶ 159). Also on October 31, the CDC became involved in the response to the outbreak, after it had been "apprised of the numerous food-borne illness outbreaks at Chipotle that had already taken place during the Class Period." (*Id.* at ¶¶ 160-61).

Beginning on the first of November, media outlets "began reporting that Chipotle locations had been closed due to an E. coli outbreak." (SAC ¶ 162). This news "[a]lmost immediately … began having a significantly negative impact on Chipotle's common stock price and same-store sales." (*Id.* at ¶ 163).

15

A day following the reports in the press, the FDA notified Chipotle "that the 'FDA, CDC[,] and the states [were] working together to respond to this outbreak.'" (*Id.* at ¶ 164). And a day following that, on November 3, 2015, a spokesman for the Oregon Public Health Division publicly announced that the produce under consideration as the source of the outbreak was cilantro, romaine lettuce, and tomatoes. (*Id.* at ¶ 166). On that same date, Chipotle issued a press release addressing the outbreak. (*Id.* at ¶ 167).

The following day, November 4, 2015, the CDC publicly announced the status of its investigation into the outbreak online, and the CDC periodically updated that announcement. (SAC ¶¶ 168-69). These updates reflected that the "investigation was ongoing," which, in Plaintiffs' view, "meant that the CDC believed there was an ongoing threat to the public because the specific cause of the outbreak had not yet been identified and/or because several weeks' time had not yet passed since the last reported case." (*Id.* at ¶ 169). By November 17, 2015, the CDC connected the outbreak "to Chipotle customers in California, Minnesota[,] and New York, in addition to those in Oregon and Washington," and Chipotle was apprised of those illnesses no later than that same date. (*Id.* at ¶¶ 170-71). The CDC reported these findings online on November 20, 2015. (*Id.* at ¶ 172).

On December 4, 2015, the CDC updated its reporting once more to reflect seven additional ill people in California, Illinois, Maryland, Ohio, Pennsylvania, and Washington. (SAC ¶ 173). The update provided further that among the individuals for whom information was available, "whole genome

sequencing has been performed" on the strain of E. coli producing the outbreak from ill people in Washington, California, Minnesota, and New York. (*Id.* at ¶ 174). The testing indicated that isolates of that strain taken from those individuals "were highly related genetically to one another," thus suggesting that "illnesses outside the Pacific Northwest [were] related to the illnesses in Oregon and Washington." (*Id.*).

"On December 21, 2015, the CDC provided another" update "reporting that 53 people were ill in Washington, Oregon, California, Illinois, Maryland, Minnesota, New York, Ohio[,] and Pennsylvania." (SAC ¶ 175). The update provided further that "the most recent person reporting Chipotle exposure became ill on November 10, 2015, and 'CDC and state and local public health partners are continuing laboratory surveillance … to identify additional ill persons and to interview them.'" (*Id.*).

The CDC finally closed its investigation on February 1, 2016, when it calculated a final count of those infected by E. coli consisting of 55 people across 11 states, ranging from one- to 94-years old. (SAC ¶ 176). The CDC was unable, however, to link the outbreak to a particular ingredient or supplier conclusively. (*Id.*).

### k. The October 2015 Multistate E. Coli Outbreak

Beginning in late October 2015, four Chipotle customers from California, Colorado, and Oregon fell ill as a result of an E. coli outbreak. (SAC ¶ 187). No other individuals with the same strain of E. coli were identified as being linked to this outbreak, and the CDC failed to suspect or link any ingredient to the

outbreak.  (*Id.*).  By November 24, 2015, the CDC notified Chipotle that it was monitoring the outbreak.  (*Id.* at ¶ 188).  The CDC's investigation lasted as late as December 21, 2015.  (*Id.* at ¶ 189).

### 1.    The November 2015 Multistate E. Coli Outbreak

Beginning on November 18, 2015, an E. coli outbreak "was traced to" Chipotle customers in Kansas, North Dakota, and Oklahoma.  (SAC ¶ 177). Five people fell ill as a result of the outbreak.  (*Id.*).  Chipotle was aware of this outbreak "no later than when the CDC learned about these individuals' illnesses, which was on or about November 26, 2015."  (*Id.* at ¶ 178).

On December 21, 2015, the CDC announced these outbreaks and that two Chipotle restaurants, one in Oklahoma and one in Kansas, were involved in the outbreak.  (SAC ¶ 182).  On that same date, *The New York Times* also reported on the outbreak.  (*Id.* at ¶ 184).  The report noted that according to the CDC, the strain of E. coli detected in both the October and November 2015 outbreak was "rare, with the CDC seeing it previously on only three other occasions," but that the DNA of the E. coli differed from the October outbreak to the November outbreak, "meaning that the two outbreaks were unrelated and likely came from different ingredient sources."  (*Id.* at ¶¶ 183-84).

On February 1, 2016, the CDC "officially closed its investigation" into the October and November 2015 outbreaks.  (SAC ¶ 186).  The CDC confirmed that the two outbreaks had "different DNA profile[s]."  (*Id.*).  Once again, the CDC did not conclusively identify the source of the E. coli outbreak.  (*Id.*).

### m.     The December 2015 Massachusetts Norovirus Outbreak

On December 7, 2015, a Chipotle restaurant in Brighton, Massachusetts, experienced a Norovirus outbreak.  (SAC ¶ 191).  "According to Chipotle, 143 customers were reported ill" and "Norovirus was the confirmed source of this outbreak."  (*Id.*).  An email from a Chipotle employee to a CDC official indicated that an employee reported to work sick on December 3 and was vomiting, yet the store did not initiate the Norwalk Protocol.  (*Id.* at ¶¶ 193-94).  The restaurant remained open at least until December 7.  (*Id.* at ¶ 194).

### 4.     Chipotle's Remedial Measures and the Market's Response

Although seven of the above-described outbreaks were not publicly disclosed immediately,[4] negative publicity stemming from other outbreaks during the Class Period "was significant enough to cause the Company to institute drastic remediation efforts."  (SAC ¶¶ 196-97).  In relation to the October 2015 multistate E. coli outbreak, Chipotle issued a press release on November 3, 2015, stating that the Company was undertaking "immediate steps to assist investigators," as well as "[r]etaining two preeminent food safety consulting firms ... to help the [C]ompany assess and improve upon" its food-safety standards.  (*Id.* at ¶ 198).  On December 4, 2015, Chipotle issued another press release detailing the recommendations the Company had received from its food-safety consultants, including "high-resolution testing of

---

[4]     These outbreaks were the 2014 Salmonella outbreak, the February 2015 Salmonella outbreak, the March 2015 E. coli outbreak, the July 2015 multistate Salmonella outbreak, the July 2015 New York salmonella outbreak, the August 2015 Washington norovirus outbreak, and the July 2015 E. coli outbreak.  (SAC ¶ 196).

all fresh produce … before [it is] shipped to restaurants," and "[e]nhanc[ed] internal training to ensure that all employees thoroughly understand the [C]ompany's high standards for food safety and food handling." (*Id.* at ¶ 199). Also on December 4, 2015, Chipotle issued a Form 8-K detailing the "adverse impact" of the October 2015 multistate E. coli outbreak on the Company's financial and operating results in the fourth quarter of 2015. (*Id.* at ¶ 200).

The Individual Defendants also made public statements about Chipotle's remedial measures. On December 8, 2015, at the Sanford C. Bernstein Consumer Summit, Ells stated that the Company made "system-wide" changes, including dicing tomatoes in a commissary because the Company "found it impossible" to "test every tomato coming into the restaurants." (SAC ¶ 201). Moran echoed this changed approach, stating that the Company would transport romaine lettuce to restaurants "having been already washed and tested." (*Id.*). Hartung emphasized the costs associated with the Company's remediation efforts, stating, "when it's all said and done we're going to have really safe food and the investment's probably going to be outsized." (*Id.*).

On December 16, 2015, Ells and Moran were interviewed by CNBC's Jim Cramer. (SAC ¶ 202). During the interview, Ells stated that the Company "couldn't do … high-resolution testing in the restaurants" and that the new procedures would "bring[] the risk of contamination in [a] tomato, for example, to near zero when we do it in the central commissary." (*Id.*). Plaintiffs posit that this "indicated that Chipotle had initiated a move back to central

commissary preparation for produce." (*Id.*). Ells made similar remarks at a January 2016 "ICR Conference." (*Id.* at ¶ 203).

On January 19, 2016, Chipotle issued an additional press release detailing its remediation efforts. (SAC ¶ 204). The press release stated that the Company would implement "comprehensive new food safety programs," which included high-resolution testing and "[c]hanges to food prep and food handling practices." (*Id.*). The press release also announced that the Company would hold a national employee meeting on February 8, 2016, during which every Chipotle restaurant would be closed. (*Id.*). And indeed, on that date, "Chipotle closed all of its restaurants and held a food safety symposium for all of its employees." (*Id.* at ¶ 208).

On January 28, 2016, the U.S. Attorney's Office for the Central District of California served Chipotle with a subpoena that superseded the prior subpoena and "broaden[ed] the scope of the criminal investigation." (SAC ¶ 205). Chipotle expressed its intention to cooperate fully, and as of the Company's 2016 Form 10-K, the investigation remains ongoing. (*Id.*).

On the final day of the Class Period, February 2, 2016, Chipotle held a conference call in which the Individual Defendants participated. (SAC ¶ 206). During the call, Ells reiterated his earlier comments on the Company's plan to rework its food-safety procedures, stating, for instance, that "[t]he plan is designed to prevent unsafe food from ever entering our restaurants through the use of extensive testing and through washing in central kitchens." (*Id.*). Moran stated, in relevant part, "[w]e are also completing a comprehensive food tracing

system that will allow us to locate each ingredient we use from its source," and that "the CDC has confirmed [that the E. coli investigation] is behind us and resolved, which helps to serve as an all-clear signal to our customers that may have been hesitant in recent months." (*Id.*).  Hartung again emphasized the financial costs of the Company's remedial efforts.  (*Id.*).

On February 5, 2016, Chipotle filed a Form 10-K for the fiscal year ending December 31, 2015.  (SAC ¶ 207).  The Form "included pages of new information and risk disclosures pertaining to Chipotle's food-safety practices, the risk of Chipotle experiencing food-borne illness outbreaks, Chipotle's food safety remediation efforts, and the fallout from the seven food-borne illness outbreaks that the Company experienced during the Class Period." (*Id.*).

