UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

SUSIE ONG, Individually and on Behalf of All :   Civil Action No. 1:16-cv-00141-KPF
Others Similarly Situated,                 :

                                  :   CLASS ACTION
                Plaintiff,   :

                                  :   PLAINTIFFS' MEMORANDUM OF LAW
        vs.                       :   IN SUPPORT OF MOTION FOR RELIEF
                                  :   FROM JUDGMENT AND FOR LEAVE TO
CHIPOTLE MEXICAN GRILL, INC., M.   :   AMEND
STEVEN ELLS, MONTGOMERY F.       :
MORAN and JOHN R. HARTUNG,       :

                                  :
                Defendants.   :
                                  :

—————————————————————— x

## TABLE OF CONTENTS

**Page**

GLOSSARY OF DEFINED TERMS ................................................................................v

I.      INTRODUCTION .............................................................................................1

II.     RELEVANT BACKGROUND ..........................................................................3

      A.     Plaintiffs' Investigative Efforts ...........................................................3

      B.     The Court Dismisses the SAC on March 22, 2018 ..............................4

      C.     The New Facts and Information Alleged in the PTAC............................4

III.    ARGUMENT .....................................................................................................6

      A.     The Standards Governing This Motion..................................................6

      B.     Plaintiffs Should Be Given Leave to File the PTAC Because Amendment Would Not Be Futile.............................................................................7

            1.     The PTAC States a Claim for the Commissary Switch Omissions ............7

            2.     The PTAC States a Claim for the Quality Assurance Omissions.............11

            3.     The PTAC States a Claim for the Ingredient Traceability Omissions........................................................................13

            4.     The PTAC States a Claim for the November 2015 Misrepresentations and Omissions ...........................................15

            5.     The PTAC States a Claim for the Items 303 and 503 Omissions.............17

            6.     The PTAC Adequately Alleges that the Individual Defendants' Stock Sales Support Scienter ...................................................18

            7.     The PTAC Adequately Alleges Loss Causation ......................................19

IV.    CONCLUSION..................................................................................................21

# TABLE OF AUTHORITIES

**Page**

## CASES

*60223 Trust v. Goldman, Sachs & Co.*,
  540 F. Supp. 2d 449 (S.D.N.Y. 2007)...................................................................21

*Anthony v. City of New York*,
  339 F.3d 129 (2d Cir. 2003)..............................................................................7

*Christine Asia Co. v. Ma*,
  2017 U.S. App. LEXIS 24647
  (2d Cir. Dec. 5, 2017) ................................................................................9, 15

*Cohen v. Kitov Pharms. Holdings, Ltd.*,
  2018 U.S. Dist. LEXIS 45676
  (S.D.N.Y. Mar. 20, 2018) ............................................................................20

*Cruz v. TD Bank, N.A.*,
  742 F.3d 520 (2d Cir. 2013)...........................................................................6

*Duval v. Albano*,
  2017 U.S. Dist. LEXIS 111780
  (S.D.N.Y. July 18, 2017) .............................................................................12

*Fogel v. Wal-Mart De Mexico SAB de CV*,
  2018 U.S. Dist. LEXIS 27762
  (S.D.N.Y. Feb. 21, 2018) ..............................................................................6

*Foley v. Transocean Ltd.*,
  861 F. Supp. 2d 197 (S.D.N.Y. 2012)...........................................................12

*Foman v. Davis*,
  371 U.S. 178 (1962)....................................................................................6, 7

*Gubricky v. Ells, et al.*,
  No. 1:16-cv-02011 (D. Colo. Aug. 8, 2016)............................................3, 4, 5, 11

*In re AXIS Capital Holdings Ltd. Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006)............................................................19

*In re BHP Billiton Ltd. Sec. Litig.*,
  276 F. Supp. 3d 65 (S.D.N.Y. 2017)..............................................................13

*In re CannaVest Corp. Secs. Litig.*,
  2018 U.S. Dist. LEXIS 55920
  (S.D.N.Y. Mar. 31, 2018) ............................................................................20

**Page**

*In re Donna Karan Int'l Sec. Litig.*,
1998 U.S. Dist. LEXIS 22435
(E.D.N.Y. Aug. 14, 1998) ..................................................................12

*In re Moody's Corp. Sec. Litig.*,
612 F. Supp. 2d 397 (S.D.N.Y. 2009)................................................21

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015)................................................13

*In re PXRE Grp., Ltd., Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009)...............................................6, 7

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008)...................................................7

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)...............................................................20

*In re Winstar Commc'ns*,
2006 U.S. Dist. LEXIS 7618
(S.D.N.Y. Feb. 27, 2006) ....................................................................6

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016).............................................................13, 17

*Kleinman v. Elan Corp., plc*,
706 F.3d 145 (2d Cir. 2013)...............................................................15

*Lashkari v. Ells, et al.*,
No. 1:16-cv-03180 (D. Colo. Dec. 27, 2016) ............................3, 4, 5, 11

*Meyer v. JinkoSolar Hldgs. Co., Ltd.*,
761 F.3d 245 (2d Cir. 2014)...............................................................14

*Nguyen v. New Link Genetics Corp.*,
2018 U.S. Dist. LEXIS 53561
(S.D.N.Y. Mar. 29, 2018) ...................................................................19

*Ruotolo v. City of New York*,
514 F.3d 184 (2d Cir. 2008)................................................................6

*Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.*,
2018 U.S. Dist. LEXIS 55359
(D. Conn. Mar. 31, 2018).....................................................................20

**Page**

*Williams v. Citigroup, Inc.*,
    659 F.3d 208 (2d Cir. 2011)................................................................................6

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
    Rule 12(b)(6)......................................................................................10, 13
    Rule 15(a)(2)......................................................................................1, 6
    Rule 59(e)...........................................................................................1, 6
    Rule 60(b) ..........................................................................................1

**LEGISLATIVE HISTORY**

Private Securities Litigation Reform Act of 1995 ("PSLRA")
    Pub. L. No. 104-67, 109 Stat. 737 (1995)..................................................7

**SECONDARY AUTHORITIES**

Stefan J. Padfield,
    *Is Puffery Material to Investors? Maybe We Should Ask Them*
    10 U. PA. J. BUS. & EMP. L. 339, 376 (2008).......................................13