Chipotle also undertook a number of hiring decisions that reflected an emphasis on changing its food-safety management.  On March 15, 2016, the Company disclosed that it had hired a new Executive Director of Food Safety; this occurred during the same month in which Chipotle's Director of Quality Assurance and Food Safety during the Class Period departed from the Company.  (*See* SAC ¶¶ 209-10).  The new Executive Director of Food Safety has since "led a comprehensive assessment and enhancement of Chipotle's food safety practices" and designed a "Food Safety Advisory Council" within the Company.  (*Id.* at ¶¶ 219-20).  Also, on May 11, 2016, "media outlets reported that, in late 2015, Chipotle hired two food safety experts in addition to" the consultants whom the Company had already hired.  (*Id.* at ¶ 211).

Since the Class Period food-borne illness outbreaks, the Chipotle Board has been the target of a number of derivative shareholder actions. (SAC ¶ 212). In particular, the SAC points to two such actions filed in the U.S. District Court for the District of Colorado in the second half of 2016. (*Id.* at ¶¶ 212-13). Plaintiffs assert that the "redacted complaint" in one such action, *Lashkari* v. *Ells*, No. 1:16 Civ. 3180 (D. Colo.), "establishes that the most senior executives and directors at Chipotle had knowledge of, or recklessly disregarded, the pervasive food safety problems at the Company by at least August 2015 and did nothing to stop their continued proliferation." (*Id.* at ¶ 216).[5]

Chipotle's financial results for 2016, presented in conjunction with its 2016 Form 10-K, reflect a substantial drop in profitability for the Company. (SAC ¶ 221). Specifically, for 2016, Chipotle reported $22.9 million in earnings, "compared with $475.6 million in earnings for fiscal year 2015," which represents a "95.2% drop in profitability year-over-year." (*Id.*). "The Company directly attributed this drop to the negative fallout from the numerous Class Period [food-borne illness] outbreaks[.]" (*Id.*).

## B.    The Alleged Material Misrepresentations or Omissions

Based on the above factual allegations, Plaintiffs point to six statements or categories of statements by Defendants that are alleged to have been false or misleading when made. These alleged misstatements and omissions are

---

[5]    The Court pauses to reject out of hand this illogical contention. Putting to the side the obvious point that allegations in a complaint are not substantiated findings of fact, Plaintiffs here are asking the Court to make an additional inferential leap and to arrive at their proffered conclusion of scienter based on two section headings of a heavily-redacted complaint. (SAC ¶¶ 212-16). The Court will do no such thing.

contained in financial statements filed by Chipotle with the SEC and in press releases issued by the Company.

### 1.    The Commissary Switch Omissions

The first statement that Plaintiffs claim is false and misleading, contained in Chipotle's 2014 Form 10-K, reads as follows:  "Our food is prepared from scratch, with the majority prepared in our restaurants while some is prepared with the same fresh ingredients in larger batches in commissaries."  (SAC ¶¶ 222-23).  The 2014 Form 10-K also states, "We may be at a higher risk for food-borne illness outbreaks than some competitors due to our use of fresh produce and meats rather than frozen, and our reliance on employees cooking with traditional methods rather than automation."  (*Id.* at ¶ 222).  Plaintiffs claim these statements were "materially false and misleading when made because the 2014 Form 10-K omitted and failed to disclose that the risk associated with Chipotle's produce was even greater following a transition in late 2014 to in-store processing of produce instead of commissary preparation."  (*Id.* at ¶ 223 (emphasis omitted)).

Building on this theory, Plaintiffs also allege that the following statement was materially false and misleading:  "There have been no material changes in our risk factors since our annual report on Form 10-K for the year ended December 31, 2014."  (SAC ¶ 225).  This statement is contained in Chipotle's Forms 10-Q for the fiscal quarters ending March 31, 2015, filed April 22, 2015 ("April 2015 Form 10-Q"); June 30, 2015, filed July 22, 2015 ("July 2015 Form 10-Q"); and September 30, 2015, filed October 21, 2015 ("October 2015 Form

10-Q"). (*Id.* at ¶¶ 225-26). Plaintiffs also contend that the October 2015 Form

10-Q was materially false and misleading because it failed to disclose the food-

borne illness outbreaks that had only been discovered by Plaintiffs' counsel;

that such outbreaks harmed the Company's operations and financial

performance; that the Company failed to take sufficient remedial steps to

prevent further outbreaks; and that as these outbreaks were disclosed to the

public, "they were reasonably expected to have an increased damaging effect on

the Company's operations and financial performance." (*Id.* at ¶ 227).

### 2. The Quality Assurance Omissions

*Second*, Plaintiffs allege that the following statement, contained in

Chipotle's 2014 Form 10-K, under the heading "Quality Assurance and Food

Safety," is materially false or misleading:

> We are committed to serving safe, high quality food to
> our customers. Quality and food safety are integrated
> throughout our supply chain and everything we do;
> from the farms that supply our food all the way through
> to our front line. We have established close
> relationships with some of the top suppliers in the
> industry, and we actively maintain a limited list of
> approved suppliers from whom our distributors must
> purchase. Our quality assurance department
> establishes and monitors our quality and food safety
> programs for our supply chain. Our training and risk
> management departments develop and implement
> operating standards for food quality, preparation,
> cleanliness and safety in the restaurants. Our food
> safety programs are also designed to ensure that we
> comply with applicable federal, state and local food
> safety regulations.

(SAC ¶¶ 250-51 (emphasis omitted)).

Plaintiffs contend this statement was

> materially false and misleading when made because
> Defendants omitted and failed to disclose that
> Chipotle's quality assurance department did not
> adequately monitor Chipotle's food safety programs,
> that in 2015 Chipotle failed to live up to its own food
> safety standards, that Chipotle executives ignored
> internal [safety, security, and risk ("SSR")] audit reports
> designed to assess numerous food safety metrics in
> individual Chipotle restaurants, that these SSR audits
> were inherently deficient because the industry standard
> was to use external, not internal, audits and because
> Chipotle would pre-announce the audits to the
> restaurants, thereby allowing them time to cover up
> deficiencies, and that there were insufficient controls
> and procedures in place to ensure that operating
> standards had been properly implemented and adhered
> to.

(SAC ¶ 251). Plaintiffs also contend Defendants had a duty to disclose that

Chipotle's late-2014 transition away from commissary produce preparation

"greatly increase[ed] the risk of food-borne illness being contracted from its

produce." (*Id.* at ¶ 252). In addition, Plaintiffs tether this theory to the alleged

misstatements in the Company's Forms 10-Q as identified above. (*See id.* at

¶¶ 253-54).

### 3. The Traceability Omissions

*Third*, Plaintiffs claim that a statement contained in Chipotle's 2014

Form 10-K regarding the Company's use of a variety of produce types and

produce suppliers, including "local or organic produce" and "farmers markets,"

was materially false or misleading. (SAC ¶ 289). The allegedly false or

misleading statement reads as follows: "These produce initiatives may make it

more difficult to keep quality consistent, and present additional risk of

food-borne illnesses given the greater number of suppliers involved in such a system and the difficulty of imposing our quality assurance programs on all such suppliers." (*Id.* (emphasis omitted)). Plaintiffs argue that this statement was "false and misleading when made because Defendants omitted and failed to disclose that, regardless of the number of suppliers used by the Company, Chipotle lacked any ability during the Class Period to effectively or accurately trace ingredients through its supplier system[.]" (*Id.* at ¶ 290 (emphasis omitted)). Plaintiffs also claim this statement created a duty to disclose "that any produce-related food-borne illness outbreak from those suppliers would cause additional harm to Chipotle because" the Company lacked the ability to trace any contaminated produce back to its supplier. (*Id.* at ¶ 291). As with the alleged misstatements above, Plaintiffs also tie the alleged misstatements in the Company's Forms 10-Q to this alleged misstatement. (*Id.* at ¶ 292).

In addition, Plaintiffs claim that the following statements in Chipotle's November 3 and 10, 2015 press releases, respectively, were materially false and misleading: "no cause [for the October 2015 multistate E. coli outbreak] has yet been identified by investigating health officials," and "[n]o cause has been established between this issue [*i.e.*, the October 2015 multistate E. coli outbreak] and any ingredient." (SAC ¶¶ 293-94). Plaintiffs claim that these statements were "materially false and misleading when made" because they triggered a duty for Defendants to disclose that because Chipotle lacked the ability to trace contaminated ingredients to a specific supplier, a cause for the

outbreak would not have been identifiable, and that this inability would prolong any investigation into the outbreak by the CDC.  (*See id.* at ¶ 295).

### 4.  The Guidance Misstatements and Omissions

*Fourth*, Plaintiffs claim that the following statements, contained in both Chipotle press releases announcing financial results for the first and second fiscal quarters of 2015 and Chipotle's Forms 8-K filed April 21, 2015, and July 21, 2015, were materially false and misleading:  "For 2015, management expects … [l]ow-to-mid single digit comparable restaurant sales increases." (SAC ¶¶ 326-28).  Plaintiffs allege this statement was "materially false and misleading when made because Defendants did not have a reasonable basis to issue such guidance," given that the Company switched away from commissary produce processing, followed faulty food-safety monitoring protocols, and lacked the capability to trace any contaminated produce to its source.  (*Id.* at ¶ 327; *see id.* at ¶ 329).

Similarly, Plaintiffs allege that statements contained in both a Chipotle press release announcing the Company's financial results for the third fiscal quarter in 2015 and the Company's October 20, 2015 Form 8-K, were materially false and misleading.  (SAC ¶ 330).  Those statements included an estimated sales performance for 2015 identical to those in the Forms 8-K above, as well as an expectation for 2016 of "[l]ow-single digit comparable restaurant sales increases."  (*Id.*).  Plaintiffs allege that these statements were "false and misleading when made," in addition, because when Defendants made them, "Chipotle had experienced numerous food-borne illness outbreaks"

28

that negatively impacted the Company's performance, that Chipotle failed to take sufficient remedial measures to avoid further outbreaks, and that the Company would suffer further damage when the outbreaks were publicized. (*Id.* at ¶ 331).