## GLOSSARY OF DEFINED TERMS

| ¶__ or ¶¶___: | Paragraphs in the PTAC |
|---|---|
| **11/3/15 Press Release:** | A press release issued by Chipotle on November 3, 2015 regarding the First Multistate Winter E. Coli Outbreak |
| **11/10/15 Press Release:** | A press release issued by Chipotle on November 10, 2015 regarding the First Multistate Winter E. Coli Outbreak |
| **11/20/15 CDC Update:** | A web update on the First Multistate Winter E. Coli Outbreak issued by the CDC on November 20, 2015 |
| **12/8/15 Conference:** | The December 8, 2015 Sanford C. Bernstein Consumer Summit |
| **3Q15 Form 10-Q:** | The Form 10-Q filed by Chipotle with the SEC on October 21, 2015, for the third fiscal quarter of 2015, the period ended September 30, 2015 |
| **AC:** | The Amended Complaint for Violations of the Federal Securities Laws, dated June 17, 2016 (ECF No. 49) |
| **Arnold:** | Chris Arnold, Chipotle's Public Relations Director |
| **August 2015 Report:** | A report prepared by the SSR department in August 2015 that was provided to defendants Ells and Moran, along with the Audit Committee of the Board, on August 31, 2015 |
| **August Salmonella Outbreak:** | An outbreak of Salmonella that sickened 83 individuals across 2 states (Minnesota and Wisconsin) and lasted from August 25, 2015 to September 16, 2015 and was linked to Chipotle |
| **Board:** | The Chipotle Board of Directors |
| **CA August Norovirus Outbreak:** | An outbreak of Norovirus that sickened 243 individuals at a Chipotle restaurant in California on or about August 21, 2015 |
| **CDC:** | The United States Center for Disease Control and Prevention |
| **CEO:** | Chief Executive Officer |
| **CFO:** | Chief Financial Officer |
| **Chipotle/ the Company:** | Chipotle Mexican Grill, Inc. |
| **Class Period:** | The period February 5, 2015 through February 2, 2016 |

| December 2015 Report: | A report prepared by the SSR department dated December 8, 2015 that was provided to defendants Ells and Moran, along with the Board, on December 16, 2015 |
|---|---|
| Defendants: | Chipotle and the Individual Defendants |
| DOJ: | The United States Department of Justice |
| Donnelly Declaration: | The Declaration of L. Scott Donnelly, Ph.D., dated April 7, 2017, that was submitted as Exhibit A to the SAC and is incorporated by reference into the SAC |
| Dr. Wise: | Dr. Matthew Wise, the CDC's Outbreak Response Team Lead for the First Multistate Winter E. Coli Outbreak |
| E. coli: | Escherichia coli is a virus, typically contracted through consumption of contaminated and raw food or water, and is highly virulent |
| Ells: | Defendant M. Steven Ells, founder of Chipotle and co-CEO and Chairman of the Chipotle Board during the Class Period, who resigned as CEO in November 2017 |
| FDA: | The United States Food and Drug Administration |
| FE3: | Former Employee 3, who worked as a Restauranteur and Area Manager at Chipotle from January 2012 to August 2016 |
| FE4: | Former Employee 4, who worked as an Area Manager at Chipotle from May 2015 to January 2016 |
| FE5: | Former Employee 5, who worked as an Area Manager at Chipotle from December 2014 to August 2016 |
| FE6: | Former Employee 6, who worked as a Team Director at Chipotle from 2015 to March 2017 |
| February Salmonella Outbreak: | An outbreak of Salmonella that sickened 8 individuals across 5 states and lasted from February 22, 2015 to June 5, 2015 and was linked to Chipotle |
| First Multistate Winter E. Coli Outbreak: | The First Multistate Winter E. Coli Outbreak, which sickened 55 individuals across 11 states and lasted from October 30, 2015 to February 1, 2016 and was linked to Chipotle |
| FOIA: | The Freedom of Information Act |
| FY16: | Fiscal year 2016 |
| *Gubricky* Action or *Gubricky*: | A shareholder derivative litigation captioned *Gubricky v. Ells, et al.*, No. 1:16-cv-02011 (D. Colo.), filed on August 8, 2016 |

| **Hartung:** | Defendant John R. Hartung, Chipotle's CFO |
| --- | --- |
| **Individual Defendants:** | Defendants Ells, Moran and Hartung |
| **Judgment:** | The judgment ordered by the clerk on March 23, 2018, dismissing this case (ECF No. 105) |
| **July E. Coli Outbreak:** | An outbreak of E. coli that sickened 5 individuals in Washington State and took place during July 2015 and was linked to Chipotle |
| ***Lashkari* Action or *Lashkari*:** | A shareholder derivative litigation captioned *Lashkari v. Ells, et al.*, No. 1:16-cv-03180 (D. Colo.), filed on December 27, 2016 |
| **Late 2014 E. Coli Outbreak:** | An outbreak of E. coli that sickened 8 individuals across several states and lasted from October 2014 to December 2014 and was linked to Chipotle |
| **Mann:** | Patti Mann, Chipotle's Investigations Manager in the SSR department |
| **March E. Coli Outbreak:** | An outbreak of E. coli that sickened 5 or 6 individuals across 3 states and lasted from March 23, 2015 to May 14, 2015 and was linked to Chipotle |
| **Messner & Reeves:** | Messner & Reeves LLC, a law firm kept on permanent retainer by the Company to function effectively as Chipotle's general counsel |
| **Moran:** | Defendant Montgomery F. Moran, co-CEO of Chipotle during the Class Period who resigned on December 12, 2016 |
| **Multistate July Salmonella Outbreak:** | An outbreak of Salmonella that sickened 19 individuals across 3 states and lasted from July 7, 2015 to October 13, 2015 and was linked to Chipotle |
| **Norovirus:** | Norovirus, also known as the "Norwalk virus," is a member of the virus family Caliciviridae, which infects humans through person-to-person transmission or through contamination of food or water and is highly virulent |
| **Order:** | The Opinion and Order issued by the Court on March 22, 2018 dismissing the SAC (ECF No. 104) |
| **Plaintiffs:** | Lead Plaintiffs Metzler Asset Management GmbH and Construction Laborers Pension Trust of Greater St. Louis |
| **PSLRA:** | The Private Securities Litigation Reform Act of 1995 |

| **PTAC:** | The [Proposed] Third Amended Complaint for Violations of the Federal Securities Laws, dated April 19, 2018 |
|---|---|
| **Rule:** | Federal Rule of Civil Procedure |
| **SAC:** | The Second Amended Complaint for Violations of the Federal Securities Laws, dated April 7, 2017 (ECF No. 80) |
| **Salmonella:** | Salmonella refers to a group or family of bacteria that variously cause illness in humans and is usually transmitted by humans eating food contaminated with animal feces or foods that have been handled by infected food service workers who have practiced poor personal hygiene |
| **SEC:** | The United States Securities and Exchange Commission |
| **Section 220 Documents:** | Documents produced by Chipotle to the plaintiffs in the *Gubricky* Action and the *Lashkari* Action pursuant to requests made under 8 Del. C. §220, which affords stockholders a right to review the corporation's books and records |
| **Spong:** | Tim Spong, Chipotle's Executive Director of SSR |
| **SSR:** | Chipotle's Safety, Security and Risk department that was overseen by defendant Hartung and whose Executive Director was Spong and whose Investigations Manager was Mann |
| **Stone:** | Roslyn Stone, Chief Operating Officer of Corporate Wellness, Inc., a consultant retained by Chipotle during the Class Period |
| **Wederquist:** | Heidi Wederquist, Chipotle's Director of Quality Assurance & Food Safety until March 2016 |