### 5. The Item 303 and Item 305 Omissions

*Fifth*, based on the facts alleged above, Plaintiffs contend that Chipotle's 2014 Form 10-K, and the Company's Forms 10-Q for the first, second, and third financial quarters of 2015, omitted information required by Items 303 and 503 of SEC Regulation S-K, 17 C.F.R. §§ 229.303, 229.503. (*See* SAC ¶¶ 344-45, 351). Plaintiffs claim these filings failed to satisfy Item 303 by omitting description of "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income," and "any known trends or uncertainties that have had or that the [Company] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." (*Id.* at ¶ 346). As to Item 503, Plaintiffs claim Chipotle's 2014 Form 10-K failed to disclose sufficiently a "discussion of the most significant factors that make the [securities] speculative or risky," and that the 10-Q Forms failed to provide "'any material changes from risk factors as previously disclosed' in Chipotle's 2014 Form 10-K." (*Id.* at ¶ 351).

### 6. The November 2015 Press Release Misstatement

*Sixth* and finally, Plaintiffs contend that a November 10, 2015 Chipotle press release was materially false and misleading. (SAC ¶ 358). The press

release was issued shortly after the October 2015 multistate E. coli outbreak, and stated that "'[h]ealth officials have concluded that there is no ongoing risk from this incident[,]' and that there was 'no ongoing threat' related to" the October 2015 multistate E. coli outbreak. (*Id.*). Plaintiffs contend that these statements "were materially false and misleading when made because they misrepresented" that investigations into the outbreak remained open and ongoing, that there remained "an ongoing public health risk and/or threat from this outbreak," and the statements omitted "that Chipotle lacked a reasonable basis to make representations on behalf of public health officials[.]" (*Id.* at ¶¶ 359-60).

## C.    **Procedural Background**

Plaintiffs filed the initial complaint in this action on January 8, 2016 (Dkt. #1), and on June 17, 2016, Plaintiffs amended their Complaint (Dkt. #49). On March 8, 2017, the Court granted Defendants' motion to dismiss the FAC. (Dkt. #79). In doing so, the Court held that alleged misstatements in Chipotle's 2014 Form 10-K, April 2015 Form 10-Q, and July 2015 Form 10-Q were not actionable because no alleged facts showed that they were inaccurate or "support[ed] an inference that any Defendants were aware of [any] heightened risk" associated with in-store produce preparation, and that statements "regarding Chipotle's food-safety programs and protocols [were] generalized statements that courts in this Circuit have consistently deemed inactionable puffery." *Chipotle I*, 2017 WL 933108, at *11-12.

As to alleged misstatements in Chipotle's October 20, 2015 Form 8-K, October 2015 Form 10-Q, November 10, 2015 press release, and an October 20, 2015 conference call, the Court held that although these statements may have been actionable, the Court was "skeptical" that they were material "given the highly publicized nature of the outbreaks documented in the Complaint," but even so, the claims based on these statements failed because the FAC did not sufficiently allege scienter. *Chipotle I*, 2017 WL 933108, at *12-13, 15-19. And because Plaintiffs' § 10(b) and Rule 10b-5 claims failed, their § 20(a) claims for control-person liability failed as well. *Id.* at *19. The Court thus dismissed the FAC but granted Plaintiffs leave to amend, while cautioning "that additional clarity need not require additional length," and "expect[ing] that Plaintiffs will consider carefully the Court's observations in [its] Opinion." *Id.*

Consequently, Plaintiffs filed the SAC on April 7, 2017, which includes as an exhibit the Declaration of L. Scott Donnelly, Ph.D. (the "Donnelly Declaration"). (Dkt. #80). On June 7, 2017, Defendants moved to dismiss the SAC and to strike the Donnelly Declaration along with any paragraphs in the SAC relying on the Donnelly Declaration. (*See* Dkt. #83-87). Plaintiffs opposed these motions on August 7, 2017 (Dkt. #90-92), and Defendants replied to the opposition on September 6, 2017 (Dkt. #94-95).

After briefing on the instant motions closed, Plaintiffs submitted several additional letters in an effort to shore up their arguments. On November 1, 2017, Plaintiffs provided a letter "to apprise the Court of facts and information

obtained ... as part of [Plaintiffs'] ongoing investigation into the events detailed in the [SAC]." (Dkt. #96). Defendants responded to this letter two days later (Dkt. #97), and on November 6, 2017, the Court endorsed Defendants' letter, stating that Plaintiffs' letter "relies on factual allegations not contained in the [SAC] and responds to arguments raised in Defendants' reply papers," therefore, "[i]n the absence of a motion to amend or a motion to convert the pending motion to dismiss into a motion for summary judgment, the Court does not believe that it can consider Plaintiffs' newly-proffered factual information" (Dkt. #98). On November 8, 2017, Plaintiffs wrote the Court again "to clarify ... that Plaintiffs do not intend to file a motion to amend ... at this time." (Dkt. #99).

Plaintiffs wrote the Court yet again on December 13, 2017, to apprise the Court of a "recent decision from the Second Circuit that," Plaintiffs argued, "further supports denial of Defendants' motion to dismiss." (Dkt. #100 (footnote call number omitted)). That "recent decision" was a summary order by the Second Circuit, *Christine Asia Co. Ltd.* v. *Ma*, No. 16-2519-cv, — F. App'x — , 2017 WL 6003340 (2d Cir. Dec. 5, 2017) (summary order). Defendants responded to the letter on December 22, 2017. (Dkt. #101). The Court has considered these submissions, along with the parties' briefing.

## DISCUSSION

### A. Defendants' Motion to Strike Is Granted in Part

Before addressing the adequacy of the pleadings, the Court must determine what documents it may properly consider. In that vein, Defendants

move to strike the Donnelly Declaration and those paragraphs of the SAC that rely on it. Declarant L. Scott Donnelly holds a Ph.D. in Food Science and is "the former Director of Product Safety for the Nutritional Business Unit of Wyeth (Pfizer) Pharmaceuticals." (Donnelly Decl. ¶¶ 1-6). The Declaration offers Donnelly's opinion on food-safety standards and practices for fast-food companies; the effects of Chipotle's alleged shift away from commissary produce processing; Chipotle's alleged inability to trace its ingredients to their source; and the efficacy of other food-safety practices at Chipotle. (*See id.* at ¶¶ 15-42). As set forth herein, the Court agrees that it may not consider the Declaration in judging the sufficiency of the SAC. Moreover, the Court will not consider any conclusory allegations in the SAC that are based on the Declaration, although it will consider well-pleaded factual allegations that cite to the Declaration.

### 1. Applicable Law

Federal Rule of Civil Procedure 12(f) allows a court to "strike from a pleading … any redundant, immaterial, impertinent, or scandalous matter." Federal courts have discretion to decide whether to grant a motion to strike. *Gaughan* v. *Rubenstein*, 261 F. Supp. 3d 390, 412 (S.D.N.Y. 2017) (quoting *Orientview Techs. LLC* v. *Seven for All Mankind, LLC*, No. 13 Civ. 538 (PAE), 2013 WL 4016302, at *3 (S.D.N.Y. Aug. 7, 2013)), *appeal withdrawn*, No. 17-2490, 2017 WL 7532583 (2d Cir. Dec. 6, 2017). Although courts generally disfavor motions to strike, a court may grant a motion to strike where

"the pleading is obviously insufficient as a matter of law." *Orientview Techs.*, 2013 WL 4016302, at *3.

In the context of ruling on a motion to dismiss, courts are generally limited to considering facts alleged in the complaint, any written instrument attached to a complaint as an exhibit pursuant to Federal Rule of Civil Procedure 10(c), and any document incorporated into a complaint by reference. *Gant* v. *Wallingford Bd. of Educ.*, 69 F.3d 669, 674 (2d Cir. 1995). Rule 10(c) provides that "[a] copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes." The Second Circuit considers such "written instrument" to include only "legal document[s] that define rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate." *Smith* v. *Hogan*, 794 F.3d 249, 254-55 (2d Cir. 2015) (quoting BLACK'S LAW DICTIONARY (10th ed. 2014)) (refusing to consider plaintiff's affidavit attached to complaint that did not "evidenc[e] legal rights or duties" nor "set[] forth the legal basis for [plaintiff's] claims").

To be incorporated into a complaint by reference, a plaintiff must "*rely* on the terms and effect of the document in drafting the complaint." *Nicosia* v. *Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016) (quoting *Global Network Commc'ns, Inc.* v. *City of New York*, 458 F.3d 150, 156 (2d Cir. 2006)). "Merely mentioning a document in the complaint will not satisfy this standard[.]" *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). And "even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity[, relevance,] or accuracy of the document." *DiFolco*

v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Faulkner* v. *Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).

### 2.    Analysis

Within the framework outlined above, the Court may not consider the Donnelly Declaration, either as a written instrument under Rule 10(c) or as incorporated into the SAC by reference.  Plaintiffs so much as concede that the Declaration does not satisfy Rule 10(c) by arguing solely that the Court may consider the Declaration as being incorporated into the SAC by reference.  (*See* Pl. Strike Opp. 3-6).  And for good reason: the Second Circuit has refused to consider affidavits attached to a complaint under Rule 10(c) where they do not provide the rights from which the complaint's claims spring.  *Smith*, 794 F.3d at 255.

So too here:  The Declaration was created long after the events giving rise to this litigation and is thus not the type of "written instrument" falling within the purview of Rule 10(c).  *See, e.g.*, *Murphy* v. *Cadillac Rubber & Plastics, Inc.*, 946 F. Supp. 1108, 1115 (W.D.N.Y. 1996) (holding that plaintiff's affidavits and resignation letter, and attorney's affirmation were "not 'written instruments' within the meaning of Rule 10(c)").  Indeed, as a useful point of reference, the Fifth Circuit has upheld a district court's decision to strike an expert opinion attached to a complaint in a securities fraud case, noting that "[e]ven if *non-opinion* portions of an expert's affidavit constitute an instrument pursuant to Rule 10, opinions cannot substitute for facts under the [Private Securities Litigation Reform Act]."  *Fin. Acquisition Partners LP* v. *Blackwell*, 440 F.3d 278,

35

285-86 (5th Cir. 2006); *see also DeMarco* v. *DepoTech Corp.*, 149 F. Supp. 2d 1212, 1220-22 (S.D. Cal. 2001) (striking expert opinion attached to complaint in securities fraud case under Rule 10); *In re Ashworth, Inc. Sec. Litig.*, No. 99 Civ. 0121-L (JAH), 2001 WL 37119391, at *3 (S.D. Cal. Dec. 3, 2001) (same).