Plaintiffs respectfully submit, pursuant to Rules 15(a)(2), 59(e), and 60(b) of the Federal Rules of Civil Procedure, this memorandum of law in support of Plaintiffs' motion for relief from the Judgment dismissing this case, entered on March 23, 2018 (ECF No. 105), and for leave to file the PTAC, submitted herewith as Exhibit A to the Declaration of David A. Rosenfeld, dated April 20, 2018 (the "Rosenfeld Decl."). A redlined version of the PTAC, showing the proposed changes to the SAC, is attached to the Rosenfeld Decl. as Exhibit B. A glossary of defined terms used in this memorandum is set forth above.

## I.   INTRODUCTION

On March 22, 2018, the Court granted Defendants' motion to dismiss the SAC. ECF No. 104. Judgment was entered the next day. ECF No. 105. Although Plaintiffs had, in opposing Defendants' motion, requested leave to amend the SAC if the motion was granted (ECF No. 91 at 30), the Court denied that request and directed the Clerk to close the case. *See* Order at 74. Plaintiffs now seek relief from the Judgment to file the PTAC based on: (a) information received (i) since the SAC was filed, from FOIA requests; and (ii) since the Court dismissed the SAC, from recently unsealed pleadings in related litigation; and (b) other information not considered by the Court in rendering its decision.[1]

Plaintiffs can now plead, for example, that Company executives, lawyers and agents had ***actual knowledge*** of food-borne illness outbreaks as early as ***December 2014***, and were actively responding to those events. Plaintiffs can also now plead the extraordinary timing of the outbreaks they allege: Chipotle had a total of only three pre-Class Period outbreaks in 2008 and 2009, followed by a ***five-year period of no outbreaks whatsoever***, until the first outbreak at issue

---

[1]   Plaintiffs expressly reserve all rights with respect to any appeal regarding the adequacy of the allegations of the SAC, including any allegations that were included in the SAC but not in the PTAC, as well as the Donnelly Declaration, which is not attached to the PTAC but is a source for certain factual allegations in the PTAC.

in this lawsuit – the Late 2014 E. Coli Outbreak.  The Late 2014 E. Coli Outbreak – which was coincident with Chipotle's late-2014 switch from commissary produce processing to restaurant produce processing – was the first of **14** outbreaks over a mere **13-month** period.  This unusual pattern of outbreaks also underscores the highly suspicious timing of the Individual Defendants' Class Period sales of Chipotle stock.  Those sales began in February 2015, just as Defendants were becoming aware of the early outbreaks at issue, and ended as this new spike of outbreaks finally began to become public information.

Thus, Plaintiffs' new allegations cure the deficiencies perceived by the Court with the commissary switch omissions, the quality assurance omissions, the ingredient traceability omissions, the November press release misrepresentations, the Items 303 and 503 omissions, and the timing aspect of the Individual Defendants' stock sales.  In addition, in dismissing the SAC, the Court overlooked: (1) controlling authority in dismissing the commissary switch omissions, the quality assurance omissions, the November press release misrepresentations, the Items 303 and 503 omissions, and the timing aspect of the Individual Defendants' stock sales; and (2) factual allegations in the SAC supporting the commissary switch omissions and the November press release misrepresentations.  The PTAC also challenges two new statements, one related to the ingredient traceability omissions and one related to the November press release misrepresentations.  Finally, although technically not a basis for dismissing the SAC (but raised by the Court in *dicta*), the PTAC adequately alleges loss causation.

Because: (1) it is the usual practice in the Second Circuit to allow amendment where the plaintiffs have, as here, timely presented additional facts that would cure perceived deficiencies with the operative pleading; (2) Plaintiffs rely on new information that was either unavailable or not considered by the Court in dismissing the SAC; and (3) Plaintiffs have demonstrated that

amendment would not be futile, Plaintiffs respectfully request that the Judgment be vacated so that the PTAC can be filed and leave be granted to file the PTAC.

## II.     RELEVANT BACKGROUND

### A.     Plaintiffs' Investigative Efforts

At all relevant times during this litigation, Plaintiffs have been aggressively investigating the relevant events at Chipotle.  These efforts have included multiple FOIA requests to the CDC, FDA, and various state and local health regulators, which have resulted in a number of different productions at different points in time, including several after the SAC was filed.

In addition, Plaintiffs have sought information from two related derivative lawsuits against the Chipotle Board in federal court in the District of Colorado – the *Gubricky* Action and the *Lashkari* Action.  Those actions were based, in part, on the Section 220 Documents made available to several Chipotle shareholders under Delaware law, and concerned the seven food-borne illness outbreaks alleged in the AC.  As the Court knows, Plaintiffs are now aware of an additional seven outbreaks.

On September 29, 2017, the parties in *Gubricky* and *Lashkari* reached a settlement in principle, subject to court approval, creating a settlement class that explicitly carved out the Class proposed by Plaintiffs here.  On March 26, 2018, several days after the Court dismissed the SAC, Judge Martinez permitted Plaintiffs' counsel to intervene and partially granted their motion to unseal the redacted complaints in both proceedings.  On April 2, 2018, the plaintiffs in *Gubricky* and *Lashkari* filed versions of their complaints that unsealed substantial portions of each pleading, including portions that were based on the Section 220 Documents.  On April 4, 2018, Judge Martinez granted final approval to the joint settlement in *Gubricky* and *Lashkari*.

### B.     The Court Dismisses the SAC on March 22, 2018

In opposing Defendants' motion to dismiss the SAC on August 7, 2017 (ECF No. 91), Plaintiffs requested leave to amend the SAC in the event the Court was inclined to grant Defendants' motion.  In support of that request, Plaintiffs cited, *inter alia*, their still-pending FOIA requests and ongoing efforts to unseal the pleadings in *Gubricky* and *Lashkari*.  ECF No. 91 at 30 n.19.