Nor may the Court consider the Donnelly Declaration as incorporated into the SAC by reference. Although the incorporation-by-reference doctrine "has its greatest applicability in cases alleging fraud" — to test, for instance, the accuracy of SEC filings — "the court is to consider them on a Rule 12(b)(6) motion 'only to determine *what* the documents stated,' and '*not to prove the truth of their contents.*'" *Roth* v. *Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Kramer* v. *Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)) (emphases in *Roth*). By asking the Court to consider the Donnelly Declaration as part and parcel of the allegations in the SAC, Plaintiffs would have the Court do just that — consider the Donnelly Declaration for the truth of the opinions it contains. And, most fundamentally, the Donnelly Declaration was drafted *for the purpose of this litigation*; Plaintiffs therefore could not have relied on its terms while drafting their complaint. *See Global Network Commc'ns*, 458 F.3d at 157 (concluding that document that "was issued after [the] action was initiated ... logically could not have been contemplated by, much less integral to, the complaint").

Moreover, the Defendants clearly challenge the accuracy of the Donnelly Declaration, which provides a second reason why it may not be incorporated by reference. *See DiFolco*, 622 F.3d at 111. Indeed, evidentiary uncertainty is a

36

primary reason why courts have refused to consider such submissions at the pleadings stage. *See, e.g.*, *Blackwell*, 440 F.3d at 285-86 ("[A]llowing plaintiffs to rely on an expert's opinion in order to state securities claims requires a court to 'confront a myriad of complex evidentiary issues not generally capable of resolution at the pleading stage" and "might require ruling on the expert's qualifications." (quoting *DeMarco*, 149 F. Supp. 2d at 1221)).

The Court therefore grants Defendants' motion to strike the Donnelly Declaration from the SAC. And although the Court does not grant that portion of Defendants' motion requesting it to strike any paragraphs from the SAC that rely on the Declaration, the Court will not, and indeed cannot, consider any conclusory allegations in the SAC based on the Declaration. *See, e.g.*, *In re Ashworth, Inc. Sec. Litig.*, 2001 WL 37119391, at *3 (striking expert declaration and refusing "to accept as true" any paragraphs in complaint alleging expert's "legal conclusions").

## B. Defendants' Motion to Dismiss Is Granted in Full

### 1. Applicable Law

#### a. Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under Rule 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)). Thus, "[t]o survive a

motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).

"While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### b. Heightened Pleading Standard

A claim for securities fraud must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1996 (the "PSLRA"), 15 U.S.C. § 78u-4(b), meaning that the claim must "stat[e] the circumstances constituting fraud with particularity." *Special Situations Fund III QP, L.P.* v. *Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 423 (S.D.N.Y. 2014). Rule 9(b), which is applicable to any fraud claim, requires a complaint to identify: "[i] the allegedly

fraudulent statements, [ii] the speaker, [iii] where and when the statements were made, and [iv] why the statements were fraudulent." *Pehlivanian* v. *China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 642 (S.D.N.Y. 2015).

Similarly, the PSLRA requires a securities fraud claim to "[i] 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' and [ii] 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (alterations in original) (quoting 15 U.S.C. § 78u-4(b)(1)-(2)). In other words, "[t]he PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Id.* at 313 (quoting *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 194 (1976)). The Court expands on the element of scienter below.

### c.    Securities Fraud Under § 10(b), Rule 10b-5, and § 20(a)

"[I]n connection with the purchase or sale of any security," Section 10(b) of the Exchange Act prohibits "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). In turn, the SEC promulgated Rule 10b-5, which provides that a person may not, "in connection with the purchase or sale of any security,"

> employ any device, scheme, or artifice to defraud[;] ... make any untrue statement of a material fact or ... omit to state a material fact necessary in order to make the statements made, in the light of the circumstances

39

under which they were made, not misleading[;] or … engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]

17 C.F.R. § 240.10b-5. "[C]ourts have long recognized an implied private right of action under Section 10(b) and Rule 10b-5." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 376 (S.D.N.Y. 2013) (citing *Superintendent of Ins. of State of N.Y.* v. *Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971)).

To prevail on a Section 10(b) or a Rule 10b-5 claim, a plaintiff must prove "[i] a material misrepresentation or omission by the defendant; [ii] scienter; [iii] a connection between the misrepresentation or omission and the purchase or sale of a security; [iv] reliance upon the misrepresentation or omission; [v] economic loss; and [vi] loss causation.'" *GAMCO Inv'rs, Inc.* v. *Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co.* v. *Erica P. John Fund, Inc.*, — U.S. —, 134 S. Ct. 2398, 2407 (2014)).

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under [the Exchange Act and its implementing regulations] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a). A claim under § 20(a) is thus dependent on the validity of an underlying securities violation. Indeed, to establish control-person liability, a plaintiff must show [i] "a primary violation by the controlled person"; [ii] "control of the primary violator by the defendant"; and [iii] that the controlling person "was, in some meaningful sense, a culpable

participant in the controlled person's fraud." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

### d. The Relevant Elements of a Securities Fraud Claim

Defendants' motion attacks three elements of Plaintiffs' claims, arguing that Plaintiffs failed to allege adequately (i) a material misrepresentation or omission; (ii) scienter; and (iii) loss causation. The Court discusses the first two of these elements below, as they prove dispositive of the claims at issue.

### i. Material Misrepresentation or Omission

Rule 10b-5 prohibits "mak[ing] any untrue statement of a material fact" or "omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). "A statement is misleading if a reasonable investor would have received a false impression from the statement." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017) (quoting *Freudenberg* v. *E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010)). "The 'veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers.'" *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 472 (S.D.N.Y. 2017) (quoting *Kleinman* v. *Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013)).

"Section 10 'do[es] not create an affirmative duty to disclose any and all material information.'" *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d at 472 (quoting *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 44 (2011)).

41

"Thus, generally, 'an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts.'" *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d at 609 (quoting *Stratte-McClure* v. *Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015)). "A duty to disclose under Rule 10b-5 may arise 'when there is a corporate insider trad[ing] on confidential information, a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or misleading.'" *Id.* (alteration in original) (quoting *Stratte-McClure*, 776 F.3d at 101)).

Even where a company is not under a duty to disclose, however, once it "chooses to speak, it has a 'duty to be both accurate and complete.'" *Sharette* v. *Credit Suisse Int'l*, 127 F. Supp. 3d 60, 78-79 (S.D.N.Y. 2015) (quoting *Plumbers' Union Local No. 12 Pension Fund* v. *Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 180 (S.D.N.Y. 2010). This obligation only extends, however, to facts necessary to render "what was revealed [to] not be so incomplete as to mislead." *Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 273 (S.D.N.Y. 2012) (quoting *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008)). Indeed, a company need not "accuse itself of wrongdoing" nor disclose an ongoing investigation where the failure to do so would not make the company's statements misleading. *Id.* (quoting *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004)); *see also Menaldi* v. *Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 511 (S.D.N.Y. 2017) ("For such a duty [to disclose uncharged wrongdoing] to arise, … there

must be a connection between the illegal conduct and the misleading statements beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or the bottom line." (quoting *Menaldi* v. *Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016))).

To be actionable, a misstatement or omission must also be material, meaning that "a reasonable investor would have considered [it] significant in making investment decisions." *Heller* v. *Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 614 (S.D.N.Y. 2008) (quoting *Ganino* v. *Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir. 2000)). This is so where "there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 646 (S.D.N.Y. 2017) (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)). "[W]hether an alleged misrepresentation is material necessarily depends on all relevant circumstances," and "[b]ecause materiality is a mixed question of law and fact, in the context of a Fed. R. Civ. P. 12(b)(6) motion, a complaint may not properly be dismissed … on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) (last alteration in original) (quoting *ECA*, 553 F.3d at 197)).

### ii. Scienter

As mentioned above, pursuant to the PSLRA, "no defendant may be held liable for any ... false or misleading statements unless [a] [p]laintiff has stated 'with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'" *In re Banco Bradesco*, 277 F. Supp. 3d at 664 (emphasis added) (quoting 15 U.S.C. § 78u-4(b)(2)). To satisfy this standard, "an inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 314. Scienter includes "a mental state embracing intent to deceive, manipulate, or defraud," or "recklessness." *In re Banco Bradesco*, 277 F. Supp. 3d at 664 (quoting *Hochfelder*, 425 U.S. at 193 n.12; *ECA*, 553 F.3d at 198). A securities fraud claim premised on recklessness requires "defendants' knowledge of facts or access to information contradicting their public statements." *Id.* (quoting *Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015))

"To establish the requisite 'strong inference' of scienter, plaintiffs must allege 'facts [i] showing that the defendants had both motive and opportunity to commit the fraud or [ii] constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Friedman* v. *Endo Int'l PLC*, No. 16 Civ. 3912 (JMF), 2018 WL 446189, at *4 (S.D.N.Y. Jan. 16, 2018) (quoting *ATSI Commc'ns*, 493 F.3d at 99). To prove scienter via evidence of motive and opportunity to defraud, a plaintiff must show that the defendant (i) "benefited

in a concrete and personal way from the purported fraud," (ii) "engaged in deliberately illegal behavior," (iii) "knew facts or had access to information suggesting that their public statements were not accurate," or (iv) "failed to check information they had a duty to monitor." *S. Cherry Street, LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 110 (2d Cir. 2009) (quoting *Novak* v. *Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)). And to establish a corporation's liability for securities fraud, a plaintiff must allege facts giving rise to a strong inference that the scienter of an individual may be imputed to the corporation. *See Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

### 2. Analysis

#### a. Plaintiffs' Section 10(b) Claims

As an analytical structure, the Court's prior opinion in this case separated the alleged misstatements and omissions temporally. For additional precision, the Court addresses each alleged misstatement or category of misstatement in turn. Ultimately, despite additional verbiage, the SAC exhibits the same pleading deficiencies, and is destined for the same fate, as its predecessor.