On March 22, 2018, the Court granted Defendants' motion to dismiss and denied Plaintiffs' request for leave to amend on the ground of futility, even while recognizing that: (1) Plaintiffs were pursuing additional FOIA documents beyond those included in the SAC; (2) Plaintiffs' motions to intervene and unseal in *Gubricky* and *Lashkari* were still pending; and (3) Plaintiffs' counsel's investigation was otherwise ongoing.  Order at 72-73.  The Court noted that "none of these efforts has a clear end date, and extending the pleading stage in this litigation indefinitely would cause Defendants undue prejudice given their interest in finality and repose." *Id.* at 73.  Within two weeks of that decision, however, Plaintiffs had received all the documents they sought through their FOIA requests and efforts in *Gubricky* and *Lashkari*, thereby ending their active investigation and dispelling any concerns about indefinite delay.

### C.     The New Facts and Information Alleged in the PTAC

Based on the additional investigative efforts described above, the PTAC alleges new information that was unavailable when the SAC was filed.  It alleges, for example:

- the occurrence of the Late 2014 E. Coli Outbreak at Chipotle restaurants in December 2014, and the participation of numerous Chipotle executives, lawyers and agents in the response to the outbreak, evidencing their contemporaneous knowledge of its existence and impact on Chipotle (¶¶111-30);

- the active participation of Chipotle executives, lawyers and/or agents in the response to the February Salmonella Outbreak (by no later than May 2015), the March E. Coli Outbreak (by June 2015), the Multistate July E. Coli Outbreak (by August 2015), the July E. Coli Outbreak (by August 2015), the CA August

Norovirus Outbreak (by August 2015), and the August Salmonella Outbreak (by September 2015), establishing their contemporaneous knowledge of these outbreaks and their impact on Chipotle (¶¶137-38, 143-45, 151-52, 165-66, 176-79, 200-03);

- Chipotle's knowledge of, or reckless disregard for, all ten outbreaks that occurred before October 2015.  The CDC was tracking those outbreaks based upon reporting by either Chipotle itself or state or local health departments, validating the Class Period reporting procedures identified by FE3, FE4, FE5 and FE6 (¶¶44-77);

- the fact of only three outbreaks occurring before the Late 2014 E. Coli Outbreak (one in 2008 and two in 2009), as tracked by the CDC.  Thus, the fourteen outbreaks beginning in December 2014 represented an unprecedented epidemic of outbreaks – especially given the complete absence of outbreaks in the previous five years before the switch to in-restaurant produce processing (in late 2014) (¶¶46-47, 107-09);

- the fact, confirmed by the August 2015 Report (which was unsealed in *Gubricky* and *Lashkari*), that defendants Ells and Moran were informed by August 31, 2015 that Chipotle was underfunding and understaffing the SSR audits designed to assess food safety in Chipotle's restaurants, and that the few SSR audits that took place identified such troubling food safety practices that the SSR department recommended retraining the Company's entire workforce.  Coupled with Spong's and Moran's testimony concerning these SSR audits – *i.e.*, that they covered only 60% to 70% of Chipotle's 1,900 restaurants in a given year, and that they were ignored by the Individual Defendants – the August 2015 Report establishes that Defendants could not have reasonably believed their Class Period quality assurance statements (¶¶338-41);

- the fact, confirmed by the December 2015 Report (which was also unsealed in *Gubricky* and *Lashkari*), that defendants Ells and Moran knew that the SSR audit team was understaffed, knew that Chipotle's Class Period SSR audits were too infrequent to be effective, and knew that the audits focused on cultural issues at the expense of food safety (¶¶342-44);

- Wederquist's extensive communications with the FDA from June 2015 to August 2015 regarding the agency's concern that Chipotle's ingredient traceability program could not track ingredients from farm to restaurant, and her work beginning no later than September 30, 2015 to implement such traceability capabilities at Chipotle (¶¶394-403);

- the unusual timing of the Individual Defendants' insider sales, which began just as Chipotle was experiencing more outbreaks in a few months than it had in the preceding seven years.  As the PTAC alleges, Chipotle had a total of three outbreaks in 2008 and 2009, and then ***no outbreaks*** for the next five years – until the Late 2014 E. Coli Outbreak, which began the spike of outbreaks at issue in

this lawsuit.  The Individual Defendants' sales intensified as the Class Period outbreaks proliferated, and then ended as soon as the public first began learning about some of those outbreaks (¶¶510-15).

## III.   ARGUMENT

### A.   The Standards Governing This Motion

Rule 59(e) permits a party to file "[a] motion to alter or amend a judgment . . . no later than 28 days after the entry of the judgment."  As this Court has recently recognized, Rule 59(e) relief is appropriate, *inter alia*, where newly discovered evidence is obtained, where the court overlooked controlling decisions or factual matters that could have reasonably altered the result, and to correct clear errors or prevent manifest injustice.  *See Fogel v. Wal-Mart De Mexico SAB de CV*, 2018 U.S. Dist. LEXIS 27762, at *10 (S.D.N.Y. Feb. 21, 2018) (denying Rule 59(e) where "Plaintiff neither points to new evidence nor identifies facts or law that the Court overlooked.").  Where Rule 59(e) relief is sought in support of an amended pleading, as here, "the interest in finality generally applicable to post-judgment motions may give way to allow courts 'to take into account the nature of the proposed amendment in deciding whether to vacate [a] previously entered judgment.'"  *Id.* at *9 (citing *Williams v. Citigroup, Inc.*, 659 F.3d 208, 213 (2d Cir. 2011)).

Under Rule 15(a)(2), "leave [to amend] shall be freely given when justice so requires." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008); *see also Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) ("[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead.").  "Where there is neither a showing of the movant's undue delay, bad faith or dilatory motive, nor a showing of undue prejudice to the opposing party by virtue of allowance of the amendment, leave to amend should be granted."  *In re Winstar Commc'ns*, 2006 U.S. Dist. LEXIS 7618, at *4 (S.D.N.Y. Feb. 27, 2006) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 523-24 (S.D.N.Y.

2009).  The judicial policy favoring amendment is so strong that the burden is on the ***non***-moving party to demonstrate bad faith or undue prejudice.  *See Anthony v. City of New York*, 339 F.3d 129, 138 n.5 (2d Cir. 2003).  As the Supreme Court recognized in *Foman*: "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."  371 U.S. at 182.

Moreover, given the PSLRA's special pleading requirements, it is particularly appropriate to grant plaintiffs prosecuting securities fraud an ample opportunity to plead their claims.  *See, e.g.*, *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 312 (S.D.N.Y. 2008) (noting the "importance of adherence to liberal amendment standards in [the] context of complicated pleading rules of PSLRA," and granting leave to file a third amended complaint).

## B.      Plaintiffs Should Be Given Leave to File the PTAC Because Amendment Would Not Be Futile

The PTAC cures the perceived deficiencies with the SAC identified in the Order and adequately alleges actionable claims related to the commissary switch omissions, the quality assurance omissions, the ingredient traceability omissions, the November 2015 misrepresentations and omissions, and the Items 303 and 503 omissions.  The PTAC also adequately alleges scienter (through, *inter alia*, the Individual Defendants' insider sales) and loss causation.  Thus, granting leave to file the PTAC would not be futile.