#### i. Commissary Switch Omissions

The Court previously dismissed Plaintiffs' claims premised on Defendants' alleged duty to disclose any heightened risk associated with Chipotle's switch from commissary produce processing to in-store processing, finding that the 2014 Form 10-K's disclosed risk factors were "both accurate

and candid," and the commissary switch itself did not "change[] these disclosed risk factors in a material way."  2017 WL 933108, at *17-18.  As to the misstatements contained in the Company's Forms 10-Q, providing that there had been "no material changes" in Chipotle's risk profile since the 2014 Form 10-K, the Court found this to be accurate until Chipotle filed its October 2015 Form 10-Q, at which point "four food-borne illness outbreaks [had been] identified."  *Id.* at *12.  The Court therefore held that the alleged misstatement in that 10-Q, which declined to update the risk factors since the 2014 Form 10-K, "may be actionable."  *Id.*

After reviewing the SAC, the Court concludes again that the 2014 Form 10-K adequately disclosed the risks associated with Chipotle's food processing. Indeed, the 2014 Form 10-K contained a lengthy disclosure of risks associated with food safety and risks that might arise as a consequence of acquiring and processing produce.  Because of its significance, the relevant portion of the disclosure is reprinted here as presented in the SAC:

> *Our food is prepared from scratch, with the majority prepared in our restaurants while some is prepared with the same fresh ingredients in larger batches in commissaries.*
>
> ***
>
> *On a small number of occasions one or more Chipotle restaurants have been associated with customer illness, and on those occasions our sales have sometimes been adversely impacted, at times even in markets beyond those impacted by the illness.*  If our customers become ill from food-borne or localized illnesses or if an illness is attributed to our food, even incorrectly, we could also be forced to temporarily close some

46

restaurants, further impacting sales. In addition, reports linking nationwide or regional outbreaks of food-borne illnesses have caused us to temporarily suspend serving some produce items in our foods or to otherwise alter our menu. Similarly, past outbreaks of E. coli relating to certain food items caused consumers to avoid certain products and restaurant chains, Asian and European countries have experienced outbreaks of avian flu, and incidents of "mad cow" disease have occurred in Canadian and U.S. cattle herds. These problems, other food-borne illness (such as hepatitis A or norovirus) and injuries caused by food tampering have had in the past, and could have in the future, an adverse effect on the price and availability of affected ingredients. A decrease in customer traffic as a result of these health concerns or negative publicity, or as a result of a change in our menu or dining experience or a temporary closure of any of our restaurants, would adversely impact our restaurant sales and profitability. Furthermore, if we react to these problems by changing our menu or other key aspects of the Chipotle experience, we may lose customers who do not accept those changes, and may not be able to attract enough new customers to generate sufficient revenue to make our restaurants profitable. Customers may also shift away from us if we choose to pass along to consumers any higher ingredient costs resulting from supply problems associated with outbreaks of food-borne illnesses, which would also have a negative impact on our sales and profitability.

\*\*\*

Furthermore, as we grow, the ability of our suppliers to expand output or otherwise increase their supplies to meet our needs may be constrained. Moreover, we have made a significant commitment to serving local or organic produce when seasonally available, and a small portion of our restaurants also serves produce purchased from farmers markets seasonally as well. *These produce initiatives may make it more*

> *difficult to keep quality consistent, and present additional risk of food-borne illnesses given the greater number of suppliers involved in such a system and the difficulty of imposing our quality assurance programs on all such suppliers. Quality variations and food-borne illness concerns could adversely impact public perceptions of Food With Integrity or our brand generally.*
>
> ***
>
> *Our quarterly results may fluctuate significantly and could fail to meet the expectations of securities analysts and investors because of various factors, including … negative publicity about the ingredients we use or the occurrence of food-borne illnesses or other problems at our restaurants.*

(SAC ¶ 423 (emphases and alterations in original)).

Despite the length of the above disclosure, Plaintiffs argue not only that it was insufficient, but further that Defendants had a duty to update this risk disclosure in the Company's subsequent Forms 10-Q, given the addition to the SAC of allegations concerning "Defendants' contemporaneous knowledge of five 'new' outbreaks that took place from December 2014 to July 2015." (Pl. Opp. 6 (citing SAC ¶¶ 45, 92-110)). Yet the SAC does not, and cannot, allege that *any* of these outbreaks was conclusively tied to a specific ingredient or supplier, much less to any shift away from commissary produce processing. The Court thus finds no reason to revisit its previous ruling that "[a]ny heightened risk posed by that transition [away from commissary produce processing] was only potential, and the Company's disclosure of its probable, imminent risks was both accurate and candid." 2017 WL 933108, at *18. Plaintiffs also attempt to "buttress[]" their argument by relying on the Donnelly Declaration for the

proposition that "Chipotle's switch from preparing produce in commissaries to the individual restaurants greatly increased the existing risk of food-borne illness outbreaks[.]" (Pl. Opp. 6-7). But this statement of opinion is exactly the sort of conclusory allegation that this Court may not consider in this procedural setting. *See supra* at 32-37.

Thus, with respect to Chipotle's pre-October 2015 Forms 10-Q, Chipotle was under no duty to disclose any further information than it had already provided, as Plaintiffs allege no facts showing any appreciable uptick in the Company's disclosed risk profile because of the illness outbreaks newly alleged in the SAC. *Cf. In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 235 (S.D.N.Y. 2010) (holding complaint stated actionable misstatement where bank's representations allegedly gave impression that its holdings were insulated from certain risks when other allegations established that such holdings were "directly at risk"). The Court will thus proceed on the assumption, based on its previous holding, that one or more statements in the October 2015 Form 10-Q "may be actionable." 2017 WL 933108, at *12. But even as to those statements, the SAC fails to allege the requisite scienter.

If the "new outbreaks" add little to Plaintiffs' claim that Defendants were under a duty to disclose greater risks associated with Chipotle's food safety, they add even less to Plaintiffs' claim that Defendants knew or should have known that such increased risk even existed. After all, none of the new outbreaks was linked to a specific ingredient or supplier. Plaintiffs do not

propose how these risks would be quantifiable going forward, or some other basis for further tailoring of Chipotle's then-existing risk disclosure.

And although Plaintiffs argue that "the SAC plainly alleges that Chipotle executives had contemporaneous knowledge of customer sicknesses," the paragraphs of the SAC to which they cite do not sufficiently allege, with the precision required by Rule 9 and the PSLRA, that any Chipotle employee was aware of, or recklessly disregarded, the illnesses associated with the newly-alleged outbreaks. (Pl. Opp. 19). Instead, they merely discuss procedures by which customers and officials *could have* reported illnesses. (*See id.* (citing SAC ¶¶ 45 ("Upon information and belief, at least one [Chipotle food-safety employee] would be apprised by local, state and/or federal health officials anytime that a Chipotle customer was sickened by E. coli or Salmonella during the Class Period."), 52-54 (discussing "Chipotle's corporate policy regarding food-borne illness complaints" requiring "customers [to] fill out an online Customer Incident Report")). Even here, the SAC does not allege that any customers or regulators actually utilized those reporting procedures for the newly-alleged outbreaks. Defendants thus cannot be said to have recklessly disregarded information to which they never had access. In sum, the Court's previous holding still stands: "[T]he Company's decision to transition to in-store produce production [did not] change[ Chipotle's] disclosed risk factors in a material way." 2017 WL 933108, at *17-18. Plaintiffs have not alleged sufficient facts to indicate that Defendants should have believed otherwise.

Nor do Plaintiffs' perfunctory allegations that the Individual Defendants had the motive and opportunity to commit fraud suffice to allege scienter. The parties do not dispute that the Individual Defendants, as corporate executives, had the opportunity to commit fraud. *See, e.g.*, *San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Companies, Inc.*, 75 F.3d 801, 813 (2d Cir. 1996); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 306 (S.D.N.Y. 2013). The issue therefore turns on whether the SAC adequately alleges the motive to do so, which requires a showing of "a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (citing *Novak*, 216 F.3d at 307-08). Thus, "[m]otives that are generally possessed by most corporate directors and officers do not suffice[.]" *Id.*

A complaint may establish such motive where it alleges "that defendants misrepresented corporate performance to inflate stock prices while they sold their own shares." *Kalnit*, 264 F.3d at 139. Such alleged insider trading activity does not support an inference of scienter unless the activity is "unusual." *Acito* v. *IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). To determine whether trading activity is unusual, courts consider the profit derived from the sales, the portion of holdings involved, the change of volume in sales, the amount of insiders selling, and the timing of the sales. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-75 (2d Cir. 2001); *Stevelman* v. *Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999).

Here, Plaintiffs allege sales by the Individual Defendants beginning in February 2015 for Ells, March 2015 for Hartung, and May 2015 for Moran, all of which ended "contemporaneously with the public beginning to learn about the numerous food-borne illness outbreaks that were plaguing the Company." (SAC ¶ 401; *see id.* at ¶ 399). But as the Court found with respect to similar allegations in the FAC, "[t]o accept Plaintiffs' theory of motive, the Court must infer that Defendants were selling off a small portion of their stock for months prior to the first outbreak of food-borne disease because they believed that such an outbreak was imminent." *Chipotle I*, 2017 WL 933108, at *16. The proffered end dates of the alleged sales, July and August of 2015 (SAC ¶ 397), are equally if not more consistent with the obvious innocent explanation, i.e., the negative publicity associated with the food-borne illness outbreaks and the consequent diminution in value of Chipotle stock (*see id.* at ¶ 7).

Returning for a moment to the proffered start dates of the sales, the Court finds no evidence from which an inference of scienter may be drawn. As provided above, the first statement that may be actionable was in the October 2015 Form 10-Q, but the sales identified by Plaintiffs as proof of scienter occurred months earlier, in February, March, and May. Moreover, the first outbreak that was actually traced to Chipotle was not until July 2015. And the first alleged corrective disclosure, published on October 31, 2015 (SAC ¶ 247(a)), was issued months after this supposed insider trading ceased. *See, e.g.*, *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 596 (S.D.N.Y. 2006) ("Timing is more typically an indicia of fraud where sales occur

shortly after insiders allegedly learn undisclosed adverse information or made affirmative misrepresentations, or shortly before corrective disclosures are made in the market." (internal citations omitted)).  Even if the Individual Defendants engaged in profitable trades, those trades were not sufficiently unusual to suggest that they were made in order to offload stock before anticipated illness outbreaks were tied to Chipotle.[6]

Thus, even if Defendants had a duty to disclose any heightened risk associated with Chipotle's shift away from commissary produce processing, as may be the case for statements in the October 2015 Form 10-Q, the SAC does not support a strong inference that Defendants failed to do so with scienter. Plaintiffs' claims premised on such switch are therefore dismissed.