### 1.      The PTAC States a Claim for the Commissary Switch Omissions

In dismissing the commissary switch omissions, the Court held that the SAC failed to adequately allege that "any Chipotle employee was aware of, or recklessly disregarded, the illnesses associated with the newly-alleged outbreaks."  Order at 50.  Based on FOIA-request information that was unavailable when the SAC was filed, the PTAC remedies this perceived

deficiency by pleading the participation of Chipotle executives, lawyers and agents in the Late 2014 E. Coli Outbreak, as well as each of the other nine pre-October 2015 outbreaks.

The PTAC provides significant detail concerning Chipotle's knowledge of the Late 2014 E. Coli Outbreak. These allegations establish that by mid-December 2014, Wederquist, Mann, Arnold, Stone and Messner & Reeves were all actively participating in Chipotle's response to that outbreak, about which they had actual knowledge. ¶¶111-30. Because that knowledge is imputable to Chipotle, which Defendants do not contest (ECF No. 91 at 19 n.11), Plaintiffs have pleaded corporate scienter as to Chipotle, and, at a minimum, the reckless disregard of the other Defendants. *Cf.* Order at 50 (dismissing SAC for lacking such allegations).

Similarly, the PTAC alleges that Wederquist, Spong and Stone were actively involved in Chipotle's response to the February Salmonella Outbreak (by May 2015) (¶¶137-38), that Wederquist and Mann were apprised of the March E. Coli Outbreak (by June 2015) (¶¶143-45), that Wederquist was likely involved in Chipotle's response to the Multistate Salmonella Outbreak (by August 2015) (¶¶151-52) and the July E. Coli Outbreak (by August 2015) (¶¶165-66), that Messner & Reeves was actively involved in Chipotle's response to the CA August Norovirus Outbreak (by August 2015) (¶¶176-79, 82), and that Wederquist, Mann, Spong, Stone, Arnold and Messner & Reeves were all actively involved in Chipotle's response to the August Salmonella Outbreak (by September 2015) (¶¶200-03). These allegations again plead Chipotle's corporate scienter, and the other Defendants' reckless disregard of these outbreaks, as so many senior Chipotle employees and agents contemporaneously knew about them.

In addition, the PTAC includes allegations validating the Class Period use of the reporting procedures identified by FE3, FE4, FE5 and FE6 in the SAC, which the Court discounted. Because, as the PTAC alleges, the CDC had been tracking food-borne outbreaks at

Chipotle restaurants (¶¶46, 107-09), either Chipotle itself or state or local health officials contemporaneously reported those outbreaks to the CDC.  ¶47.  If it was a state or local health department, then, as explained by FE3, FE4, FE5 and FE6, the restaurant inspections precipitating those reports would have resulted in paperwork to Chipotle's SSR department.  *Id.* If it was Chipotle itself, the Company was, by definition, aware of the information.  *Id.*  Either way, the CDC's awareness of the pre-October 2015 outbreaks means that Defendants knew about, or recklessly disregarded, all ten of those outbreaks, as well.  *Id.*

The CDC's tracking efforts also revealed that Chipotle had experienced only three E. coli or Salmonella outbreaks from 2008 until the Late 2014 E. Coli Outbreak (¶¶107-09) – all in 2008 and 2009 – vividly illustrating that the ten pre-October 2015 outbreaks represented an unprecedented epidemic, especially given the five-year gap between the last 2009 outbreak and the Late 2014 E. Coli Outbreak.  *Id.*  This unusual spike in food-borne illness outbreaks, beginning in December 2014, further contributes to an inference that Defendants knew, or recklessly disregarded, the dramatically increased risk facing Chipotle during the Class Period.

Separate and apart from the question of scienter, the Court improperly failed to credit an important inference in Plaintiffs' favor – that the spike in food-borne illness outbreaks was attributable to the switch in produce-processing methodology: "[T]he SAC does not, and cannot, allege that *any* of these outbreaks was conclusively tied to a specific ingredient or supplier, much less to any shift away from commissary produce processing."  Order at 48 (emphasis in original). But Plaintiffs were not required to "conclusively tie" the outbreaks in question to the switch in processing methodology, but merely to create a "reasonable inference" of that link based on factual allegations that are deemed to be true.  *See, e.g.*, *Christine Asia Co. v. Ma*, 2017 U.S. App. LEXIS 24647, at *5-6 (2d Cir. Dec. 5, 2017) (district court abused its discretion by

"inappropriately discredit[ing] significant allegations on which Plaintiffs' claims relied, failing to treat the complaint in the light most favorable to the Plaintiffs, and [failing] to draw reasonable inferences in the Plaintiffs' favor, as required [on a Rule 12(b)(6) motion]").

Plaintiffs have pleaded such an inference. In support of the common-sense proposition that Chipotle lacked the ability – in its 1,900 individual restaurants – to replicate the food safety testing it had previously undertaken in its single central commissary (¶¶78-93), Plaintiffs have alleged: (1) the temporal coincidence of the spike in food-borne outbreaks with the Company's change in produce-processing methodology (¶298); (2) the absence of any Class Period procedure at the restaurant level to test produce for bacteria (¶301), even though such testing was required in the commissary (¶81); (3) the acknowledgment by one of Chipotle's suppliers that the commissary switch inherently increased Chipotle's food safety risks (¶302); and (4) Defendants' statements at the end of the Class Period confirming that a return to commissary produce processing was necessary to lessen food safety risks. ¶309.[2]

Moreover, the inability to "conclusively tie" the outbreaks in question to a "specific ingredient or supplier" is relevant not to Plaintiffs' commissary switch allegations, but to their traceability allegations. Plaintiffs allege that Chipotle lacked the ability to trace any contaminations in its ingredients to their source. ¶¶390-426. It would be odd indeed if Defendants could assert this inability – a problem of their own creation – as a defense to Plaintiffs' related commissary switch allegations.

Thus, considering Plaintiffs' new and old allegations altogether, the PTAC pleads both the misleading nature of the commissary switch omissions and Defendants' scienter. Doing far more than plead the awareness of "any Chipotle employee" (Order at 50), the PTAC alleges that

---

[2]   Thus, the SAC did not rely solely on information from Dr. Donnelly, whose declaration the Court ruled could not be considered at this stage of the litigation (and which is not submitted with the PTAC).

multiple Chipotle executives, as well as their lawyers and agents, were aware of – and participated in the response to – these outbreaks.  Order at 50.  These allegations plead both Chipotle's corporate scienter and the knowledge or actionable recklessness of the Individual Defendants.