### ii.    Quality Assurance Omissions

In *Chipotle I*, the Court held "that the statements ... regarding Chipotle's food-safety programs and protocols [were] generalized statements that courts in this Circuit have consistently deemed inactionable puffery."  2017 WL 933108, at *12.  Despite Plaintiffs' asseverations to the contrary, that remains the law. And any portions of Defendants' statements regarding Chipotle's food-safety programs that are not puffery remain otherwise inactionable.

Courts widely recognize that generalized statements of corporate aspiration and optimism are inactionable puffery on which no reasonable investor would rely.  *See Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004);

---

[6]    This analysis applies equally to the claims discussed later in this Opinion that also fail for lack of scienter.

*In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d at 647. "The quintessential examples of such inactionable 'puffery' are 'general statements about reputation, integrity, and compliance with ethical norms[.]'" *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d at 647 (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014)). And "[s]tatements of general corporate optimism" are inactionable "unless 'they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them.'" *Id.* (alteration in original) (quoting *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund* v. *Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 392 (2d Cir. 2015)).

The alleged misstatements at issue are either not demonstrably false or inactionable puffery. Portions of the alleged misstatement provide that Chipotle's "quality assurance department establishes and monitors [the Company's] quality and food safety programs," and that the Company's "training and risk management departments develop and implement operating standards for food quality, preparation, cleanliness and safety." (SAC ¶ 250 (emphasis omitted)). But these statements are not demonstrably false: The SAC does not allege that Chipotle failed to undertake such endeavors, but merely that Chipotle failed to do so "adequately," or that Chipotle "failed to live up to its own food safety standards," or that Chipotle's food-safety auditing system was "inherently deficient." (SAC ¶ 251). These allegations do not conflict with Defendants' statements regarding the food-safety programs and

procedures that Chipotle had in place, but merely quibble with Chipotle's execution of those programs and procedures.

The remainder of the statement — for instance, that Chipotle is "committed to serving safe, high quality food to [its] customers" and that its "food safety programs are also designed to ensure that [the Company] compl[ies] with applicable federal, state and local food safety regulations" — is inactionable puffery. (SAC ¶ 250). Indeed, Chipotle couched these statements in aspirational terms, such as the Company's "commit[ment]" to food safety and assertion that "[q]uality and food safety are integrated throughout [Chipotle's] supply chain and everything [the Company] do[es]." (*Id.*) *See, e.g.*, *Foley* v. *Transocean Ltd.*, 861 F. Supp. 2d 197, 204 n.7 (S.D.N.Y. 2012) (noting that company's "commitment to safety and training" "would likely be considered expressions of 'puffery' that cannot form the basis of a securities fraud claim").

Plaintiffs argue that even if these statements are puffery, "the material omissions that Defendants were required to disclose by virtue of these statements raising the topic of Chipotle's food safety practices are still actionable." (Pl. Opp. 11). But such logic is circular: Defendants would only have such duty if the statements were themselves misleading absent further disclosure. *See Richman*, 868 F. Supp. 2d at 273. And because these statements did not amount to a guarantee with regard to the efficacy of Chipotle's food-safety practices, they were not misleading without being accompanied by the results of those practices or further specifics on internal

approaches to those practices. *See, e.g., ECA, Local 134 IBEW Joint Pension Tr. of Chi.*, 553 F.3d at 206 (holding generalized statements on company's business practices were puffery where they did not "amount to a guarantee that its choices would prevent failures in its risk management practices"); *Lopez* v. *Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 28 (S.D.N.Y. 2016) (holding that "statements regarding [company's] 'transparent' and 'objective' compensation structure" were puffery where they were "so broad and nebulous as to not provide any specific or concrete guarantee on which a reasonable investor could have relied"); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 538 (S.D.N.Y. 2016) (holding statements by company "exalt[ing]" its "monitoring of its managers and sub-advisers" were puffery where they were mere "imprecise descriptors" of company's "approach to oversight and [did] not amount to a promise or guarantee").

Accordingly, Plaintiffs' claims premised on Defendants' statements regarding its quality-assurance procedures are dismissed.

### iii.    Traceability Omissions

Plaintiffs offer a new theory of liability in the SAC that pertains to Chipotle's ability to trace ingredients through its supply chain. In brief, Plaintiffs argue that "[b]y commenting on Chipotle's use of multiple produce suppliers and the corresponding risk of food-borne illnesses in its SEC filings, Defendants were obligated to disclose the material facts" regarding the Company's ability to trace ingredients back to their suppliers. (Pl. Opp. 11

(internal citations omitted)).  The Court finds Plaintiffs' arguments unpersuasive, and holds that these alleged misstatements are not actionable.

For starters, the alleged misstatement — the 2014 Form 10-K's discussion of Chipotle's use of multiple produce suppliers — is far too attenuated from the alleged omission — the nondisclosure of Chipotle's ability to trace ingredients — to trigger a corresponding duty to disclose.  *See, e.g.*, *Menaldi*, 164 F. Supp. 3d at 582 ("[T]he connection between [company's] public statements" regarding regulatory scrutiny and "alleged criminal conduct is too tenuous to give rise to a duty to disclose criminal wrongdoing."); *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) (holding connection between misleading statement, the source of company's success, and the alleged omission, nondisclosure of predatory business model, was "too tenuous" to make statements misleading).  Indeed, Plaintiffs do not contend that Defendants relied (or claimed in their public statements to rely) on their suppliers to guarantee contaminant-free produce; any such reliance might have triggered a duty to disclose that Chipotle had no way of verifying which producers supplied produce with contaminants.  To the contrary, Chipotle disclosed that its "produce initiatives ... present[ed] additional risk of food-borne illnesses."  (SAC ¶ 289 (emphasis omitted)).

Plaintiffs also claim that press release statements from November 2015, issued shortly after the October 2015 E. coli outbreak, and stating that a cause for the outbreak had not yet been identified, were misleading for failing to disclose that Chipotle's inability to trace ingredients was the reason that (i) a

cause had not and would not be identified and (ii) any investigation into the issue would be delayed.  (*See* SAC ¶ 295).  But the cited statements did not give rise to such a duty to disclose for much the same reason that the Form 10-K did not trigger such a duty:  Defendants did not purport to speak — and no reasonable investor would have understood them to speak — to the intricacies of investigating an outbreak, but only to the simple fact (undisputed by Plaintiffs) that no cause for the outbreak had yet been discovered.

In addition, no reasonable investor would have considered significant Chipotle's ability to trace ingredients through its supply chain in deciding whether to invest in Chipotle, and the alleged misstatement is therefore immaterial.  *See Heller*, 590 F. Supp. 2d at 614.  To be sure, a reasonable Chipotle shareholder in early 2016 — having suffered losses as a result of the outbreaks and having learned the intricacies of investigating such an outbreak — might now consider the issue material, but the Court cannot find, *ex ante*, that Chipotle's ability to nose to the source of a contaminated piece of produce would weigh significantly on an investor's mind.  *See Panther Partners, Inc.* v. *Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008) ("[I]n assessing whether a misrepresentation or omission was material, courts may not employ 20/20 hindsight[.]" (quoting *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1363 (S.D. Fla. 2001)), *aff'd*, 347 F. App'x 617 (2d Cir. 2009) (summary order); *accord United States* v. *Martoma*, 993 F. Supp. 2d 452, 457 (S.D.N.Y. 2014); *Sedighim* v. *Donaldson, Lufkin & Jenrette, Inc.*, 167 F. Supp. 2d 639, 650 (S.D.N.Y. 2001).  And the immateriality of such ability on Chipotle's

part is only underscored by the Company's prior disclosure that having multiple produce suppliers "may make it more difficult to keep quality consistent, and present additional risk of food-borne illnesses given the greater number of suppliers involved ... and the difficulty of imposing our quality assurance programs on all such suppliers." (SAC ¶ 289). Having addressed these issues in general terms, Defendants did not omit material facts by failing to address, in more granular terms, every eventuality. *See Katz* v. *Realty Equities Corp. of N.Y.*, 406 F. Supp. 802, 805 (S.D.N.Y. 1976) (holding accounting firm's refusal to certify financial statements put public on notice that statements were unreliable and any "failure to reveal every detail which gave rise to the unreliability [could ]not possibly be a material omission").

Nor, for much the same reasons, do Plaintiffs allege facts establishing that Defendants knew or recklessly disregarded Chipotle's inability to trace produce back to its supplier. Plaintiffs seek to establish such knowledge by pointing to statements by a Chipotle employee providing that the Company was undertaking efforts to install a traceability program in September 2015, but that as of November 2015, the Company had not completed this effort. (*See* SAC ¶¶ 300, 307). Plaintiffs also cite *internal* CDC communications suggesting that Chipotle's lack of a traceability program was delaying the CDC's investigations. (*See id.* at ¶¶ 305, 308). But Plaintiffs fail to allege any facts suggesting that this information crossed paths — the SAC does not allege that Defendants were aware that its lack of a traceability program would delay

investigations into food-borne illness outbreaks such that it would have a deleterious effect on the Company's sales.

In sum, Defendants made no statements triggering a duty to disclose Chipotle's inability to trace an item of produce to its supplier, and such information would not have struck a reasonable investor as particularly important given the information that Chipotle did provide regarding its produce supply chain. Moreover, the SAC contains no facts suggesting that Defendants should have known that such a minute detail in the overarching topic of food-borne illness would have any significant impact on the Company's profitability. Plaintiffs' claims premised on Chipotle's failure to disclose its inability to trace ingredients back to their source are therefore dismissed.