### 2.    The PTAC States a Claim for the Quality Assurance Omissions

The Court dismissed the quality assurance omissions because it found the relevant statements in Chipotle's SEC filings were puffery.  Order at 53-56.  Based on the unsealed allegations from *Gubricky* and *Lashkari*, however, the PTAC alleges that Defendants did not genuinely or reasonably believe their statements about Chipotle's food safety efforts, thereby satisfying the Court's concern.

By no later than August 31, 2015, the SSR department informed defendants Ells and Moran, via the August 2015 Report, that its audits of food safety in Chipotle's 1,900 restaurants were understaffed and underfunded.  ¶¶338-41.  The numbers provided in the August 2015 Report were stark, documenting that, for the year, Chipotle had committed only 95 hours to assessing food safety in Chipotle restaurants as of July 31, 2015.  ¶338.  That translated to three minutes per restaurant, assuming all Chipotle restaurants were audited – which they were not – even though the Company had experienced no fewer than seven food-borne illness outbreaks by that point in 2015.  ¶110.  Based on the troubling food safety practices identified in the few Class Period SSR audits that had occurred, the SSR department recommended retraining Chipotle's entire workforce on food safety.  ¶341.

The December 2015 Report, which the SSR department provided to Ells and Moran on December 16, 2015, confirms that Chipotle did not alter its audit practices after the August 2015 Report.  ¶¶342-44.  Rather, the SSR audit team continued to be understaffed, the frequency of the Class Period SSR audits continued to be inadequate to evaluate Chipotle's food safety

practices across its operations, and the audits continued to be inherently deficient by virtue of focusing on cultural issues at the expense of food safety. *Id.*

Coupled with Spong's and Moran's admissions in their deposition testimonies – not addressed in the Order – establishing that Chipotle conducted SSR audits in only 60% to 70% of its restaurants in a given year, and that the Individual Defendants were willfully ignoring the results of these audits (¶¶346-51), the August 2015 Report and December 2015 Report establish that Defendants could not have genuinely or reasonably believed that "[o]ur training and risk management departments . . . implement operating standards for food quality, preparation, cleanliness and safety in the restaurants." *See Duval v. Albano*, 2017 U.S. Dist. LEXIS 111780, at *30 (S.D.N.Y. July 18, 2017) (Failla, J.) (statement not puffery when it is alleged defendant had no basis for the representation); *In re Donna Karan Int'l Sec. Litig.*, 1998 U.S. Dist. LEXIS 22435 at *28 (E.D.N.Y. Aug. 14, 1998) ("[the] mere fact that the conduct . . . arguably constitutes mismanagement will not preclude a claim . . . if the defendant made a statement of material fact wholly inconsistent with known existing mismanagement or failed to disclose a specific material fact resulting from that mismanagement").   At the very least, Chipotle's statements in the 3Q15 Form 10-Q omitted this material information from investors.

Despite Chipotle's representations that food safety has "always been a top priority," and that "[e]nsuring that all of our fresh ingredients are as safe as possible is a serious effort" (¶329), the Court cited to *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 204 n.7 (S.D.N.Y. 2012) (Buchwald, J.), for the proposition that statements about safety would likely be considered expressions of puffery.  Order at 55.  More recently, however, Judge Buchwald found safety statements to be material, and therefore actionable, when the statements were repeatedly made "'in an effort to reassure the investing public' about matters particularly important to the

company and investors." *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) (quoting *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015)).  Because Chipotle repeatedly represented its purported dedication to food safety both before (¶¶532, 537) and during (¶324) the Class Period, those quality assurance statements were material to investors and not puffery.[3]

### 3.   The PTAC States a Claim for the Ingredient Traceability Omissions

In dismissing Plaintiffs' claims based on Defendants' ingredient traceability omissions, the Court concluded that "no reasonable investor would" – before early 2016, and without the benefit of hindsight – "have considered significant Chipotle's ability to trace ingredients through its supply chain in deciding whether to invest in Chipotle[.]"   Order at 58; *see also id.* (characterizing the question of traceability as a "minute detail").  But if that is true, it is only because Defendants **hid** that significance from investors.  As alleged in the PTAC, Chipotle itself became aware of that significance by September 30, 2015 – **at the absolute latest** – but failed to disclose its inability to accurately trace to investors.

As an initial matter, "[b]ecause materiality is a mixed question of law and fact, in the context of a [Rule] 12(b)(6) motion, [the] complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) ("*SAIC*") (internal quotation marks and citation omitted; alterations by Second Circuit).   Plaintiffs

---

[3]    *See also* Stefan J. Padfield, *Is Puffery Material to Investors? Maybe We Should Ask Them*, 10 U. PA. J. BUS. & EMP. L. 339, 376 (2008) (concluding, based upon a survey given to investors to assess the materiality of statements courts have dismissed as puffery, "that judges may be improperly relying on the puffery doctrine to dismiss securities regulation claims prematurely").

respectfully submit that, whether a fast food company's inability to trace its contaminated ingredients to their source constitutes, in the words of the Court, a "minute detail," is a question about which reasonable minds can  differ, such that the Court's dismissal of that claim was error.

Nonetheless, the PTAC alleges, based on documents produced in response to a FOIA request, that Wederquist extensively communicated with the FDA from June 2015 to August 2015 concerning Chipotle's inability to track its ingredients from farm to restaurant in several of the Class Period outbreaks.   ¶¶395-98.   Following these communications, Chipotle itself necessarily recognized, by no later than September 30, 2015, the importance of farm-to-restaurant traceability, as well as the legal and financial jeopardy to which its inability to trace exposed it, and was actively working to implement such traceability capabilities at Chipotle. ¶¶399-403.  Yet Defendants failed to disclose those known, material risks to investors.  The fact that some investors may not have appreciated the significance of those risks, as the Court posits, does not make them any less significant or material.