### iv.    Item 303 and Item 305 Omissions

"Section 17, Part 229 of the Code of Federal Regulations, also known as 'Regulation S[-]K,' provides standard instructions for filing forms under the Securities Act" and "gives rise to specific duties to disclose[.]" *Panther Partners, Inc.*, 538 F. Supp. 2d at 668. "Item 303 of Regulation S-K imposes disclosure requirements on companies filing" SEC forms, including Form 10-Q reports, such as "the obligation to '[d]escribe any known trends or uncertainties ... that the registrant reasonably expects will have a material ... unfavorable impact on ... revenues or income from continuing operations." *Stratte-McClure*, 776 F.3d at 101 (quoting 17 C.F.R. § 229.303(a)(3)(ii)). Such "disclosure is necessary 'where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects

on the registrant's financial conditions or results of operations.'" *Id.* (quoting Management's Discussion and Analysis of Financial Condition and Results of Operations, Exchange Act Release No. 6835, 43 S.E.C. Docket 1330, 1989 WL 1092885, at *4 (May 18, 1989)).

Item 503, on the other hand, addresses the disclosure of risks. *Panther Partners*, 538 F. Supp. 2d at 669. Specifically, "[i]t requires an issuer to include in its disclosures 'a discussion of the most significant factors that make the offering speculative or risky.'" *Id.* (emphasis omitted) (quoting 17 C.F.R. § 229.503(c)). "[C]ourts have generally found Item 503 violations to track Rule 10b-5 violations," including "the familiar materiality standard." *City of Roseville Employees' Ret. Sys.* v. *EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011) (collecting cases). Omissions of required disclosures under either Items 303 or 503 give rise to liability under the Securities Act. *Panther Partners*, 538 F. Supp. 2d at 669.

Plaintiffs' claims under Item 303 allege material omissions from Chipotle's 2014 Form 10-K, April 2015 Form 10-Q, and July 2015 Form 10-Q; these alleged omissions sound in the same theories underlying Plaintiffs' commissary-switch, quality-assurance, and traceability claims. (SAC ¶ 348). Using the same theory, Plaintiffs include a claim under Item 503, alleging a material omission of risk factors in the 2014 Form 10-K. (*Id.* at ¶¶ 351-53). In addition, Plaintiffs bring claims under Items 303 and 503 alleging material omissions from Chipotle's October 2015 Form 10-Q consisting of the Company's failure to disclose several outbreaks occurring from late 2014

61

through August of 2015,[7] the impact of these outbreaks, that the Company "had not taken sufficient remediation steps to prevent further outbreaks," and that the outbreaks would have further negative impact once they became public. (*Id.* at ¶ 349).

These claims fail for substantially the same reasons as the claims above. Specifically, the 2014 Form 10-K, and by incorporation the April 2015 Form 10-Q and July 2015 Form 10-Q, provided robust risk disclosures that satisfied the requisites of Items 303 and 503. As the Court previously held, "Chipotle provided disclosures regarding its risks that were company-specific and related to the direct risks it uniquely faced; there can be no argument that these were boilerplate statements insufficient to satisfy the Company's obligations under Items 303 or 503." *Chipotle I*, 2017 WL 933108, at *11. And as to the Item 503 claim involving the October 2015 Form 10-Q, it bears noting that of the eight outbreaks Plaintiffs allege Defendants were under a duty to disclose, four were never linked to a certain ingredient or supplier. The Company's disclosure that its restaurants "have been associated with customer illness" "[o]n a small number of occasions," as of October 2015, thus satisfied its duty of disclosure. (SAC ¶ 423 (emphasis omitted)).

In addition, because the commissary-switch claims failed for lack of scienter, the claims here premised on that same theory fail because the SAC

---

7    These outbreaks include the December 2014 Salmonella outbreak, the February 2015 Salmonella outbreak, the March 2015 E. coli outbreak, the July 2015 Salmonella outbreak, the July 2015 E. coli outbreak, the August 2015 Washington Norovirus outbreak, the August 2015 California Norovirus Outbreak, and the August 2015 Salmonella outbreak. (SAC ¶ 349).

does not allege a "*known* trend[] or uncertaint[y]" as required under Item 303 related to any such omission, whether in the 2014 Form 10-K or in any of the relevant Forms 10-Q. *Stratte-McClure*, 776 F.3d at 101 (emphasis added). As to the Item 303 claims that mirror Plaintiffs' quality-assurance claims under § 10(b), as held above, the SAC does not sufficiently allege a material omission based on Chipotle's food-safety procedures and standards. And Chipotle's execution of those programs was not "reasonably likely to have material effects" on the Company's financial condition as required for disclosure under Item 303. *Stratte-McClure*, 776 F.3d at 101. The Item 303 claims mirroring Plaintiffs' traceability claims similarly fail as they did under § 10(b): They were not reasonably likely to materially impact Chipotle's financial condition. Plaintiffs' claims based on Items 303 and 503 are therefore dismissed.

### v. The Guidance Misstatements and Omissions

Although the Court's opinion in *Chipotle I* found that the alleged misstatement in the October 2015 Form 8-K might be actionable, it later concluded that Plaintiffs' claims based on these statements failed for lack of scienter and concomitantly fell within the PSLRA's safe harbor for forward-looking statements. *See* 2017 WL 933108, at *12, 18 & n.8. These claims, as repleaded in the SAC, continue to suffer from the same inadequacies.

At base, this category of alleged misstatements and omissions is a "second bite at the apple" for three categories of misstatements just discussed. In other words, Plaintiffs are alleging that Defendants failed to disclose, in the financial projections sections of several of Chipotle's Forms 8-K, information

63

that replicates Plaintiffs' commissary-switch, quality-assurance, and traceability claims. (*See* SAC ¶ 327). But recasting such claims in the context of financial projections in a Form 8-K only further attenuates them. Put simply, and for the reasons stated above, by speaking on Chipotle's expected sales, Defendants did not thereby acquire a duty to speak also on its switch away from commissary produce processing, its compliance with its own food-safety standards, or its ability to trace ingredients to their original supplier. Indeed, Plaintiffs make no showing as to how these factors were tied to sales, aside from the risks that Chipotle already disclosed in its 2014 Form 10-K. Plaintiffs contend further, however, that given these "material adverse facts existing at the time," Chipotle lacked "a reasonable basis to issue such guidance." (*Id.*). Yet that theory fails for separate reasons.

As evidence of Defendants' scienter, Plaintiffs point to Chipotle's Form 8-K, filed on December 4, 2015, which provided financial guidance for fiscal year 2016 and rescinded the Company's "previously-announced 2016 outlook for comparable restaurant sales increases" due to "recent sales trends and additional uncertainty related to the E. coli incident[.]" (SAC ¶ 338 (emphasis omitted)). Chipotle also filed a Form 8-K on February 2, 2016, announcing that the Company had observed "[c]omparable restaurant sales increase[s of] 0.2%." (*Id.* at ¶ 339).

But these statements — issued *after* the alleged misstatements and omissions — do not support the notion that, at the time, Defendants issued Chipotle's financial projections either knowing or recklessly disregarding that

the Company would realize lower sales increases than expected. *See, e.g.*, *In re Poseidon Concepts Sec. Litig.*, No. 13 Civ. 1213 (DLC), 2016 WL 3017395, at *14 (S.D.N.Y. May 24, 2016) (holding complaint failed to plead scienter based on "red flags" that appeared after alleged misstatements); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13 Civ. 8846 (LGS), 2014 WL 7176187, at *8 (S.D.N.Y. Dec. 16, 2014) (holding "weak accounting controls" that were brought to defendants' attention "after the allegedly false and misleading financial statements were issued" did not support scienter); *In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690-91 (S.D.N.Y. 2004) (revisions to amount of loan loss reserves that defendants earlier deemed adequate "provide[d] absolutely no reasonable basis" to conclude "defendants did not think reserves were adequate at the time" they made the alleged misstatements). The Court struggles to understand how an accurate prediction of a downward trend evidences scienter. And it notes that a 0.2% comparable sales increase is within the range of a "low to single digit" sales increase. (SAC ¶ 339).

And because these claims fail for lack of scienter, they are also protected by the PSLRA's safe harbor for forward-looking statements. Where an alleged misstatement is contained in a forward-looking statement, the safe harbor shields defendants from liability in three circumstances: "[A] defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton* v. *Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010). Forward-looking

statements include "a statement containing a projection of ... income ... , earnings ... per share, or other financial items' and 'a statement of future economic performance, including any such statement contained in a discussion of analysis of financial condition by the management[.]'" *Id.* at 766-67 (quoting 15 U.S.C. § 78u–5(i)(1)(A) & (C)). The safe harbor is limited, however, to forward-looking statements; it does not apply "to material omissions or misstatements of historical fact." *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001); *see In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003).

As the Court held in *Chipotle I*, the statements at issue — projections of expected sales — are clearly forward-looking. *See Chipotle I*, 2017 WL 933108, at *18; *see also Slayton*, 604 F.3d at 766-67. And although Plaintiffs argue that the safe harbor does not apply because their claims involve material omissions, as provided above, Defendants were under no duty to make the disclosures on which Plaintiffs base those claims. Thus, the core of the claims at issue consists of the allegation that Chipotle's financial projections were materially misleading. Because the SAC fails to plead scienter as to these claims adequately, it follows *a fortiori* that the SAC fails to plead that Defendants made the alleged misstatements with the higher standard of "actual knowledge," and thus the financial projections in Chipotle's Forms 8-K fall within the purview of the PSLRA's safe harbor. *Gissin* v. *Endres*, 739 F. Supp. 2d 488, 502 (S.D.N.Y. 2010) ("Liability under the actual knowledge prong

of the safe harbor 'attaches only upon proof of knowing falsity' — a showing of recklessness is insufficient." (quoting *Slayton*, 604 F.3d at 773)).

Plaintiffs' claims premised on Chipotle's financial guidance are therefore dismissed.

### vi.    November 2015 Press Release Misstatement

The Court next addresses the alleged misstatement in a November 11, 2015 Chipotle press release, following the October 2015 multistate E. coli outbreak, which stated that "[h]ealth officials have concluded that there is no ongoing risk" from the E. coli outbreak, and that the outbreak then presented "no ongoing threat."  (SAC ¶ 358 (alteration in original)).  Although the SAC quotes only those snippets from the press release, the latter of which appears only as a subtitle, Defendants have provided the press release in its entirety.[8] Entitled, "Chipotle to Reopen Northwest Restaurants," the press release announced that Chipotle would "reopen all 43 restaurants in the Seattle and Portland, Ore[gon] markets that the company voluntarily closed" with a "fresh supply of all new ingredients."  (Pl. Br. Ex. 10).  It also outlined steps that the Company had taken both to ensure food safety going forward and "to help health officials investigate [the] incident."  (*Id.*).