For example, in the 11/3/15 Press Release, Chipotle stated that "no cause has yet been identified by investigating health officials" for the First Multistate Winter E. Coli Outbreak. ¶387.  As Defendants were well aware, however, but did not disclose, health officials would **never** be able to determine the source of this outbreak – precisely because of the Company's inability to trace its ingredients.  Defendants failed to disclose that fact, however, rendering their statement materially incomplete and misleading.  *See Meyer v. JinkoSolar Hldgs. Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014) (statements were actionable because they omitted information about existing problems known to defendants).[4]

---

[4]    In addition to these omissions, the PTAC alleges an additional affirmative misrepresentation: "Quality and food safety are integrated throughout our supply chain and everything we do; from the farms that supply our food all the way through to our front line."  ¶379.  This statement squarely implicated

4.      **The PTAC States a Claim for the November 2015
Misrepresentations and Omissions**

Plaintiffs respectfully submit that the Court erred in dismissing Plaintiffs' claims based on the statements in the 11/10/15 Press Release concerning the First Multistate Winter E. Coli Outbreak.  The Court concluded that, because the press release specifically addressed the impact of the outbreak in Washington and Oregon, it could not be misleading as to the ongoing risk elsewhere, even though the press release used broad phrases such as "no ongoing threat" and "no ongoing risk."  Order at 69.  Not only did this conclusion fail to "treat the complaint in the light most favorable to the Plaintiffs," and "to draw all reasonable inferences in the Plaintiffs' favor," *Christine Asia Co.*,  2017 U.S. App.  LEXIS 24647, at *5-6, but it overlooked news articles issued in the wake of the 11/10/15 Press Release.  Those articles made it clear that the public **_understood_** the 11/10/15 Press Release to refer to the entirety of the outbreak.  ¶¶474-77 (*e.g.*, *Eater* article from November 10, stating that "Chipotle's E. Coli Scare is Over: Restaurants to Reopen This Week").  Thus, by failing to clarify that it was addressing only one area of the outbreak, not the entirety, the 11/10/15 Press Release misled investors.  *See Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) ("veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers").  When investors finally learned, from the 11/20/15 CDC Update, that other states were involved in the CDC's investigation, Chipotle's stock price declined over 12%.  ¶¶500-01.

Second, the Court failed to credit the inference, arising from the CDC's November 2 call with Chipotle, that the Company fully understood the CDC's investigation to be ongoing, and that it extended beyond Washington and Oregon.  On the call, Dr. Wise stated that the CDC did

---

Chipotle's ability to accurately trace ingredients from farm to restaurant during the Class Period.  *Cf.* Order at 57.

not have "***a lot of confidence that this [outbreak] is only OR and WA and CDC [is] working hard to figure this out***."   ¶465.   Although the Court recognized that there was, arguably, "tension" between the November 2 call and the 11/10/15 Press Release, Order at 69, it resolved that tension in Defendants' favor by construing the press release to refer only to the restaurants in Washington and Oregon, not to the broader investigation.   But because, as a result of the November 2 call, Chipotle ***knew*** the CDC's investigation extended beyond the Pacific Northwest and was ongoing, it was obligated to word the 11/10/15 Press Release, with its representations of "no ongoing threat" and "no ongoing risk," in a way not to confuse investors.   Yet it did not.[5]

Relatedly, the PTAC pleads a false statement from the 11/3/15 Press Release that was not alleged in the SAC – that, as of November 3, health officials were "look[ing] to conclude th[eir] investigation" into the First Multistate Winter E. Coli Outbreak.   ¶¶456, 464.   Defendants knew this statement was untrue because, as discussed above, the CDC had informed Chipotle on November 2 – ***the day before*** – that its investigation was expanding, not imminently concluding.   ¶465.   And there can be no question about Chipotle missing the CDC's point.   On a later November 2 call between Dr. Wise and a colleague at the FDA, Dr. Wise apologized if he had "dropped the hammer a little too hard at the end [of the call with Chipotle]."   ¶467.   But he explained, referring to the First Multistate Winter E. Coli Outbreak: "I just think this has been one too many outbreaks."   ¶467.

---

[5]   Furthermore, because Defendants knew, as Wederquist admitted to the FDA on November 6, that the Company lacked "the ability to track food cases with specific lot codes to specific restaurants" (¶468), they also knew the CDC would have no basis on which to close its investigation before the passage of time made clear that the risk had passed.   Yet the Company issued the 11/10/15 Press Release in a way that would mislead investors.

**5.      The PTAC States a Claim for the Items 303 and 503 Omissions**

Chipotle had an independent obligation to disclose the commissary switch, quality assurance, and ingredient traceability omissions because they related to known trends or uncertainties that were reasonably likely to materially impact Chipotle's financial condition and operations.  ¶¶443-51.  Because the PTAC addresses the Court's scienter concerns regarding the commissary switch omissions by alleging Defendants' knowledge of the ten pre-October 2015 outbreaks, Plaintiffs allege an Item 303 claim for those omissions.

As to the quality assurance and ingredient traceability omissions, the Court found there could be no Item 303 liability because neither was reasonably likely to materially impact Chipotle's financial condition.  Order at 63.  But even if Defendants were uncertain about the likely effect of, for example, their inability to trace their ingredients to their source, Second Circuit authority required them to disclose that uncertainty.  *See SAIC*, 818 F.3d at 95-96 ("SAIC was aware of the fraud by late March 2011 but was uncertain about its likely effect on SAIC's current and future revenues.  Under those alleged circumstances, SAIC was required under Item 303 to 'disclose the manner in which th[at] then-known trend[ ], event[ ], or uncertaint[y] might reasonably be expected to materially impact' SAIC's future revenues.").  Moreover, at the 12/8/15 Conference, defendant Hartung stated that remediating Chipotle's deficient food safety practices, including its ingredient traceability program, would require an "outsized" investment that could involve raising menu prices.  ¶264.  Chipotle was aware, therefore, of the reasonable likelihood that remediating its quality assurance and ingredient traceability problems would materially impact Chipotle's finances.[6]

---

[6]    Disclosure was also required under Item 503 because all the facts underlying all three omissions materially increased the food safety risks facing the Company.  ¶¶438-41.  The Court did not address

Regarding Defendants' obligation to disclose the existence and impact of the pre-October 2015 outbreaks under Items 303 and 503 in the 3Q15 Form 10-Q, the PTAC alleges Defendants' knowledge of these outbreaks.  ¶¶106-258.  These known events, trends or uncertainties required disclosure under Item 303 because their proliferation, and the resultant publicity, would materially impact Chipotle's revenues.  ¶¶432-37.  Likewise, they should have been disclosed under Item 503 because they represented a material change to Chipotle's risk profile.  Chipotle's then-existing boilerplate disclosure – that "[o]n a small number of occasions one or more Chipotle restaurants have been associated with customer illness" – was stale at best, as Chipotle had experienced only three outbreaks between 2008 and the Late 2014 E. Coli Outbreak, and none before 2010.  That disclosure did not communicate the dramatically increased risk Chipotle was facing during the Class Period.  ¶¶537-43.

### 6.    The PTAC Adequately Alleges that the Individual Defendants' Stock Sales Support Scienter

In concluding that the Individual Defendants' Class Period sales of Chipotle stock could not support an inference of scienter, the Court focused on only a single relevant factor – the timing of those sales (Order at 52-53) – without considering the other factors that unambiguously support the existence of motive.  Those factors include the amount of the sales, the Individual Defendants' relative lack of pre-Class Period sales, the unusually large profits realized from the sales, the high percentage of the Individual Defendants' stockholdings sold, and the similar timing of all three Individual Defendants' sales.  ¶¶515-20.

The PTAC addresses the Court's timing concern by alleging that the Individual Defendants embarked on their sales by February 2015, shortly after Chipotle became aware it

---

whether these three omissions should have been disclosed under Item 503 in dismissing the SAC.  Order at 62-63.

had experienced three outbreaks in three months – outbreaks about which investors were ignorant.  ¶¶510-12; *cf.* Order at 52-53 (citing *In re AXIS Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 596 (S.D.N.Y. 2006) ("Timing is more typically an indicia of fraud where sales occur shortly after insiders allegedly learn undisclosed adverse information[.]")).  The quick succession of these three outbreaks was both alarming and unusual, as Chipotle had experienced only three outbreaks in the preceding seven years, with none between 2010 and the Late 2014 E. Coli Outbreak, rendering the initiation of Defendants' insider sales suspicious.  ¶¶511-12.

As Chipotle's undisclosed Class Period outbreaks continued, the Individual Defendants' selling intensified.   ¶513.   Once investors began learning about some of those outbreaks, however, the Individual Defendants abruptly stopped selling – by early August 2015 – with no sales during the remaining six months of the Class Period.  ¶¶514-15.  These allegations plead the unusual and suspicious timing of the Individual Defendants' sales.  *See Nguyen v. New Link Genetics Corp.*, 2018 U.S. Dist. LEXIS 53561 at *50 (S.D.N.Y. Mar. 29, 2018) (motive scienter adequately pleaded where an executive began trading two weeks after learning negative non-public information, and then stopped selling a month before this information became public). That the Individual Defendants collectively sold $214 million worth of Chipotle stock over six months, when none of the outbreaks was publicly known, and ***none*** during the remaining six months of the Class Period, after some of them became public, is highly suspicious and unusual.

### 7.    The PTAC Adequately Alleges Loss Causation

Without fully articulating its concerns, the Court indicated, in *dicta*, that the SAC may not plead loss causation because Chipotle's stock had declined slightly in the months preceding the first corrective disclosure on October 31, 2015, and because some of the corrective disclosure dates were "intertwined with the publicity attendant to additional outbreaks."  Order at 71 n.9. Those concerns are unfounded.

For the reasons given in Plaintiffs' brief opposing Defendants' motion to dismiss the SAC, both the SAC and PTAC adequately allege loss causation for each of the eight disclosures alleged.  ECF No. 91 at 24-29.  While four of those disclosures are announcements of new outbreaks (the October 31 event, the December 21 event and the December 7 event) or the expansion of existing outbreaks (the November 20 event) (¶¶321, 377, 500), the fact that those corrective disclosures are purportedly "intertwined with the publicity" regarding outbreaks cannot defeat loss causation allegations on a motion to dismiss.  *See In re CannaVest Corp. Secs. Litig.*, 2018 U.S. Dist. LEXIS 55920, at *42-44 (S.D.N.Y. Mar. 31, 2018) (loss causation adequately pleaded even though defendants pointed to "broader market forces" as causing the declines because "such arguments are typically not appropriate to resolve on a motion to dismiss"); *Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.*, 2018 U.S. Dist. LEXIS 55359, at *31 (D. Conn. Mar. 31, 2018) (argument that market conditions caused plaintiff's losses inappropriate on a motion to dismiss).  In any event, these outbreaks were the natural consequence of Chipotle's undisclosed, deficient food safety practices, and themselves satisfy the loss causation requirement.  *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 262 (2d Cir. 2016) ("Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus.").

The four remaining disclosures concern new food safety procedures implemented at Chipotle (December 4 event), the Company's withdrawal of its FY16 financial guidance as a result of the First Multistate Winter E. Coli Outbreak (the December 4 post-close event), the DOJ's criminal investigation into Chipotle's food safety practices (the January 6 event), and Chipotle's implementation of farm-to-restaurant ingredient traceability (the February 2 event).

¶¶321, 377, 429.  Because each of these disclosures revealed new information to investors tied to particular omissions and misrepresentations alleged in the PTAC, resulting in a decline in the price of Chipotle stock, those allegations are sufficient to plead loss causation.  *See, e.g., Cohen v. Kitov Pharms. Holdings, Ltd.*, 2018 U.S. Dist. LEXIS 45676, at *17-20 (S.D.N.Y. Mar. 20, 2018) (disclosure of a regulatory investigation sufficient to plead loss causation).

Finally, the Court's previous citation to *60223 Trust v. Goldman, Sachs & Co.*, 540 F. Supp. 2d 449 (S.D.N.Y. 2007), does not support its concern about declines in Chipotle's stock price before the first corrective disclosure.  ECF No. 79 at 44-45 n.9.  Specifically, the 4.5% decline in Chipotle's stock price from August 6 to October 30, 2015 is far less than, and does not implicate the concerns raised by, the over 80% decline in the company's stock from the start of the class period to the first corrective disclosure in *60223 Trust*.  ECF No. 91 at 29-30 (citing *In re Moody's Corp. Sec. Litig.*, 612 F. Supp. 2d 397, 401 (S.D.N.Y. 2009)).  Because the Court overlooked Plaintiffs' argument on this point in dismissing the SAC, the modest price decline that occurred here should not provide a barrier to granting leave to file the PTAC.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Judgment be vacated so that the PTAC can be filed and leave be granted to file the PTAC.

DATED:  April 20, 2018                                ROBBINS GELLER RUDMAN
                                                                        & DOWD LLP
                                                                      SAMUEL H. RUDMAN
                                                                      DAVID A. ROSENFELD
                                                                      MARK T. MILLKEY
                                                                      MICHAEL G. CAPECI


                                                                          */s/ David A. Rosenfeld*
                                                          _____
                                                                      DAVID A. ROSENFELD

- 21 -

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
mmillkey@rgrdlaw.com
mcapeci@rgrdlaw.com

MOTLEY RICE LLC
JAMES M. HUGHES (*pro hac vice*)
CHRISTOPHER F. MORIARTY (*pro hac vice*)
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
Telephone:  843/216-9000
843/216-9450 (fax)
jhughes@motleyrice.com
cmoriarty@motleyrice.com

MOTLEY RICE LLC
WILLIAM H. NARWOLD
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT  06103
Telephone: 860/882-1681
860/882-1682 (fax)
bnarwold@motleyrice.com

*Lead Counsel for Lead Plaintiffs*

**CERTIFICATE OF SERVICE**

I, David A. Rosenfeld, hereby certify that on April 20, 2018, I authorized a true and correct copy of the Plaintiffs' Memorandum Of Law In Support of Motion For Relief From Judgment and For Leave to Amend to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ David A. Rosenfeld*
_____
DAVID A. ROSENFELD