---

[8]    Although not fully quoted within the SAC or attached thereto, the Court may consider the press release because the claim at issue relies on its terms and Plaintiffs do not contest the Court's ability to do so.  *See Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (holding that a court passing on a Rule 12(b)(6) motion may consider a document "where the complaint 'relies heavily upon its terms and effect'" (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam))); *cf. DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("[E]ven if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity[, relevance,] or accuracy of the document."  (quoting *Faulkner* v. *Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).

Plaintiffs allege that the press release misstated the then-current fact that "the CDC's investigation was nowhere near conclusion." (SAC ¶ 364). Moreover, Plaintiffs claim that Defendants knew this at the time because on November 2, 2015, eight days before issuing the press release, Chipotle employees participated in a phone call with officials from the CDC and the Washington State Department of Health, during which a CDC official "stated that the CDC did not have 'a lot of confidence that this [outbreak] is only OR and WA and CDC [is] working hard to figure this out.'" (*Id.* (alterations in original) (emphasis omitted)). Plaintiffs also allege that the CDC maintained online updates regarding the outbreak, of which Defendants were aware, throughout November, December, and into February 2016, all of which "consistently maintained that [the CDC's] investigation was ongoing, meaning that the CDC believed there was an ongoing threat to the public[.]" (*Id.* at ¶¶ 365-66 (emphasis omitted)). Finally, the SAC recites statements made after the November 10, 2015 press release by Chipotle, its representatives, and the CDC, to support the notion that Defendants must have known that the press release was misleading. (*See id.* at ¶¶ 371-85).

Yet this claim fails for the same reason that it failed as alleged in the FAC: Plaintiffs do not allege adequately that Defendants made a material misstatement or omission with the requisite scienter. *See Chipotle I*, 2017 WL 933108, at *17. Plaintiffs' current iteration of this claim is predicated on isolated phrases shorn of their context. Nowhere in the press release does Chipotle say that the CDC investigation had concluded; instead, the Company

notes that after undertaking a series of remedial measures "to make certain that [its] food is as safe as it can be," and after taking "additional steps to help health officials investigate this incident," it was reopening 43 restaurants in Washington and Oregon. Arguably, there is tension between, on one hand, Chipotle's statement that as of November 10, 2015, "[h]ealth officials ha[d] concluded that there [was] no ongoing risk" from the outbreak, and on the other hand, the CDC's statement during the November 2, 2015 phone call that it was "working hard to figure … out" where the outbreak was contained to Oregon and Washington. But reading Chipotle's press release as a whole, these statements can be reconciled: The press release is focusing on the 43 heretofore-closed restaurants, and not on the CDC investigation as a whole. Given the findings to that point, which included the incubation period for E. coli, the absence of a definitive link to any ingredient, the sanitizing of the restaurants in question, and the restocking with "all new ingredients," Chipotle was comfortable reopening the restaurants. There is no suggestion that health officials perceived any ongoing risk or threat arising from the E. coli outbreak at these 43 restaurants, even as the CDC sought to determine whether the outbreak was contained to Oregon and Washington. This statement from the CDC therefore does not establish that the alleged misstatement was false, and Plaintiffs have similarly failed to allege "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99.

Plaintiffs argue alternatively that because Defendants were previously involved in CDC investigations lasting "at least three weeks or more," Chipotle

must have known that the CDC's investigation of the October 2015 outbreak "would not be concluding less than two weeks after the outbreak began." (Pl. Opp. 20-21). Again, however, this proffered circumstantial evidence fails to show that the statements made were in fact false. Nothing suggests that Chipotle was able to, much less that it had a duty to, predict the length of a CDC investigation from prior, unrelated investigations of which it was aware. And the language cited by Plaintiffs is equally amenable to another, more convincing inference — that Defendants were only speaking of the 43 restaurants they were reopening rather than the entirety of the CDC's investigation. The inference that Plaintiffs wish to draw from this allegation is thus not "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

Finally, Plaintiffs' allegations regarding statements made by Defendants and the CDC *after* November 10, 2015, do not establish that Defendants knew or recklessly disregarded that any statements made on that date may have been false. Indeed, several of the CDC statements on which Plaintiffs base this argument were only published internally, and at least one of them dealt with the investigation of an entirely different outbreak. (*See, e.g.*, SAC ¶¶ 375 (discussing "internal CDC documents" indicating "that the CDC could never have concluded on November 10, 2015, that there was no ongoing risk" (emphasis omitted)), 378 (discussing internal CDC documents regarding E. coli outbreak that began November 18, 2015)). Even if these documents indicate

that the investigation was ongoing as of November 10, 2015, the SAC does not allege that Defendants were aware of them.

Plaintiffs' claims based on Chipotle's November 10, 2015 press release are therefore dismissed.  Further, because all of Plaintiffs' claims inadequately plead either a material misstatement or omission, or facts giving rise to a strong inference of scienter, the Court need not reach the issue of loss causation.[9]

### b.    Section 20(a) Claims

As provided above, Plaintiffs' claims under § 10 and Rule 10b-5 fail. Plaintiffs' § 20(a) claim therefore fails, as a control person may not be liable without a primary securities violation.  *ATSI Commc'ns, Inc.*, 493 F.3d at 108.

## C.    Plaintiffs' Application for Leave to Amend Is Denied

Finally, the Court addresses Plaintiffs' application for leave to file a third amended complaint.  Rule 15(a)(2) provides that a court should freely give leave to amend "when justice so requires."  *McCarthy* v. *Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007); *see also* Fed. R. Civ. P. 15(a).  "This permissive standard is consistent with [the Second Circuit's] 'strong preference for resolving disputes on the merits.'"  *Williams* v. *Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (per curiam) (quoting *New York* v. *Green*, 420 F.3d 99, 104 (2d Cir. 2005)).

---

[9]    The Court nevertheless notes, as it did in *Chipotle I*, its skepticism "that Plaintiffs have pleaded adequately loss causation," given that Chipotle's stock value had been declining before the first corrective disclosure on October 31, 2015 (*see* SAC ¶ 7), and that the impact of an alleged corrective disclosure is intertwined with the publicity attendant to additional outbreaks.  2017 WL 933108, at *19 n.9.

Leave to amend may be denied, however, if the amendment would be futile. *See, e.g.*, *Knife Rights, Inc.* v. *Vance*, 802 F.3d 377, 389 (2d Cir. 2015). Amendment is futile if the "amended portion of the complaint would fail to state a cause of action." *Parker* v. *Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000); *see also Kassner* v. *2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007) (holding that amended complaint must be "sufficient to withstand a motion to dismiss under [Federal Rule of Civil Procedure] 12(b)(6)"). Leave to amend may also be denied "when a party has been given ample prior opportunity to allege a claim," *De Jesus* v. *Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 72 (2d Cir. 1996), or where the defendant would suffer undue prejudice as a consequence of further amendment, *Doe* v. *Columbia Univ. in City of N.Y.*, 165 F.R.D. 394, 396 (S.D.N.Y. 1996).

The above principles weigh against further amendment. Plaintiffs request leave to amend, in part, on the basis that the SAC contains allegations that were not included in the FAC that "the Court has not previously addressed." (Pl. Opp. 30). Were this a valid ground on which to grant leave to amend, however, there would be no end to a plaintiff's opportunities to replead. *See Foman* v. *Davis*, 371 U.S. 178, 182 (1962) (holding that "repeated failure to cure deficiencies by amendments previously allowed" constitutes grounds for denying amendment). In addition, Plaintiffs claim that amendment would not be futile because (i) Plaintiffs are awaiting responses to requests for information under the Freedom of Information Act, 5 U.S.C. § 522; (ii) Plaintiffs have moved to intervene in other cases against Chipotle involving similar allegations "for

72

the limited purpose of unsealing the redacted ... pleadings" filed therein; (iii) the criminal investigation into Chipotle is ongoing; and (iv) Plaintiffs are continuing their own investigation. (Pl. Opp. 30 n.19). But these attempts to discover further information without any indication that such efforts would cure the deficiencies in Plaintiffs' pleadings do not assure the Court that amendment would not be futile. Moreover, none of these efforts has a clear end date, and extending the pleading stage in this litigation indefinitely would cause Defendants undue prejudice given their interest in finality and repose.

Plaintiffs' application to amend the SAC and file a third amended complaint is therefore denied.

## CONCLUSION

The Court has reviewed the many new allegations added by Plaintiffs to the SAC, and concludes that they do not remedy the fundamental problems outlined in *Chipotle I*. While numerous, the new allegations fail because, broadly speaking, they are (i) conclusory assertions, including assertions to materials the Court may not properly consider, or (ii) allegations that add new facts but exhibit the same pleading deficiencies. At its core, the SAC faults Defendants for failing to disclose duties they did not assume; for failing to be prescient; and for presenting accurate, but general, discussions of material risks rather than attempting the impossible task of outlining the myriad possible outcomes. The food-borne illness outbreaks were unfortunate, but whatever else they might reveal about Chipotle, they do not on this record reveal securities fraud.

73

Given the foregoing, Defendants' motion to strike is GRANTED IN PART and Defendants' motion to dismiss is GRANTED WITH PREJUDICE. Pursuant to the PSLRA, the Court finds that the parties and counsel in this matter have complied with Federal Rule of Civil Procedure 11(b): Neither the claims nor defenses were harassing or frivolous; all factual contentions had evidentiary support or were reasonably based on belief or a lack of information; and Defendants did not affirmatively allege improper conduct nor move for sanctions. *See Pehlivanian* v. *China Gerui Advanced Materials Grp., Ltd.*, No. 14 Civ. 9443 (ER), 2017 WL 1192888, at *10 n.13 (S.D.N.Y. Mar. 29, 2017) (citing 15 U.S.C. § 78u-4(c)(1)).

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     March 22, 2018
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge